1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | . | Criminal No. 1:05cr264-3 |
| | . | |
| vs. | . | Alexandria, Virginia |
| | . | August 6, 2015 |
| THOMAS MOROCCO HAGER, | . | 9:23 a.m. |
| | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . . .

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:              JAMES L. TRUMP, AUSA
                               CHRISTOPHER CATIZONE, SAUSA
                               United States Attorney's Office
                               2100 Jamieson Avenue
                               Alexandria, VA 22314

FOR THE DEFENDANT:             BLAIR G. BROWN, ESQ.
                               Zuckerman Spaeder LLP
                               1800 M Street, N.W., Suite 1000
                               Washington, D.C. 20036
                                 and
                               JULIE BRAIN, ESQ.
                               916 South 2nd Street
                               Philadelphia, PA 19147

ALSO PRESENT:                  JOHN C. KIYONAGA, ESQ.
                               JOSEPH J. MC CARTHY, ESQ.

OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                               U.S. District Court, Fifth Floor
                               401 Courthouse Square
                               Alexandria, VA 22314
                               (703)299-8595

(Pages 1 - 44)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

2

PROCEEDINGS

(Defendant not present.)

THE CLERK:  Criminal Case 05-264-3, United States of America v. Thomas Morocco Hager.  Would counsel please note their appearances for the record.

MR. TRUMP:  Good morning, Your Honor.  Jim Trump for the United States.

MR. CATIZONE:  Christopher Catizone, Your Honor.

THE COURT:  Good morning.

MR. BROWN:  Good morning, Your Honor.  Blair Brown on behalf of Mr. Hager.

MS. BRAIN:  Judy Brain, good morning, Your Honor, also on behalf of Mr. Hager.

THE COURT:  Good morning.  Counsel, first of all, have a seat please.  I want to apologize to you.  The Clerk's Office for some inexplicable reason changed the time from ten to nine, so none of you is in trouble for having not been here at nine o'clock, but we are able to start at this time, so that's how it goes.

I have before me the government's motion to modify the schedule, and I've read the opposition of the defendant, but the government is correct that the normal practice in this court before the government responds to a habeas petition in which there are allegations of ineffective assistance of counsel is the government does get discovery from the trial

counsel.  That's been our practice in the past, and I'm not going to change that practice here.  So I am going to be granting the government's motion to a significant degree.

And I see that Mr. Kiyonaga and Mr. McCarthy are in court.  So the first thing I would like to know from you, Mr. Brown -- and I'm going to address you as lead counsel, but if Ms. Brain is the one who can answer this, then she may stand up instead.  Before you filed your motion, did you interview or have communications with Mr. Kiyonaga and Mr. McCarthy?

MR. BROWN:  Yes, Your Honor, we did, and we, we have all or substantially all of the trial counsel's trial records, which we got through the appellate counsel for Mr. Hager. There may be additional material that Mr. Kiyonaga and Mr. McCarthy don't have, but we've gotten, we've gotten those.

THE COURT:  All right.  Well, I'm not going to require Mr. McCarthy and Mr. Kiyonaga to go to the expense of reproducing that for the government, so I'll put the burden on you-all to get a full copy of everything you got from defense counsel.  And I'm going to call them trial counsel; it's easier to distinguish at this point.  That must be turned over to the government promptly so they know what it was you had access to.

Now, part of their motion also requests that this Court order the documents, the pleadings that were filed ex parte be unsealed, and I'm assuming that Mr. -- Mr. McCarthy and Mr. Kiyonaga, why don't you come up for a bit and sit up

4

here.

And again, Mr. McCarthy, I'll address you only because I assume you were the lead counsel, so if you can just get up to the lectern as well, we'll do this a little bit informally.  I'm going to assume that you did file during the course of representing Mr. Hager ex parte motions with Judge Ellis to authorize experts or authorize various expenses, and I'm also assuming at the end of the case that you filed, and Mr. Kiyonaga, CJA petitions for excess funds, and then you explained what you had done and why you wanted the money.

Is that accurate?

MR. MC CARTHY:  Yes, Your Honor.

THE COURT:  Other than that, were there any other ex parte filings that you-all filed in the litigation as far as you can recall?

MR. MC CARTHY:  I don't believe there are, standing here maybe eight years later.  I don't think so, Your Honor.

THE COURT:  Then there's no reason why those would not be available -- should not be available to the government at this point, is there?

MR. MC CARTHY:  I'll let, I'll let habeas counsel answer that question, Your Honor.

THE COURT:  Well, I mean, that explains -- that's part of the documentary evidence which the government routinely has in these types of cases which documents, for example, how

5

much time you-all spent interviewing a particular witness or conducting certain types of investigative strategy.  It certainly is relevant to this case.

So you have no objection to it being turned over yourself?

MR. MC CARTHY:  I embrace whatever objection Mr. Brown has.

THE COURT:  Is that the same, your same position, Mr. Kiyonaga?

MR. KIYONAGA:  Yes, ma'am.

THE COURT:  All right.

MR. BROWN:  Your Honor?

THE COURT:  Mr. Brown?

MR. BROWN:  May I be heard for just a moment?

THE COURT:  Yes.

MR. BROWN:  Because, Your Honor, I would like to have the opportunity to persuade the Court that the entire file should not be disclosed because this 2255 motion does not put in issue every aspect of trial counsel's performance and, therefore, does not waive the privilege with respect to communications and work product that counsel expended on other, other matters.

I mean, there's, there's a, there's a number of other things that trial counsel worked on and that still remains privileged and still remains work product that are not put at

6

issue here, so that the production --

THE COURT:  Well, give me an example of that because the problem we have here -- and I guess Judge Ellis at one point did when he still had this case comment on the length of the complaint, which he deemed a motion, you know, these sort of strange hybrid matters, part criminal, part civil.

