**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 1:05-cr-00264 (LMB)** |
| | : | **Civil Action No. 1:15-cv-00551** |
| | : | |
| **THOMAS MOROCCO HAGER,** | : | **CAPITAL § 2255 PROCEEDINGS** |
| | : | |
| **Defendant.** | : | |
| | : | |

**DEFENDANT'S REPLY TO THE RESPONSE OF THE UNITED STATES TO**
**DEFENDANT'S PROPOSED DISCOVERY PLAN**

Defendant Thomas Morocco Hager ("Mr. Hager"), through undersigned counsel, respectfully submits this reply to the government's response to Mr. Hager's Proposed Discovery Plan. For the reasons set forth below, the government's objections to Mr. Hager's requested discovery are meritless and the Court should enter the proposed discovery order attached to Mr. Hager's plan.[1]

**ARGUMENT**

**A.  Discovery Concerning Government Witness Charles Johnson**

Habeas counsel have shown good cause for each of the three categories of discovery they seek regarding government witness Charles Johnson, for their Motion sets forth specific allegations that provide reason to believe that the discovery sought will help them demonstrate that Mr. Hager is entitled to relief. In its Response, the government alleges that habeas counsel make seven baseless "assumptions" in making their discovery request for this information. Resp. at 11-13. The seven matters that the government lists are not "assumptions," they are

---

[1] In its Response, the government represents that Detective Murphy appeared before a Regular Grand Jury in Fairfax County Circuit Court and, because such proceedings are conducted without a court reporter or recording device of any kind, there are no transcripts or records other than the state-court indictment. Resp. at 25. Based on this representation, Mr. Hager withdraws his request for discovery of Fairfax County Grand Jury Testimony.

issues pertinent to the question of whether good cause for discovery exists, and each one supports habeas counsel's requests.

        1.      There is Every Reason to Believe that the Requested Discovery Procedures will Yield Evidence that Could and Should Have Been Used to Impeach Johnson's Testimony.

Firstly, the government claims that there is no basis to believe that the documents sought regarding Charles Johnson "will identify information that could have impeached his testimony." Resp. at 11. To the contrary, habeas counsel set forth in painstaking detail in the Section 2255 Motion the facts which overwhelmingly support the inference that the government is in actual or constructive possession of evidence that reveals that Johnson's personal motives for testifying against Mr. Hager were orders of magnitude more significant and compelling than anything that was elicited at trial. Section 2255 Motion at 23-32. Johnson testified at trial that he did not shoot anyone, and was in fact shot himself, in the incident underlying the double homicide with which he was charged in F-5055-94 in D.C. Superior Court and subsequently given immunity in exchange for testifying against Mr. Hager. However, habeas counsel's investigation has revealed evidence that Johnson was not only indeed a shooter, he was an instigator of the attack which was made in retaliation for the victims' killing of Johnson's god-brother two days earlier. *See* Ex. 1. Further evidence proving these facts is virtually guaranteed to be discovered in the government's files, and in those of the D.C. Metropolitan Police Department for which habeas counsel seek leave to issue a subpoena.

Information already in habeas counsel's possession also belies Johnson's testimony at trial that he did not shoot anyone during the 1993 non-fatal shooting on 2900 block of Nelson Place, S.E., for which he was also given immunity for his cooperation in this case. *See* Ex. 2. Further evidence proving this fact, also, is highly likely to be discovered in the government's files. And given the fact that Johnson lied to the jury regarding his culpability for two of the five

criminal acts for which he received express immunity, there is certainly good reason to believe that he may have misrepresented the facts regarding the other three, and thus that the government and the MPD are in possession of evidence that will enable habeas counsel to show that he did.

There is also good reason to believe that the government is in possession of further evidence of the full extent of Johnson's enormous criminal exposure at the time of his testimony in this case, namely the additional criminal acts to which he admitted during the multiple proffer sessions and other interviews with Federal, State and local law enforcement that Johnson underwent prior to his testimony at trial. Like any other cooperating witness in a federal case, Johnson would have been required to make full disclosure of any criminal conduct of which he had knowledge or was involved in. Under the terms of Johnson's immunity agreement, the government was free to prosecute him for any crimes that he admitted committing during these interviews in the event that Johnson violated the terms of the agreement. And by the time of trial, Johnson had indeed violated the agreement, having been convicted of two new crimes since the agreement was entered into. Habeas counsel therefore have good reason to seek production of the notes and other records of those interviews in order to calculate the full extent of Johnson's criminal exposure should he displease the government at Mr. Hager's trial.

For similar reasons, habeas counsel have shown good reason to believe that there is evidence that Johnson's criminal exposure was even greater because he was the subject of an investigation into charges involving possession of marijuana and of a stolen gun. Documents show that in March of 1998 a search warrant was executed at the Stafford County, Virginia, residence of Johnson's grandfather, with whom Johnson was then living. See Ex. 3. The search revealed numerous illegal items which Johnson's grandfather told police belonged to Johnson. *See id.* Notes of law enforcement contact with Johnson show that Johnson was subsequently

3

charged with possession of drugs and stolen guns, and indeed that he reached out to AUSA Trump as a result. *See* Ex. 4. Informal attempts to obtain records of this prosecution from the Stafford County courts have been fruitless; good cause therefore exists to grant discovery of them now.

> 2. There Exists No Basis Upon Which to Excuse Trial Counsel's Failure to Obtain This Evidence.

The government's second objection to Mr. Hager's request for discovery regarding Charles Johnson is that there is no basis to believe that counsel were ineffective for failing to secure and utilize this mountain of impeachment evidence because they "did in fact seek subpoenas to obtain similar information" and because they "dispatched their investigator to identify similar information." Resp. at 11. The government's argument is meritless. As a legal matter, if trial counsel fail to obtain readily available, material evidence that could have altered the outcome of the trial in the defendant's favor, the fact that they performed other tasks that did not produce the important evidence that they missed is irrelevant. *See, e.g, Rompilla v. Beard*, 545 U.S. 374, 388-89 (2005) (finding "objectively unreasonable" the conclusion "that defense counsel's efforts to find mitigating evidence by other means excused them from looking at" the file that contained the relevant information); *Kimmelman v. Morrison*, 477 U.S. 365, 385-86 (1986) (holding that counsel's failure to conduct necessary investigation was deficient performance, notwithstanding counsel's performance at trial which, "while generally creditable enough," nevertheless failed to "lift counsel's performance back into the realm of professional responsibility"); *Elmore v. Ozmint*, 661 F.3d 783, 861 (4th Cir. 2011) (holding that trial counsel's "failure to investigate cannot be excused by the lawyers' other efforts").

As a factual matter, the government's points also miss the mark. First, it is of no consequence that trial counsel sent an investigator to look for relevant information. The very

premise of Mr. Hager's discovery motion, which is clearly stated therein, is that the information sought cannot be procured by investigative or any other informal means. Habeas counsel have tried, and they have been wholly unsuccessful; hence the need to invoke the processes of the Court.

Second, the fact is that trial counsel entirely failed to request much of the information that is the subject of habeas counsel's requests, and they failed to obtain the small portion that could have been covered by subpoenas they did seek because their request was so overbroad and scattershot that it was denied by the trial court. Trial counsel never requested that the government provide them with information regarding the five categories of crimes for which Johnson was given immunity, despite the fact that they were provided with Johnson's plea agreement in which those categories were plainly set forth. Trial counsel never sought production from the government of the notes and other documents of Johnson's numerous interviews and debriefings, and never sought to subpoena them from the Fairfax County Commonwealth's Attorney. Nor did trial counsel seek disclosure of evidence regarding Johnson's drug and gun charges in Stafford County, either from the government via subpoena to the Stafford County Police Department, Sheriff's Department or Commonwealth's Attorney. To the extent that some information might have been included in response to subpoenas directed to the FBI, DEA, MPD or Fairfax County Police Department, counsel's request for permission to issue those subpoenas was quite rightly denied, as discussed below.