But you filed a 197-page complaint, and quite frankly, it raised dozens of issues about the way in which Mr. McCarthy and Mr. Kiyonaga represented Mr. Hager.  I think by filing that broad and expansive a motion, you've essentially opened the door to everything that they did.

Unless you can highlight for me some specific things that are not at all at issue in the motion that you feel should still not be made available to the government, unless you can specify that, given the breadth of the issues you've raised in the motion, my feeling would be that the entire file is appropriate.

MR. BROWN:  Let me give you some examples, and it's not exhaustive, Your Honor.  First of all, there are three homicides, other homicides that the government alleged and that are not at issue in this 2255 motion.

Two of them are unadjudicated, and they were part of this case for a long period of time.  Ultimately at trial, the government did not present evidence about it, but those are unadjudicated homicides that the trial counsel looked into and

7

believed was at issue in the case until very late in the game. So they would have looked into those, investigated those, talked to the client about those, and they're unadjudicated, so we're not talking about something that is theoretical.

We're talking about turning over material to the government, privileged communications about homicides that could still be, two of which could still be, could still be prosecuted.

THE COURT:  However, to the extent that defense counsel are required to work within a certain time period, if a significant amount of the time these lawyers had to spend in the total preparation of defending this case were directed at those issues, that's part of the evaluation of whether their conduct under the *Strickland* standard and the decisions they made as to how to approach the case were reasonable and within the realm of professional -- of proper professionalism.

Certainly you know as a criminal defense attorney yourself, I mean, if you're worried that your client is facing multiple murder charges, you're going to be looking at all of them, and to the extent you have to spend time on those, you may not have as much time as in a perfect world you would have liked to have had to talk to family members or people in the community.  So I'm not convinced that that is appropriate.

MR. BROWN:  Your Honor, there are other examples. There are plea discussions.  There's no issue about whether

8

Mr. Hager should have pled guilty or not.  There was proposed cooperation about yet another matter that there were communications with the client about.  There's no issue about jury selection.  There's no issue about the presentation of evidence regarding certain aspects of Mr. Hager's childhood, including his time in juvenile detention facilities.

There were experts that were retained and consulted that were not used, and, and there are no issues with respect to those individuals as well.

And I think that the whole --

THE COURT:  Yes, but although -- but again, the government is allowed to come in and show these defense attorneys, maybe they looked at five experts.  I mean, you, you have focused on Dr. Cunningham, and a great amount of the argument you've made in your petition is taking apart, you know, the decision to choose him and the various types of things that he said.

I think therefore that the other experts with whom the defendants communicated and the decisions why they chose Cunningham over perhaps somebody else is certainly relevant to this case.  You've made the expert issue a definite highlighted issue in your complaint.

MR. BROWN:  Well, using that example, Your Honor, I'm talking about in this instance experts who, for example, were consulted with respect to issues at the guilt phase of the

9

trial, and there's simply no issue raised with respect to their calling of that expert or not calling the expert or calling a different expert.

The, the whole purpose of the selective, selective waiver, or I should say limited waiver is the better term, of attorney-client privilege and work product that were addressed in the ABA opinion and the Virginia Bar ethics opinion really have no relevance if every time you allege ineffective assistance of counsel, then the government gets to hear everything from trial counsel and gets all of the documents and work product from trial counsel.

There is -- those opinions recognize and I think the law recognizes a, you know, a fact that raising an ineffectiveness claim even on a number of issues does not, does not waive the privilege or work product with respect to every single thing that counsel did, and I think that there is a way to produce documents and there is a way to get information from Mr. Kiyonaga and McCarthy that limits the scope of the waiver to what is at issue in this case and not allow a fishing expedition through counsel's files and with counsel that will touch on issues that are not waived by the privilege and have very practical, realistic implications for the client in dealing with very serious matters that were not put at issue in this 2255.

THE COURT:  All right, Mr. Trump, I'd like you to

10

respond to that.

MR. TRUMP:  Yes, Your Honor.  Good morning.  I think one, one thing we're forgetting about is that the *Strickland* test is a two-part test.  It's not only trial counsel's assistance but also prejudice.

To the extent that, excuse me, Mr. Hager made admissions in the context of other discussions, whether it be about plea or other homicides or whatever, those admissions go to the issue of prejudice because if he admitted to his attorneys that yes, I killed Barbara White, and this is why I did it, and it's consistent with what was proved at trial, those are damning with respect to the second prong of the *Strickland* test and could also go to whether counsel was ineffective or not in dealing with some of these issues, but more specifically, for example, the other homicides, there were a number of other homicides which we discussed with trial counsel because we had this very, very delicate balance with 404(b) evidence.

We did not want to have the case go up on appeal in which 404(b) was a major issue.  The case was, was -- there was a tremendous amount of 404(b) evidence that could have been brought to bear, but we decided we're going to, we're going to stick to the Barbara White homicide as much as possible.  In that context, we discussed with trial counsel as to whether we would even go into these other homicides in the penalty phase

11

in an effort to keep things as tight as possible.

These other homicides, they, they involve Tommy Hager, they involve Terrell Hager, they involve other people that if cross-examined, for example, in the guilt phase, they could have talked about, oh, yeah, that other crime that you're trying to impeach me with, Tommy Hager was part of that, and, in fact, they're the ones who killed so-and-so.  Or you want, you want us to call Tommy Hager's brother, Terrell, to the stand?  Well, look at all this stuff that Terrell was involved in.

So if they had discussions and they had inquiries and they had experts or whatever with respect to these other homicides, they may very well be very relevant to issues of ineffective assistance and the decisions made both in the guilt phase and the penalty phase as to why some of those things were not pursued.