Trial counsel's request for permission to issue subpoenas to these four agencies was part of an application that, as the government notes, the trial judge described as "an indiscriminate, blunderbuss filing" that was "breathtakingly broad in scope and markedly lacking in specificity of the documents sought." *See* Ex. 5 at 7. The trial court found that the request provided "no

5

sound or persuasive reasons for the requested subpoenas," "failed to request specific documents or categories of documents, [] failed to demonstrate the relevance of many categories of documents sought, and has not shown that the requested documents are not otherwise procurable in advance of trial by the exercise of due diligence." *Id.* at 7, 12-13.

The trial judge's characterization of trial counsel's request is indisputably accurate. The application sought the issuance of subpoenas to 114 governmental agencies, each directing production of records relating to 41 different individuals. *See* Ex. 6. In other words, it would have required the agencies to conduct a total of over 4,500 separate searches. *See* Ex. 5 at 1. Nor were the subpoenas drafted to target specific records. On the contrary, as drafted by trial counsel, the requested subpoenas could not have been broader. For example, the proposed subpoena to 22 correctional agencies sought "[a]ny and all information of any nature whatsoever related to any and all occasions when any of the [41 named] persons were in your custody." *Id.* at 4. From 25 law enforcement agencies, including the FBI, the DEA, the MPD and Fairfax County Police Department, trial counsel sought production of "[a]ny and all information of any nature whatsoever related to any and all investigations of any nature whatsoever," again for each of 41 named individuals. *Id.* at 5.

Nor did trial counsel offer any basis to believe that it was even plausible that the majority of the agencies they sought to subpoena were likely to have information regarding all or indeed any of the 41 individuals. By way of just one example, and there are many, the 25 subpoenas to law enforcement agencies included agencies in jurisdictions such as Spotsylvania County, Virginia; Manassas, Virginia; Takoma Park, Maryland; and Montgomery County, Maryland. See Ex. 6 at 7-8. The list of 41 individuals for whom trial counsel requested these agencies to

search included Mr. Hager's parents, siblings and other relatives, *id.* at 2, despite a complete absence of any indication that they had ever set foot in those places. *See* Ex. 5 at 11-12.

Unsurprisingly, the trial court immediately rejected the vast majority of trial counsel's requests. *Id.* at 13. The court granted permission only for subpoenas to 22 of the 25 law enforcement agencies, and only for records on Mr. Hager himself, and none of the remaining 40 individuals, recognizing as it did so that it was reviewing these requests "charitably," and granting them "more as a matter of grace than as a matter of right." *Id.* at 13.[2] Thereafter, the government caught wind of trial counsel's plan, and moved to quash the subpoenas issued to the FBI, the DEA and the Fairfax County Police Department. *See* Ex. 7. That motion was granted, and the trial court quashed not only those three subpoenas but also all other subpoenas to law enforcement agencies that remained outstanding. *See* Ex. 8.[3]

At the end of this process, then, trial counsel was left with no subpoenas that covered any of the information that habeas counsel are requesting with respect to Johnson. However, instead of regrouping and making specific requests for such evidence and setting forth the reasons to believe that relevant records existed, as habeas counsel have, trial counsel simply abandoned the issue. As a result, the jury never heard the true facts of Johnson's bias and motives to lie to protect himself and instead received a highly misleading picture of a witness who was essentially merely doing his civic duty by coming forward.

---

[2]  The trial court also authorized subpoenas for Mr. Hager's records only to the D.C. Pretrial Services Agency and the criminal and family divisions of the D.C. Superior Court, as well as to the D.C. Medical Examiner's Office for autopsy reports on the six homicide victims named in the government's Notice of Intent to Seek a Sentence of Death. The thousands of remaining requests were denied.

[3]  Some agencies had already returned the subpoena noting that they had no responsive records in their possession. *See* Ex. 7 at 9.

3.     The Information Sought by Habeas Counsel Would Have Been Proper
Fodder for Cross Examination of Johnson.

For its third point, the government asserts that there is "no basis to assume" that the information sought by habeas counsel could have been used at trial to impeach Johnson's credibility.  In fact, the law is clear that all of the evidence of Johnson's staggering criminal exposure at the time of his testimony against Mr. Hager was admissible to show Johnson's bias and motive to fabricate.  "Bias" refers to "the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party."  *United States v. Abel*, 469 U.S. 45, 52 (1984).  One well-recognized source of bias is the witness's self-interest.  *Id.* "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  *Id.  See also United States v. Parker*, 790 F.3d 550, 558-59 (4th Cir. 2015) (finding fact that witness was under active investigation by the SEC was material impeachment evidence that government should have disclosed to defense, noting that "'the exposure of witness' motivation in testifying is a proper and important function' of cross-examination") (quoting *United States v. Ambers*, 85 F.3d 173, 176 (4th Cir. 1996)).

Indeed, precluding a defendant from eliciting evidence of a witness's bias on cross-examination violates a defendant's constitutional rights under the Sixth Amendment Confrontation Clause.  *See Davis v. Alaska*, 415 U.S. 308, 319 (1974) (reversing conviction where defendant was precluded from eliciting fact that crucial government witness was on juvenile probation at the time of his testimony in order to show bias, noting that "[s]erious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry").  Whether evidence of bias is or is not admissible under Fed. R. Evid. 608(b), Resp. at 12, is therefore irrelevant.  *Abel,* 469 U.S. at 56.

8

> 4.      The Court Cannot Determine Whether the Cross Examination that Trial Counsel did Conduct Was Constitutionally Deficient Until it Considers All of the Evidence that Trial Counsel Missed.

The government's fourth point turns the law governing claims that trial counsel rendered constitutionally ineffective assistance on its head.  The government appears to be arguing that, before the Court can look at the evidence that trial counsel missed and failed to present, the Court must first find that the cross examination of Johnson that was conducted was ineffective on its face.  *See* Resp. at 12 n.6 ("Discovery will not help demonstrate entitlement to relief unless and until the actual cross-examination conducted by trial counsel is shown to be ineffective.").  To the contrary, ineffective assistance may be established only by showing both that counsel's performance was deficient and that the defendant was prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 691-92 (1984).  The only way to analyze whether Mr. Hager suffered prejudice from trial counsel's failure to effectively cross-examine Johnson is to examine the evidence that would have been presented had counsel been performing as constitutionally adequate advocates, i.e., in part, the evidence that habeas counsel now seek to discover.  Thus, it is logically impossible for the Court to determine whether the actually-conducted cross-examination constituted ineffective assistance before deciding whether to grant the requested discovery.

To the extent that the government intended to argue that habeas counsel must establish that the actually-conducted cross-examination constituted deficient performance before discovery may be granted, this argument similarly fails.  To determine whether a cross-examination was deficient, a court cannot simply look at what trial counsel did; rather, it must also take into account what they could have, but did not, do.  Accordingly, this inquiry also cannot be completed without the evidence that habeas counsel seek.

5.      There is Ample Basis to Believe that The Impeachment Evidence, When Fully Revealed, Would Have Led the Jury to Reject Johnson's Testimony.

To say that the impeachment evidence that trial counsel failed to gather and present is "marginal," as the government does in its fifth point, Resp. at 12, is disingenuous at best.  Even based on what habeas counsel already know, the evidence that trial counsel failed to gather and present represents the difference between the false picture of Johnson as having no reason to testify against Mr. Hager other than his own good conscience that was presented at trial, and the true picture of Johnson as an individual who was facing the rest of his life in prison if he did not cooperate against Mr. Hager to the satisfaction of the government.  There is thus every reason to believe that, had they heard it in its entirety, the evidence against Johnson would have caused the jury to decline to find his testimony credible and to reject it altogether.  Discovery is therefore appropriate in order to permit habeas counsel to demonstrate the full impact of the cross examination that should have been conducted.