So we can't parse it out.  It's just as you, as you come at it, Judge, it is such a broad motion that touches almost every aspect of the trial, every witness for the trial, and every decision that was made, and, and at some point, I think Mr. McCarthy and Mr. Kiyonaga will explain that some of the decisions made not to cross-examine or not to pursue were done because they did not want to open the door to mammoth amounts of 404(b) evidence.

Before trial, we sat down and we discussed the fact

12

that Tommy Hager was probably involved with a dozen other homicides, and if they went down certain roads on cross-examination, some of that stuff was going to come in, and that's why a lot of it was curtailed.  That's why you can't just take this and say, well, this is what the motion addresses, this particular piece of defense counsel's performance, but that piece relates to so much else.

THE COURT:  All right.  Now, let me ask you this:  If the Court does continue with its view that everything should be turned over to you, given the nature of this complaint, if, for example, the motion were solely that counsel made a fatal error in basing their entire defense on the liability phase on their view of the in furtherance of or in relation to a crime of -- a drug offense, I mean, the legal argument that seemed to permeate the theory of the, of the guilt phase, if that were the only issue that were raised, I think Mr. Brown would have a good argument that the, a lot of the other information in the file would not be relevant, because this was a legal, tactical decision, if that were the only complaint, but it's not.

As I said, the choice of Cunningham and how Cunningham was approached, the failure to call some of the siblings, all those other issues that are in this petition, in my view, do open the door, and I think you've properly addressed the 404(b) issue is a very interesting issue, and certainly that would be relevant to counsel's tactical

13

decisions, which is what we have to be looking at.

However, there is this other issue that I think is lurking in Mr. Brown's concern, and that is, within that information, if, for example, if, for example, Mr. McCarthy or Mr. Kiyonaga's notes reflect that Mr. Hager admitted that he committed two or three other murders, I think the government could not use that as evidence.  In other words, this is almost like an immunity.  You can't use that information to bring a new case.

MR. TRUMP:  And I think an appropriate protective order if necessary could be structured to deal with that issue. We certainly are not here to try to charge Tommy Hager with additional crimes.

THE COURT:  But there's no statute of limitation for murder, is there?

MR. TRUMP:  That's true.

THE COURT:  So, I mean, I think there would have to be some way of protecting so you get the information you need to respond to this case but that the, Mr. Hager can't be penalized by the use of that information in some further investigation.

Are you comfortable, can you --

MR. TRUMP:  I'm comfortable with that, Your Honor.

THE COURT:  All right.

MR. TRUMP:  For example, it may come up in the

14

context, in the guilt -- excuse me, in the penalty phase, we made a very deliberate decision after discussions with Mr. Hager's counsel that the prior convictions would only come in as prior convictions. We did not introduce evidence of what happened, you know, how Hager had killed Duvall or how Hager had killed Robinson. We just introduced the fact that he was convicted of those crimes.

That was done in part to avoid relitigating issues that had been litigated previously in D.C. and also again to limit the scope of the penalty phase so that it would be much narrower than what was originally contemplated.

If he had made admissions with respect to those cases, that would be different because he's been convicted in those cases. If he'd made admissions as to others, then I, I share Your Honor's concern that we certainly would not be able to use -- we wouldn't call up the U.S. Attorney's Office in D.C. and say, hey, we've got a document here where Hager confesses to murder, but it, it could, it could be relevant to show why trial counsel was, why they were able to stipulate or why they stipulated certain issues and why they took certain actions with respect to, to the penalty phase.

THE COURT: All right. And, Mr. Brown, you're not objecting to the unsealing of the ex parte filings that counsel made supporting their application for fees and that sort of thing?

15

MR. BROWN:  Your Honor, I'm afraid I am because not all of them relate to issues that were raised in this case.  I mean, there were -- in this 2255 motion.  There were, for example, ex parte submissions that --

THE COURT:  Have you seen all the ex parte submissions?

MR. BROWN:  I've, I've had -- I've seen a summary of the submissions, yes, and I do know the subject matter that they relate to.  The ones that I'm focused on that I am particularly familiar with relate to experts and the use of, use of experts, and there were experts that were sought from the court, justification was provided, and those experts were not used, and no testimony from any expert regarding the subject matter of those experts was presented at the guilt phase or the sentencing phase and are not at issue in this case.  So there are some of those that are not relevant in my view in these proceedings.

There is something else that Mr. Trump said that I want to be clear about.  While there were two convictions for homicides that were presented at the sentencing phase of the case, there was an unadjudicated homicide that was presented as well, and there were two unadjudicated homicides for which Mr. Hager has exposure as well that were part of the case until very late in the game, when the government decided not to present them at the sentencing phase.  So I just wanted to make

16

sure the record is clear about that.  So the point is that there is still risks, if you will, with respect to those.

I should also point out with respect to this particular case, there is -- at the time that it was indicted, there was also virtually simultaneously an indictment handed down in the Fairfax County Circuit Court with respect to the murder of Barbara White.  So that's an additional fact that I want to bring to the Court's attention.

THE COURT:  Well --

MR. BROWN:  I realize that there are -- I realize that there are aspects, that many aspects of the representation at the guilt phase of the case are put at issue, but that is just another fact that I wanted to make sure the Court was aware of as well.

THE COURT:  All right.  Well, as I said, I think if the complaint had been drafted differently -- if the motion had been drafted differently, the ruling of the Court might very well be different.  I'm sensitive to the fact that an attorney's entire file being exposed to the government is not ideal, but in this case, I don't think the government can have a fair chance of fully evaluating the universe in which these two attorneys were functioning so that one can determine whether the decisions they made were reasonable or unreasonable under the circumstances.