6.      Had the Jury Discredited Johnson's Testimony, the Government's Case for a Nexus Between the Murder and a Drug Conspiracy Would Have Been Significantly Weakened and There Would Have Been Virtually No Evidence of the Substantial Planning Aggravating Circumstance.

As set forth in the Section 2255 Motion, far from being "overwhelming," Resp. at 13, the government's evidence regarding the necessary element of a nexus between the killing of Barbara White and the drug conspiracy was eminently assailable.  One of the ways in which reasonably competent counsel would have challenged that evidence was by alerting the jury to all of the available evidence impeaching Charles Johnson's credibility, because Johnson's testimony regarding two supposed conversations he had with Mr. Hager constituted a substantial part of the government's case on this issue.

Additionally, Johnson provided the only evidence the government had that Mr. Hager planned from the outset to kill Barbara White, as opposed to talk to or threaten her, and to do so

specifically by stabbing her multiple times with knives.   Neither Arlington Johnson, Lonnie Barnett nor Shenita King testified that there was a plan to kill Barbara White before they arrived at her apartment.   Absent Johnson's testimony, the government had no evidence to rebut the far more plausible theory that Mr. Hager had no specific plan to murder Ms. White and that events in Ms. White's apartment that night unfolded haphazardly and chaotically.   The "other evidence of Hager's planning and premeditation" cited by the government in its Response to the Section 2255 Motion, such as witness testimony that Mr. Hager said earlier that day that they were "about to get at Barbara" or "do something about Barbara," or testimony that the participants wore ski masks and gloves, Resp. to Section 2255 Motion at 36 n.15, fails to establish the existence of a plan to kill her, much less to do so by inflicting multiple stab wounds using whatever implements could be found at the scene.   Had trial counsel gathered and used the full scope of the available evidence to impeach Johnson, there is a reasonable likelihood that the jury would have rejected the substantial planning aggravating circumstance and would have had a significantly different picture regarding how the crime unfolded than that which was presented by the government.

       7.       The Prejudice Resulting From Trial Counsel's Numerous Errors and Omissions Must he Considered Cumulatively.

Finally, the government asserts that there is "no basis" to find that, had the jury heard the full evidence impeaching Johnson and rejected his testimony, they may have acquitted Mr. Hager or declined to impose the death penalty. Resp. at 13.  The government's treatment of the question of prejudice with respect to this evidence, and other categories of evidence that habeas counsel seek to discover, ignores the fact that the determination of whether trial counsel's deficient performance was prejudicial requires a collective analysis of the totality of the effects of counsel's errors and omissions on the outcome of the trial.

Under the familiar standard, to satisfy the prejudice prong of a claim of ineffective assistance of counsel, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. As indicated by the Supreme Court's use of the plural, a court conducting a prejudice inquiry on an ineffective assistance claim must consider the cumulative effect of all of counsel's errors that are raised by the claim. *See Elmore*, 661 F.3d at 868-71. In *Elmore*, the petitioner raised, *inter alia*, a claim that he received constitutionally ineffective assistance of counsel at the guilt phase of his capital trial. *Id.* at 789 (noting that the court's opinion is focused on two of Elmore's claims, one of which is his "Sixth Amendment claim of ineffective assistance in the guilt phase" of his trial). Elmore's claim raised multiple, diverse failures of his trial counsel, including their failure to challenge the medical examiner's opinion regarding the decedent's time of death; failure to challenge law enforcement testimony that 45 of Elmore's pubic hairs had been recovered from the bed where the body was found; failure to discover and present evidence that what the State described as blue fibers recovered from the body were in fact hairs, one of which did not match Elmore; failure to present evidence that law enforcement had erroneously classified at least one  fingerprint from the crime scene as unidentifiable, and thus may have done so with respect to a bloody fingerprint in the victim's bathroom; failure to present evidence that the amount of blood on Elmore's clothes was inconsistent with the amount of blood at the crime scene; and failure to present evidence that Elmore's clothes had been tampered with prior to being examined at the crime lab. *Id.* at 855-56.

In assessing the prejudice that Elmore suffered as a result of his trial counsel's multiple errors and omissions, the Fourth Circuit noted that courts are required to evaluate the totality of the evidence, including "*all* of the trial evidence and the [evidence discovered by habeas

12

counsel] favoring Elmore's acquittal and then to reweigh that evidence against the State's evidence of guilt." *Id.* at 868. In other words, the correct analysis is to "evaluate[] the collective trial evidence together with the collective evidence that a reasonable investigation of the State's forensic evidence would have uncovered." *Id.* Accordingly, the court found, the state post-conviction court that had reviewed Elmore's claim unreasonably applied clearly established federal law when it failed to apply a totality of the evidence standard and instead "unreasonably discounted evidence favorable to Elmore by unduly minimizing its import and evaluating it piecemeal." *Id.*

The government's approach to the prejudice analysis in its Response precisely mirrors the approach of the state court in *Elmore* that the Fourth Circuit rejected. Instead of considering the totality of the effects of all of trial counsel's errors and omissions during the guilt phase, the government carves out those sections of the claim for which habeas counsel are seeking discovery and argues that Mr. Hager will be unable to demonstrate prejudice based on that isolated section of the claim. *See* Resp. at 13 ("habeas counsel assume that, if Johnson were impeached with the hoped-to-be-discovered information, the jury would have acquitted Hager or declined to impose the death penalty. There is no basis for [this] assumption[]").

The approach that the Court must take under *Elmore* instead requires consideration not only of the prejudice that resulted from trial counsel's failure to discover and utilize the mountain of impeachment evidence against Johnson, but also the collective prejudice that Mr. Hager suffered as a result of all of trial counsel's failures at the guilt phase that are set forth in Claim I of the Section 2255 Motion. If the entirety of those "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate" that he was prejudiced, Mr. Hager has shown good cause for the requested

discovery. *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).  Considered collectively, as they must be, there is plainly reason to believe that Mr. Hager may be able to demonstrate that he was prejudiced by trial counsel's multiple failures during the guilt phase.  While the government certainly presented a great deal of evidence of Mr. Hager's participation in the murder of Barbara White, its evidence of the required nexus between the killing and a conspiracy to distribute cocaine was far from overwhelming.  Without a jury finding that such a nexus existed, Mr. Hager could not have been convicted of the crime with which he was charged and would have to have been acquitted.[4]

### B.        Discovery Concerning Shenita King

In its Response, the government argues that Mr. Hager should be permitted no discovery regarding the details of the monetary and other compensation given to Shenita King in exchange for her cooperation and testimony against Mr. Hager.  Although it alleges that Mr. Hager's request is based solely on speculation that responsive information exists beyond that disclosed at trial, the government declines to deny being in possession of such material and there are in fact good reasons to believe that the material exists.  The government's argument that cross-examination of Shenita King regarding the compensation she received would have opened the

---

[4] Indeed, *Strickland* and its progeny require not only that the prejudice from all errors and omissions raised in an ineffective assistance of counsel claim be analyzed collectively, but also that the totality of prejudice from errors raised in separate ineffectiveness claims be considered together.  *See, e.g., Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (holding that while deficient performance by trial counsel at the guilt phase was not itself prejudicial, and therefore petitioner's guilt phase ineffectiveness claim failed, that deficient performance combined with deficient performance at the penalty phase prejudiced the outcome of the sentencing phase and required the grant of relief for penalty phase ineffective assistance).  Habeas counsel recognize that this argument is presently foreclosed by the Fourth Circuit's decision in *Fisher v. Angelone*, 163 F.3d 835, 852 (4th Cir. 1998).