I've had several other capital habeas matters.  One

17

case involved some of the similar issues that you've raised, failure to call siblings in the penalty phase.  The reality of the situation was that at the time the case was being tried, the relationship between the defendant and the siblings was at a very low point, and over the many years that passed between the time of the trial and the time of the habeas proceedings, things had changed.  Among other facts, the family now realized that their family member was facing death.

And so now when habeas counsel come along and they interview these witnesses, they look like they would have been phenomenally valuable witnesses, but that's not the perspective that the Court must use.  The Court must look at the perspective that these attorneys had, the universe in which they were functioning at that time.

And so given, as I said, the breadth of the number of issues you've raised in this motion, I am going to grant the government's motion to a significant degree.  At this point, I'm going to require habeas counsel to turn over everything they've received from trial counsel to the government.

And just so I understand it, Mr. McCarthy, do you believe that you've turned over everything that was in your file that related to the Hager case?

MR. MC CARTHY:  Everything went to, excuse me, the appellate counsel, and I understand they've given it to habeas counsel.

18

THE COURT:  All right.  And, Mr. Kiyonaga, is that the same with, in your situation?

MR. KIYONAGA:  Correct, Your Honor.  I'm not certain I turned over my time sheets.  They were done by hand.  They're not --

THE COURT:  But the Court will have those when you submitted your voucher, would it not?

MR. KIYONAGA:  Well, certainly.

THE COURT:  All right.  So I'm also going to rule that all of the Court's records from our Finance Office, so we can get those for the government -- and if you don't have those, Mr. Brown, we'll get them for you as well.  Do you have those, the time sheets?

MR. BROWN:  I honestly don't know sitting here right now, Your Honor.

THE COURT:  All right.

MR. BROWN:  I would like to see them just in case.

THE COURT:  All right, I will check with our Finance Office and get those documents because those are not actually filed in the case file.  And then any under seal ex parte filings by defense counsel because the government's never had access to those.

Because my understanding is right now that all of that has to do with, again, experts or other types of materials that you needed; is that right?

19

MR. MC CARTHY:  That's my recollection, Your Honor.

THE COURT:  All right.  Is that also yours, Mr. Kiyonaga?

MR. KIYONAGA:  Yes, ma'am.

THE COURT:  All right.  So those will need to be turned over to the government as well.  And those again I can direct the Clerk's Office to make available, so we'll do it that way.

So that takes care of points 2 and 3 on the reply brief.  The next thing is I am not going to ask at this point, however, for the defendants to turn over an appendix or any other evidence that they used to put their motion together. The key thing that the government needs at this point is an understanding of what counsel did, what they did and why they did it in order to file a response.  I don't think at this point you need anything else, Mr. Trump, unless you can specify what else you think you need.

You've got the trial transcript.  That says what it says.  What else do you think you need?

MR. TRUMP:  Well, I think if you start around page -- it's primarily, Judge, the entire section dealing with mitigation.  We have absolutely no idea where that comes from.

THE COURT:  Well, much of it as I was reading this would be hearsay that wouldn't have come in anyway.  Did Mr. Hager testify at this trial at any stage?

20

MR. TRUMP:  No.

THE COURT:  So a lot of the representations in this petition about the impact on Mr. Hager and that sort of thing wouldn't be coming from him.  It would be coming from outside sources.  I mean, and to the extent that you already have -- you'll have a record if --

MR. TRUMP:  We have a record of what was presented --

THE COURT:  At the trial.

MR. TRUMP:  -- at the trial, but 60-70 pages of this motion --

THE COURT:  But wait.

MR. TRUMP:  -- is what should have been presented, and we have no ability to assess where that came from, was it the mitigation expert that was hired back in 2005-2006, was it someone who's looking at it today.  We have absolutely no clue as to where that information came from.

There's reference to mental health reports.  Again, we have nothing.  We have, we have not a single report, summary report, anything dealing with the defendant's mental capacity or mental health.  There is absolutely no way we can address anything really in the penalty phase.

And the reason I say it, Judge, there's, there's two standards at work here.  The guilt phase is pretty much a traditional 2255, the *Strickland* test.  The Court is more familiar with it than, than any of us.

We evaluate counsel's performance, and we evaluate whether there's any prejudice, and prejudice is a standard which because the government's burden is proof beyond a reasonable doubt, the Court has to look at the evidence and determine whether the defendant was as a practical matter innocent of the crime to show prejudice.

The penalty phase is a whole different animal, so to speak. The Court has to look at the pleadings in the motion to determine whether certain evidence should have been presented or should not have been presented, and if the Court were to conclude that counsel was ineffective and certain evidence should have been presented or certain evidence should have been excluded, then the Court has to evaluate whether that would have made a difference to a reasonable jury.

THE COURT: Well, I'll give you -- I'm going to give you an example. It's frequently the case that there's a mental health component that defense counsel want to raise in mitigation, and that's certainly part of the argument that the, that habeas counsel are making, and one of the arguments they've made is that the, Mr. Hager has an intellectual functioning that puts him at the low normal or possibly even the mildly mentally disabled range.

Now, I know that there are many defendants who absolutely bristle at any representation that they may be not functioning at a fully normal level, and we -- you will

22

probably see, I would expect, from the papers you get of the interaction between Mr. McCarthy and Mr. Kiyonaga and Mr. Hager something along those lines.

If you remember in the *Moussaoui* case, he vigorously opposed any argument on his behalf by his defense counsel that he suffered from any kind of mental illness.  He just did not want that defense made, period.

If you have that evidence when you've gone through the attorneys' records, it's not going to make any difference what habeas counsel have come up with now.