In *Fisher*, the petitioner raised four separate ineffective assistance of counsel claims: one alleging an error by counsel at the guilt phase; one alleging error in responding to the government's presentation of aggravating evidence; one for failing to present mitigating evidence at the penalty phase; and one for errors committed at the post-trial sentencing hearing before the judge.  *Id.* at 849.  The court declined to consider the collective effects of the four claims in the aggregate for the purposes of assessing prejudice, stating that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively." *Id.* at 852.  For the reasons stated in *Moore*, however, habeas counsel believe that the opinion in *Fisher* must inevitably be invalidated as contrary to *Strickland* and its progeny.

door to redirect regarding Mr. Hager's past abuse of her similarly fails to defeat Mr. Hager's showing of good cause for discovery on this issue.

   1.  There is Good Reason to Believe that There Exists Information Regarding Compensation Given to Shenita King Beyond That Disclosed at Trial**.**

Cross-examination of Shenita King regarding the financial benefits she received in exchange for her cooperation against Mr. Hager would have been entirely proper and relevant to demonstrate one source of her bias against him. *See generally United States v. Abel*, 469 U.S. 45, 52 (1984). Prior to trial, the government provided trial counsel with two documents relevant to this subject. The first was a supplementary report prepared by the Fairfax County Police Department that reflected it had paid a total of $4707.67 to King between April 6, 2004, and August 30, 2007. *See* Ex. 9. The second was a letter from AUSA Trump stating that King had received a total of $72,935.99 from various government agencies, including the Fairfax County Police Department, over the period from 1999 through 2007. *See* Ex. 10.

Also in that letter, the government represented that King "typically received about $500 per month," although she had received a larger amount on certain occasions. *Id.* As an example of such an occasion, the government pointed to the fact that King had been moved into a long-term hotel for a few months rather than placed in a new apartment after the apartment complex she was living in had a fire. *Id.* Had King indeed been given about $500 per month for the 8 years between the beginning of her cooperation against Mr. Hager and her testimony at trial, she would have received a total of $48,000. However, she received at least $72,935.99, significantly more than could reasonably be accounted for by a few months in a hotel and begging the question of whether this sum was necessary for her protection or, instead, was a straightforward inducement for her continued cooperation. Habeas counsel should therefore be permitted

discovery to develop the facts regarding the amounts of money that King was given, when she was given them and for what purpose were they intended.

The idea that the money was simply to protect King is also undermined by the fact that she was not relocated out of the D.C. area until 2005. *See* Ex. 11. Once again, the question of why she was given money between 1999 and 2005, and how much she was given during that period, is highly relevant to whether the money she received was in fact a simple inducement for her to continue to work with the government. Further underscoring the evidence that the money was unrelated to ensuring King's safety are the facts that she never did agree to enter the witness protection program despite discussing it with the government; at certain times prior to the 2007 trial King and her daughter were living with Mr. Hager's mother; and that at all times between 1999 and 2007, wherever she was living, King and her daughter were in regular telephone and mail contact with Mr. Hager and Mr. Hager was always aware of where she was located.

Given the amounts of money that King was given in the period leading up to the trial, there is ample reason to believe that she continued to receive more money and other benefits even after the trial was over. While the fact of the benefits she received post-trial would obviously not have been available for use during cross-examination of King, her expectations of continued payments and other support certainly would have been, as would any promises or reassurances made to her in this regard by the government. Habeas counsel should therefore be permitted to discover information regarding any post-trial payments in order to fully develop the facts of King's knowledge and expectations at the time of her testimony.

2.    There is Good Reason to Doubt that Cross-Examination of King on the Financial Benefits she Received for Cooperating with the Government Would Have Opened the Door to the Redirect Examination Posited by the Government.

In its Response, the government claims that Mr. Hager should be denied the requested discovery because, no matter what, a decision by trial counsel to cross examine King on the subject of monetary inducement would have opened the door to redirect examination regarding prior violent acts against her by Mr. Hager. Resp. at 14. Here, the government is indulging in unsupported assumptions. First, redirect of this type would only have been even arguably permissible if King had testified on cross that she was indeed afraid of Mr. Hager throughout the period from 1999 until the 2007 trial and took the government's money for that reason. As noted above, there are significant reasons to doubt that such would have been the case; at a minimum, if she had made such a claim, King would have been readily impeached by reasonably competent counsel.

Second, the government assumes that evidence that Mr. Hager was violent towards King during disputes between the couple when Mr. Hager was in the community would have been sufficiently probative of the proposition that Mr. Hager represented a threat to King while incarcerated to outweigh the substantial prejudice that such evidence would cause. By the time of trial Mr. Hager had been aware of King's cooperation against him for eight years. During that time he continued to communicate with her and with his daughter, and there is no evidence that he ever threatened to harm her or tried to do so.

Third, the government assumes that the particular incidents of violence it lists in its Response to the Section 2255 Motion could have been brought up on redirect, which is far from clear. Resp. to Section 2255 Motion at 31. ████████████████████

██████████████████████████████████████████

17



███████ This fact, together with the obvious prejudice that it would cause to Mr. Hager, gave the trial judge serious pause regarding whether to grant the government's request for permission to use it to rebut the defense evidence that Mr. Hager was an engaged and caring father. *See* Tr. Trans. 10/29/07 at 136-37. Ultimately the court was not required to decide the issue as the government withdrew its request, but the government's assumption that it would have been permitted to use the evidence on redirect examination of King must be viewed with considerable skepticism. The Court should grant the requested discovery in order to enable full development of the facts regarding the areas of cross-examination of King that reasonably competent counsel would have had available to them and whether in fact competent counsel would have foregone that cross-examination for the reasons that the government posits.

**C.    Discovery Concerning the Cornell Coplin Homicide**

In its Response, the government takes a similar approach to habeas counsel's requests for discovery concerning the Cornell Coplin homicide as it does to requests for discovery regarding Charles Johnson. The objections are meritless for similar reasons.

> 1.    The Requested Discovery Will Enable Habeas Counsel to Fully Develop the Facts of This Aspect of Mr. Hager's Penalty Phase Ineffective Assistance Claim.

18

In its Response, the government asserts that habeas counsel "has no idea what they hope to find and simply assume it will be something useful." Resp. at 15. The government overlooks the fact that the absence of evidence is, in some circumstances, as relevant as its presence. The allegations set forth in the Section 2255 Motion regarding the Coplin homicide are sufficient to establish that, when the facts are fully developed, Mr. Hager may be able to prove that trial counsel rendered ineffective assistance when they failed to move to exclude evidence of the incident. It is entirely possible that the requested discovery will yield no additional information that purports to inculpate Mr. Hager in the homicide, thereby supporting Mr. Hager's claim. However, if that is not the case, and there exists additional evidence with which the government could have defeated a motion to exclude, the merits of the claim would be assessed entirely differently, and it is for that reason that discovery is warranted.[5]

> 2.    Trial Counsel's Attempts to Subpoena and Otherwise Obtain Records Regarding Cornell Coplin are Immaterial.

The government's third objection to Mr. Hager's request for discovery regarding the Coplin homicide is that there is no basis to believe that counsel were ineffective in this regard because "they received the D.C. police file from the government . . . the district court denied their subpoenas for additional materials relating to Coplin's killing [and] their investigator conducted significant independent research on this and various other issues in the case." Resp. at 15. As noted above, habeas counsel's claim with respect to this homicide is not that trial counsel failed to obtain available, exculpatory information. Rather, it is that, as set forth in the Section 2255 Motion, based upon the evidence that was available to them trial counsel rendered deficient performance by failing to move to exclude all reference to the incident from Mr. Hager's penalty

---

[5] Of course, if the discovery requests were to result in the identification of material that "undercut[s] the idea that Loneldon "Neldy" Windsor 'acted at the direction of Mr. Hager,'" such material would be exculpatory and government counsel would be independently obligated to disclose it under *Brady v. Maryland*, 373 U.S. 83 (1963).