MR. TRUMP:  That may be true, but, Judge, in 25 years, I've never seen a 2255 motion where the movant hasn't been willing to show to the Court or to the government the basis of the motion.  There is reference to reports.  We shouldn't have to go through thousands of pages of discovery to find out what they're referring to.  It's just not, it's not our burden to do that, Judge.

They should be required to say if they're referencing documents received in discovery, they should put the Bates numbers down of where that document came from.  If they're referencing something they got from the government, they should be required to state what document they got that from.

This is akin to a motion for summary judgment.  This Court would throw out this motion if received in a civil case because it is unsupported.

23

THE COURT:  All right.

MR. TRUMP:  There has to be some basis by which we can evaluate it.  We've gone through a lot of this.  We have been able to piece together some reports.  There's information that is incorrect.  There's information that is out of context.

But we should not be sitting here, again, eight years after a trial, trying to reconstruct what they have at their fingertips.  That's just not the way that this should be litigated.

And to the extent that there's 70-80-90 pages of narrative that is completely unsupported by any reference to a report, to an expert, to interview notes, whatever, those should be provided because to the same extent that they might be taken out of context or there are mistakes in it, we should be allowed to see that, because on its face, it might be incorrect.  Notwithstanding whether trial counsel had a good reason not to present it, it just may not be true, but there's no way to evaluate that.

And that's why in almost any 2255, the court requires the movant to submit affidavits, supporting documentation. Even pro se prisoners provide the supporting documentation, and it's just not here.

And eight years later, with a record as large as this is and the Court not having witnessed the trial, it is crucial that we know where this stuff came from, and we don't.

24

THE COURT:  All right.  Mr. Brown?

MR. BROWN:  Your Honor, may I respond?

THE COURT:  Yes.

MR. BROWN:  First of all, this is not a summary judgment motion.  It is from our perspective in the nature of a complaint, and I think that there can be theoretical discussions about it, but as a practical matter, these are our allegations.  It is not a summary judgment motion.

Second of all, and there are processes and procedures, whether under the 2255 rules or under the rules of civil procedure that are incorporated by reference that we'll potentially perhaps get to that point, but what is important to point out as well is that the government has an enormous amount of material.  They have the trial record.  Under the Court's ruling, they're going to have all of trial counsel's files.  They have lots of information.

And there are allegations in this 2255 motion that are based on our work product.  Just as when one files a complaint, a lawyer interviews people or gathers up material, that's our work product at this point.  In the course of discovery, perhaps some of that might need to be disclosed.  I will have to, you know, tell the Court and, you know, the government that, you know, much of this is based on interviews, and there are not, there are not, you know, formal reports, for example, from mental health experts for a number of reasons,

25

not the least of which is funding reasons.

So I think the government has ample material from which to respond to this, and over the course of time, as this case develops, if there are other documentations and documentation becomes appropriate to provide under whatever discovery processes the Court rules are appropriate, then there may be additional information provided, but at this point, they have more than enough to respond to this.

THE COURT:  Mr. Trump, I think actually you've got enough information to respond to all the key issues.  All, all your response has to say is, "Denied," or this would have not come in because it would have been hearsay.  Much of the way that stuff was presented in the complaint seems to me would be hearsay.

And again, as I said, you may very well find when you've gone through the details of defense counsel's records that they may have -- they may provide you -- and also when you speak with defense counsel, that may explain why many of these witnesses were not called, why the family history was not brought out.

I think truly the majority of the information you need you're going to get from the files and from the questioning of defense counsel.  So at this point, I'm going to deny that portion of your motion.  You're going to get everything from the defense attorneys, and we need to probably

26

now also set up a structure for how you're going to handle defense counsel.

MR. TRUMP:  I'll point out, Judge --

THE COURT:  Yeah.

MR. TRUMP:  I'm not trying to belabor this point, but if we proceed without knowing where this stuff came from, it's going to take weeks, if not months, longer.  There are boxes of files.  This was not done in the electronic age of, of discovery for the most part, for example, homicide files from D.C. in which some of these same witnesses and events were probed.

THE COURT:  Well --

MR. TRUMP:  For us to have to go through all of that to find perhaps the one page from a report that was provided on discovery that fits what they're talking about is just an onerous task.

THE COURT:  Well, let me -- can we get more specific?  Let's look at the complaint.  Can you show me an allegation?

MR. TRUMP:  Well, for example, if you go through paragraph by paragraph --

THE COURT:  Well, just give me a paragraph number.

MR. TRUMP:  All the discussion of Charlie Johnson, starting at page 23.

THE COURT:  All right, hold on a second.

MR. TRUMP:  I assume that came from discovery

27

documents.

THE COURT:  All right, this is failure --

MR. TRUMP:  And to the extent --

THE COURT:  Wait, I'm sorry, this is the failure to impeach Johnson with his prior criminal convictions?

MR. TRUMP:  Right.  Now, we have files on Charlie Johnson.  We'll have to pick through all of those files to determine the accuracy of what's represented here.

It would have been very simple just to put down the Bates numbers of where that information came from so we don't have to search for, for weeks to figure that out.  We've pulled Detective Murphy out of retirement, Judge.  We don't -- every law enforcement officer that worked on this case is retired.  I don't have anybody that I can go to who investigated this crime in 1993, who worked on the investigation in the early stages, 2004-2005, and who was at trial in 2007.  I have to sit there and go through these files myself.

There is just absolutely no reason why in each of these paragraphs, there can't be a citation to the discovery information that it's taken from.  They know it.  It should be made available to Your Honor; it should be made available to us.

THE COURT:  Well, was Johnson a government witness?

MR. TRUMP:  Yes.

THE COURT:  All right.  So you would have -- the

28

government would have been under an obligation in pretrial discovery to turn over Johnson's criminal history.