19

phase proceeding.  The purpose of the requested discovery is to permit habeas counsel to fully develop the relevant facts in order to be able to prove this aspect of the penalty phase ineffective assistance claim.

The government also suggests that trial counsel were relieved of any obligation to challenge the government's evidence regarding the Coplin homicide because "they knew that the killing occurred essentially as the government witnesses described it at trial."  Resp. at 15.  ████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████  Resp. at 15 n.8.

As an initial matter, neither confidential information received from a client nor evidence that the government claims to have in any way vitiates counsel's duty to put the government's case through "the crucible of meaningful adversarial testing."  *United States v. Cronic*, 466 U.S. 648, 656 (1984).  "'The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.'"  *Id*. at 655 (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975)).  "The constitutional right of a defendant to be heard through counsel necessarily includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor, however simple, clear, unimpeached, and conclusive the evidence may seem."  *Herring*, 422 U.S. at 860.

Of course, counsel must act within the bounds of the law, and may not make false statements or offer evidence known to be false.  American Bar Association, *Model Rules of*

20

*Professional Responsibility*, Rule 3.3; American Bar Association, *Criminal Justice Standards for the Defense Function*, Standard 4-1.4.  Short of that, however, counsel must zealously pursue the client's objectives.  "The duty to investigate [a client's case] is not terminated by factors such as the apparent force of the prosecution's evidence, a client's alleged admissions to others of facts suggesting guilt . . . or statements to defense counsel supporting guilt."  *Id*. Standard 4-4.1(b).  Nor, for example, does counsel's personal belief that a witness is telling the truth "preclude vigorous cross-examination, even though defense counsel's cross-examination may cast doubt on the testimony."  *Id.* Standard 4-7.7.



Such a motion would not have required trial counsel to make any false statement or offer any false evidence, and would have been fully consistent with the objective of avoiding a sentence of death.  But the fact is

*See* Ex. 12.

*See* Ex. 13.

████████████████████████████████████████████████ Lonnie

Barnett instead told law enforcement that Mr. Hager told him that he himself shot Coplin, and

never mentioned the presence of anyone else at the scene.  *See* Ex. 14. Barnett's testimony would

therefore have contradicted that of Fields, and the government not surprisingly did not call him

to testify.

██████████████████████████████████████

████████████████████████████████████████████████

Resp. at 15 n.8.  ████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████ *Id.* ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ *id.,* ████████████████████

████████████████████████████████████████████████

████████

3.   The Government's Fourth and Fifth Points Suffer from the Same Defect as the Third.

As noted above, habeas counsel's claim with respect to the Coplin homicide is not that

trial counsel failed to obtain available, exculpatory information.  Rather, it is that, as set forth in

the Section 2255 Motion, based upon the evidence that was available to them trial counsel

rendered deficient performance by failing to move to exclude all reference to the incident from

Mr. Hager's penalty phase proceeding.  Accordingly, the claim involves no "assum[ption] that

any newly discovered evidence would be admissible at trial" and no "assum[ption] that the information [habeas counsel] hope to find regarding the Coplin killing would be such that trial counsel would have been deemed ineffective for *not* using it." Resp. at 15 (emphasis in original).

> 4. Although Highly Prejudicial, the Evidence of Mr. Hager's Purported Culpability in the Coplin Homicide was So Weak that its Admission Violated Due Process and Fundamental Fairness.

The government makes two points in support of its argument that a motion to exclude evidence of the Coplin homicide by trial counsel would have been denied. First, it avers that "numerous witnesses" testified at trial that Mr. Hager directed Loneldon Windsor to kill Coplin. In fact, however, the only witness who so testified was Anthony Fields. The government's remaining evidence about the killing consisted of the testimony of an eyewitness who saw the shooting but had nothing to say about Mr. Hager's purported role in it; testimony regarding the autopsy of Coplin, which also had no bearing on any alleged culpability of Mr. Hager; hearsay statements of Shenita King, read to the jury by a police detective, in which she told police that Mr. Hager said "Neldie, Neldie, there's your man, there's your man, go get him," which, even if credited by the jury, suggest that the motive, and thus the culpability, for the homicide lay with Loneldon Windsor alone; and the testimony of the decedent's brother regarding an alleged dispute between Coplin and Mr. Hager regarding some PCP.

Second, the government states that the fact that the jury found the Coplin killing as an aggravating factor demonstrates that the evidence presented in support of that factor was sufficient. Resp. at 16. Of course, juries can all too readily be persuaded to make findings based upon emotions, prejudice or bias against a defendant – that is why, for example, the Federal Rules of Evidence cast the trial court in the role of gatekeeper, empowered to exclude evidence that has the potential to lead a jury astray. *See, e.g.*, Fed. R. Evid. 104(a) ("The court must decide

any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible."); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice").

The potential for a jury to be improperly swayed is also the reason why the Federal Rules of Criminal Procedure allow a defendant to move for a judgment of acquittal prior to his case being submitted to the jury.  *See* Fed. R. Crim. P. 29(a) ("the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction"); 2A Charles A. Wright, Fed. Prac. & Proc. Crim. § 461 (4th ed. 2013) ("judgment for acquittal . . . is an important safeguard to the defendant.  It tests the sufficiency of the evidence against defendant, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of guilt").  The fact that the jury found the aggravating circumstance of the Coplin homicide on such flimsy evidence is the reason why a motion to exclude should have been made and granted, and not proof that it should have been denied.

> 5.  The Prejudice Resulting From Trial Counsel's Numerous Errors and Omissions Must he Considered Cumulatively.

Finally, the government once again applies an incorrect analysis to the question of prejudice with respect to trial counsel's failure to move to exclude the Coplin homicide.  Resp. at 16 (suggesting that habeas counsel must show that "with the Coplin murder excluded, the jury would have declined to impose a verdict of death").  As explained above, under the Fourth Circuit's decision in *Elmore*, 661 F.3d at 868-71, the determination of whether Mr. Hager can establish that trial counsel's deficient performance was prejudicial requires a collective analysis of the totality of the effects of counsel's errors and omissions at the penalty phase of the trial as alleged in the Section 2255 Motion.

24

**D.      Discovery Concerning Government Witness Anthony Fields**

In its Response, the government again takes a similar approach to habeas counsel's requests for discovery concerning Anthony Fields as they do to requests for discovery regarding Charles Johnson.  Their objections are meritless for similar reasons.

1.      There is Every Reason to Believe that the Requested Discovery Will Reveal Evidence Impeaching Anthony Fields' Testimony.

Once again, the government overlooks the fact that the absence of evidence is, in some circumstances, as probative or more probative than its presence.  Habeas counsel's first request, for information supporting or negating Fields' false testimony at trial that he was incarcerated on a mere probation violation, is another one of those circumstances.  Habeas counsel's own investigation has revealed absolutely no evidence that Fields was in jail at the time of trial because of a probation violation in an old drug possession case.  Habeas counsel therefore fully expect that no documents will be forthcoming from any of the agencies from which they seek discovery.  Of course, if habeas counsel are wrong, the merits of the claim will be assessed entirely differently, and that is the reason why discovery is warranted.