MR. TRUMP:  Right.  And we did.

THE COURT:  Well, all right.

MR. TRUMP:  But there's no reason why I should have to piece back through the discovery now to figure out where this came from.  This is not hide-and-seek at this point, Judge.

THE COURT:  No, but let's, but let's just look at paragraph 44 because that one's fairly simple.  It says, "Unbeknownst to Mr. Hager's jury, Johnson was a convicted felon.  He also had a prior conviction for a misdemeanor involving dishonesty or moral turpitude."

And then it says what he was convicted of.  "Both convictions were admissible and relevant to impeach Johnson's credibility as a witness, but neither was mentioned on cross-examination by trial counsel."

And so all you need for that would be a citation to the transcript.

MR. TRUMP:  Correct.

THE COURT:  I mean, that's not a piece of evidence you have to go out and, and flesh out.  I'm assuming you turned his record over in discovery.

MR. TRUMP:  Of course, Your Honor.  That's, that's a very simple example, but as you go through this narrative, it

29

pieces together multiple interviews with Johnson.  It pieces together stuff from other sources.  It has to do with things that happened in Virginia and D.C.

And again, I'm just -- this is off the top of my head right now.

THE COURT:  Yeah.

MR. TRUMP:  But it's all -- I don't know how long it would take, but they have the information from which this, this information was pulled.  They have the documents.  It's as simple as providing the Bates numbers from which that came.

THE COURT:  So -- and that's true when we're talking about Shenita King, we're talking about Charlie Johnson, when we're talking about the other witnesses, but more importantly, when we get to the penalty phase, then it's just a complete guess as to where it came from, and it -- you know, when we brief this, Your Honor, we want to brief the whole thing.  We don't want to have to brief the things that we know and then say:  Judge, we don't know enough about this other issue that we have to go back and ask for more information.

We contemplate a procedure by which once all the information is gathered, you get our brief, you get their brief, and you can make your, your ruling.

Now, again, I just, I was kind of dumbfounded when I saw all the pleadings because I've never seen a 2255 this devoid of references, and it's not a complaint, Judge.  The law

30

is crystal clear that this is not in the nature of a civil complaint. Every case, when you look at Fourth Circuit law, you look at Supreme Court law --

THE COURT: It's a motion.

MR. TRUMP: It's analogous to a motion, summary judgment, whatever we call it, but it is a substantive plea asking for relief, and it needs to be supported, and if, if in any other case, if this were not a death penalty case, our first motion would be motion to strike this for failure to support it, and all we're asking is that provide citations to discovery. If they're relying on reports, let us have copies of those reports, and we can get this all done at once.

But this is not a trial. It's not let's play hide the ball and see strategically where the parties are going. This is put up or shut up.

THE COURT: All right.

MR. TRUMP: And that's the way it has always been, and that's the way we need to brief this.

THE COURT: I'm going to give defense counsel -- habeas counsel two options. Option No. 1 is to consider filing an amended motion reducing the scope of the motion, which would reduce some of this problem. The other option is you will have to comply, if you leave the complaint or the motion, that is, as it is with this broad range of issues, then the government has, I think, a right to see this evidence.

31

And I'll give you an example of an issue that just struck me as strange.  Again, I was not the trial judge, so in some respects, perhaps I'm at a disadvantage, or there may be an advantage to both sides because I'm coming at this fresh, but I was struck by the discussion about crack cocaine and whether or not Dr. Cunningham -- it's Cunningham, isn't it? That's the name of the doctor?

MR. TRUMP:  Yes.

THE COURT:  Was accurate or inaccurate in his description about when crack cocaine hit the streets of D.C. and all that.

I have to tell you I was the prosecutor who handled the first freebasing case in this jurisdiction.  In 1978, freebasing was starting in the District of Columbia, and that's the grandfather of crack cocaine.  That's when you were smoking it.  Came over from the West Coast.

So there was clearly now what we now know as crack cocaine on the streets of D.C., because that case came, the *Tillery* case came out of D.C.  It came out of Euclid Avenue in D.C., and there was a group of D.C. folks who were selling and using the stuff.  It was new.  But in '78, it was there, so it's not as if it didn't hit the streets until the mid '80s.  I don't know when the Len Bias case occurred, which is when it really became a public issue.

But, I mean, that whole little discussion about

32

powder cocaine versus crack cocaine struck me as a really off-the-wall problem.

But again, I think that -- my feeling is that this motion was, I think, the longest 2255 I've ever seen, and I think, you know, as with any litigant, when you file a complaint or a motion that is extremely expansive, you open up the discovery floodgates, which is what's happened here.  If their issues were more tailored and more narrow, the government might not need nor have a right to as much information.

But right now, what I'm going to do is I'm going to give habeas counsel two weeks to decide, and if you do decide to file an amended motion, it needs to be filed within that two-week time period.  If that is the case, then we may be able to tailor some of this discovery, but in any case, I think given the overall breadth as it stands now, all of the attorney information will have to be turned over, and in any case, the time sheets and the ex parte filings are definite.  That's going to be done immediately.  So you will get that within the next day or two, as soon as the Clerk's Office can, can get it all to you.

When I see the amended, if there is an amended motion, I may either with a phone conference or just by an order possibly tailor a little bit of this, but other than that, I am going to grant the government's motion, all right?

Now, the last thing is how we're going to handle the

33

attorneys.  Mr. Trump, you have suggested there are multiple ways of doing this.  Again, because there are so many issues in this case, I think the standard approach that we do in this district on habeas is an affidavit from the trial counsel.  I think it would be so long that -- and I don't even know how you'd do it.