The government's assertion that records gathered by habeas counsel "undermine the idea that Fields's testimony was inaccurate, as they appear to indicate that, at the time of Hager's trial, Fields was held on a status violation, and he was only sentenced on the underlying case *after* his testimony in Hager's case," Resp. at 17 n.10, is wrong.  The records that habeas counsel has gathered, and provided to the government at the direction of the Court in the form of an appendix, clearly show that, at the time of his testimony against Mr. Hager, Anthony Fields was being held without bond on four felony charges:  two counts of Distribution of Cocaine and two counts of Possession With Intent to Distribute Cocaine.  *See* Ex.15.  Fields had been a fugitive on those charges from January 12, 2001, when he failed to appear for a court hearing, and August

25

29, 2007, when he was arrested in D.C. for Simple Assault and the outstanding warrant was discovered. *See id.*; Ex. 16. He was therefore subject to an additional felony charge of violating the Bail Reform Act. *See* D.C. Code § 23-1327(a). Fields' criminal exposure therefore constituted a highly significant source of bias and motive to lie, which was concealed from the jury. The fact that he was not sentenced in his felony drug case until after he testified against Mr. Hager, and therefore his self-interest and motivation to curry favor with the government was at its most salient, renders these facts more, not less, impeaching of his credibility.

As to the remaining requests, each seeks documentation to establish either the full extent of Fields' prior criminal convictions, with which he could additionally have been impeached at trial, or which are relevant to mitigation. As reflected by the specificity of the information sought, each request is based upon information known to habeas counsel that establishes clear reason to believe that the cases exist. *See* Ex. 17.

2.      There Exists No Basis Upon Which to Excuse Trial Counsel's Failure to Obtain This Evidence.

The government's second objection to Mr. Hager's request for discovery regarding Fields is that there is no basis to believe that counsel were ineffective for failing to secure and utilize the available impeachment evidence because "the district court denied their subpoenas for additional materials relating to Fields" and because "their investigator conducted significant independent research on him and various other witnesses in the case." Resp. at 17. The government's argument is meritless for the same reasons set forth above with respect to the government's same claim regarding Charles Johnson. In short, the efforts of trial counsel's investigator are irrelevant because the purpose of Mr. Hager's Proposed Discovery Plan is to gain access to information that could not be obtained by informal means. And trial counsel's attempt to subpoena records, which could have netted only a fraction of the information sought

26

by habeas counsel, was so patently overbroad and impermissible that it was bound to be, and duly was, denied.

> 3.    The Information Sought by Habeas Counsel Would Have Been Proper Fodder for Cross Examination of Fields or are Otherwise Discoverable.

For its third point, the government asserts that habeas counsel "simply assume" that the information they seek could have been used at trial to impeach Fields's credibility, "without discussing the applicability of Rules 608 and 609." Resp. at 17. However, just as with Charles Johnson, evidence of Fields' criminal exposure and resulting motive to curry favor with the government was admissible to demonstrate bias, without regard to the Fed. R. Evid. 608 or 609. Fields' convictions in Fairfax County for Identity Fraud in 2006 and for Obstruction of Justice in 2001 would have been permissible impeachment under Fed. R. Evid. 609(a)(2), which expressly permits the use of misdemeanor convictions when the court determines that the elements of the crime required proof or admission of a dishonest act or a false statement.

Fields' convictions in D.C. in F-3829-80 and F-5674-80 would have been admissible under Fed. R. Evid. 609(a)(1), which permits impeachment of a witness by a conviction for any offense that was punishable by imprisonment in excess of one year. Although the Rule expresses a presumption that criminal convictions that are over 10 years old are inadmissible, older convictions may be used if the court finds that their probative value substantially outweighs any prejudicial effect. Fed. R. Evid. 609(b)(1). Fields' convictions in both cases would have been admissible under this provision. In F-3829-80, he was convicted of Robbery – Force and Violence and a felony violation of the Bail Reform Act. Not only are these offenses both punishable by more than one year's imprisonment, the Bail Reform Act violation also involved dishonesty or false statement, for proof of it requires a showing that a defendant promised to return to court as a condition of his release and subsequently broke that promise. For the same

27

reason, Fields' convictions in F-5674-80, which were for two counts of felony violation of the Bail Reform Act and one misdemeanor violation of the same Act, would also have been admissible.

As habeas counsel explained in Mr. Hager's Proposed Discovery Plan, evidence regarding the remaining cases against Fields is sought regardless of its admissibility for impeachment of Fields because they involved sexual or other violent offenses. There records will likely shed light on Anthony Fields' character, behavior and pattern of victimizing others. Because Anthony Fields was a near-constant presence in the life of his nephew, Mr. Hager, and Mr. Hager's siblings, indeed actually living with the family for extended periods of time, the records are highly relevant to Mr. Hager's background and history of exposure to psychological trauma and thus to his claim that trial counsel rendered ineffective assistance at the penalty phase with respect to the presentation of mitigating evidence (Claim III).

4.      There is Every Reason to Believe that Trial Counsel Performed Deficiently by Failing to Gather and Use all Available Impeachment Evidence Regarding Fields.

In its Response, the government asserts that, in order to show good cause for discovery of the requested materials, habeas counsel must first be able to show that "trial counsel would have had to be ineffective for not using them to impeach Fields." Resp. at 17. This assertion misstates habeas counsel's burden; in fact, they only need to make specific allegations that "show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)).

Habeas counsel have made that showing with respect to the Fields impeachment evidence. Obviously, before gaining access to the requested materials habeas counsel cannot fully assess either the reasonableness of counsel's failure to use the materials or the prejudice to

28

Mr. Hager that resulted from that failure. However, there is ample reason to believe that trial counsel's investigation of Fields' background and criminal history was inadequate; that as a result they were unaware of the impeachment evidence that was available to them; and that they therefore were never in a position to make, and in fact did not make, a strategic decision not to use that evidence. Certainly, the evidence impeaching Fields' credibility was substantial. Fields was a key witness in the government's case for death for Mr. Hager, as he provided the only evidence of Mr. Hager's purported culpability for the Coplin homicide. It is therefore difficult to imagine a valid strategic reason not to cross examine him to the most vigorous extent possible.

5.      There is Ample Basis to Believe that the Impeachment Evidence, When Fully Revealed, Would Have Led the Jury to Reject Fields' Testimony.

For its fifth point, the government asserts that habeas counsel "assume that whatever materials they discover would have caused the jury to disbelieve Fields's testimony." Resp. at 17. Habeas counsel do not base their requests for discovery on any such assumption; rather, they rely on the fact that the allegations in Mr. Hager's Section 2255 Motion show good reason to believe that, had trial counsel used the materials that habeas counsel have already gathered, together with the additional materials sought in discovery, the jury would have rejected Fields' testimony as incredible. It is a virtual certainty that habeas counsel will be able to prove that Fields flat-out lied to Mr. Hager's jury when he claimed to be in jail on a probation violation stemming from an old simple possession case. The truth was far different; he was facing a dauntingly long period of incarceration, which gave him a compelling motive to fabricate in order to curry favor with the government. Had the jury been aware of that, and also been informed of Fields' lengthy list of prior criminal convictions, there is every reason to believe that they would have concluded that, if he was willing to lie to them about his legal situation, he was

29

willing to lie to them about Mr. Hager in order to enhance that legal situation.   On that basis, the jury would likely have rejected Fields' story in its entirety.

6.      Absent Fields' Testimony the Government had No Evidence that Mr. Hager Bore Responsibility for the Coplin Homicide.

The government's assertion that the jury would have concluded that Mr. Hager directed Loneldon Windsor to kill Coplin even without Fields' testimony, Resp. at 18 n.12, is contrary to the record.  In its Response to the Section 2255 Motion, Resp. at 66-67, the government points to four sources of evidence about the Coplin homicide other than Anthony Fields.  The first, the testimony of an eyewitness who saw the shooting, helps to establish that the shooting occurred but says nothing about Mr. Hager's purported role in it.  The same is true for testimony regarding the autopsy of Coplin; it establishes that Coplin was shot and died, but has no bearing on any alleged culpability of Mr. Hager.