Your suggestion of depositions seems to strike the Court as making in this particular case perhaps more sense, and that allows both sides to get all the information out from the trial counsel at one time, but that was your suggestion, and I'm amenable to it, recognizing that as a routine matter, we wouldn't do this in a habeas case.

MR. TRUMP:  And to a certain extent, I guess I don't know what Mr. McCarthy or Mr. Kiyonaga would prefer.

THE COURT:  I mean, you could do it --

MR. TRUMP:  Typically, we would ask for a written response, and if that were sufficient, we could just proceed without interviews or deposition or whatever, but if, if the Court in discussing it with Mr. McCarthy and Mr. Kiyonaga feel that it would be too burdensome to do a written response, then we could proceed right to either sort of a formal interview with both, both sides or a deposition.

It really, it really doesn't matter to us what the specifics are of the process, but I think once we have the records, it will become a little more clear as to what the

34

burden would be on trial counsel to do this, but they, they may know now and may have an opinion, but --

THE COURT:  All right.  Well, let me hear first from Mr. Brown.

MR. BROWN:  Your Honor, I need to address the Court on option --

THE COURT:  Well, address this issue first.

MR. BROWN:  This issue first, fine.  Your Honor, it -- we are amenable to a deposition if that's the road that the Court would like to go down.  Now, I think it should be -- the deposition cannot occur or should not occur for some period of time, however, because -- and Mr. Trump, I assume, will agree with this -- that if there is a document, when the document production occurs, the government is going to need some time to do that as well, to review those documents and prepare for this, this deposition.

And I have some substantial scheduling issues in the next few months, but I do think that Mr. Hager is not going anywhere.  I know the Court's interest, this Court's interest in moving things along, but I would ask the Court both because of the volume of material and, frankly, because of my schedule, that we proceed on a pace that gives us sufficient time to, to fully prepare for these proceedings and to produce these documents, etc., and I was going to start with the two-week period for this.

We were -- as the Court knows, I'm comfortable saying this even though it's an under seal order, I mean, we were directed to stand down in this case back in early June, and we've had to respond, obviously, and did that because it was our professional obligation to do so, but it's -- it will take much more than two weeks to, to comply with the Court's directive to annotate essentially this 2255 motion, if I understand the Court --

THE COURT:  Well, I mean, if it, if it were a shorter motion, it wouldn't take as much time to have to annotate it. That's what concerns me.  That's why I've said I think if you are interested in looking at whether this thing should be pared down, if not, it is what it is, and it does need to be documented.

MR. BROWN:  I understand.

THE COURT:  And, I mean, you-all have had a year to prepare this motion.  I recognize the fact this is a very serious case because it's a capital case, but it's also, you know, a one-count charge other than the very interesting legal issue which permeated the guilt phase, the legal issues other than that one are not in my view complicated.

So this is a fact-specific motion, and you've had a year, and you've spent a great deal of time already on this case, so I don't see why it should be that difficult to decide rather quickly what issues are sort of ephemeral or peripheral

and that really could be jettisoned and it will make this thing a lot simpler, and/or to say, well, we got this from talking to these three people, we got this from looking at that, and put it all together.

MR. BROWN:  Well, Your Honor, the, the dilemma that is faced in this situation is being sufficiently factually specific so that there is not a claim by the, by the government and a ruling by the Court that there aren't sufficient facts alleged in support of certain claims, especially these ones that were raised with respect to the, to the sentencing phase of the case, and, and so that is the reason for being specific.

I think the, the law suggests that one should be specific in, in making these allegations.  So that's why there is the level of detail there is.

But, you know, as you, I'm sure, know, sometimes it's often harder to write something shorter than it is to write something longer, so it is going to take some time to distill these allegations down.  I think it unlikely that there will be claims abandoned.

THE COURT:  Well, then let's leave it as it is.  I don't want to make it more complicated than it is.  I'm going to go back on this.  The motion is what it is.  You need to annotate it, provide the government with an appendix that properly shows where you got these various allegations, in other words, if this person would have said such and such, this

37

expert would have said such and such, what these reports are that you're relying on, if you have reports, and that needs to be done, and the only issue then is how much time it's going to take to get that information to the government.

The attorney stuff can go right away.  That's -- there's no holdup on that.

MR. BROWN:  You mean producing the documents?

THE COURT:  The attorney files that you have --

MR. BROWN:  Yes.

THE COURT:  -- that can be turned over immediately.

As soon as -- you just have to copy them, get them to the, to the government.

MR. BROWN:  There are 10,000, about 10,000 documents, so it will, it will take some time to process them.  Many of these are documents that are being produced back to the government because there's a lot of discovery material within that 10,000 documents that the government would already have, but, you know, it's not something that I can make happen tomorrow.  It's going to take some time to, to do this and produce it to the government.

THE COURT:  You might talk with Mr. Trump.  The government may not need or want just a return of the discovery they turned over.  What I'm sure they're looking for are the, the notes of interviews that the attorneys have with the client, with the witnesses whom they interviewed, any e-mails

38

back and forth where Mr. Kiyonaga and Mr. McCarthy are talking about, you know, well, I saw this case. What are we going to do with it?

You know, I mean, I don't know what you have, but I would think that's the information that's most critical for the government. They know what they turned over in discovery.

Now, they don't know what discovery on their own the defense counsel came up with, although back in those days, wasn't there still reciprocal discovery obligations, Mr. Trump? I mean, you were the trial -- weren't you one of the trial counsel on this case?

MR. TRUMP: Yes.

THE COURT: Yeah.

MR. TRUMP: No offense to Mr. McCarthy and Mr. Kiyonaga.

THE COURT: Yeah.