The government next points to hearsay statements of Shenita King, read to the jury by a police detective,  in which she told police that Mr. Hager said "Neldie, Neldie, there's your man, there's your man, go get him."  This evidence, even if it had been credited by the jury, suggests that the motive, and thus the culpability, for the homicide lay with Loneldon Windsor alone. Finally, the government presented the testimony of the decedent's brother, David Jennifer, regarding an alleged dispute between Coplin and Mr. Hager regarding some PCP.  However, the account of this dispute failed to explain why Loneldon Windsor shot Coplin, or why Coplin was Windsor's "man," and not Mr. Hager's. Moreover, while Jennifer testified at trial that the PCP dispute had occurred just a few days before the shooting, he told police at the time of the incident that in fact several weeks had passed between the two events, further supporting the inference that the incident had nothing to do with Windsor's decision to shoot Coplin.  This evidence is wholly insufficient to establish that Mr. Hager bore responsibility for the Coplin homicide.

30

7.      The Prejudice Resulting From Trial Counsel's Numerous Errors and
Omissions Must he Considered Cumulatively.

Finally, the government once again applies an incorrect analysis to the question of prejudice with respect to this evidence.  Resp. at 18 (suggesting that habeas counsel must show "that, without the Coplin homicide, the jury would not have voted for death").  As explained above, under the Fourth Circuit's decision in *Elmore*, 661 F.3d at 868-71, the determination of whether Mr. Hager can establish that trial counsel's deficient performance was prejudicial requires a collective analysis of the totality of the effects of counsel's errors and omissions alleged in the Section 2255 Motion at the penalty phase of the trial.

8.      The Government Should be Directed to Disclose the Transcript of Fields'
Grand Jury Testimony.

The government's response to habeas counsel's request for the transcript of Anthony Fields' testimony before the grand jury is puzzling.  Resp. at 16 n.9.  The government of course knows whether it turned over the transcript to trial counsel or not, but it declines to say.  Nor does it state that the transcript is contained in trial counsel's files, a complete copy of which the government has in its possession.  Instead, the government asserts that "it appears that this transcript was in fact turned over," ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████      *See* Ex. 18.  ███████████

██████████████████████████████████████  The Court should order the government to disclose the transcript to habeas counsel now.

## E.      Discovery Concerning the Jerome Robinson Murder

The government argues that Mr. Hager's targeted request for discovery regarding the Jerome Robinson murder should be denied because trial counsel already sought the fingerprint

31

evidence that habeas counsel now seek and, even if that evidence and the autopsy report that habeas counsel also seek exists, habeas counsel make a series of additional unreasonable assumptions that render discovery inappropriate.  Resp. at 19-20.  The government's objections should be rejected for the following reasons.

First, even though trial counsel did attempt to locate the latent fingerprints lifted from a gun found in Robinson's apartment during the MPD's investigation, they did not ask the Court, as habeas counsel do now, for a targeted subpoena granting them access to those prints.  Instead, as discussed above, *supra* p. 5, trial counsel submitted "an indiscriminate, blunderbuss filing" that listed Jerome Robinson as one of 41 individuals about whom trial counsel sought documents but did not specify what material they wanted.  Trial counsel's subpoena also did not specify why they wanted it:  because they believed the prints would be a match for Paul Lucas and thus corroborate their theory that it was Lucas, not Mr. Hager, who participated in the Robinson homicide with David Parker.  Nor did trial counsel ever specifically request Paul Lucas's autopsy report, even though it also likely supports Mr. Hager's innocence by showing that Lucas's height matched an eyewitness's initial description of the taller gunman in the Robinson shooting and that Lucas had suffered a gunshot wound, which habeas counsel believe was inflicted during the shooting.  By not making these targeted requests to bolster the case that Mr. Hager was actually innocent of the Robinson murder, trial counsel was ineffective.

Second, the government criticizes habeas counsel for assuming that the fingerprint and autopsy evidence exists.  But habeas counsel do not need to know with certainty that evidence exists to request it; rather, habeas counsel need only show that such evidence, if it exists, would support claims that demonstrate that Mr. Hager is entitled to relief.  *See Bracy*, 520 U.S. at 908-09.  If the fingerprint and autopsy evidence shows what habeas counsel believe it will show, it

would support Mr. Hager's claim that he is actually innocent of the Robinson murder and that Lucas and Parker are the responsible parties, and that trial counsel was ineffective for not pursuing that claim at trial.

Third, the government argues that habeas counsel wrongly assume that, even if this evidence does exist, trial counsel was ineffective for entering into the stipulation regarding the Robinson murder and that, had trial counsel challenged Mr. Hager's conviction, the jury would have reached a different conclusion about both Mr. Hager's role in the Robinson homicide and imposing the death penalty. But trial counsel's decision to stipulate to the Robinson killing instead of presenting evidence establishing Mr. Hager's innocence, and the effect of that decision, cannot be assessed in isolation. As discussed above and below, trial counsel's decision not to challenge the Robinson non-statutory aggravator was but one of several ways in which trial counsel's performance in responding to and rebutting the government's presentation of aggravating evidence was deficient. If trial counsel had presented the autopsy, fingerprint, and other evidence showing that Mr. Hager was not involved in Robinson's murder, *and* trial counsel had performed effectively by moving to exclude the government's evidence regarding Mr. Hager's involvement in the Cornell Coplin homicide, adequately cross-examining Anthony Fields, and adequately attacking the government's portrayal of the incidents at USP Pollock and Northern Neck Regional Jail, there is a reasonable probability that the jury would have declined to find the several non-statutory aggravating factors relating to those incidents and not returned a sentence of death. *See Elmore*, 661 F.3d at 868-71.

### F.    Discovery Concerning the Prison Altercations

Like many of its responses to Mr. Hager's other discovery requests, the government's response to the request for materials relating to the altercations at USP Pollock consists of a list of assumptions it claims that Court must make before it can grant the request. Resp. at 20-21.

33

But the government's convoluted list obscures the reason why this evidence is crucial and would likely have made a difference. The two incidents at USP Pollock, as well as the incident at Northern Neck Regional Jail, were the core of the government's claim that Mr. Hager should be put to death because he was a danger to others while incarcerated. The government's case was not that Mr. Hager was a mere participant in a few scuffles between inmates from different parts of the country, but rather that he was the instigator of three serious brawls and, even more crucially, that he had stabbed and seriously injured other inmates during those fights. Effectively rebutting these incidents was essential to persuading the jury to impose a life sentence.

For the reasons set forth in the Section 2255 Motion, however, trial counsel was ineffective in cross-examining the government's two key witnesses who testified about the USP Pollock altercations, Bruce Davidson and John Feeney. Section 2255 Motion, Claim II, ¶¶ 43-50. Trial counsel could and should have done more to undermine those witnesses' credibility. And one of the things they should have done is to request the materials that habeas counsel now seek. These materials – attachments to the DC-Memphis Report, drafts of that report, and video surveillance recordings that were used to prepare the DC-Memphis and DC-Alabama Reports – are all likely to contain evidence that would have directly undermined the government's future dangerousness case. Taken together, all of this material would have demonstrated that the testimony of these witnesses, and the government's portrayal of Mr. Hager's role in these incidents, was grossly exaggerated.