MR. TRUMP: We had some litigation over that, and we really didn't get much reciprocal discovery, so --

THE COURT: All right. So that might be something new that you don't have as well. I mean, do you want your discovery back that's part of the thousands of pages that are in the files that they've got?

MR. TRUMP: I think they would -- they'd probably have to go through it and see if there are any handwritten notes or things like that. It might be easier just to produce

39

back what they got.

THE COURT: All right.

MR. TRUMP: I'm comfortable with the schedule that would give habeas counsel 30-45 days to put everything together and just give it to us in whatever time that they can. I'm not pushing for this next week. We have to get up to speed as well. We have to get stuff out of storage and go through it and start processing our own files to, to respond.

So it's -- unfortunately, the time it took to get the appeal finished was much too long in our opinion, so we're dealing with files that are in some cases almost 22 years old because the murder occurred in 1993, and it's just a lot of, a lot of paper to go through.

THE COURT: All right.

MR. TRUMP: So again --

MR. BROWN: Your Honor -- I'm sorry.

MR. TRUMP: -- if 30 or 45 days is necessary to put everything together and the Court has ordered it, we'd be comfortable with that type of time frame.

THE COURT: All right. Mr. Brown?

MR. BROWN: I should also point out to the Court, it's not at issue today, but once we begin work again, given what has occurred in today's proceeding, we will be seeking discovery from the government as well. We will be filing a motion for discovery.

40

THE COURT:  Well, don't spend any time on that yet. Let's get the government's opposition in first, all right? We're not going to have it going in two directions at the same time.  I am mindful, as you are, of the need to keep this case within reasonable parameters.

How about a deadline of October 16?  That gives you almost two months.

MR. BROWN:  To produce the --

THE COURT:  To produce everything.  And you can do it, it should be a rolling production.  The attorney files, it seems to me, simply need to be photocopied and sent over or ideally scanned.  Would you rather have them electronic? Whichever is cheaper, I guess, and faster.

MR. TRUMP:  Whatever is easier.

THE COURT:  Whatever is cheaper or faster.

MR. BROWN:  Very well, yes.

THE COURT:  All right, so the attorney files.

And then your appendix, so to speak, or the documentation for the allegations you've made in your motion, that needs to be all finished by October 16.

MR. BROWN:  Very well.

THE COURT:  I'm giving you two months, all right? All right.

Then I recommend strongly that you sit down together and try to work out how you want to handle the defense counsel.

41

In a civil case, interrogatories are often proposed before a deposition.  The interrogatories -- I don't think it's fair to have defense counsel read the motion and then they respond to it line by line.  I think the government has to decide what it is to which you want a response.

In a normal civil case, that would be done by filing interrogatories or requests for admission, but having the attorneys or the witnesses respond in writing to specific issues, that then formulates the context in which a deposition, if it's needed, would be done.

And so, I mean, apparently, Mr. Brown, you've already had access to defense counsel.  They've already talked with you; is that correct?

MR. BROWN:  They have, yes.

THE COURT:  All right.  So, so it's the government that hasn't had that access.

MR. TRUMP:  I'm comfortable with whatever procedure the Court is comfortable with and trial counsel, Mr. Kiyonaga and Mr. McCarthy, are comfortable with.  If a deposition is the more efficient process, that's fine with us.

THE COURT:  All right.  Then let me say the last thing is this:  Mr. McCarthy, what has your experience been when we have attorneys who are CJA panel attorneys who are going to be spending a fairly significant amount of time either being interviewed or deposed, is there a way that you can put a

42

voucher in for that, or has that ever happened before?

MR. MC CARTHY:  I've not been at the podium in this situation before, Your Honor.  Frankly, in talking with habeas counsel, I haven't been keeping track of my time.  I view myself as a witness, quite frankly, at this point in time, and I'm happy to serve the Court as, as a witness.

THE COURT:  Mr. Kiyonaga?  I mean, I know you're both in small practices, and I'm concerned that we not also tie -- and you're both capital qualified; is that right?  I know you are, Mr. McCarthy.

Are you also at this point, Mr. Kiyonaga?

MR. KIYONAGA:  Yes, ma'am.

THE COURT:  I mean, you're also lawyers who, I'm sure, are being called upon by other judges in this court to be representing people.  So I want to make sure that -- I'm going to check with the Fourth Circuit and see whether or not there's a way of getting your time compensated somehow because you're going to get tied up for a significant amount of time in this case, all right?

MR. KIYONAGA:  Thank you, Your Honor.

THE COURT:  All right.  Is there anything further?

MR. BROWN:  Just to clarify, Your Honor, as I understand it, we're -- I'm to confer with the government about the discovery process for Mr. Kiyonaga and Mr. McCarthy, and you're not precluding use of interrogatories in anticipation of

43

a deposition.

THE COURT:  Correct.

MR. BROWN:  Something like that.

THE COURT:  Correct.

MR. BROWN:  Right.

THE COURT:  All right?

MR. BROWN:  The other point is is that there will -- I think I heard the Court agree that there should be a protective order of some kind entered with respect to discovery.

THE COURT:  And I think you-all should try to work that language out, all right?  Mr. Trump and his cocounsel are officers of the Court.  I know that they will stick by whatever order you-all agree to, but it is a sensitive point.  We want to have full disclosure, and in order to have full disclosure in a case like this, then I think there has to be some reasonable protection for the defendant, yes.

MR. BROWN:  Very well, Your Honor.

THE COURT:  Anything further we need to address?  No?

MR. BROWN:  No.

THE COURT:  All right, we'll recess court for the day.

(Which were all the proceedings

had at this time.)

Anneliese J. Thomson OCR-USDC/EDVA (703)299-8595

44

CERTIFICATE OF THE REPORTER

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter.


                                        /s/
                                 Anneliese J. Thomson