The government also urges the Court to deny Mr. Hager's request for information that could have been used to impeach Alphonso Satchell, who testified that Mr. Hager stabbed him with a pen while they were incarcerated at Northern Neck Regional Jail. The government argues that ███████████████████████████████████████████████, it would

have "waste[d] time and credibility" for trial counsel to attack Satchell's credibility.  Resp. at 22-23.  But, as discussed above, *supra* p. 21, counsel's personal belief that a witness is telling the truth does not "preclude vigorous cross-examination, even though defense counsel's cross-examination may cast doubt on the testimony."  American Bar Association, *Criminal Justice Standards for the Defense Function*, Standard 4-7.7.  Trial counsel were obligated to pursue Mr. Hager's objectives – to avoid a death sentence – by, first, seeking to discover the full scope of Satchell's cooperation with the government and his mental health history and use of prescription and other drugs, and, second, using that evidence to undermine his credibility and the reliability of his testimony.

The effect that trial counsel's use of the requested materials to effectively cross-examine Davidson, Feeney, and Satchell would have had on the jury's sentencing decision cannot be assessed in isolation.  Instead, it must be determined by looking at the other myriad ways in which trial counsel was ineffective in rebutting the government's future dangerousness case specifically, *see* Section 2255 Motion, Claim II ¶¶ 24-96, and the government's presentation of aggravating evidence generally, *id.*, Claim II.  When these errors are considered collectively, as they must be, there is plainly reason to believe that Mr. Hager may be able to demonstrate that he was prejudiced by trial counsel's multiple failures during this phase of the case.

### G.    Discovery Concerning Terrell Hager

Habeas counsel have shown good cause for granting the two categories of discovery they seek regarding Terrell Hager, Mr. Hager's brother, who trial counsel failed to call as a mitigation witness at the penalty phase of Mr. Hager's trial.  In its Response to the Section 2255 Motion, the government asserts that trial counsel were not ineffective for failing to call Terrell Hager to the stand on the ground that the government would have impeached him by cross-examining him about three incidents: (1) the murder of DeCarlos Bannister; (2) the shooting of an individual

knows as "Black;" and (3) the murder of Quan Harris.  Resp. to Section 2255 Motion at 145-47. Habeas counsel have not sought discovery regarding the Quan Harris murder, as there is no theory under which it would have been a permissible subject for cross examination of Terrell Hager at Mr. Hager's trial.  With respect to the other two incidents, habeas counsel have sought all available information in order to allow them to make a determination of whether there is any legitimate basis upon which cross examination of Terrell Hager about them could have been permitted.  If there is no such basis, then a decision to forego the presentation of Terrell Hager's testimony for fear of impeachment was unreasonable.

In its response to Mr. Hager's Proposed Discovery Plan, the government ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████.[6]    Resp.  at  23-24. However, these actions all occurred prior to the beginning of Mr. Hager's trial.  They could not, therefore, have been the basis for trial counsel's decision not to call Terrell Hager, for as late as their opening statement at the penalty phase, trial counsel planned on using him as the principal focus of their mitigation presentation.  *See* Section 2255 Motion at 169-70 (quoting trial counsel's promises to call Terrell as witness during penalty phase opening statement).

Instead, while the penalty phase was already underway, trial counsel changed course and decided not to call Terrell Hager because the government told them that it would impeach him. As noted, if there was in fact no legitimate basis upon which the government would have been allowed to cross examine on its proposed impeachment evidence, then a decision to forego the presentation of Terrell Hager's testimony for fear of impeachment was unreasonable.   The

---

[6] Habeas counsel note that the file that was provided to trial counsel by the government was heavily redacted. Habeas counsel's discovery requests are for unredacted documents.

requested discovery is necessary in order to allow habeas counsel to develop the facts necessary for resolution of this portion of Mr. Hager's penalty phase ineffective assistance claim.

**H.      Discovery Concerning Records from Third Parties Relevant to Claim III of the Section 2255 Motion**

In its Response, the government quotes at length from that portion of Mr. Hager's Proposed Discovery Plan where he sets forth some of the reasons why the standard of care for representing a defendant in a capital case includes the duty to conduct a thorough search for records that may shed light on the client, his psychosocial history and his family background. Resp. at 24-25. It is on the basis of these remarks that the government accuses habeas counsel of engaging in a "generalized fishing expedition lacking in specific allegations" on the basis of "the mere hope of discovering favorable evidence." Resp. at 25. However, the quoted remarks are not a description of the information habeas counsel seek to discover; rather, the carefully circumscribed list of documents sought is set forth in the Proposed Discovery Plan at pp. 29-30. This list is the antithesis of a generalized fishing expedition.

Habeas counsel have set forth precisely the records to which they seek access, the individuals to whom each set of records concern and their reasons to believe that the targeted agencies do in fact have the records sought. They seek access to a few specific criminal indices, in one of which counsel know there is a relevant record and in the others there is a strong basis to believe that there will be relevant records based upon their search of indices for adjoining years. Habeas counsel seek case files for criminal cases that they know exist, because they have reviewed indices and found case numbers of matters involving 14 members of Mr. Hager's family. It is plainly relevant to a thorough understanding of Mr. Hager's psychosocial history that individuals in his life and in the lives of those who raised him were charged with and convicted of crimes. In addition, many of the cases habeas counsel have identified involve not

only criminal conduct but charges related to alcohol abuse, and criminal files frequently contain information regarding mental illness and impairment. It is for these reasons that habeas counsel also seek access to MPD criminal history files for specified individuals known to have been involved with law enforcement in D.C.

Habeas counsel seek access to the files of three child support actions for which he has case numbers and therefore knows to exist. One of the cases was brought by the D.C. Department of Human Services against Mr. Hager's father for failing to support Mr. Hager and his brother, which is obviously significant. The other two involve similar matters brought against Mr. Hager's paternal uncle, with whom Mr. Hager spent a great deal of time as he was growing up.

Medical records are critically important to a mitigation investigation and so habeas counsel seek medical records for immediate family members of Mr. Hager who are known, or believed, to have been treated at D.C. General Hospital, from the agency that counsel has been informed has possession of the records. The same is true for school records. As noted in Mr. Hager's Proposed Discovery Plan, Mr. Hager's school records will contain information that is vital to the development of his claim of Intellectual Disability, as well as to the claim that trial counsel were ineffective in failing to present evidence of his cognitive impairments in mitigation. The school records of his family members will also contain information relevant to both claims. Intellectual Disability frequently has a genetic component and so evidence of impairment in family members is corroborative of the existence of the disability in the client. As set forth in the Section 2255 Motion, pp. 150-54, habeas counsel have a strong basis to believe that at least three of Mr. Hager's siblings have significant cognitive impairments. Mr. Hager has shown good cause for each category of the requested discovery.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court enter the proposed discovery order accompanying Mr. Hager's Proposed Discovery Plan.

Dated: April 21, 2017                    Respectfully submitted,


/s/ Blair G. Brown
Blair G. Brown (Va. Bar No. 29706)
ZUCKERMAN SPAEDER LLP
1800 M Street, NW, Suite 1000
Washington, DC 20036
(202) 778-1829 (telephone)
(202) 822-8106 (facsimile)
bbrown@zuckerman.com

*Counsel for Defendant Thomas Morocco Hager*


/s/ Julie Brain
Julie Brain
916 South 2nd Street
Philadelphia, PA  19147
(267) 639-0417 (telephone)
Juliebrain1@yahoo.com

*Counsel for Defendant Thomas Morocco Hager*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of April, 2017, I have caused a copy of this

**DEFENDANT'S REPLY TO THE RESPONSE OF THE UNITED STATES TO DEFENDANT'S PROPOSED DISCOVERY PLAN** to be served on the following by electronically filing it on the court's ECF system:

> James L. Trump
> Christopher Catizone
> United States Attorney's Office
> Eastern District of Virginia
> 2100 Jamieson Avenue
> Alexandria, VA 22314
> jim.trump@usdoj.gov
> christopher.catizone@usdoj.gov

> /s/ Blair G. Brown
> Blair G. Brown

40