# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:05-cr-264-LMB |
| | ) | |
| THOMAS MOROCCO HAGER, | ) | **UNDER SEAL** |
| | ) | |
| Defendant. | ) | |

**RESPONSE OF THE UNITED STATES TO
DEFENDANT'S MOTION UNDER 28 U.S.C. § 2255**

Respectfully submitted,

Dana J. Boente
United States Attorney

By:           /s/
_____
James L. Trump
Christopher Catizone
Eduardo F. Bruera
Assistant United States Attorneys
Eastern District of Virginia

The Justin W. Williams
        U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:        (703) 299-3700
Fax:          (703) 299-3980

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................... iv

Introduction.................................................................................................................................. 1

Legal Standard ............................................................................................................................ 3

Background .................................................................................................................................. 6

    I.       Procedural background. .............................................................................................. 6

    II.     Efforts undertaken by trial counsel. ......................................................................... 7

Argument .................................................................................................................................... 17

    I.       Trial counsel provided effective assistance during the guilt phase. ........................... 17

        A.  Hager cannot establish prejudice as a result of the guilt-phase errors he
             alleges. ................................................................................................................ 17

        B.  Trial counsel was not deficient in arguing that § 848(e)(1)(A) requires
             that the murder be committed during an ongoing drug transaction. ..................... 19

              1.  Trial counsel's guilt-phase legal theory was developed after
                  extensive research and discussion, and nearly prevailed on
                  direct appeal, earning a dissenting vote from a Fourth
                  Circuit judge................................................................................... 19

              2.  Trial counsel was not ineffective in advancing their § 848
                  argument during closing argument. ............................................... 23

              3.  Far from making a "devastating and wholly unnecessary
                  concession," trial counsel properly identified the focus of
                  their Rule 29 argument—a "concession" also made by the
                  dissenting court of appeals judge................................................ 25

        C.  Trial counsel provided effective representation in challenging the
             government's guilt-phase case. ............................................................................ 26

               1.  ████████████████████████████████ ....................................... 26

              2.  Trial counsel was not deficient for not attempting to present
                  an alternative theory based on Shenita King's and
                  Cassandra Robinson's supposed threats against Barbara
                  White............................................................................................ 29

3. Trial counsel were not inefficient for not seeking to undercut the government's theory of the offense, which was supported by overwhelming evidence ███████████ ███████████. .............................................................. 32

4. Trial counsel were not ineffective in challenging the government's witnesses. ............................................ 34

D. Trial counsel was not ineffective in declining to object to Paul White's testimony. ..................................................................... 54

II. Trial counsel provided effective assistance during the penalty phase. ...................... 55

A. Penalty phase procedural background. ...................................................... 56

1. Eligibility Phase ............................................................... 57

2. Selection Phase ................................................................ 58

B. Hager cannot establish prejudice at the penalty phase. ............................................. 62

C. Trial counsel provided effective assistance regarding aggravating evidence. ...................................................................... 65

1. Trial counsel effectively responded to aggravating evidence regarding prior homicides connected to Hager. ...................................... 65

2. Trial counsel effectively responded to aggravating evidence regarding Hager's violent activities in prison and his likelihood of future violence. .............................................. 75

3. Trial counsel effectively responded to the offense-related aggravating factors. ............................................... 103

D. Trial counsel provided effective assistance regarding mitigating evidence. ......................................................................113

1. Trial counsel presented essentially all of the evidence that habeas counsel now alleges "should have" been presented. ....................114

2. Trial counsel made a strategic decision not to present evidence regarding Hager's psychological condition or mental health. .......................................................... 133

3. Trial counsel wisely chose not to call Terrell Hager as a mitigation witness. ............................................... 145

4. Trial counsel effectively utilized what little evidence was available of Hager's relationship with his daughters. ........................... 147

5.  Trial counsel effectively responded to information regarding the murder of federal judge. ................................................... 151

6.  Trial counsel effectively responded to the government's victim impact testimony. ......................................................... 154

III.  Hager's claims of government misconduct are waived, procedurally barred, and meritless. ............................................................................. 155

IV.  Hager's intellectual disability claim is procedurally barred and meritless. .................................................................................................. 156

V.  An evidentiary hearing is unnecessary ................................................... 158

Conclusion ............................................................................................................. 159

## TABLE OF AUTHORITIES

**Cases**

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003).............................................................................. 9

*Atkins v. Virginia*, 536 U.S. 304 (2002) ............................................................................................ 161

*Bacon v. Lee*, 224 F.3d 470 (4th Cir. 2000) ........................................................................................ 9

*Bell v. Cone*, 535 U.S. 685 (2002) ............................................................................................... 19, 147

*Bell v. Thompson*, 545 U.S. 794 (2005) ........................................................................................... 148

*Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976) ................................................... 156

*Bousley v. United States*, 523 U.S. 614 (1998) ......................................................... 159, 160, 161

*Boyd v. Allen*, 592 F.3d 1274 (11th Cir. 2010) ............................................................................... 66

*Burger v. Kemp*, 483 U.S. 776 (1987)................................................................................................ 8

*Cagle v. Branker*, 520 F.3d 320 (4th Cir. 2008)...................................................................... 33, 37

*Caldwell v. Mississippi,* 472 U.S. 320 (1985).................................................................................. 59

*Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) ........................................................... 9

*Coleman v. Thompson*, 501 U.S. 722 (1991) ................................................................................. 161

*Cox v. Ayers*, 414 F. App'x 80 (9th Cir. 2011) ............................................................................. 163

*Drew v. Collins*, 964 F.2d 411 (5th Cir. 1992) ............................................................................. 160

*Dyer v. Calderon*, 122 F.3d 720 (9th Cir. 1997) ............................................................................ 78

*Earp v. Cullen*, 623 F.3d 1065 (9th Cir. 2010).............................................................................. 148

*Elmore v. Sinclair*, 799 F.3d 1238 (9th Cir. 2015) ................................................................. 146, 147

*Garland v. Maggio*, 717 F.2d 199 (5th Cir. 1983) .......................................................................... 5

*Gatti v. Cain*, 558 F. App'x 496 (5th Cir. 2014) ............................................................................ 91

*George v. Smith*, 586 F.3d 479 (7th Cir. 2009) .............................................................................. 53

*Gordon v. United States*, 518 F.3d 1291 (11th Cir. 2008)............................................................. 70

*Hamilton v. Workman*, 217 Fed. Appx. 805 (10th Cir. 2007) ..................................................... 148

*Harrington v. Richter*, 562 U.S. 86 (2011) .................................................... 4, 27, 57, 67

*Hedrick v. True*, 443 F.3d 342 (4th Cir. 2006) .............................................................. 8

*Hernandez Portillo v. United States*, 2014 WL 3615815 (E.D. Va. July 17, 2014).................... 159

*Herrera v. Collins*, 506 U.S. 390 (1993)....................................................................... 95

*Hinton v. Alabama*, 134 S. Ct. 1081 (2014)............................................................... 22

*Hooker v. Mullin*, 293 F.3d 1232 (10th Cir. 2002)........................................................ 77

*Hooks v. Branker*, 348 F. App'x 854 (4th Cir. 2009) .................................................... 47

*Hough v. Anderson*, 272 F.3d 878 (7th Cir. 2001) ...................................................... 45

*Humphries v. Ozmint*, 397 F.3d 206 (4th Cir. 2005) ............................................. 57, 158

*Hunt v. Nuth*, 57 F.3d 1327 (4th Cir. 1995).................................................................. 24

*In re Austen M.*, 2015 WL 2166516 (Conn. Super. Ct. Mar. 31, 2015) ...................................... 107

*In re Christopher S.*, 2013 WL 5436673 (Tenn. Ct. App. Sept. 27, 2013)................................. 107

*Jennings v. McDonough*, 490 F.3d 1230 (11th Cir. 2007) ............................................. 53

*Johnson v. Mississippi*, 486 U.S. 578 (1988)............................................................... 74

*Jones v. Estelle*, 632 F.2d 490 (5th Cir. 1980) .......................................................... 160

*Lamarca v. Sec'y, Dep't of Corrections*, 568 F.3d 929 (11th Cir. 2009)..................................... 36

*LeCroy v. United States*, 739 F.3d 1297 (11th Cir. 2014) .......................................... 147

*Lockhart v. Fretwell*, 506 U.S. 364 (1993) .................................................................. 6

*Mancuso v. Olivarez*, 292 F.3d 939 (9th Cir. 2002) ..................................................... 44

*Messer v. Kemp*, 760 F.2d 1080 (11th Cir. 1985)....................................................... 158

*Meyer v. Branker*, 506 F.3d 358 (4th Cir. 2007) .................................................. 5, 165

*Moore v. United States*, 934 F. Supp. 724 (E.D. Va. 1996)........................................... 57

*Nix v. Whiteside*, 475 U.S. 157 (1986) ........................................................................... 30

*Ortiz v. United States*, 664 F.3d 1151 (8th Cir. 2011) .................................................... 162

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ......................................................................... 148

*Purkey v. United States*, 729 F.3d 860 (8th Cir. 2013) .................................................... 163

*R.H. v. Texas Dep't of Family & Protective Servs.*,
  2013 WL 1281775 (Tex. App. Mar. 28, 2013) ............................................................. 108

*Ries v. Quarterman*, 522 F.3d 517 (5th Cir. 2008) ............................................................ 6

*Rodriguez v. Bush*, 842 F.3d 343 (4th Cir. 2016) ............................................................... 6

*Romero v. Quiroga*, 2013 WL 6158067 (D. Nev. Nov. 21, 2013) ................................... 108

*Rompilla v. Beard*, 545 U.S. 374 (2005) ......................................................................... 148

*Sawyer v. Whitley*, 505 U.S. 333 (1992) .................................................................... 96, 163

*Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010) ...................................................................... 57

*State v. Goff*, 297 Or. 635 (1984) ..................................................................................... 108

*State v. Riggs*, 2 S.W.3d 867 (Mo. Ct. App. 1999) .......................................................... 108

*Stokley v. Ryan*, 659 F.3d 802 (9th Cir. 2011) ................................................................ 148

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................................... passim

*Sully v. Ayers*, 725 F.3d 1057 (9th Cir. 2013) ................................................................... 47

*Taylor v. Culliver*, 2012 WL 4479151 (N.D. Ala. Sept. 26, 2012) .................................. 78

*Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998) .............................................................. 8

*Truesdale v. Moore*, 142 F.3d 749 (4th Cir. 1998) ............................................................ 29

*United States v. Arnold*, 126 F.3d 82 (2d Cir. 1997) ......................................................... 26

*United States v. Basham*, 789 F.3d 358 (4th Cir. 2015) ...................................................... 3

*United States v. Bell*, 5 F.3d 64 (4th Cir. 1993) ............................................................... 155

*United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014) .................................................. 163

*United States v. Chong*, 98 F. Supp. 2d 1110 (D. Haw. 1999) ....................................................... 73

*United States v. Conteh*, 234 F. App'x 374 (6th Cir. 2007) ........................................................ 52

*United States v. Dieguez*, 2015 WL 9310708 (4th Cir. Dec. 23, 2015) ........................................ 68

*United States v. Dyess*, 730 F.3d 354 (4th Cir. 2013) .......................................................... 156, 159

*United States v. Ellis*, 121 F.3d 908 (4th Cir. 1997) ......................................................................... 51

*United States v. Fields*, 483 F.3d 313 (5th Cir. 2007) .............................................................. 59, 70

*United States v. Hager*, 521 F. Supp. 2d 533 (E.D. Va. 2007) .................................................. 21, 23

*United States v. Hager*, 721 F.3d 167 (4th Cir. 2013) ......................................................... passim

*United States v. Harrison*, 716 F.2d 1050 (4th Cir. 1983) .......................................................... 25

*United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) ..................................................................... 85

*United States v. Johnson*, 617 F.3d 286 (4th Cir. 2010) ................................................................ 47

*United States v. Jones*, 287 F.3d 325 (5th Cir. 2002) .............................................................. 5, 160

*United States v. Jones*, 758 F.3d 579 (4th Cir. 2014) ................................................................... 162

*United States v. Kittrell*, 269 F. App'x 338 (4th Cir. 2008) ......................................................... 56

*United States v. Lee*, 2008 WL 4079315 (E.D. Ark. Aug. 28, 2008) ................................... 131, 132

*United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010) ................................................................. 157

*United States v. McCall*, 352 F. App'x 811 (4th Cir. 2009) ......................................................... 68

*United States v. McIntosh*, 2006 WL 293224 (M.D. Pa. Feb. 7, 2006) ....................................... 71

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) .......................................................... 56

*United States v. Mikalajunas*, 186 F.3d 490 (4th Cir. 1999) ............................................... 159, 160

*United States v. Molina-Uribe*, 429 F.3d 514 (5th Cir. 2005) ...................................................... 30

*United States v. Moore*, 703 F.3d 562 (D.C. Cir. 2012) ......................................................... 33, 49

*United States v. Rodriguez*, 2006 U.S. Dist. LEXIS 11230 (D.N.D. Feb. 28, 2006) ................... 73

vii

*United States v. Runyon*, 2017 WL 253963 (E.D. Va. Jan. 19, 2017) ................................. 145, 146

*United States v. Runyon*, 707 F.3d 475 (4th Cir. 2013) ......................................................... 59, 157

*United States v. Sablan*, 555 F. Supp. 2d 1177 (D. Colo. 2006) ..................................................... 73

*United States v. Thompson*, 130 F.3d 676 (5th Cir. 1997) ......................................................... 157

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) ......................................................... 21, 22, 23

*United States v. Watkins*, 486 F.3d 458 (8th Cir. 2007) .................................................................... 45

*United States v. West*, 877 F.2d 281 (4th Cir. 1989) ....................................................................... 157

*United States v. Wilson*, 115 F.3d 1185 (4th Cir. 1997) .................................................................. 68

*United States v. Wilson*, 484 F.3d 267 (4th Cir. 2007) ................................................................... 68

*Walker v. Kelly*, 593 F.3d 319 (4th Cir. 2010) ................................................................................ 162

*Waters v. Thomas*, 46 F.3d 1506 (11th Cir. 1995) ............................................................................ 8

*Wiggins v. Smith*, 539 U.S. 510 (2013) ....................................................................................... 8, 96

*Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2002) ................................................................... 148

*Wong v. Belmontes*, 558 U.S. 15 (2009) ................................................................................... 4, 66

*Wyatt v. City of Richland Police Dep't*, 2005 WL 3118123
(E.D. Wash. Nov. 22, 2005) ........................................................................................................ 71

*Yarborough v. Gentry*, 540 U.S. 1 (2003) ................................................................................. 4, 39

**Statutes**

18 U.S.C. § 3591 ................................................................................................................................ 55

21 U.S.C. § 841(b) ....................................................................................................................... 19, 20

21 U.S.C. § 848(e) ..................................................................................................................... passim

21 U.S.C. § 848(h) ............................................................................................................................ 55

21 U.S.C. § 848(j) ............................................................................................................................. 56

21 U.S.C. § 848(k) ............................................................................................................................ 56

viii

21 U.S.C. § 848(n) ..............................................................................................55, 56, 111, 112

21 U.S.C. § 859..............................................................................................................111, 112

28 U.S.C. § 2255(b) .............................................................................................................. 158

## Rules

Fed. R. Evid. 609 ............................................................................................................ 37, 68

Fed. R. Evid. 701 ................................................................................................................... 45

Fed. R. Evid. 801(c)............................................................................................................... 42

Fed. R. Evid. 803 ................................................................................................................... 42

**INTRODUCTION**

On January 24, 2006, John C. Kiyonaga and Joseph John McCarthy were appointed to represent Thomas Morocco Hager against charges that he had murdered Barbara White. By the time Hager's trial began in October, 2007, they had spent thousands of hours and hundreds of thousands of dollars working on the case; consulted with dozen of expert witnesses; emailed over legal strategy with death-penalty specialists; attended seminars and death-penalty-defense workshops; obtained hundreds of subpoenas seeking records from virtually every aspect of Hager's life; sent investigators searching after witnesses and information relating to Hager's family history, schooling, childhood, and years in prison; chased down Hager's uncooperative and at times hostile family to help build a mitigation case; and argued, strategized, and agonized with each other and with their client in deciding how to present his defense.

As they worked and learned about the case and their client, however, trial counsel saw what were always slim chances of gaining an acquittal or avoiding a death sentence narrow to virtual impossibilities.

First, there was the murder itself. The jury would learn (through the testimony of Hager's three accomplices, along with corroborating physical evidence and testimony from others who heard Hager speak about the killing before and after), that on the evening of November 29, 1993, Hager had driven his accomplices from Washington, D.C. to Northern Virginia to the home of Barbara White, a friend of Hager's girlfriend who had the misfortune of accidentally learning where Hager lived. Fearing that White would inform others of his whereabouts, Hager decided to kill her. He did so brutally and methodically: handing out gloves and masks to his crew, knocking on her door and pretending to pay a social visit as Barbara watched TV and fed her 13-month old daughter, and then suddenly smashing her jaw with a handgun and dragging to her bathtub, where she was essentially tortured to death, stabbed 82 times with dull steak knives. Upon leaving her

apartment, Hager took the phone off the hook, drew the blinds, and left the little girl alone with her mother's body. On the way back to Washington, D.C., Hager gloated about Barbara's screams: "Did you hear that bitch telling me about her daughter? . . . That bitch was trying to get me killed."

Those were just some of the facts supporting Hager's guilt, ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Naturally, then, trial counsel was not able to offer an alternative theory of how Barbara White was killed, and habeas counsel still does not do so today. Habeas counsel nonetheless raises numerous challenges to trial counsel's representation during the guilt phase, but they cannot establish deficient performance or prejudice given that it is undisputed that Hager committed the murder precisely as alleged by the government.

Second, as trial counsel developed their defense they learned that the chances of avoiding a death penalty were hardly better than of gaining an acquittal. Most critically, there was overwhelming evidence that Hager had murdered an innocent victim in senseless and brutal killing, disregarded a child's life in the process, and shown no remorse for his action. Trial counsel soon learned that Hager had been convicted for two other killings, ████████████████ ████████████████████████. Hager had been incarcerated since 1997 and racked up a slew of disciplinary violations, including possession of shanks, involvement in two prison brawls, and the stabbing of a fellow inmate in just the year before trial. In seeking to build a case in mitigation to set against Hager's terrible record and the viciousness of his offense, trial counsel ran into additional roadblocks. He had done little with his life aside from hustle crack cocaine. He had no substantive relationship with his daughters to speak of (the mother of one of Hager's daughters, when asked how the daughter would respond to Hager's execution, remarked that she would "get over it."). And trial counsel could not contend that Hager suffered from a mental defect or

2

psychological disorder; indeed, one of the several psychologists they consulted with on the case, after evaluating Hager, declared that he was ████████████████████████ ████████ [TC0036875]

Again, habeas counsel argue nonetheless that trial counsel provided ineffective assistance in connection with his death sentence. But Hager's death sentence, like his conviction, was not the result of bad lawyering, poor trial prep, lack of foresight, or poor strategic choices. The jury unanimously decided on death because that is what the evidence in this case called for. That evidence was too much for trial counsel to overcome, and it is too much for habeas counsel to overcome now. Hager's motion should be denied.

## LEGAL STANDARD

"[A] movant seeking collateral relief from his conviction or sentence through an ineffective assistance claim must show (1) that his counsel's performance was deficient and (2) that the deficiency prejudiced his defense." *United States v. Basham*, 789 F.3d 358, 371 (4th Cir. 2015) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

In this death penalty case, the jury first found Hager guilty beyond a reasonable doubt of killing Barbara White. The jury then, in a separate penalty phase, determined beyond a reasonable doubt that Hager was eligible for a death sentence and—after considering additional aggravating and mitigating evidence—decided to impose a death sentence. Hager now challenges his trial counsel's effectiveness both at the guilt phase and at the penalty phase.

The *Strickland* standard at the guilt stage is well-established. Trial counsel's performance was deficient if it "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland*, 466 U.S. at 688. There is a "strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (citation and internal quotation marks omitted). A defendant

3

cannot simply "second-guess" trial counsel "after [a] conviction or adverse sentence," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). Establishing prejudice at the guilt stage requires showing that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Put differently, the movant must make a "showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," *id.* at 687, given "the totality of the evidence before the judge or jury," *id.* at 695.

With respect to the sentencing phase, the standard for assessing deficient performance remains the same: "reasonable competence," *Yarborough*, 540 U.S. at 8, in light of "prevailing professional norms," *Strickland*, 466 U.S. at 688. The prejudice analysis for sentencing focuses on "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. "In evaluating that question, it is necessary to consider *all* the relevant evidence that the jury would have had before it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009). This means that a movant "must show a reasonable probability that the jury would have rejected a capital sentence after it weighed the entire body of mitigating evidence . . . against the entire body of aggravating evidence." *Id.* In "consider[ing] all the evidence—the good and the bad—when evaluating prejudice," the reviewing court can and should consider the "brutality" and "needless suffering" associated with the crime. *Id.* at 26–27 (citation and internal quotation marks omitted).

The government will make frequent reference to these general standards throughout this response. At the outset, it is important to highlight several well-established doctrinal points that should guide the Court's review of Hager's ineffectiveness claims.

**Strategic decisions are "virtually unchallengeable."** In the course of 205 pages of attacks on trial counsel's efforts in the guilt and penalty phases of Hager's trial, habeas counsel uses the words "strategy" or "strategic" only three times. That omission is understandable, because it is well established that "'[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)). As the Fourth Circuit has observed, "[i]t is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that 'strategic decisions made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Meyer v. Branker*, 506 F.3d 358, 371 (4th Cir. 2007) (quoting *Strickland*, 466 U.S. at 690).

**Investigations must be "reasonable in all the circumstances."** Hager's motion repeatedly alleges that trial counsel failed to "investigate" (alleged 19 times in the petition) and "develop" (alleged 24 times in the petition) evidence relating to his guilt and punishment. Under *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . . A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. *Strickland* itself recognizes that there will be times when "reasonable professional judgments support . . . limitations on investigation." *Id.* Courts conduct an objective review of counsel's performance, which includes a

context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time." *Strickland*, 466 U.S. at 688–89.

**Counsel is not ineffective for failing to press a meritless objection.** Habeas counsel alleges some 40 times that trial counsel failed to object at various stages in the guilt and penalty phase. But Hager cannot prove either deficient performance or prejudice unless, of course, an objection actually has merit. *See, e.g.*, *Ries v. Quarterman*, 522 F.3d 517, 530 (5th Cir. 2008) ("In order to show that counsel was deficient for failing to object under the first prong of *Strickland*, the objection must have merit."); *Rodriguez v. Bush*, 842 F.3d 343, 346 (4th Cir. 2016) ("A defendant is not prejudiced if his counsel fails to make an objection that is 'wholly meritless under current governing law.'" (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993)).

## BACKGROUND

### I.   Procedural background.

On January 12, 2006, a grand jury in the Eastern District of Virginia returned a superseding indictment against Hager. [Dkt 21][1] John Kiyonaga and Joseph McCarthy were appointed as Hager's trial counsel on January 24, 2006. [Dkt 22, 23] A second superseding indictment was returned on May 4, 2006. [Dkt 50] On May 30, 2006, the government filed a Notice of Intent to

---

[1] The government will cite court-filed pleadings with a bracketed reference to the docket number and page number (where applicable). This response also frequently cites to the Joint Appendix filed as part of Hager's Fourth Circuit direct appeal (which includes, among other things, the trial transcript), which will be referenced with a bracketed citation to "JA" and a page number. Cites to trial counsel's files will generally be indicated by "TC' and a page number. (These page numbers were assigned by habeas counsel when trial counsel's files were produced to the government.) The government will shortly file with the Court a single appendix containing all of these cited record sources.

Hager's § 2255 petition will be cited with bracketed references to "Pet. at" and a page number. Finally, habeas counsel produced an appendix of documents allegedly supporting the claims in Hager's § 2255 petition. Following the numbering assigned by habeas counsel, this appendix will be referenced as "APP" and a page number.

6

Seek a Sentence of Death. [Dkt 58] The Court initially set a trial date of April 2, 2007. [Dkt 61] Trial was rescheduled several times and ultimately set for October 1, 2007. [Dkt 232] After six days of voir dire, the jury was empaneled on October 11, 2007. [JA 40]

Hager's trial commenced on October 15, 2007. [JA 40] The government rested its guilt-phase case on October 16 and the jury returned a verdict of guilty on October 17. [JA 40–41] The eligibility phase occurred on October 22, and the jury returned a special verdict that day concluding that Hager was eligible for a death sentence. [JA 4142] The selection phase began on October 23, 2007. The government rested on October 24. [JA 42] Hager adduced evidence over three days. [JA 42] The government presented rebuttal evidence. [JA 42] Closing arguments were made on October 30. The jury deliberated on October 30, October 31, and November 1 before returning a special verdict of death on November 1. [JA 42–43]

Hager filed a notice of appeal on May 7, 2008. [JA 3032.] His 213-page opening brief was filed on August 3, 2012. *See United States v. Hager*, No. 08-0004, Dkt. 58. The court of appeals affirmed his conviction and sentence in all respects in a published opinion issued on June 20, 2013. *United States v. Hager*, 721 F.3d 167 (4th Cir. 2013).

## II.    Efforts undertaken by trial counsel.

As discussed above, trial counsel has a duty "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see Wiggins v. Smith*, 539 U.S. 510, 533 (2013). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. A showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *Burger v. Kemp*, 483 U.S. 776, 794 (1987). "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed

not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998) (citing *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995)).

The duty to investigate depends upon the facts known to the attorney. *Wiggins*, 539 U.S. at 527; *see Hedrick v. True*, 443 F.3d 342, 350 (4th Cir. 2006). The reasonableness of the investigation is determined by the information conveyed to counsel by his client, as well as other information in his possession, recognizing "the reality that lawyers do not enjoy the benefit of endless time, energy or financial resources." *Chandler v. United States*, 218 F.3d 1305, 1318 & n.22 (11th Cir. 2000) (internal quotation omitted). Where counsel did not know of facts that would alert him to the need to conduct a particular investigation, a failure to investigate does not amount to deficient performance. *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003); *see Bacon v. Lee*, 224 F.3d 470, 481 (4th Cir. 2000).

"Counsel's 'strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Gray*, 529 F.3d at 229 (quoting *Strickland*, 466 U.S. at 690–91).

In this case, the investigation conducted by Hager's trial counsel was more than just reasonable. This investigation was thorough and robust, encompassing both guilt- and penalty-phase evidentiary and legal issues. Trial counsel confronted a number of significant obstacles throughout the process: bad facts, reluctant witnesses (including members of Hager's family), missing records, and, often, an uncooperative, guilty client (to name only a few). Yet, despite these setbacks, trial counsel methodically pushed forward and, as a result, was able to present a well-organized, strategically sound, carefully orchestrated defense at trial.

8

Trial counsel were appointed by Judge Ellis on January 12, 2006, before Hager had been transported to this district for his arraignment. [TC0004548.] Soon thereafter, Mr. McCarthy started a running journal about his work on the case, including telephone calls, meetings, interviews, emails, and other case-related events, beginning on January 18, 2006, and ending on September 22, 2008. [*See* TC0004548–4851.] Trial counsel first met with their client on February 21, 2006, at the Alexandria jail.  [TC0004549–4550.] During that very first meeting, counsel began gathering information about Hager's family background and criminal history in anticipation of a potential capital prosecution. By early March 2006, counsel had already begun to review discovery and map out an investigative and trial defense plan, which included the following:

**Trial counsel conferred with prior defense counsel.** Trial counsel conferred with Richard Gilbert, who had represented Hager in three D.C. Superior Court trials. Trial counsel recognized the importance of Mr. Gilbert as a resource of information as well as someone whom their client trusted. Trial counsel obtained Gilbert's files, including police and investigative reports, transcripts of grand jury and trial testimony (including the prior testimony of witnesses who would most likely testify against Hager in this case), pleadings, briefs, and witness files. [TC0012173–2180.] Counsel learned, for example, in their first meeting with Mr. Gilbert that Hager had testified in the second Robinson murder trial and, according to Gilbert, "did not help himself." [TC0004581–4582.]

**Trial counsel retained expert witnesses.** In mid-March, even before a death notice had been filed, counsel began to contact potential expert witnesses, including experts for a possible capital sentencing hearing. Counsel identified the need for a number of expert witnesses. Beginning in March 2006, counsel began reaching out to potential expert witnesses and retained or consulted with the following: Neil Blumberg, M.D. (psychiatrist), David Williamson (forensic

9

psychologist), Richard Callery (pathologist), Barry Colvert (polygrapher), Hope Hill (psychologist/mitigation specialist), Mark Cunningham (forensic psychologist/future dangerousness), Harvey Cox (Bureau of Prisons), David Aultschuler (crime demographics/DOJ studies), Larry McCann (crime scene analysis), David Schretlen (neuropsychologist), Richard Restek, M.D. (neurologist/MRI); Richard Garland (former prisoner/future dangerousness); Ivan Futrell (fingerprints); Stephanie Harrison (D.C. juvenile facilities); Stephen Penrod (eyewitness identification); Michael Lieppe (eyewitness identification); William Cummings (Rule 35 process); and Les Roane (ballistics).

**Trial counsel hired an investigator and mitigation specialist.** Trial counsel hired Larry Bailey, a former police officer, as an investigator. Christine Penry was hired as a mitigation specialist. Bailey and Penry were utilized by trial counsel for conducting witness interviews and for obtaining records, documents, and other evidence. [*See, e.g.*, TC0066395–6447 (Penry reports); TC0065916–6092 (Bailey reports).]

**Trial counsel attended death-penalty seminars.** Trial counsel attended a number of criminal practice seminars in preparing for trial, including a criminal defense seminar in San Diego, CA in June 2006 [*see* TC0045867–5876; TC0045883–5886; TC0045887–5895; TC0048998]; a federal death penalty conference in San Antonio, TX, in November 2006 [*see* TC0012540; TC0012541–2543]; a jury selection conference in Richmond in May 2007 [*see* TC0004949]; and a Death Penalty College in Santa Clara, CA, in August 2007 [*see* TC0007583–7586; TC0012374–2407; TC0004979]. These conferences were educational; they also cultivated valuable communication on death penalty legal issues and trial strategy among capital defense counsel. Trial counsel remained in contact with and sought advice from legal experts and other defense counsel they met at these conferences.

10

**Trial counsel consulted with experienced death penalty legal experts.** Throughout the investigation and continuing through trial, Hager's trial counsel consulted with death penalty legal experts, including David Bruck[2] and Lisa Greenman.[3] David Bruck, a law professor at Washington and Lee University School of Law and director of the Virginia Capital Case Clearinghouse, is one of several Federal Death Penalty Resource Counsel, a position created as part of the Federal Death Penalty Resource Counsel Project.[4]  Project attorneys monitor all federal death penalty cases and assist trial counsel with legal research, pleadings, and jury instructions and with identifying and working with investigators, mitigation specialists, and expert witnesses.  Resource counsel are also available to discuss trial strategy and legal questions. In this case, Mr. Bruck provided trial counsel with a collection of CDs which included educational materials on a host of capital defense issues

---

[2] Bruck, according to his faculty webpage, "has represented capital defendants at trial in more than 20 cases, including *State v. Susan Smith* (1995), in which he and co-counsel Judy Clarke obtained a life sentence after their client was convicted of drowning her two small children." *See* https://law2.wlu.edu/faculty/ profiledetail.asp?id=143 (last visited Mar. 7, 2017). Bruck "has spent decades crafting legal strategies to keep people out of the country's execution chambers. He has argued before the United States Supreme Court on seven occasions, winning six times. He has frustrated prosecutors, challenged judges and softened grim-faced juries." Alan Blinder, *A Top Defender, Sidelined by the Accused in the Charleston Church Massacre*, N.Y. Times, https://www.nytimes.com/2016/12/13/us/dylann-roof-trial-charleston.html?_r=0 (last visited Mar. 7, 2017).

[3] Greenman's work "involves death penalty defense, where she focuses on sentencing issues. She is a frequent presenter on mental health topics at death penalty training programs around the country and a co-author of the Practitioner's Guide to Representing Individuals with Intellectual Disability." *See* https://www.capdefnet.org/FDPRC/pubContent.aspx?id=5962 (last visited Mar. 7, 2017).

[4] Established in early 1992 by the Administrative Office of the United States Courts, the Federal Death Penalty Resource Counsel Project is comprised of veteran capital defense attorneys. Created for the benefit of court-appointed CJA panel attorneys, federal defenders, and the judiciary, the Project serves as a national clearinghouse for information which might be helpful to defense counsel appointed in federal capital cases. *See* https://www.capdefnet.org/FDPRC.

11

as well as legal research materials and sample briefs and pleadings from other federal death penalty cases. Ms. Greenman is also an attorney with the Federal Death Penalty Resource Counsel Project.

Trial counsel remained in close contact with Mr. Bruck and Ms. Greenman from June 2006 through the end of trial counsel's involvement in the case. Trial counsel regularly consulted with them on guilt and penalty phase legal issues, pleadings, mental health evidence, the scope and progress of the mitigation investigation, jury selection and voir dire, jury instructions, and argument; and they, in turn, provided trial counsel with tactical and legal advice and with materials to assist trial counsel in their trial preparation. [*See, e.g.*, TC0004593 (Bruck memorandum regarding 21 U.S.C. § 848(e); TC0004623 (meeting with Bruck regarding Rule 12.2, trial subpoenas, and other topics); TC0007507 (Greenman mitigation checklist); TC0004708–4711 (meeting with Bruck and Greenman covering all outstanding issues); TC0012183–2185 (Feb. 2007 email exchange with Bruck regarding death penalty procedures), TC0012305 (Jan. 2007 email exchange with Bruck re death penalty procedures); TC0012459–2460 (Mar. 2007 email exchange with Bruck regarding speedy trial issues); TC0012461 (July 2006 email exchange with Bruck regarding repealed § 848 procedures); TC0012523–2524 (Dec. 2006 email exchange with Bruck regarding trifurcation procedures and instructions); TC0017263–7264 (July 2007 email exchange with Bruck and Greenman re records); TC0017333–7334 (email exchange with Bruck and Greenman regarding mitigation data).] These are only a few of the dozens of documented communications between trial counsel and resource counsel. Simply put, trial counsel did not make any significant strategic decisions without consulting with them.

**Trial counsel sought and obtained records and documents relating to both guilt and penalty phase issues.** Trial counsel recognized the need to obtain records to tell their client's life story—his residences, education, criminal history, juvenile detention, health and medical care, etc.,

12

as well as the same for his parents and siblings. Trial counsel obtained a number of trial subpoenas for records. [*See, e.g.*, Dkt 74 (Def.'s Ex Parte Motion for Issuance of Subpoenas Duces Tecum, filed Sept. 27, 2006); Dkt 114 (Ex Parte and Under Seal Memorandum Opinion, Nov. 22, 2006); TC0007609–8159 (summary of subpoenas and subpoenas sought); TC0049993–50002 (summary of subpoenas sought and obtained).]. Releases were obtained from Hager and family members, after considerable efforts, for medical records. [*See, e.g.*, TC0011957–1961 (Penry draft affidavit detailing difficulties interviewing potential witnesses, obtaining records, and getting releases from family members).] Some records were destroyed, lost or missing. [TC0012083 (June 2007 email McCarthy to Greenman); TC0012089–2090 (Aug. 2007 email exchange between Penry and McCarthy re missing court records); TC0016585 (June 2007 email from McCarthy noting that Hager's hospital birth records had been destroyed); TC0017300 (Aug. 2007 email from Penry listing 26 sources where Hager family records requested).]. In some instances, investigators had to hand-search voluminous records in storage.  [*See, e.g.*, TC0016371 (Dec. 2006 memo from defense investigators noting they spent several hours going through boxes looking for Hager records in a "small dust-filled room full of broken glass and old boxes").] Some records were obtained and analyzed through assistance obtained through Bruck and Greenway from the D.C. Public Defender Service, who assigned four interns to these efforts [TC0016412; TC0004752–4753 ("Each of the students will take a sibling to research what paper trail is available for them.").] Detailed memoranda were prepared summarizing these records and related research. [*See* TC0004505–4517 (memo re Hager Juvenile Records); TC0004518–4522 (memo re conditions at Oak Hill and Cedar Knoll juvenile facilities from 1989–1993); TC0004523–31 (memo re Hager's housing history).] Trial counsel similarly solicited and obtained legal assistance from pro bono attorneys working with major Washington law firms. [*See, e.g.*, TC0070320–0334 (memorandum

13

regarding 21 U.S.C. § 848(e)); TC0012469–2474 (memorandum from Virginia Capital Case Clearinghouse regarding 5th Amendment warnings for witnesses).]  Trial counsel kept careful track of outstanding document requests and created to-do list for collecting these materials. [TC0017611–7614.] Trial counsel also reached out to Hager's counsel during juvenile adjudications to obtain those records. [TC0017508.] Trial counsel made repeated inquiries to agencies and the courts to obtain necessary documents and records.  [TC0004730.]

**Trial counsel directed their investigator to search local courthouses for records relating to potential witnesses.**  [*See, e.g.*, TC0017277; TC0017122–7133; TC0065930–5931; TC0065949–5950; TC0065981–66036.]

**Trial counsel directed their investigators to search commercial databases for information about possible witnesses.**  [*See, e.g.*, TC007286–7293.]

**Trial counsel, their investigator and mitigation specialist, and mental health and other experts interviewed Hager's family members and friends.** Trial counsel, Larry Bailey, Christine Penry, and several expert witnesses (including Cunningham, Williamson, Blumberg, and Hill) conducted dozens of interviews of Hager's family and friends. Most family members were interviewed on multiple occasions. They encountered numerous obstacles in arranging interviews and obtaining cooperation from Hager's family. For example, during her first meeting with Hager's mother, Christine Penry was told by Hager's sister, Tisha, that his mother has mental health and memory problems and is wither unwilling or unable to help. [TC004589.] During Hope Hill's first meeting with Hager's family, Dr. Hill encountered resistance from the family and a lack of understanding as to the nature of a capital trial.  [TC0012091; *see also* TC0011957–1960 (draft Penry affidavit); TC0016383 (Penry report that Hager's father failed to show up for an

14

interview).][5] In one email, Penry expressed frustration that "[w]orking with Hager's family is like working with squirrels. We slowly and carefully cultivate their trust and try to get closer to them, but any sudden moves and Poof! They're scared away. . . . [W]e all know that families like this have their own difficulties in life to deal with. . . . We want to make it as simple as possible for them." [TC0038455.]

**Trial counsel attempted to locate and interview potential witnesses from Hager's neighborhoods, including friends or acquaintances of government witnesses.** [*See. e.g.*, TC0017283; TC0016371–6372; TC0016378; TC0017211; TC0061324; TC0065918–5919; TC0065947.]

**Trial counsel attempted to locate and interview teachers, counselors, school principals, coaches.** [*See*, *e.g.*, TC0012086; TC0017280; TC0017497; TC007275; TC0016371–6372; TC0016403; TC0017318; TC0017646.]

**Conducted interviews and research regarding the Hager family various residences from the 1970s through the 1990s.** [*See, e.g.*, TC0017263–7264; TC0017324.]

---

[5] There is no single document in trial counsel's files which lists all of the interviews conducted by trial counsel and their investigators. Larry Bailey and Christine Penry prepared dozens of interview reports, which were made available to the government as part of habeas counsel's production. Trial counsel also maintained a number of different types of case summaries in which this information was memorialized. [*See*, *e.g*., TC0005267–5690 (trial counsel's Mitigation Outline); TC007511–5130 ("Cast of Characters – Persons"); TC0011121–1137 (same); TC0005370 (witness summaries); TC007271–7320 (Penry reports); TC0017382–7412 (Penry reports); TC0066395–6447 (Penry reports); TC0008331–8437 ("Hager- Defense Witnesses"); TC0008535–8760 ("Hager Witnesses"); TC0010169 (Defendant's List of Witnesses, Dkt. 302, filed September 24, 2007); TC0011114–1330) ("Case Report Book"); TC0017325–7328 ("Mitigation Overview" (6/19/07)); TC0018133-206 ("Questions").]

**Trial counsel, their investigator, and mitigation specialist interviewed prisoner witnesses and prison and jail officials regarding prison incidents.** [*See*, *e.g.*, TC0017329; TC0016368; TC0016369; TC0017224–7225.]

**Trial counsel summarized and reviewed interviews and prior testimony of potential government witnesses.** [*See*, *e.g.*, T0008192-289; TC008438-8534.]

**Trial counsel maintained frequent contact with their client.**[6]

Through requests for funding, requests for subpoenas, and other under seal and ex parte filings, the Court was regularly updated about trial counsel's pretrial and investigative efforts. On August 31, a little more than one month before jury selection was to begin, the Court issued an order denying trial counsel's fifth motion to continue the trial to permit additional time for trial counsel to prepare their mitigation case. [Dkt 274.] In doing so, the Court succinctly summarized trial counsel's "zealous[]"efforts to investigate Hager's background and prepare for trial over the eighteen months since they had been appointed:

> [T]o date, defense counsel, collectively, have spent more than 2,300 hours working on this case and have been paid close to $400,000.00 in approved compensation and expenses. *See* Attached Chart (summarizing the compensation paid to the appointed attorneys and experts to date). A total of sixteen additional experts have also been approved by the Court to assist the defense in this case, including a private investigator and not one, but two mitigation experts. The private investigator alone has already been compensated $47,229.25, representing nearly 650 hours devoted to this case. Likewise, one of the mitigation specialists has, to date, been paid a total of $37,836.65 for close to 500 hours spent assisting the defense with its mitigation case.

[Dkt 274 at 2 (footnote omitted).] Jury selection began on October 1, 2007.

---

[6] Vouchers prepared by trial counsel, their investigator, and their mitigation specialist documented their efforts and are included in the government's appendix.

16

## <u>ARGUMENT</u>

### I.    Trial counsel provided effective assistance during the guilt phase.

Hager makes three sets of arguments regarding the guilt phase of the trial: *first*, that trial counsel was ineffective in arguing that the murder of Barbara White lacked a sufficient connection to Hager's drug dealing to establish guilt under the statute of conviction, 21 U.S.C. § 848(e)(1)(A); *second*, that trial counsel's cross-examination of and response to various government witnesses was ineffective; and, *third*, that trial counsel was ineffective in failing to object to various pieces of background testimony from Paul White, the victim's father. None of these claims is persuasive. Trial counsel provided effective representation during the guilt phase. And, in any event, Hager cannot establish prejudice as a result of any of the errors he now alleges.

### A.    Hager cannot establish prejudice as a result of the guilt-phase errors he alleges.

The Fourth Circuit summarized the facts of the case:

> In November 1993, Hager was engaged in the sale and distribution of crack cocaine at Nelson Place, in the Southeast area of Washington, D.C. In October 1993, he shot and wounded Christopher Fletcher and Ric Pearson, two members of a drug gang from Ely Place, over a dispute about one of his guns. Ely Place is a few blocks from Nelson Place. After the shooting, Hager went into hiding, living with his then-girlfriend, Shenita King, in her apartment in Maryland.

> After the shooting, sometime in mid-November, White stopped by King's apartment. King did not allow White into the apartment, however, and did not tell her that Hager was there. Even so, Hager was very upset because no one was to know where he lived. White had previously dated and had a child with Williams Seals, a member of the Ely Place drug gang. Because Hager feared that White would tell others of his whereabouts, he decided that he would kill her.

> On November 29, 1993, Hager, King, Arlington Johnson, and Lonnie Barnett went to White's Alexandria, Virginia, apartment. When they arrived that evening, King knocked on White's patio door. White, who was feeding her thirteen-month-old baby daughter Alexis, invited them in.

Shortly after they arrived, White showed King and Hager Alexis's room. She then took a brief telephone call. Shortly after the call, Hager turned up the volume on the television, pulled out a gun, and hit White's face with enough force to break her jaw and knock out a tooth. He and Barnett then took White, crying and bleeding, down the hallway to her bedroom. Hager told Johnson to run some water in bathtub. All the while, King stayed in the living room with Alexis.

Throughout the ordeal, Hager repeatedly asked White whether she told her baby's father, Seals, where Hager lived. White insisted that she had not.

Hager sat White on the bed and instructed Barnett to find something with which to gag her. After he gagged her, he and Barnett walked her to the bathroom. Hager told her to get in the bathtub and then grabbed some hot curlers, plugged them in, and threw them into the water, attempting unsuccessfully to electrocute White. Next, he told Johnson and Barnett to go to the kitchen and retrieve some knives with which to stab White. They followed his instructions. All told, the three stabbed her over eighty times in her legs, chest, neck, face, hands, buttocks, and back. After some of the knives broke or bent, Hager instructed Johnson and Barnett to retrieve more knives.

At some point, Hager put White face down into the water and stood on top of her to make sure that she was dead. When Barnett insisted that they go, Hager "said that he couldn't leave because he could get the death penalty for it, and he wanted to make sure that she was dead."

After Hager was convinced that White was dead, he, King, Johnson, and Barnett proceeded out the door, but not before taking the telephone off of the hook and locking the door behind them, leaving Alexis alone in the apartment with her dead mother.

On their way back to the District, Hager counseled the others not to tell anyone about the murder and teased Barnett for being scared. He also mocked White's pleas for her life and her concern for Alexis. He later bragged that Johnson and Barnett "were soldiers now, and that [they] go hard."

*Hager*, 721 F.3d at 175–76.

Hager's trial counsel were "faced with the formidable task of a defending a client who had committed a horribly brutal and senseless crime" for which the government "had near conclusive proof of guilt on the murder charge[]." *Bell v. Cone*, 535 U.S. 685, 699 (2002). In its case, the

18

government called Hager's three accomplices to the murder of Barbara—Shenita King, Lonnie Barnett, and Arlington Johnson—all of whom were physically present at the murder and corroborated each other's testimony regarding the details of and motivation for Barbara's killing. Their testimony was also consistent with the physical evidence collected from the crime scene. Additionally, the government called Charles Johnson, who had conversations with Hager about Hager's plans to murder Barbara and to whom Hager later boasted about the murder after it was done, and Stanley Currie, who also confirmed that Hager had murdered Barbara over a dispute with a rival drug gang and heard Hager boast about the murder. In the face of this overwhelming evidence, trial counsel were unable to present any plausible alternative theory for the murder. Indeed, trial counsel knew, ████████████████████████████, that the Government was right: Hager had killed Barbara because he was concerned that she might reveal his location to rival drug dealers whom he had shot. Thus, while trial counsel were not deficient in representing Hager, for the reasons explained below, the overwhelming evidence against Hager also means that habeas counsel does not and cannot demonstrate that "there is a reasonable probability that, but for [trial] counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

**B.      Trial counsel was not deficient in arguing that § 848(e)(1)(A) requires that the murder be committed during an ongoing drug transaction.**

   *1.      Trial counsel's guilt-phase legal theory was developed after extensive research and discussion, and nearly prevailed on direct appeal, earning a dissenting vote from a Fourth Circuit judge.*

Hager was convicted under the third prong of 21 U.S.C. § 848(e)(1)(A), which provides:

> [A]ny person [1] engaging in or [2] working in furtherance of a continuing criminal enterprise, or [3] any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results . . . may be sentenced to death.

19

At the time of the trial, the law regarding the necessary connection between the murder and the associated § 841(b)(1)(A) offense had not been fully clarified. *See United States v. Tipton*, 90 F.3d 861, 887 (4th Cir. 1996) (holding that appealed instructions "sufficiently required proof of a substantive as well as temporal connection between [the murder and drug crime]," but noting that "the substantive connection [wa]s not as clearly expressed as it might be"). Trial counsel recognized this gap in the law shortly after being appointed to the case. [*See* TC0017695 (March 27, 2006 casebook entry: stating that "the theory of our defense" is that "[t]he government must prove only the direct relationship between the murder and the 841 violation," not an "indirect relationship").] Other avenues to defend the case had been foreclosed by the government's considerable evidence, ███████████████████████████████████████ [*see* TC0004567 (May 16, 2006 casebook entry: ██████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████ [*see, e.g.*, TC0004624 (December 6, 2006 memo to file: ████████████

████████████████████████████████████████████

███████]. Trial counsel therefore determined that challenging the link between the murder and Hager's drug dealing was the best strategy and argued in Hager's Rule 29 motion that a conviction under § 841(b)(1)(A) requires proof of a drug "event occurring that is accompanied by the killing"—for instance, "an actual hand-to-hand sale" [JA 1252–1253]—a burden which trial counsel argued the government could not meet. [Dkt 360 (Motion for Judgment of Acquittal).] While trial counsel's legal argument ultimately did not prevail before the district court, see *United States v. Hager*, 521 F. Supp. 2d 533, 535-36 (E.D. Va. 2007), or on direct appeal, where it was

raised by separate appellate counsel, *see Hager*, 721 F.3d at 179–83, it did with one Fourth Circuit judge, who dissented on appeal, see *Hager*, 721 F.3d at 213–14 (Wynn, J., dissenting).

Habeas counsel now argue [Pet. at 4–10] that trial counsel was ineffective in arguing for such a standard because "there was a substantial risk, if not certainty, that the Court would reject [this theory]" in light of the Fourth Circuit's decision in *Tipton*.

This argument fails on both the facts and the law. Trial counsel's selection of this strategy was not the result of "ignorance of a point of law" or "failure to perform research." *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014). Far from it. In March 2006, more than a year and half before the trial, trial counsel was already planning how to litigate and raise the § 848(e)(1)(A) issue. [*See, e.g.*, TC0017695–96 (entry in case book for March 27, 2006, stating that "the theory of our defense" is that "[t]he government must prove only the direct relationship between the murder and the 841 violation," not an "indirect relationship"); TC0011614-15 (May 23, 2006 checklist noting "our theory of a Rule 29 motion at trial that the defendant was not engaged at the time of the murder in violation 848"); TC0011609 (July 21, 2006 "To Do List" discussing § 848(e)(1)(A) issues).]

In the months that followed, trial counsel undertook significant research on the surrounding legal issues, including the relevance of *Tipton*, culminating in a 14-page legal memorandum on the strengths and weaknesses of this approach. [*See* TC12358-71 (July 27, 2006 memorandum analyzing "how close a relationship may exist between a murder and drug activity before a defendant can be convicted under 21 U.S.C. § 848(e)(1)(A)"); *see also* TC0011273-75 (July 16, 2007 casebook discussing § 848(e)(1)(A) theory); TC0007178–80, 7482 (undated research memorandum explaining theory and citing cases).] Trial counsel also consulted with death-penalty

21

defense experts to discuss the merits and limitations of proceeding this way. [*See* TC0012720–22 (March 2007 email exchange with Bruck); TC0012464 (similar request to Bruck for help).]

Contrary to habeas counsel's contentions, this was a viable approach to the case. Indeed, neither this Court nor the Fourth Circuit treated *Tipton* as foreclosing trial counsel's arguments on this point. Hager seizes on the Fourth Circuit's passing recognition that it was "bound" by *Tipton*. *Hager*, 721 F.3d at 180. But he disregards that both the district court and court of appeals instead understood *Tipton* as only "*implicitly* recogniz[ing] the applicability of [§ 848(e)(1)(A)] in a variety of circumstances not involving a contemporaneous drug trafficking act." *Hager*, 521 F. Supp. 2d at 536 n.3 (emphasis added); *Hager*, 721 F.3d at 180 (observing that *Tipton* only "indirectly" dealt with "intentional killing [that] did not occur contemporaneous to the drug trafficking activity"). As both Courts made clear, *Tipton* left open the ultimate question of "what sort of connection is required between the drug offense and the murder [under § 848(e)(1)(A)]." *Hager*, 721 F.3d at 180. Trial counsel's decision to focus their efforts on that open legal question in the face of overwhelming evidence against Hager was far from deficient performance, especially given the success of that argument in persuading a court of appeals judge. Nor was this decision ultimately prejudicial given the significant case against Hager. *See Strickland*, 466 U.S. at 694 (holding that establishing prejudice requires a "probability sufficient to undermine confidence in the outcome").[7]

---

[7] Habeas counsel also contend that trial counsel's decision to "lie in wait" with this theory until the Rule 29 motion was unreasonable. [Pet. at 7.] But trial counsel had weighed the pros and cons of this approach and were concerned with "[t]he danger" of "alert[ing] the government to our theory . . . that the defendant was not engaged at the time of the murder in violation of 841," which would have allowed the government to adduce more evidence on this point. [*See, e.g.*, TC0011614–15 (May 23, 2006 checklist).] As trial counsel noted during the trial, disclosing the theory prior to the Rule 29 hearing would have "telegraph[ed] concerns [trial counsel] had about the [Government's] evidence, that could [have] be[en] remedied" by the Government with advance

2. *Trial counsel was not ineffective in advancing their § 848 argument during closing argument.*

Habeas counsel also argue (at 7-8) that Hager was denied effective assistance when, during closing arguments, trial counsel stated that § 848(e)(1)(A) requires that the murder occur during "an event related to a violation of our narcotics laws" [JA 1315], triggering a government objection, and further argument on rebuttal from the government. [Pet. at 7–8.]

This argument fails under both prongs of *Strickland*. It was not deficient performance for trial counsel to focus on the jury's attention on the requirement that the murder and the drug conspiracy be connected in a "meaningful way" to Barbara White's murder [JA 1316], given the overwhelming evidence that Hager intentionally killed Barbara White. While pursuing that line of argument raised the risk that the prosecution might object, taking a calculated gamble does not constitute deficient performance. *See Hunt v. Nuth*, 57 F.3d 1327, 1332 (4th Cir. 1995) (holding that even decisions that are "uncommon and highly criticized by experts in trial advocacy," such as reserving an opening statement, are not ineffective if "such a decision is fundamentally tactical and within the range of reasonably competent representation" (citation and internal quotation marks omitted)); *Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

Nor was trial counsel's argument prejudicial. The government's objection to the argument was brief [*see* JA 1316], as was trial counsel's exchange with the Court [*see* JA 1316–1317]. The

---

notice. [JA 1255.] A lawyer's strategic decision to avoid tipping her or his hand is not deficient representation.

government did roundly criticize trial counsel on rebuttal,[8] but trial counsel objected to the government's criticism and, though the Court did not sustain this objection, the denial of trial court's objection occurred at a sidebar away from the jury, during which the Court commented that trial counsel's argument was "clever" and admonished the government to "avoid . . . any semblance of personal attack." [JA 1323–24.] From that point on, the government only once more briefly submitted that "[trial] counsel's characterization" of the law would "not [be] what the Court will instruct you" [JA 1324], and did not revisit the issue [*see* JA 1325–1328]. Whatever harm did remain from this exchange was cured when the Court instructed the jury: "you are to draw absolutely no inference against the side to whom an admonition of the Court may have been addressed during the trial of the case."[JA 1346.] *See United States v. Harrison*, 716 F.2d 1050, 1053 (4th Cir. 1983) (holding that that curative instructions "by the trial judge, combined with the fact that the prosecutor's comments were not used to bolster his case, but instead were provoked by defense counsel's vitriolic attack, leads us to the conclusion that the defendants' trial was not 'so fundamentally unfair as to deny [them] due process' " (citation and internal quotation marks omitted)). Put plainly, nothing in those exchanges was "so serious as to deprive the defendant of a fair trial [or] a trial whose result is reliable." *Strickland*, 466 U.S. at 687.

---

[8] Government counsel argued: "It's certainly ironic that Mr. McCarthy asked you to adhere to the law, because what he just told you about a drug conspiracy and its connection to this crime is not the law. That is not the instruction that you are going to get from the Court, and he knows it. And he knows that there was a ruling, right before we came out and argued this case, that contradicted exactly what he told you. He told you that at the time of this death, that you must find on that very day, that some sort of drug deal was going on. And that is not the law, and that is not what you are going to be instructed by the judge. And he knows it. It was a trick. It was a gimmick, to try to focus you—" [JA 1321.]

24

> 3.    *Far from making a "devastating and wholly unnecessary concession," trial counsel properly identified the focus of their Rule 29 argument—a "concession" also made by the dissenting court of appeals judge.*

Similarly, unavailing is habeas counsel's argument [Pet. at 8-10] that trial counsel was ineffective in stating during the Rule 29 hearing that the "killing, based on the evidence that the government has offered, certainly furthered drug trafficking, [Hager's] conspiracy." [JA 1254.] Habeas counsel contend that this statement was "devastating" because the court of appeals later referenced it in concluding that "Hager's trial counsel admitted that White's murder furthered Hager's drug conspiracy." *Hager*, 791 F.3d at 181–82.

But the decision to admit that the Government had presented evidence that Barbara's murder was drug related, but not enough to meet the standard of § 848(e)(1)(A), far from "devastating," was obvious. *See United States v. Arnold*, 126 F.3d 82, 89 (2d Cir. 1997) ("Trial counsel's 'intent defense' was appropriately directed at the most questionable aspect of the Government's case. Trial counsel's strategy to concede the other elements of the offense was reasonable in light of the overwhelming evidence in the case."). Indeed, the dissenting opinion in the Fourth Circuit made essentially the same "concession," noting that "[c]learly, any individual committing a substantive drug offense at the time of a murder would be 'engaging in' the drug offense for purposes of the statute." *Hager*, 721 F.3d at 212 (Wynn, J., dissenting). Trial counsel's "concession" also was not prejudicial. Habeas counsel identifies nothing that this statement changed at trial; only that the court of appeals relied on it after the panel rejected trial and appellate counsel's legal arguments on the nexus required by § 848(e)(1)(A). That does not suggest that it was "'reasonably likely'" that "the result would have been different" at trial. *Harrington*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696).

### C.      Trial counsel provided effective representation in challenging the government's guilt-phase case.

Habeas counsel next argue that trial counsel was ineffective in developing an alternative theory of the case and, relatedly, in cross-examining various government witnesses. [Pet. at 10–43.] Running through all of Hager's arguments on these issues are two basic problems. *First*, ████ ███████████████████████████████████████████████████████ ████████ necessarily limited the defense strategies that trial counsel could pursue. Combined with the overwhelming evidence against him, trial counsel knew that there was little mileage to be gained at trial by piecemeal attacks on government witnesses. *Second*, for each of the witnesses, trial counsel was aware that cross-examination on the issues currently raised by Hager would inevitably lead to government redirects tying Hager to still more violence and crimes. Given this dilemma, trial counsel made the reasonable decision to avoid implicating Hager in still more criminality.

*1.*      ████████████████████████████████████

Trial counsel's strategic options were sharply limited by ████████████████ ████████. For instance, trial counsel's notes from a December 6, 2006, interview with trial counsel state:





[TC0004624.] ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████ [*See, e.g.*, TC0011124 (casebook entry: ████████████

████████████████████████████████████████████

████████████████████████ ; TC0012511 (June 18, 2007 email from trial counsel: ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ ]9

████████████████████████████████████████████

████████████████████████████████████████████

---

9 As is described in greater detail below, ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[TC0004566–4567.] Counsel is not ineffective in electing "not to pursue futile claims." *Truesdale v. Moore*, 142 F.3d 749, 755 (4th Cir. 1998). To the contrary. Such "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

Additionally, trial counsel could not, consistent with their ethical obligations to the Court, put on testimony or pursue lines of defense that they knew to be false. To present an alternative theory of the case, as habeas counsel now propose, would almost certainly have required Hager to take the stand and ████████████████████████████████

████████████████████████████████████████████

████████████████████████. The Supreme Court has been unequivocal on this point: it is not ineffective assistance for defense counsel to decline to suborn a defendant's perjury. *See Nix v. Whiteside*, 475 U.S. 157, 161–62, 173–76 (1986). As the Fifth Circuit has explained, even when defense counsel "obviously ha[s] alternatives available to them"—which was not the case here— it is a sound strategy to pursue even a "bizarre conspiracy theory" when those alternative "theories would . . . arguably require[] [defense] counsel to suborn perjury." *United States v. Molina-Uribe*, 429 F.3d 514, 519-20 (5th Cir. 2005) ("Pursuing more conventional [defenses] would require putting [the defendant] on the stand. Counsel's concern about this was acute, because [the defendant] had been tested by a polygraph examiner, and his answers were deceptive, suggesting

28

any testimony based on self-defense or any other customary theory would constitute perjury.").

Thus, contrary to habeas counsel's current protestations, it was far from ineffective for trial counsel

to focus their attention on the nexus between the murder and Hager's drug dealing, rather than

alternatives which might have exposed Hager and trial counsel to needless and fruitless legal

risks.[10]

Further, trial counsel could rightly conclude that they were better of preserving their

credibility with the jury for the penalty phase rather than wasting it on far-fetched theories ███

███████████ (such as the theory, discussed below, that King orchestrated Barbara's

murder and persuaded Hager, her jealous former lover, to participate because of jealousy over

another old boyfriend). Given these considerations, it is clear that none of the alternative lines of

investigation that habeas counsel now propose would have been viable, and counsel was not

ineffective for not pursuing them.

> 2.    *Trial counsel was not deficient for not attempting to present an alternative theory based on Shenita King's and Cassandra Robinson's supposed threats against Barbara White.*

Habeas counsel first argue that trial counsel should have looked more into threats that

Shenita King and Cassandra Robinson made against Barbara White. [Pet. at 10–16.] Here, habeas

counsel apparently refer to early investigative notes indicating that approximately one week prior

to Barbara's murder, "Cindy Robinson and two other black females [one of whom was Shenita

King] came to White's apartment and threatened to kill White regarding an alleged affair White

was having with Robinson's boyfriend, Rodney [Ronthony Ward]." [APP-000011-12; *see* APP-

---

[10] Trial counsel also faced ongoing challenges in persuading Hager to assist them in preparing for cross-examining witness at trial. [*See* TC0045833 (August 2006 memo stating that Hager "would not give any information on [Ric Pearson, Chris Fletcher, Charles Johnson, and Stanley Curry, among others] to assist in cross examination . . . during trial").]

000016 ("White told [other individuals] that Robinson and King had just threatened her about her having an affair with Rodney.").] In essence, habeas counsel argue that trial counsel should have pursued an argument that King killed White—or, more bizarrely still, convinced Hager to kill White—out of jealousy.

But such a theory would have been futile and likely counterproductive. To begin with, ██ ████████████████████████████████████████████████████████████████████████████████. Moreover, there was little evidence to undermine the Government's strong case. Robinson consented to and passed a polygraph test on "whether or not Robinson murdered, or had direct knowledge of who murdered, White." APP-000018. And, in fact, Robinson had contacted law enforcement in 1995 to report that Shenita King had "stated [to Robinson] that her [King's] boyfriend, Tommy Hager, told her that he had killed Barbara White." [TC0065186] Robinson had little to offer Hager's defense.[11]

Thus, to build the defense habeas counsel now propose, trial counsel would have had to pursue the theory that King was able to persuade Hager—King's boyfriend and the father of her

---

[11] None of the other witness proposed by habeas counsel had any additional information. [*See* APP-000016 (Alexander Patton and Marcus Clinkscale: "Patton stated that Cassandra Robinson and Shenita King were leaving White's apartment as they were arriving and White told Patton and Clinkscale that Robinson and King had just threatened her about her having an affair with Rodney (Ranthany [sic] Ward)."); APP-000019 (Rodney Ward: "Ward admitted to having an affair with White after meeting her through Robinson and King. . . . Ward denied any involvement in White's murder or having any knowledge of it."); APP-000011-12 (Natasha Fultz: "Fultz stated that approximately one week prior to Thanksgiving, 1993[,] Cindy Robinson and two other black females came to White's apartment and threatened to kill White regarding an alleged affair White was having with Robinson's boyfriend, Rodney.").]

Ethical obligations—and basic human decency—also foreclosed offering such an outlandish theory, which habeas counsel hasten to note was supported by evidence that Ms. White "was very active sexually and had numerous boyfriends, all of them being African American," and that White "recently became pregnant and had an abortion" and did not know who the father was. [Pet. at 13–14.] Trial counsel was not ineffective for not presenting a half-baked theory for the purpose of tarring of an innocent murdered woman.

child—as well as Johnson and Barnett, to kill Barbara because of Barbara's relationship with Rodney Ward, an alleged, different boyfriend. That theory is not only implausible on its face, but it would have required trial counsel to cross-examine King on these issues and thus open the door for the government to question King regarding her relationship with Hager, who was brutal and abusive. Even a partial listing of Hager's brutal attacks on King—all of which trial counsel were aware of—is devastating:

- Hager shot King at one point in their relationship, leaving her with a long scar across her neck. Trial counsel ████████████████████ but were actively strategizing ways to keep it out until the Government indicated that it would not introduce it on direct examination. [*See* TC0005201 ████████████████████]

- In 1997, Hager kicked down the door to King's residence at around 3 AM, jealous that she had a male friend over. [TC0065066–5067.] He then proceeded to beat her with a gun in the head, face, and back and threatened to kill her. [TC0065068–5070.] Hager eventually left, but then proceeded to shoot out the windows and slash the tires of King's car. [TC0065070–5071.]

- Shortly after King started dating Hager in July 1993, she was grabbed, had her eyes duct taped, and was robbed. [APP-000091.] She suspected and heard that Hager and his brother had robbed her. [*Id.*]

- King testified before the grand jury that she was afraid of Hager, that he had both hit and assaulted her, and that he would have retaliated against her if he knew she had testified against him. [TC0065053–5054.][12] ████████████ [TC0045849.] [*See, e.g.*, TC00045850 (Apr. 28, 2006 letter from retained investigator: ████████████]

---

[12] ████████████████████ [TC0008498 ████████████████] That casts further doubt on the viability of pursuing habeas counsel's after-the-fact defense and would have provided further fodder for redirect.

31

Faced with these facts, trial counsel made the entirely reasonable judgment to avoid advancing an outlandish theory, ██████████████████████████████████, and risk a lacerating redirect. *See Cagle v. Branker*, 520 F.3d 320, 327-28 (4th Cir. 2008) (holding that the strategic decision not to "open the door to devastating rebuttal evidence" is not ineffective assistance).

> 3.      *Trial counsel were not inefficient for not seeking to undercut the government's theory of the offense, which was supported by overwhelming evidence* ██████████████████████████████.

Habeas counsel also complain, in a vague and unspecific way, that trial counsel should have done something more to undermine the government's theory that Hager killed Barbara White to prevent associates of Fletcher and Pearson, the two men Hager shot, from discovering his whereabouts. [Pet. at 16–18.] Such a "bare sketch of alleged errors" is insufficient to make out a claim of ineffective assistance. *United States v. Moore*, 703 F.3d 562, 574 (D.C. Cir. 2012). In any event, habeas counsel's claim is unsustainable.

To begin with, the precise degree to which there was a "dispute about territory" between Hager and others or how much Seals, the father of Barbara's child, viewed himself as an associate of Fletcher and Pearson—the issues habeas counsel focus on—were not essential questions to the government's case, as trial counsel understood. Trial counsel knew, as the government did, that

██████████████████████████████████████████████████████████

██████████████████████████████" [TC0004624 (trial counsel's notes).][13] (In this regard, the motive for the killing presented by the government at trial—that Hager killed Barbara White

---

[13] ████████████████████████████████████████████████████████ ██████ undermines habeas counsel's allegations that the government "concocted" the theory in order to "to exploit stereotypical images associated with wars between urban gangs of drug dealers." [Pet. at 16.]

because of her connection to Seals and because of Seals's connection with Fletcher and Pearson—

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████" [TC0004624.] Barbara White was an innocent victim who dropped by

to see her friend at the wrong place at the wrong time. But it could have been anyone.

More fundamentally, though, habeas counsel's contentions collapse under scrutiny. Habeas counsel suggest that trial counsel were ineffective in failing to establish that there was no real conflict between the drug gangs of Nelson Place (to which Hager belonged) and Ely Place (to which Fletcher and Pearson belonged) because they were separated by several city blocks, did not compete for customers, and rival gang members could frequent the same establishments without violence erupting. To begin with, even if the alleged calm between these rival gangs that habeas counsel describes had existed, Hager would obviously have been concerned that Fletcher and Pearson's shooting would shatter it. But this alleged calm is a present-day concoction. The investigative and pretrial evidence indicated that there were ongoing disputes between Hager's gang and Pearson and Fletcher. For instance, Seals told investigators that "[h]e had heard that there was some kind of a beef . . . between Chris Fletcher, Rick Pierson [sic], and the guys on Nelson Place" [TC0065139], and that "he knew Hager was the man . . . on Nelson Place" [TC0065140; *see* APP-000075 (Seals reporting that Hager "was the man out there [Nelson Place]")]. He clearly distinguished between these organizations and where they operated. [*See* APP-000075 ("Q. . . . [W]here are [Fletcher and Pearson] selling [drugs]? A. All on Ely Place, all on Ely. Q. Okay. And then this other group . . . where are they selling? A. They down the G and G area, like Nelson Place.").]

33

Habeas counsel also argue that trial counsel should have pressed the point that Seals was not really close with Fletcher and Pearson. But this is based on misreading the evidence. For instance, habeas counsel point out [Pet. at 17, quoting APP-000073]: "While in a liquor store in the Nelson Place neighborhood, some men asked Seals whether he intended to retaliate for the shooting. Seals denied that he would, stating 'I ain't worried about that' and 'I'm my own man.'" But it is entirely unsurprising that Seals, finding himself in that neighborhood, "confronted by several people from the Nelson Place Crew" who were "very suspicious" of him and wanted "to determine whether he was going to come back at Hager for that shooting," disavowed close ties with Fletcher and Pearson in that moment. [TC0065140-41.] In fact, when asked in the grand jury, outside the reach of rival gang members, whether he was close with Fletcher and Pearson, Seals states "I was close to all of them, yeah." [APP-000074.] And though habeas counsel are correct that Seals had "never met" Hager [Pet. at 17], that misses the point. Even if Hager and Seals had "never met," trial counsel well understood that the evidence clearly showed each certainly knew who the other was and their respective affiliations. [*See* APP-000074-75 (Seals confirming that he knew who Hager was and that "he was the man out there" on Nelson Place); TC0004624 ███

███████████████████████████████

███████████████.] Given those facts, it would have been fruitless for trial counsel to a pursue a defense that Hager was unconcerned with retaliation from the Ely Place gang in the wake of shooting Fletcher and Pearson. Trial counsel thus opted for the best strategy they had on the facts before them.

4.      *Trial counsel were not ineffective in challenging the government's witnesses.*

Habeas counsel also contend that trial counsel were ineffective in how they approached the government's witnesses. But, as explained below, the lines of inquiry habeas counsel suggest

34

would have exposed still more misdeeds by Hager on redirect. *See Lamarca v. Sec'y, Dep't of Corrections*, 568 F.3d 929, 937 (11th Cir. 2009) (observing that defense counsel could reasonably adopt a cross-examination strategy that would "avoid opening the door to potentially incriminating information that would not otherwise been admissible" (citation and internal quotation marks omitted)). Moreover, even if trial counsel could have raised minor discrepancies and credibility issues with the government's witnesses, those would not have undermined the prosecution's overwhelming evidence, so Hager was not prejudiced.

**Shenita King.** Habeas counsel assert that trial counsel was ineffective in cross-examining Shenita King on various issues. [Pet. at 18–20.] Each contention is unfounded.

Habeas counsel first argue that trial counsel should have cross-examined King regarding the alleged threats that she and Robinson made against Barbara White, as well as the government's theory that White's murder was connected to Hager's shooting of Fletcher and Pearson. [Pet. at 18–19.] As explained above, those arguments are unpersuasive.

Habeas counsel also argue that trial counsel were ineffective in failing to cross-examine King on the "massive incentives" she received from the government for testifying, including her immunity and payments for housing and moving. [Pet. at 18–19.] But habeas counsel refute their own argument by noting that the incentives "were intended to allow King to hide her location from Mr. Hager to ensure her safety." [Pet. at 19.] A cross-examination delving into King's arrangements with the government would have opened the door for a redirect focusing on the risks King faced for testifying against Hager, who had brutally abused her, and her possible participation in the witness protection program to mitigate these risks. [*See, e.g.*, APP-000084-85 (disclosure letter from the Government indicating that King was meeting to discuss the witness protection program, which she never entered).] It was not ineffective assistance for trial counsel to make the

35

reasonable decision not to "risk opening the door to further damaging evidence." *Cagle*, 520 F.3d at 328.[14]

**Charles Johnson.** Habeas counsel focus heavily on trial counsel's cross-examination of Charles Johnson (the cousin of Arlington Johnson, an accomplice to Barbara's murder, and the brother of Stanley Currie, another Government witness). Charles Johnson "sold drugs together" with Hager [JA 1027], and over several years also sold crack cocaine to Hager [JA 1028–29]. Johnson thus knew Hager, and Hager's drug dealing activities, very well. [*See, e.g.*, JA1029–31 (discussing Hager's drug-dealing gang).] Johnson testified at trial that, over the course of various conversations, Hager: admitted to shooting Fletcher and Pearson [JA1035], expressed concerns to Johnson about possible retaliation [JA 1036], told him that White had visited Hager and King's residence in Maryland [JA 1031], told him that he (Hager) was going to kill White [JA 1031, 1038]; and then admitted to killing White along with Arlington Johnson and Lonnie Barnett [JA 1039]. All of this testimony was corroborated by and consistent with the testimony of Hager's accomplices (Shenita King, Arlington Johnson, and Lonnie Barnett) and Stanley Currie, to whom Hager also confessed. Critically, Johnson's testimony ████████████████████████████

████████████[15]

---

[14] Habeas counsel also argue that trial counsel should have elicited that King, Johnson, and Barnett had visited Barbara's apartment, without Hager's knowledge, on earlier occasions to smoke marijuana. [Pet. at 20.] But that would only have indicated that King (along with Johnson and Barnett) knew Barbara prior to her murder, and King's testimony clearly established King and Barbara's relationship. [*See* JA1066.]

[15] Habeas counsel misstate the trial record in claiming that "Johnson's testimony, and *only* Johnson's testimony, allowed the government to erroneously argue that the homicide was cold-bloodedly planned by Hager in advance to occur in exactly the gruesome manner in which it later took place." [Pet. at 21.] Habeas counsel refers to Johnson's passing testimony that Hager said "he was going to use a knife instead of a gun . . . . [b]ecause the gun would be too loud." [JA 1038.] As discussed in greater detail below, this ignores the multitude of other evidence of Hager's planning and premeditation, including (to take just a few examples) Shenita King's testimony that

Habeas counsel first assert that trial counsel were ineffective in failing to impeach Johnson with his prior convictions for felony malicious wounding in 1998, and misdemeanor obstruction of justice in 2007. [Pet. at 23.] Even before cross-examination, Johnson had admitted to being a crack dealer who carried a gun in case of "problems with other dealers" [*see* JA 1022–25; 1032], and that he had agreed to plead guilty to a conspiracy to commit murder in connection with the murder of Calvin Spriggs [JA 1021]. Trial counsel then further impeached Johnson regarding his plea agreement to a conspiracy to commit murder [*see* JA 1053], along with his involvement in the "1992 killing of William Roberts" [JA 1055]; a "non-fatal shooting by [Johnson]" [JA 1056]; and a double-homicide in which charges against Johnson were dismissed [JA 1056]. Trial counsel's decision to focus the jury on Johnson's involvement in multiple homicides and shootings rather than a lesser, decade-old felony charge[16] and a more recent misdemeanor was an entirely reasonable choice. As the Supreme Court has explained, "[t]here is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Harrington*, 561 U.S. 86, 110 (2011) (quoting *Yarborough*, 540 U.S. at 8). In any event, trial counsel's decision not to raise these prior convictions was not prejudicial to Hager given the

---

Hager told her the day of Barbara's murder "we were about to get at Barbara" and distributed "[s]ki masks and gloves" [JA 1079] and Arlington Johnson's testimony that Hager "ultimately decide[d] to do something about Barbara White" and that when they arrived to kill Barbara, Hager "gave [them] gloves," so that Johnson "knew something was going to happen" [JA 1140–41].

Habeas counsel also claim, without citation or support, that Hager was somehow prejudiced by Johnson's testimony that, after the murder, Hager stated that Arlington Johnson and Barnett "go hard now." [JA 1039.] In fact, this evidence supported the government's argument that Hager used the murder as an opportunity to bind Arlington Johnson and Lonnie Barnett closer to him and his drug dealing operation. [*See* JA 1326.]

[16] Indeed, given the age of the malicious wounding conviction and the fact that Johnson had only served two years for it, it was presumptively inadmissible under Fed. R. Evid. 609.

ample impeachment that was carried out, the consistency of Johnson's testimony with other witnesses, and the overwhelming evidence against Hager.

Habeas counsel next argue at length that trial counsel failed to impeach Johnson sufficiently on his motives to cooperate with the Government. [Pet. at 21–33.] But this argument simply denies the reality of what happened at trial. Direct examination alone established that Johnson was at significant legal risk—he was an armed crack dealer who had agreed to plead guilty to a conspiracy to commit murder—and that his cooperation had benefited him by ensuring that he would face only "up to five years" on the conspiracy to murder charge. [JA 1022; 1032; 1053.] Cross-examination built on these admissions, with trial counsel beginning by strongly reemphasizing that Johnson's plea agreement secured him a five-year sentence for murder conspiracy. [JA 1053–54.] Trial counsel then elicited that Johnson, a career drug dealer, would "not be charged with any violation of Federal or D.C. narcotics laws committed prior to the date of the agreement." [JA 1054–55.] Trial counsel next elicited that "the Government would not charge [Johnson] with any offense arising out of the September 18, 1992 killing of William Roberts . . . about which [Johnson], ha[d] provided the Government with information." [JA 1055.] Trial counsel followed with an elicitation that "the Government w[ould] not charge [Johnson] in connection with an incident that occurred in the 2900 block of Nelson Place Southeast in 1993 involving a non-fatal shooting by [Johnson] and Samuel Howarton . . . about which [Johnson] had provided information," allowing Johnson to "avoid prosecution on that act of violence." [JA 1055.] Trial counsel additionally had Johnson admit that the Government had agreed not to bring back charges in connection with a double homicide "in which another individual pled guilty to the[] crimes." [JA 1056.] Finally, trial counsel elicited that "the Government w[ould] not prosecute [Johnson] for any other charges relating to the incident that resulted in the death of Calvin

38

Spriggs." [JA 1056.] Trial counsel then elicited that despite Johnson's criminal activity—the involvement in killing, shootings, and drug dealing—Johnson was "looking at only a maximum of five years" if he cooperated with the Government. [JA 1056–57.] The Government focused its brief redirect on the fact that Johnson himself had not pulled the trigger in any of the shootings [JA 1063–64], but did not otherwise discuss Johnson's liability for these various offenses.

In other words, habeas counsel's complaints that trial counsel was ineffective on this point simply do not square with the pages and pages of trial transcript highlighting Johnson's liability for violent crime and the fact that his cooperation had secured him no more than a five-year sentence. Habeas counsel describe some of the underlying facts of these various offenses, but does not explain why eliciting these details would have further undermined Johnson's credibility, especially given that some of them paint Johnson's involvement more favorably than the shorter descriptions in the plea agreement; for instance, that Johnson was shot during one of the incidents. [JA 1064 (Johnson redirect).] Habeas counsel also suggest that trial counsel could have impeached Johnson with charges related to possession of marijuana and a stolen gun. [Pet. at 25–26.] But trial counsel was well within the boundaries of competent representation in deciding to avoid these lesser offenses and focus the jury on Johnson's pattern of violence and drug dealing. *See Harrington*, 561 U.S. at 110. Habeas counsel therefore identifies nothing in trial counsel's tactical choices that would constitute deficient performance and, moreover, fails to show that inquiring into these issues would have resulted in a reasonable probability of a different result at trial.[17]

---

[17] Habeas counsel argue [Pet. at 32] that Johnson could have been prosecuted as an accessory after the fact to Barbara's murder based on two statements from Shenita King that Johnson helped Hager dispose of bloody clothes. [*See also* APP-000099 (Apr. 7, 2004 police notes); APP-00040454 ("King stated that Charlie Johnson accompanied Hager as he was disposing of the clothes in the woods near their apartment in MD.").] But Johnson denied those claims [*see* APP-000406], and King did not mention them in her grand jury testimony [*see* TC0065028–5059], or trial testimony

Habeas counsel also argue that trial counsel failed to properly cross-examine Johnson regarding pre-trial statements. [Pet. at 33–34.] At trial, Johnson testified that Hager said he was going to use a knife to kill Barbara because a gun would be too loud given that she lived across the street from a movie theater. [*See* JA1038.] Habeas counsel observe that Johnson did not mention this conversation in an early interview with the government [*see* APP-000209-11 (May 20, 1998)], and that various pre-trial accounts contained differences [*see* APP-000415 (report from June 3, 1997 interview: "Hager stated [to Johnson] that they had stabbed White with knives from White's kitchen because they were afraid to carry a gun in Va."); APP-000409 (Jan. 7, 1999 police report: "JOHNSON stated that he knew after the fact that knives were used in killing BARBARA WHITE because of the number of police officers that are typically in the neighborhoods around multi-plex[es]."); APP-000445 (Aug. 5, 1999 grand jury testimony: "I [Johnson] told him [Hager] that he was crazy [to shoot Barbara] because the police be right across the street at the multiplex."); APP-000486 (June 9, 2005 grand jury testimony of Detective Robert Murphy: "Johnson gave him advice that you don't want to go into Virginia with guns, it makes too much noise, there's too much of a penalty in Virginia for this, there are too many police."); APP-000420 (Aug. 20, 2007 police notes: "Charlie told him [Hager] not to use a gun – VA police would catch him.")]. The differences among these statements are minor. Whether Hager decided to use knives because he was concerned about the moviegoers or the police, or whether it was Hager or Johnson who originally had the idea to eschew guns, is ultimately immaterial to the overarching point, consistent with the testimony of other witnesses, that Hager plotted to kill Barbara because he did not want

---

[*see* JA 1065–99]. In any event, Johnson's involvement or not in Barbara White's murder would not have significantly impacted Johnson's credibility, given the consistency of his testimony with that of other witnesses. And, of course, trial counsel had good reason to avoid eliciting testimony that corroborated Hager's guilt.

40

individuals associated with Fletcher and Pearson tracking him down. It was not deficient performance for trial counsel to avoid creating opportunities for the government to elicit that Johnson had been consistent on this key point for years. Nor can Hager claim any prejudice given that other witnesses corroborated this same point.

Habeas counsel also contend that trial counsel should have cross-examined Johnson regarding earlier statements that an individual called Frank Moses was present in his conversations with Hager (Arlington Johnson and Lonnie Barnett were also present). [Pet. at 34.] Habeas counsel rely on two passing references for this claim. One reference indicated that Hager "assembled a group consisting of [Hager and his accomplices] to kill White" and that "[p]resent at this time also were Charles Johnson, Frank Moses, [and various others]." [APP-000210.] The second reference, in handwritten police notes, cursorily states that when Hager told Johnson about the killing shortly after the fact, "Frank Moses there – heard conversation." [APP-000499.] At trial, Johnson testified that he talked with Hager about the murder beforehand—not mentioning whether others were present—and after—when he stated that Arlington Johnson and Lonnie Barnett were with Hager. [JA 1037–39.] Cross-examining Johnson on whether Frank Moses was present at these conversations would have changed nothing. Johnson never testified that no one else was present for the pre-murder conversations with Hager, and he only testified that Arlington Johnson and Barnett were with Hager at the post-murder conversation. [*See* JA 1038 ("Q. Was he [Hager] with anyone? A. With Junior [Barnett] and Junie [Arlington Johnson].").] Trial counsel were not ineffective in declining to elicit the irrelevant fact of whether Moses was at a particular conversation or not, and habeas counsel do not and cannot establish prejudice.

Habeas counsel further contend that trial counsel should have cross-examined Johnson on several alleged inconsistencies. [Pet. at 34–35.] None of these claims establish deficient

41

performance or prejudice. As noted above, Johnson testified that Hager indicated that he was going to use a knife, rather than a gun, to kill Barbara because she "lived across the street from [a] multiplex." [JA1038.] Hager complains that trial counsel should have elicited that the nearest movie theater was two miles away, out of hearing range for a gunshot. Hager, however, never explains what difference eliciting this fact would have made. Whether or not Hager and Johnson were sure about the location of the movie theater, Hager still told Johnson that "he was going to kill [Barbara]" because he believed that "Barbara would tell Wee-Wee where [Hager] lived." [JA 1037.] It was immaterial if Hager and Johnson were misinformed about the precise location of the nearest movie theater.

Likewise unpersuasive is the claim that trial counsel should have elicited that Charles Johnson stated in investigative interviews that Arlington Johnson talked to him about the murder after it occurred [*see, e.g.*, APP-000211], in contradiction to Arlington's testimony that he (Arlington) did not talk about the murder afterwards [*see* JA 1159]. But that would have proven irrelevant at trial. Johnson never testified that Arlington talked to him about the murder, only that Hager did. And on that point, Arlington testified that Hager and Johnson did discuss the murder. [*See* JA 1160.]

Habeas counsel next argue that trial counsel should have objected to Johnson's testimony that he had "heard" that Wee Wee Seals acted as a "hit man" for Chris Fletcher and Rick Pearson [JA 1037], contending that this statement was inadmissible hearsay. [Pet. at 35–36.] But this testimony was not offered "to prove the truth of the matter asserted in the statement," Fed. R. Evid. 801(c)(2), that is, that Seals actually was a hit man for Fletcher and Pearson. Instead, it was offered to establish that there was at least some perception around Nelson Place that Seals had such a

42

relationship with Fletcher and Pearson. *See* Fed. R. Evid. 803(21). Trial counsel did not err in declining to object to this admissible testimony and Hager was not prejudiced by its admission.

Habeas counsel are also wrong when they claim that Seals "had no such relationship with Fletcher or Pearson [as a hit man] and would have so testified had defense counsel inquired." [Pet. at 35.] Habeas counsel support this point by simply citing to their earlier, incorrect claim that Seals was not close with Fletcher or Pearson. [*See, e.g.*, APP-000074 ("I [Seals] was close to all of them [Fletcher and Pearson], yeah.").] In any event, whether or not Seals was a "hit man" or just a friend was ultimately not relevant to the trial. The point, echoed by numerous other witnesses, and consistent with what trial counsel knew to be the truth, was that Hager was concerned that Seals would retaliate for the Fletcher/Pearson shooting. [*See* JA1036.]

Ultimately, habeas counsel argue that trial counsel should have cross-examined Johnson differently. That one lawyer might approach a witness differently than another is not a valid basis for an ineffectiveness claim. *See, e.g.*, *Mancuso v. Olivarez*, 292 F.3d 939, 955 (9th Cir. 2002) ("[The habeas petitioner]'s suggestions regarding how defense counsel might have handled . . . cross-examination differently are insufficient to support an ineffective assistance of counsel claim."); *Hough v. Anderson*, 272 F.3d 878, 896 (7th Cir. 2001) ("We cannot conclude that the performance of Mr. Hough's counsel falls outside the wide range of constitutionally permissible decisions. . . . Other attorneys may have taken a more aggressive approach to keeping out the information; another approach may have, in the end, been more efficacious. Counsel's approach, however, was not unreasonable."); *United States v. Watkins*, 486 F.3d 458, 466 (8th Cir. 2007) ("As the district court noted, 'it is very difficult to show the trial outcome would have been different had specific questions been asked on cross examination,' particularly where other trial testimony repeatedly corroborated the testimony of these two witnesses. 'In hindsight, there are

few, if any, cross-examinations that could not be improved upon. If that were the standard of constitutional effectiveness, few would be the counsel whose performance would pass muster.'"), *vacated on other grounds*, 128 S. Ct. 906 (2008).

**Stanley Currie.** Habeas counsel also challenge trial counsel's decisions with respect to Stanley Currie. [Pet. at 36–39.] Currie, a relative of Arlington and Charles Johnson, knew about Hager's drug dealing activities and testified regarding the Fletcher/Pearson shooting and Hager's confession to Barbara's killing.

Habeas counsel first argue [Pet. at 37] that trial counsel should have impeached Currie with his statements to law enforcement that the two individuals shot were Fletcher and someone called "Porky," a reference Hager claims was to Fletcher's brother, rather than Ric Pearson. [*See* APP-000506 (Nov. 9, 1999 interview: "CURRIE stated that the shooting of CHRIS . . . and PORKY . . . ."); APP-000509 (notes from Nov. 9, 1999 interview regarding "Chris & Porky (Ric) shooting"); APP-000512 (Mar. 2, 2000 interview notes discussing shooting of Fletcher and "Ric (Porky)").] Habeas counsel are wrong on the facts. In his grand jury testimony, Currie left no doubt: "Porky is Rick." [TC0065299.] In any event, Currie was more circumspect at trial. When he was asked, "Do you know the two guys that were shot?", Currie only testified "I know one of them," referring to Fletcher. [JA 1005.]. Thus, impeaching Currie on this point would either have resulted in him clarifying that he meant Ric Pearson when he said "Porky" in his interviews with law enforcement, or, at most, have shown that he misidentified the second victim in the shooting at the time of those interviews, something that he explicitly did not do at trial. Trial counsel was not deficient in opting not to pursue these lines of question and Hager was not prejudiced.

Next, habeas counsel maintain that trial counsel should have raised inconsistencies between Arlington Johnson's testimony, which did not place Currie at the scene of the shooting,

44

and Currie's, which in turn did not place Johnson at the scene. [Pet. at 37.] But habeas counsel misrepresent the trial testimony. Currie testified first regarding the shooting and stated that, in addition to the victims, he, Hager, Neldy Windsor, and an individual called "Eric" were present at the shooting. [JA 1004–06.] Currie did not mention Arlington Johnson being present at the shooting, but also did not state that Johnson was absent. When Johnson later testified, he stated that he did not recall whether anyone other than him, Hager, and the victims was present at the shooting. [JA 1137 ("I don't recall.").] There was nothing "contradictory" about these two pieces of testimony. [Pet. at 37.] Currie was not asked if anyone else was present and Johnson did not recall who else may have been present. In any event, cross-examination on this would have been of little or no value because every witness at the trial, including Currie and Johnson, described Hager's shooting of Fletcher and Pearson in similar ways. *See Hooks v. Branker*, 348 F. App'x 854, 861-62 (4th Cir. 2009) (finding that when "little else could have been obtained by cross-examination because [the witness] described the shooting in terms similar to every other eyewitness, . . . cross-examination would not likely have been fruitful").

Habeas counsel also contend that trial counsel should have objected to the Government asking Currie, "Do you know what the shooting was about originally?" [JA 1005.] Habeas counsel argue that there was no foundation for this question and that Currie's answer, which focused on a stolen .357 handgun, "appeared to be hearsay." [Pet. at 37–38.] But the Government had already established that Currie knew Hager well [JA 992], and had seen him in possession of numerous weapons, including a .357 handgun [JA 1002]. There was little doubt that Currie's opinion of why the shooting occurred was "based on personal knowledge." *United States v. Johnson*, 617 F.3d 286, 292 (4th Cir. 2010) (citation and internal quotation marks omitted); *see* Fed. R. Evid. 701 (permitting lay opinion testimony). Nor did Currie's testimony on this point "appear" to be

45

hearsay. Currie could have personally observed what he testified to or could have heard it from Hager as part of a large admission of why he shot Fletcher and Pearson. Leaving aside the legal validity of the testimony, trial counsel could reasonably have decided that objecting on this point would only prolong the jury's focus on a shooting that *Hager indisputably committed*. And, in any event, this was a passing exchange of remote importance to the trial. Any objection would have had no impact on Hager's guilt. *See, e.g.*, *Sully v. Ayers*, 725 F.3d 1057, 1073 (9th Cir. 2013) ("Second, any failure to present the supposedly impeaching evidence did not prejudice Sully's defense. The jury was already well aware of Francis's role in the Barrett murder and that he might have had a motive to lie. Moreover, there was extensive physical evidence linking Sully to Barrett's murder. Therefore, there is no reasonable probability that the failure to present the additional evidence would have affected the jury's verdict with respect to the Barrett murder or the five other murders.").

Habeas counsel are also incorrect that trial counsel's cross-examination of Currie ended up strengthening the Government's theory that Barbara's was murdered to shield Hager from the Ely Place gang. [Pet. at 38.] The sections habeas counsel quote make clear that Currie, while familiar with the drug trade [*see, e.g.*, JA1015], was unfamiliar with any Ely Place gang. Currie testified that, with regards to Fletcher and Pearson, he was "not going to say they were part of a crew" [JA 1014–15]; he did not know whether they worked for William Seals [JA 1015]; or that he knew "who ran that crew up there [Ely Place]" [JA 1015]. This testimony made clear that Currie was unfamiliar with the Ely Place gang, which certainly was not helpful to the Government's case. Trial counsel did not err with these questions and Hager was not prejudiced.

Finally, habeas counsel contend that Currie's testimony that he viewed Barbara like a "big sister" [JA 1008], should have led to cross-examination regarding possible bias against Hager and

46

an objection to this testimony as improper bolstering of the victim. [Pet. at 38–39.] Both arguments are unpersuasive. Currie's passing remarks that he viewed Barbara fondly does not suggest that he was biased against Hager, much less untruthful in his testimony. Indeed, his testimony was entirely consistent with that of other witnesses. Consequently, trial counsel did not err in declining to pursue this minor point, and habeas counsel offer nothing to suggest even a slight chance it affected the fairness of the trial. Habeas counsel's claim of improper victim bolstering is equally unsustainable. The Government simply asked Currie: "How did you know Barbara White?" [JA1008.] Currie replied that he knew her while growing up and that he had a good relationship with her. [JA 1008.] Nothing in that testimony related to Barbara's character or personal characteristics. Indeed, accepting habeas counsel's argument would produce the absurd outcome that a witness in a murder trial could not be asked how he knew the victim if the answer would reflect a positive relationship. Habeas counsel do not and cannot find any law to support such an absurdity. Trial counsel was not deficient in declining to raise such fruitless objections and Hager was not prejudiced.

**Arlington Johnson, Jr.** Habeas counsel contend that trial counsel failed to effectively cross-examine Arlington Johnson, Jr., an accomplice to Barbara's murder. [Pet. at 39–41.] None of these claims hold water.

Habeas counsel first claim, in a single, vague sentence, that "[a]lthough trial counsel asked some questions on cross-examination about Johnson's deal with the government, there was much more that trial counsel could and should have done, but did not do, on cross-examination." [Pet. at 39.] This "bare sketch" of a claim is insufficient to make out a claim of ineffective assistance. *Moore*, 703 F.3d at 574. It is also flatly belied by the record. Prior to Hager's trial, Johnson pleaded guilty to murdering Barbara White, for which he received a life sentence. Following Hager's

47

conviction and death sentence, Johnson's own sentence was reduced to twenty-five years' imprisonment. Johnson's agreement with the Government was explored at length on direct examination, including his "hop[e] to get a reduction in [his] life imprisonment sentence, based on [his] cooperation." [JA 1162–64.] Trial counsel immediately revisited Johnson's agreement on cross-examination during another lengthy exchange, again emphasizing the benefits Johnson would obtain, as well as that Johnson "dislike[d]" being imprisoned and that he hoped that "by [his] cooperation, some day [he] w[ould] be reunited with [his] family." [JA 1164–66.] There is little more that trial counsel could have done to focus the jury on the benefits of Johnson's cooperation and that little would certainly not have changed the outcome of the trial.

Habeas counsel next argue [Pet. at 40] that trial counsel should have cross-examined Johnson regarding an exchange with the Court at his plea hearing:

> The Court:     Was that done in connection with the conspiracy to distribute crack cocaine that you and Mr. Hager were engaged in?
>
> Defendant:     You saw was it done in connection to that?
>
> The Court:     Yes.
>
> Defendant:     No, it wasn't.

[JA 133.] Habeas counsel now seize on this exchange as evidence that there was no link between Barbara's murder and Hager's drug dealing. But habeas counsel's argument is entirely based on omitting the remainder of the exchange. Down the same page of the transcript, the Court asked Johnson a clarifying question regarding the above exchange: "Why did Hager or you or anybody consider it necessary to kill White in terms of the drug conspiracy?" [JA 133.] Johnson replied: "She was involved with -- against a fellow drug trafficker Hager [*sic*] -- a rival drug trafficker." [JA 133.] Thus, far from undermining the Government's case against Hager—namely, that he killed Barbara to shield his location from rivals he had shot—Johnson's plea hearing confirmed it.

48

There was no error in trial counsel's decision to avoid raising Johnson's plea hearing and its elicitation would have had no impact on the proceedings.

As further impeachment material, habeas counsel point to Johnson's statements to law enforcement investigators that he did not remember whether Hager stabbed Barbara [*see* APP-000522 (July 6, 2005 interview: Q: "Who stabbed her?" Johnson: "Like Junior and me and I don't remember if Tommy did or not; I can't remember.")], and that "he never actually saw Hager stab White" [APP-000503 (September 2, 2005 interview)]. [Pet. at 41–42.] Before the grand jury, Johnson testified that during the murder Hager "pretty much kind of took over with the stabbing. He took the knives and proceeded to stab her." [APP-000555.] Johnson again testified at Hager's trial that Hager stabbed Barbara [*see* JA 1009 (Stanley Currie: "[T]hey [Hager and Barnett] got to talking about how Barbara -- how they stabbed Barbara up in a tub."); JA 1155–56], a fact Hager himself confirmed to others [*see* JA 1039 (Charles Johnson: "He [Hager] said . . . that they had stabbed her . . . .")], and that Barnett, the other accomplice, also confirmed [JA 1205 (Lonnie Barnett testimony: "Then they [Hager and Johnson] started stabbing her.")]. Trial counsel could reasonably have decided that impeaching Johnson with his interview statements—when first approached by police and before he was represented—would simply have opened the door for the Government to introduce Johnson's grand jury statements to rehabilitate his testimony, again putting Hager's gruesome role in the murder front and center. *See United States v. Ellis*, 121 F.3d 908, 919 (4th Cir. 1997) ("[W]here prior consistent statements are not offered for their truth but for the limited purpose of rehabilitation, a number of courts, including ours, have concluded that [Federal] Rule [of Evidence] 801(d)(1)(B) and its concomitant restrictions do not apply."). Instead, consistent with trial counsel's broader § 848-focused strategy, trial counsel focused cross-examination of Johnson on Johnson's deal with the Government [JA 1164–66], Johnson's and

49

Barnett's willingness to go along with the murder [JA 1166–69], and the fact that Johnson did not carry a weapon when he dealt drugs, as part of an effort to suggest to the jury that the killing was not related to the dangers of drug trafficking [JA 1169–76]. That was decision was not deficient performance, and the consistency of the evidence of against Hager confirms that he suffered no prejudice.[18]

Habeas counsel similarly assert that trial counsel was deficient in failing to ask Johnson about whether, following the murder, he heard Hager state that Johnson and Barnett "were soldiers now" and "went hard," something that Barnett testified to at trial [JA 1211], and that went to the government's theory that Hager orchestrated the murder in part to tie Johnson and Barnett more closely to his conspiracy. [Pet. at 41.] Specifically, Hager points to Johnson's grand jury testimony that he did not recall Hager making any statements about whether he and Lonnie "had gone hard." [APP-000567.] Hager neglects to mention, however, that Johnson testified before the grand jury that Hager treated the murder "[l]ike a test" to ensure that Johnson and Barnett were committed to him. [APP-000565.] That was clear support for the government's theory, regardless of whether Johnson recalled the same phrases as Barnett. Thus, trial counsel's decision not to pursue this line of cross-examination was neither deficient nor prejudicial.

Last, habeas counsel suggest that Johnson's daily marijuana use should have been raised on cross-examination. [Pet. at 42.] Habeas counsel never explain what such cross-examination

---

[18] Separately, habeas counsel claim that the government erred in not producing the transcript of Johnson's plea hearing. [Pet. at 40 n.4.] But "[t]ranscripts, so long as they exist, are kept by the clerk of the court and, unless sealed"—and Johnson's was not—"are available to the public upon request. When transcripts do not exist, they can be created by a court reporter. Transcripts are not information which the government possesses and a defendant does not. Defendants can as easily obtain a transcript from the clerk or court reporter as can the government." *United States v. Conteh*, 234 F. App'x 374, 389 (6th Cir. 2007) (rejecting *Brady*, *Giglio*, and Jencks Act claims regarding plea hearing transcripts).

50

would have changed at trial, particularly given that Johnson's testimony was consistent with that of his accomplices. "[I]n *Strickland*, the Supreme Court made clear that a habeas petitioner has an obligation to show [the court] why his counsel was ineffective." *George v. Smith*, 586 F.3d 479, 486 (7th Cir. 2009). Hager's claim fails to do that.

**Lonnie Barnett.** Habeas counsel argue that trial counsel was ineffective in cross-examining Lonnie Barnett, an accomplice to Barbara's murder. [Pet. at 41–43.] These claims are meritless.

Like Johnson, Barnett pleaded guilty to violating 21 U.S.C. § 848, what he later characterized at Hager's trial as "[m]urder while drug trafficking." [JA 1182.] Following Hager's trial and sentencing, Barnett's sentence was reduced to twenty-five years. Habeas counsel state that trial counsel "elicited nothing" about the benefits Barnett received for his cooperation and testimony. [Pet. at 42.] Yet, as habeas counsel recognize, this is because "the government elicited on direct examination Barnett's deal with the government." [Pet. at 42.] The government admitted Barnett's plea agreement [JA 1182–83], which Barnett confirmed was "an agreement that obligate[d] [him] to cooperate" and "to testify" [JA 1183]. The government then directly asked Barnett about his expectations for cooperating:

> Q.    What do you hope to gain by cooperating?
> A.    A sentence reduction.
> Q.    A sentence less than life?
> A.    Yes.

[JA 1183.] Moreover, trial counsel revisited Barnett's cooperation on cross-examination, when he asked "Mr. Barnett, you understand that you are not going to get a sentence reduction unless the government asks the Court to give you one?" [JA 1222.] To which Barnett answered in the affirmative. [JA 1222.] Put plainly, it is not ineffective assistance to decline to restate what is

51

already before the jury. *Jennings v. McDonough*, 490 F.3d 1230, 1244 (11th Cir. 2007) ("[I]t is not ineffective assistance to fail to present redundant evidence." (citation and internal quotation marks omitted)). And while Hager suggests that trial counsel should have elicited that Barnett's cooperation allowed him to avoid a state murder charge [Pet. at 42], that simply would have resulted in the Government reaffirming on direct that the state murder charge had been substituted for Barnett's plea to federal "[m]urder while drug trafficking." [JA 1182.]

Habeas counsel next argue that trial counsel should have cross-examined Barnett on his plea hearing. [Pet. at 42–43.] Specifically, habeas counsel focus on an exchange where the Court asked Barnett "Did that [*i.e.*, Barbara's murder] have to do with drug trafficking?" To which Barnett responded, "I'm not completely sure what that had to do with it." Habeas counsel contend that raising this exchange at trial would have weakened the government's case that Barbara's murder had a connection to Hager's drug dealing. Hager fails to note, however, that at Barnett's plea hearing, after hearing Barnett's answer, the Court asked the government "what is the connection to drug trafficking?" [JA 91.] The government responded that "Hager was a drug trafficker," "the leader and organizer of this conspiracy," that "Mr. Barnett worked for him as a result of that relationship" and thus "Mr. Barnett was required essentially as Hager's employee to accompany him to Barbara White's apartment." [JA 91.] The Court then asked Barnett if that was "all correct," to which Barnett replied, "Yes, sir." [JA 92.] Thus, nothing in Barnett's plea hearing cast doubt on the Government's case. Trial counsel was not ineffective in declining to raise this exchange nor was Hager prejudiced by that decision.

Finally, habeas counsel point to various prior inconsistent statements by Barnett. [Pet. at 43.] At trial, Barnett testified: "Tommy told me to go in the kitchen and get some knives." [JA 1204.] Hager argues that this is inconsistent with police notes from an interview with Barnett, after

52

he pleaded guilty, which state "Barnett stated Juney [*i.e.*, Johnson] said 'Let's use knives' and Tommy agreed and White was stabbed to death." [APP-000604, *see* APP-000610 (similar).] Raising these statements, habeas counsel contend, would have undermined the Government's argument that the murder was "directed and controlled" by Hager. [Pet. at 43.] This argument fails on multiple levels. First, habeas counsel identify no inconsistency. Johnson could have suggested that they use knives to kill Barbara and Hager, as the leader, could have ordered Barnett to retrieve the knives to that effect.

To the degree that there is any inconsistency, it is because the interview notes state that "*Hager* went into Barbara's kitchen and returned with a handful of steak knives." [APP-000610 (emphasis added); *see* APP-000605 (same).] Consequently, an inquiry by trial counsel into inconsistencies between Barnett's trial testimony and the interview notes might have led to Barnett either clarifying that there was no inconsistency or emphasizing that Hager himself brought out the knives. Second, Hager was not prejudiced by trial counsel's decision not to pursue this issue. Barnett's trial testimony was fully consistent with the interview notes on the key facts and both made abundantly clear that Hager led the murder. [*Compare, e.g.*, APP-000604 ("Barnett stated on the night of White's murder, Tommy picked him up at this grandmother's house and told him they were going to go talk with Barbara."); *id.* ("Barnett stated Tommy told him to help and he stabbed White 5 to 10 times, but she was still alive."); *with* JA 1197 (Barnett at trial: "He [Tommy] said we was going to talk to Barbara."); JA 1206 (Barnett at trial: "He basically told me to stop acting like a bitch, and to get in there and start stabbing her. He was egging us on, like, 'Go ahead. Stab her. Go ahead.'").]

**D.      Trial counsel was not ineffective in declining to object to Paul White's testimony.**

Habeas counsel's final guilt-phase argument is that trial counsel was ineffective in failing to object to what they characterize as "inadmissible and highly prejudicial" victim impact testimony from Paul White, the victim's father, who also discovered her body. [Pet. at 43–45.] Specifically, habeas counsel point to testimony by Mr. White that the day of his testimony was the birthday of Barbara's daughter, Alexis; that Barbara's life and outlook changed following Alexis's birth; and testimony describing Barbara's living and employment situations and identifying Barbara and Alexis in various photographs.

Habeas counsel's claim lacks merit because each piece of testimony was both relevant and admissible. Mr. White's statements that the day of his testimony was Alexis's birthday and explaining Barbara's relationship to her daughter, as well as Barbara's living and employment situation, were essential to establishing the closeness of his relationship with her daughter and the credibility of his later testimony regarding how he found Barbara. Such "reasonable background information about a witness is always admissible, precisely because it allows the jury to make better informed judgments about the credibility of a witness and the reliability of that witness' observations." *United States v. McVeigh*, 153 F.3d 1166, 1201 (10th Cir. 1988). Similarly, the identification of Barbara and Alexis, who was an infant when she was found at the scene, in photographs contemporaneous with the murder was "relevant to the issue of identity . . . and necessary to the Government's case." *United States v. Kittrell*, 269 F. App'x 338, 341 (4th Cir. 2008). While habeas counsel complains that such testimony allegedly generated "sympathy and emotion" [Pet. at 44], courts widely recognize that "[t]he personalization of witnesses through descriptions of their individual histories is inevitable." *McVeigh*, 153 F.3d at 1201. Habeas counsel point to nothing to suggest that this testimony was out of the ordinary for a murder trial.

Given the relevance and admissibility of Mr. White's testimony, trial counsel was certainly not ineffective in declining to object to this testimony. *See Sharpe v. Bell*, 593 F.3d 372, 383 (4th Cir. 2010) ("Counsel is not required to engage in the filing of futile motions." (citation and internal quotation marks omitted)). Moreover, even if such objections would have been valid, they were "either not worth making" or could have been "viewed as likely to cause more harm if made than if foregone." *Moore v. United States*, 934 F. Supp. 724, 727 (E.D. Va. 1996); *see, e.g.*, *Humphries v. Ozmint*, 397 F.3d 206, 234 (4th Cir. 2005) ("[T]rial counsel may have reasonably feared that the jury would view his very probably *unsuccessful* and unjustified objection at that point as mere pettifogging—and discounted his credibility accordingly.").

In any event, the absence of an objection to any or all of this testimony was not prejudicial. All of the testimony was brief and in passing. For instance, the reference to Mr. White's day of testimony being Alexis's birthday amounted to two sentences. [*See* JA 909.] It is not "'reasonably likely'" that "the result would have been different" had trial counsel objected to any or all of this testimony. *Harrington*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696).

## II.    Trial counsel provided effective assistance during the penalty phase.

Most of the remainder of Hager's § 2255 petition focuses on his allegations that he received ineffective assistance during the penalty phase of his trial. In presenting this claim, habeas counsel argue that trial counsel was deficient in challenging the government's aggravating evidence and in presenting mitigating evidence on Hager's behalf. As discussed below, habeas counsel cannot establish deficiency in either area. Moreover, and as also discussed below, the Court need not resolve Hager's deficiency arguments on a claim-by-claim basis because, even accepting the allegations in his petition, he cannot possibly show prejudice

### A.    Penalty phase procedural background.

The version of 21 U.S.C. § 848 in place at the time of Barbara's murder in 1993 provides for a death sentence for any person who intentionally kills while "engaging in an offense punishable under" 21 U.S.C. § 848(e)(1)(A).[19] To trigger death proceedings, the statute requires the government to file a notice of its intention to seek a death sentence, setting forth any applicable so-called "statutory" aggravating factors explicitly enumerated in § 848(n), and any applicable so-called "non-statutory" aggravating factors "which the Government will seek to prove as the basis for the death penalty." 21 U.S.C. § 848(h)(1). Then, if the defendant is found guilty of the offense, the statute contemplates that the court "shall conduct a separate sentencing hearing" at which the jury determines whether the defendant will receive a sentence of death or life in prison. During the hearing, the government presents evidence regarding the statutory and non-statutory aggravators identified in the death notice, and the defendant presents evidence of any mitigating factors.

Aggravating factors must be established unanimously beyond a reasonable doubt; findings regarding mitigating factors "may be made by one or more members of the jury" by a preponderance. § 848(j). The jury may—but is not required to—recommend a death sentence if it unanimously concludes that "the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist." § 848(k). The government need not prove that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt—only that the

---

[19] Hager was charged under 21 U.S.C. § 848 even though, by the time of trial, Congress had repealed the procedural provisions of § 848 in favor of a centralized procedure under the Federal Death Penalty Act of 1994, codified at 18 U.S.C. § 3591–93 (FDPA). The repealed provisions of § 848 are materially identical to the FDPA in all but a few provisions. At trial, the Court determined that, where there were procedural differences between § 848 and the FDPA, the Court would allow Hager to elect the procedure that he deemed most favorable to him. [*See, e.g.*, JA 407–19; 1761; 1767–68; 2842.] Habeas counsel does not allege that trial counsel were ineffective for taking this position. For simplicity's sake, this response will generally refer to the provisions of § 848 rather than the FDPA. All cites to § 848 are to the 1993 version of the statute.

aggravators outweigh the mitigators. *See Hager*, 721 F.3d at 207 (citing *United States v. Runyon*, 707 F.3d 475, 516 (4th Cir. 2013)). This is "because the jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Instead, it is a 'highly subjective,' 'largely moral judgment' 'regarding the punishment that a particular person deserves.'" *United States v. Fields*, 483 F.3d 313, 346 (5th Cir. 2007) (quoting *Caldwell v. Mississippi,* 472 U.S. 320, 340 n. 7 (1985))). "In death cases, the sentence imposed at the penalty stage reflect[s] a reasoned *moral* response to the defendant's background, character, and crime." *Id.* (internal quotation marks omitted).

### 1.    *Eligibility Phase*

During Hager's trial, the sentencing hearing was bifurcated into an "eligibility" phase and a "selection" phase. As part of the eligibility phase, the jury concluded that Hager was eligible for a death sentence after making unanimous findings beyond a reasonable doubt regarding the "statutory" aggravating factors listed in § 848(n)(1)–(12). First, the jury found unanimously that § 848(n)(1) was satisfied because Hager "intentionally killed Barbara White." [JA 1667–68.] Next, the jury unanimously found beyond a reasonable doubt that all of the six statutory aggravating factors alleged by the government from § 848(n)(2)–(12) were present in this case. Specifically, the jury found that Hager:

1. *has been convicted of another offense resulting in the death of a person, for which a sentence of life imprisonment was authorized by statute,*

2. has been convicted of two other offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person,

3. knowingly created a grave risk of death to a person in addition to Barbara White in the commission of the offense and in escaping apprehension for the offense,

4. committed the offense charged after substantial planning and premeditation,

5. distributed a controlled substance, namely, crack cocaine, to a juvenile, [and]

57

6. *committed the offense charged herein in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Barbara White.*

[JA 1669–71.] The italicized factors above are not disputed or challenged by Hager in his present § 2255 petition.

2.      *Selection Phase*

The trial then moved to the selection phase, during which the government presented evidence of additional non-statutory aggravating factors and Hager presented evidence of statutory and non-statutory mitigating factors, and the jury was charged with determining whether to impose a sentence of death after weighing all the aggravators against all the mitigators.

In addition to the statutory aggravating factors identified above, the jury unanimously found the following ten non-statutory aggravating factors were present beyond a reasonable doubt:

1. *On or about April 23, 1990, the defendant, a juvenile at the time, possessed with the intent to distribute cocaine. He was found guilty by an adjudication on or about September 18, 1990.*

2. *From in or about 1992, and continuing until at least in or about 1997, the defendant repeatedly bought and sold cocaine and crack cocaine in and around Washington, D.C., and directed others to buy and sell cocaine and crack cocaine. The defendant illegally obtained, possessed, used, and carried numerous firearms in relation to and in furtherance of his drug trafficking activities. The defendant regularly used violence and threats of violence to further and protect his drug business.*

3. *On or about October 22, 1993, the defendant shot and severely wounded Christopher Fletcher and Ric Pearson, two rival drug dealers, in Washington, D.C.*

4. On or about March 30, 1995, the defendant killed Jerome Robinson.

5. On or about February 26, 1996, the defendant directed Loneldon Windsor, his cousin, to kill Cornell Coplin. Coplin died as a result of the shooting.

6. *On or about October 20, 1996, the defendant killed Londell Duvall.*

7. *On or about March 15, 2003, while incarcerated at U.S.P. Pollock, a penitentiary, the defendant was observed hitting another inmate during a large scale prison fight, which resulted in a prison lock down.*

58

8. *On or about April 27, 2004, while incarcerated at U.S.P. Pollock, the defendant was disciplined for possession of a dangerous weapon, an eight-inch long metal shank with a sharpened point on one end.*

9. *On or about June 29, 2004, while incarcerated at U.S.P. Pollock, a penitentiary, the defendant was observed hitting and kicking another inmate during a prison fight, which resulted in a prison lock down.*

10. *The defendant's statements and actions following the murder of Barbara White reflect a lack of remorse.*

11. The defendant poses a future danger to others in that he is likely to commit, and to direct others to commit, additional acts of violence in any setting.

12. *The defendant caused injury, harm and loss to the victim and the victim's family and friends, as evidenced by the victim's personal characteristics and by the impact of her death upon the victim's family and friends.*

[JA 2949–52.] The italicized factors above are not disputed or challenged by Hager in his present § 2255 petition.

As for mitigating factors—which could be found by a mere preponderance by any number of jurors—the jury reached the following conclusions:

## Statutory Mitigating Factors

1. Thomas Morocco Hager was youthful, although not under the age of 18.

   __0__   Number of jurors who so find

2. Others, equally culpable in the crime, will not be punished by death because their age at the time of the offense renders them statutorily ineligible for the crime.

   __0__   Number of jurors who so find

3. Factors in Thomas Morocco Hager's background or character mitigate against imposition of the death sentence.

   __2__   Number of jurors who so find

## Non-Statutory Mitigating Factors

1. If not sentenced to death, Thomas Morocco Hager will be punished by a sentence of life imprisonment with no possibility of release.
   __5__   Number of jurors who so find

59

2. Arlington Johnson will not be sentenced to death for his role in the murder of Barbara White, because his age at the time of the offense renders him statutorily ineligible for the death penalty.

      0    Number of jurors who so find

3. Lonnie Barnett will not be sentenced to death for his role in the murder of Barbara White, because his age at the time of the offense renders him statutorily ineligible for the death penalty.

      0    Number of jurors who so find

4. Shenita King will not be sentenced to death for her role in the murder of Barbara White.

      0    Number of jurors who so find

5. The fact that Lonnie Barnett's plea agreement includes the possibility that the government will ask the Court to reduce his sentence is something that weighs against imposition of a sentence of death for Thomas Morocco Hager.

      0    Number of jurors who so find

6. The fact that Arlington Johnson's plea agreement includes the possibility that the government will ask the Court to reduce his sentence is something that weighs against imposition of a sentence of death for Thomas Morocco Hager.

      0    Number of jurors who so find

7. The offer of immunity for Shenita King in this case is something that weighs against imposition of a sentence of death for Thomas Morocco Hager.

      0    Number of jurors who so find

8. Whether the fact that William Seals kept guns and money in a safe at Barbara White's apartment constitutes a mitigating factor.

      1    Number of jurors who so find

9. Whether the evidence fails to establish Thomas Morocco Hager's guilt of the capital crime with sufficient certainty to justify imposition of a sentence of death.

      0    Number of jurors who so find

10. Whether the evidence establishes that it was Thomas Morocco Hager's belief that William Seals was out to kill him and that fact constitutes a mitigating factor.

       0    Number of jurors who so find

11. The Bureau of Prisons has facilities adequate to monitor and prevent any future assaultive and violent conduct by Thomas Morocco Hager.

       0    Number of jurors who so find

12. A sentence of life imprisonment without the possibility of release is severe and exacts both significant physical restraint and hardship as well as great psychological pain, particularly because Thomas Morocco Hager is left for years to contemplate his wrongdoing and to feel the loss of his children, friends and family.

       2    Number of jurors who so find

60

13. A sentence of life imprisonment without the possibility of release is severe because Thomas Morocco Hager is a young man who, based upon his life expectancy, reasonably can expect to serve decades of confinement.

    1     Number of jurors who so find

14. If incarcerated, Thomas Morocco Hager is unlikely to represent a continuing danger to society, as he already is showing signs of "aging out."

    0     Number of jurors who so find

15. Demonstrated factors in Thomas Morocco Hager's childhood, background and character recommend against the imposition of the death sentence and recommend in favor of life imprisonment without the possibility of release.

    7     Number of jurors who so find

16. The imposition of a life sentence without the possibility of release would preserve the opportunity for Thomas Morocco Hager to remain available to his daughters through their adolescent years and beyond.

    11     Number of jurors who so find

17. Thomas Morocco Hager has proven himself to be capable of having a positive relationship with his daughters.

    0     Number of jurors who so find

18. Thomas Morocco Hager's childhood experiences include being prematurely sexualized by his uncle.

    0     Number of jurors who so find

19. Thomas Morocco Hager's childhood circumstances led to his leaving school when he was a young adolescent.

    0     Number of jurors who so find

20. Thomas Morocco Hager's parents offered no supervision or guidance when he was a young child.

    10     Number of jurors who so find

21. At the time of Barbara White's death, Thomas Morocco Hager had no prior adult convictions.

    0     Number of jurors who so find

22. Thomas Morocco Hager's childhood was filled with risk factors.

    9     Number of jurors who so find

23. Thomas Morocco Hager's childhood enjoyed few protective factors.

    8     Number of jurors who so find

61

[JA 2953–57.] The jury was also given the opportunity to identify additional mitigating factors, not presented by the defense but found by any one or more jurors. No such factors were found. [JA 2958–59.]

### B.    Hager cannot establish prejudice at the penalty phase.

As is explained in detail below, habeas counsel fail to establish deficient performance by trial counsel. However, habeas counsel also fail to meet the burden of demonstrating prejudice from the errors they allege, taken either individual or together. To make out a claim of deficient performance, habeas counsel must show that the jury's decision regarding death "would reasonably likely have been different absent the errors." *Strickland*, 466 U.S. at 696. Habeas counsel cannot carry this burden.

The key aggravator at trial was Barbara's murder itself, a horrific and remorseless act. Even a simple recitation of the facts uncontested by Hager's petition is sufficient to indicate why the jury voted as it did and why trial counsel was not ineffective. When Hager decided that he was going to kill Barbara, he planned the murder in advance, taking into account the possibility of police presence and noise, so that he could hurt and kill Barbara free of discovery and interruption. The night of the murder, Hager and his accomplices deceived Barbara as to the reasons for their arrival, so that they could enter unimpeded, as perceived friends. Hager continued this deception as Barbara showed them Alexis's, her baby's, room. Hager then proceeded to torture Barbara, breaking her jaw and terrorizing her, as her infant daughter was in the next room. Barbara pleaded for her life and promised Hager that she had not revealed his location. Hager ignored her pleas and decided to kill her. He forced her into the bathtub where he first tried to electrocute her. When that failed, Hager, along with his minions, proceeded to stab Barbara eighty-two times, as she screamed and fought to defend herself. To ensure that she was dead, Hager flipped her body over in the bloody tub water and stood on top of it until he was satisfied that he had killed her. "I could get

62

the death penalty for this," he observed, so he needed to make sure she was dead. He then took the phone off its hook, in the hopes that the crime would not be discovered for several days, and left Alexis, a thirteen-month old child, alone with her mother's dead body, indifferent to whether the child lived or died. On the way back to Washington, D.C., Hager gloated about Barbara's screams: "Did you hear that bitch telling me about her daughter? . . . That bitch was trying to get me killed."

Barbara's murder was not only despicable and cruel, but Hager showed no remorse at all in its wake. Hager's accomplices reported that Hager never "ever expressed any regret, sorrow, [or] remorse, at any time[,] for the killing of Barbara White." [JA 1790.] To the contrary, he bragged about the murder, telling both them and others that his accomplices "go hard now," [JA 1039], that they were "soldiers now," [JA 1211]. Most disturbingly, this was no act of sick braggadocio: ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████ [TC0004702.] ████

████████████████████████████████████████

[TC0017723.] It is unsurprising, then, that the court of appeals noted Hager's "affirmative conduct displaying lack of remorse was significant and telling" and expressed the "strong opinion" that, even putting aside Hager's own silence during trial, "the jury could not reasonably have reached another conclusion regarding lack of remorse." *Hager*, 721 F.3d at 206.

Given the "extraordinary brutality" and "needless suffering" that accompanied Barbara's murder, along with Hager's complete lack of remorse, "[i]t is hard to imagine expert testimony and additional facts about [Hager's] difficult childhood outweighing the facts of [Barbara's] murder." *Belmontes*, 558 U.S. at 27-28 (emphasis omitted). Certainly, nothing habeas counsel

offers would have changed the inevitable conclusion that the balance between these aggravators and the proffered mitigators always strongly favored death. *See Strickland*, 466 U.S. at 695–96.

But there were still other factors that favored death, including Hager's future dangerousness. Hager has had a long career of brutal violence, including multiple killings, "the most power imaginable aggravating evidence." *Belmontes*, 558 U.S. at 28 (citation and internal quotation marks omitted). Indeed, the impetus for Barbara's murder was that Hager shot Fletcher and Pearson. This cycle of violence did not end after Hager was imprisoned. Over the course of his incarceration, Hager both attacked other inmates and fashioned weapons to further injure and kill. It is unsurprising, then, that the Fourth Circuit was "wholly unconvinced" that the jury's finding on future dangerousness was speculative. *Hager*, 721 F.3d at 200.

Against, this backdrop of brutality, violence, and danger, trial counsel was left with little to favor mitigation. As *Strickland* itself explained, the reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. 466 U.S. at 691. Here, there was little that trial counsel could do to deflect the devastating evidence in support of aggravation and a sentence of death. *See Boyd v. Allen*, 592 F.3d 1274, 1301 (11th Cir. 2010) ("[W]e recognize that in brutal torture-murder cases like this one, this Court generally has not found *Strickland* prejudice, even where the petitioner's counsel may have performed deficiently by failing to uncover and present evidence of troubled and abusive childhoods.").

Ultimately, to establish prejudice, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. Nothing that habeas counsel now suggests would have overcome the brutality of Barbara's murder, Hager's complete absence of remorse, and his long history of violence to create a substantial likelihood of a different result.

### C. Trial counsel provided effective assistance regarding aggravating evidence.

Habeas counsel argues that trial counsel ineffectively failed to object, resist, and respond to three broad areas of the government's aggravation evidence: (1) evidence regarding prior homicides connected to Hager; (2) evidence of Hager's violent activities in prison and supporting the government's alleged aggravating factor related to his "future dangerousness," and (3) evidence regarding the government's alleged aggravating factors that Hager committed the crime in a manner that exposed Alexis White to a "grave risk of death," that Hager committed the offense "after substantial planning and premeditation," and that Hager distributed a controlled substance to juveniles. Habeas counsel cannot prevail on either prong under *Strickland*.

*1. Trial counsel effectively responded to aggravating evidence regarding prior homicides connected to Hager.*

The first general area where habeas counsel alleges that trial counsel rendered ineffective assistance on aggravating evidence involves evidence of several killings done or directed by Hager which were offered by the government and accepted by the jury as aggravating factors supporting a death sentence. According to habeas counsel, trial counsel (1) failed to move to exclude evidence of the Coplin homicide, (2) failed to adequately cross examine Anthony Fields about the Coplin killing, and (3) failed to rebut the Robinson killing as an aggravator.

**Aggravating evidence relating to the Coplin homicide.** Habeas counsel first attack trial counsel's effectiveness in permitting the jury to consider evidence related Hager's involvement in the murder of Cornell Coplin. According to habeas counsel, because "the government lacked sufficient competent evidence to prove beyond a reasonable doubt that Mr. Hager 'directed' the murder or was otherwise culpable in any way for Coplin's death," "[r]easonably competent counsel would . . . have moved to exclude all reference to the homicide at trial and such a motion would have been required to be granted." [Pet. at 46.]

65

As habeas counsel concede, however, two witnesses—Anthony Fields and Shenita King—asserted that they were in a car with Hager and "Neldie" Windsor when Hager pointed out Coplin to Windsor and encouraged him to shoot him. Thus, the motion that habeas counsel now claim "would have been required to be granted" in fact would have been *required to be denied*, because it is blackletter law that "the uncorroborated testimony of a single cooperating witness may be sufficient to uphold a conviction." *United States v. Dieguez*, 2015 WL 9310708, at \*2 (4th Cir. Dec. 23, 2015) (citing *United States v. Wilson*, 115 F.3d 1185, 1190 (4th Cir. 1997)); *United States v. McCall*, 352 F. App'x 811, 812–13 (4th Cir. 2009) (citing *United States v. Wilson*, 484 F.3d 267, 283 (4th Cir. 2007)).

Of course, the evidence of Hager's involvement in the Coplin killing goes well beyond uncorroborated testimony of a single cooperating witness. Rather, the government proved Hager's involvement in Coplin's killing with testimony from five separate witnesses:

- Claudia Jones-Hunt testified that, in February 1996, she was standing at a gas station on Minnesota Avenue when she noticed a "young fellow" drive into the gas station in a "real pretty" yellow and black car [JA 1727] Then she saw a van pull up. "[O]ut of the van, as I watched, a gentleman got out with a black hood and sweat suit on," ran over and "pulled out a gun and . . . shot the gentleman that had the pretty car." [JA 1727] After he shot him, "all of a sudden he just stood over top of him, and he took the gun and he shot the boy again," several times. [JA 1728]

- David Jennifer testified about a snowy day in 1996 when he went to pick up his brother, Cornell Coplin. [JA 1734–35.] Jennifer and Coplin pulled into an alley, where Coplin got out of the car to look for nine bottles of PCP he had hidden there, only to discover that they were missing. [JA 1735–36] The two brothers then went around the corner where they encountered Hager. Coplin got out of the car to talk to Hager and returned to the car with nine bottles of PCP. Hager was now demanding that Coplin pay him for the drugs after he had sold them. [JA 1737–38.] Jennifer testified that Coplin was killed a few days after this incident. [JA 1738.]

- Anthony Fields, Hager's uncle, testified about a snowy day in 1996 when he saw Hager go to Coplin's hiding place and return with a supply of PCP. [JA 1746–47] Fields testified that, later, Hager and Coplin "were arguing about some money," and Coplin "made a statement like he knew my nephew had took his [PCP]." [JA 1748.] Fields then testified about a day when Hager came by in a van to pick up Fields. In the van were "Shenita," "a guy named Wood," and Hager's cousin, "Neldie." [JA 1749] As

66

they drove up Minnesota Avenue, Hager stopped by a gas station where Fields saw Coplin pumping gas. Hager and said to Neldie, "There goes your man right there, Neldie." Then "Neldie jumped up, got out of the van, put his hood over his head," went up to Coplin, "reach[ed] in his, below his belt, pulled out a gun, shot him, stood over top of him, shot him a couple times, ran back to the van." [JA 1751] Then, holding a gun, Hager turned to Fields to warn him: "'If you say anything,' you know, 'you know what's up,' you know, as far as saying you're going to get it too, or whatever." [JA 1751]

- Former FBI Agent Bradley Garrett testified regarding forensic evidence from the killing, including that the medical examiner identified six gunshot wounds on Coplin: "[o]ne in the upper right arm; one in the left arm; one in the left shoulder; and three in the head: one in the upper lip, lower lip, and the left side of Mr. Coplin's head." [JA 1781] The government also admitted an autopsy photo of Mr. Coplin. [JA 1782–83.]

- Detective Robert Murphy testified regarding statements made by Shenita King that she was in the van with Hager, Wood, Fields, and Neldie on the day of the murder when they drove past the gas station on Minnesota Avenue and "suddenly" Hager "pointed over to the gas station and exclaimed 'Neldie, Neldie, there's your man. There's your man. . . . Go get him.'" [JA 1788] Neldie "got out of the van, pulled a hoody up over his head, ran through the parking lot over to where Cornell Coplin was standing," "took a pistol out of his pocket and . . . shot Cornell Coplin numerous times in the upper body with the handgun." [JA 1788][20]

This considerable circumstantial evidence above gives the lie to habeas counsel's

contention that "[t]he only evidence purporting to connect Mr. Hager's argument with Coplin to

---

[20] Some of the evidence admitted through Agent Garrett and Detective Murphy was hearsay, which trial counsel moved to exclude before trial under the Confrontation Clause. [*See* Dkt 208, JA 476–78.] As the government argued at the time, however [*see* Dkt 214, JA 479–490], the Confrontation Clause does not apply to, and hearsay is admissible at, the sentencing selection phase of a capital trial. The Court agreed [*see* JA 1770–76], relying primarily on *United States v. Fields*, 483 F.3d 313, 325–26 (5th Cir. 2007). Habeas counsel now contend that trial counsel—having failed to persuade the Court after briefing the issue—provided ineffective assistance by failing to repeatedly raise this meritless objection "to each selection phase witness that offered hearsay testimony." [Pet. at 83–84.] Habeas counsel concede that Hager raised this claim on direct appeal and that the Fourth Circuit rejected it on plain error review, but habeas counsel nonetheless contend that trial counsel should have preserved the objection. [Pet. at 84.] Habeas counsel's argument would require the court to conclude that the standard for ineffectiveness on collateral review is lower than plain error on direct appeal. But the caselaw says otherwise. *See, e.g.*, *Gordon v. United States*, 518 F.3d 1291, 1298 (11th Cir. 2008) ("When a claim of ineffective assistance is based on a failure to object to an error committed by the district court, that underlying error must at least satisfy the standard for prejudice that we employ in our review for plain error.").

the homicide was the quintuple hearsay testimony of Agent Bradley Garrett regarding the contents of a note he found in the Metropolitan Police Department's file on the case" regarding a tip received from someone named Fitzgerald Stoney that Hager killed Coplin after stealing PCP from Coplin. [Pet. at 47–48.] Habeas counsel is actively misrepresenting the record here. At trial, trial counsel used the note from the file on *cross-examination* in an attempt to discredit the live-witness testimony above. [JA 1783–84.][21] Hager's involvement in directing the murder of Coplin was well established at trial.

Separately, habeas counsel allege that "[r]easonably competent counsel would also have established that Fields had a powerful motive to fabricate evidence and testify against Mr. Hager in order to avoid spending the rest of his life in prison" for a 1999 charge from which habeas counsel allege he had "absconded." But "[u]nder Federal Rule of Evidence 609, a witness can be impeached based on a prior *conviction*, not simply a charge." *Wyatt v. City of Richland Police Dep't*, 2005 WL 3118123, at *1 (E.D. Wash. Nov. 22, 2005); *see also, e.g.*, *United States v. McIntosh*, 2006 WL 293224, at *9 n.8 (M.D. Pa. Feb. 7, 2006), and habeas counsel do not contend that Fields had any arrangement with the government or "expect[ation] to be treated with any leniency" in exchange for his testimony, so it is unclear how trial counsel were supposed to impeach him with this information. In addition, habeas counsel allege that trial counsel failed to adequately cross-examine Fields based a 1981 robbery conviction, a 1991 conviction for

---

[21] ██████████████████████████████████████████████

[TC0048458]

68

possession with intent to distribute cocaine, and a 2006 misdemeanor identity fraud conviction. The first two convictions were more than ten years old, so they were presumptively inadmissible under Rule 609.[22] While the misdemeanor identity fraud conviction may have been admissible under Fed. R. Evid. 609(a)(2), counsel may have decided that impeachment with a misdemeanor offense would do more harm than good—especially considering that trial counsel *did* cross-examine Fields to establish that "Mr. Coplin was angry with Mr. Hager" regarding the gambling money and stolen PCP, consistent with the defense's overall strategy of seeking to contextualize Hager's behavior as a combatant in a violent drug world engaging in what he perceived as necessary preemptive strikes.[23]

**Aggravating evidence relating to the Robinson homicide.** As noted above, the government alleged as statutory aggravators that Hager "has been convicted of another offense resulting in the death of a person, for which a sentence of life imprisonment was authorized by statute," and "has been convicted of two other offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person." In support of these statutory aggravators,

_____

[22] In a single sentence at the very end of Hager's brief, habeas counsel argue that the government sponsored false testimony from Fields regarding the reasons for his current incarceration. Habeas counsel offer no support for this allegation—which appears to be undermined by the court records they cite indicating that Fields was sentenced *after* his testimony in Hager's case. Habeas counsel also argue that Fields "was told by police . . . that the reason that Ms. White was not shot to death was that the gun jammed after it was used to hit her in the jaw." [Pet. at 195.] The government could not have shared such information with Fields, let alone "failed to disclose it" to Hager, because it did not have any evidence that Hager's gun jammed.

[23] For example, in one internal email regarding the Coplin homicide, trial counsel emphasized that "[s]elf Defense is not limited to the time a threat is conveyed," and "[a] 'cold-blooded' killing can be mitigated somewhat if the killer perceived a threat from the victim." [TC0048458.] During closing arguments, defense counsel returned to this theme, emphasizing that "in the world of drug traffic[king] . . . , there are no noncombatants." [JA 2804]

69

the government intended to rely on Hager's two convictions for the killing of Jerome Robinson, for which Hager had been convicted (after a hung jury in a first trial in 1998) in 2000, and Londell Duvall, for which Hager had been convicted in 1999. As noted above, the jury was also requested to return findings on non-statutory aggravating factors, independent from the convictions, that Hager in fact committed these killings.

At trial, the government and trial counsel agreed to offer bare-bones stipulations on each of these aggravators. (Habeas counsel do not disclose in Hager's § 2255 petition that evidence of these convictions came in through stipulation.) The stipulations provided that:

- "On April 15, 1999, the defendant, Thomas Hager, was convicted at trial by a jury in the Superior Court for the District of Columbia of voluntary manslaughter while armed in the death of Londell Duvall. Duvall was shot and killed in Washington, D.C., on October 20, 1996."

- "On December 11 and 12, 2000, the defendant, Thomas Hager, was convicted at trial by a jury in the Superior Court for the District of Columbia of three counts of first degree murder while armed (felony murder), one count of second degree murder while armed, one count of first degree murder while armed, two counts of attempted robbery while armed, and two counts of possession of a firearm during a crime of violence, and one count of obstruction of justice. All convictions arose out of this single event, this killing of Robinson. Robinson was shot and killed in Washington D.C. on March 30, 1995. On November 24, 1998, the defendant, Thomas Hager, was convicted at trial by a jury in the Superior Court for the District of Columbia of carrying a pistol without a license in the death of Jerome Robinson."

- "The defendant, Thomas Morocco Hager, has been convicted of another offense resulting in the death of a person, for which a sentence of life imprisonment was authorized by statute, namely, the first degree murder of Jerome Robinson[.]"

- "The defendant, Thomas Morocco Hager, has been convicted of two other offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury upon another person, namely, the first degree murder of Jerome Robinson, and the manslaughter while armed of Londell Duvall."

70

[JA 3133–36] Habeas counsel do not dispute that Hager was convicted by juries beyond a reasonable doubt for the Duvall and Robinson killings.[24] Nor do habeas counsel raise any question about the facts of the Duvall killing or suggest that trial counsel was ineffective for not fighting the use of that homicide as an aggravator. Rather, habeas counsel challenge trial counsel's effectiveness in failing to raise doubts about Hager's involvement with the Robinson murder. But trial counsel was aware of all the issues now raised by habeas counsel, and made the strategic decision to enter into the stipulations. The record indicates that this was a wise choice and not ineffective.

Both the Duval and Robinson killings were vicious. The Duvall killing occurred after Hager and Duvall got into an argument over $20, leading Hager to shoot Duvall in the back of the head; Hager then (in the words of the DC prosecutor during opening statement in the Duvall trial) "stepped up and over him and started firing" and "[e]mptied [a] six-shot revolver into Mr. Duvall's

---

[24] Nor could they. At least three federal district courts have followed the rule pronounced in *Custis* in the context of capital sentencing hearings. For instance, in *United States v. Sablan*, 555 F. Supp. 2d 1177, 1192, 1201–02 (D. Colo. 2006), the court rejected the defendant's request to strike the underlying prior conviction used to support a statutory aggravating factor (based on a challenge to its merits), stating that the conviction should be deemed valid under principles of finality and that, allowing a defendant to challenge the conviction, "would create a logistical nightmare, as it would essentially allow the defendant to relitigate the underlying convictions." The court noted its disbelief that "Congress intended such a result when it specified what predicate offenses qualify for the statutory aggravating factors." *Id.*; *see also, e.g.*, *United States v. Chong*, 98 F. Supp. 2d 1110, 1121 (D. Haw. 1999) (holding that, while the government was entitled to introduce information concerning the underlying circumstances of the prior convictions, neither party would be permitted to "relitigate the merits underlying the convictions because of concerns of waste of time, cumulative evidence, and confusion of the issues"); *United States v. Rodriguez*, No. 2:04-cr-55, 2006 U.S. Dist. LEXIS 11230, *3-9 (D.N.D. Feb. 28, 2006) (applying the *Chong* standard to similar claim). Likewise, the ABA guidelines for death penalty defense counsel advise that, in challenging prior convictions alleged as aggravating circumstances, counsel may offer extenuating circumstances that lessen the weight of a prior conviction, but, if a prior conviction is legally flawed, counsel should seek to have it set aside in the jurisdiction where the conviction was obtained. See ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases 10.7, comment. (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 1027 (2003) (citing *Johnson v. Mississippi*, 486 U.S. 578, 586–87 (1988)).

head." [TC0027992–8009] Robinson was killed on March 30, 1995 when Hager and a man named David Parker, wearing masks, kicked down the door to the apartment where Robinson was sleeping with his girlfriend and six-month-old daughter and demanded money. After a scuffle between Parker and Robinson, the three men engaged in a gun fight, and Robinson was killed after being shot eight times—four times in the back and four times in the arms. [TC0025634–5645; *see also* TC0031418 (Duvall Gov't Sent'g Memo); TC0031461 (Robinson Gov't Sent'g Memo).]

Habeas counsel now contend that Hager is "actually innocent" of the Robinson murder, and that trial counsel was ineffective for "fail[ing] to fully investigate the incident and present to the jury the evidence that demonstrated his innocence." In support, habeas counsel challenges the reliability of the evidence presented during the DC trial, including fingerprint evidence, testimony from Charlie Johnson that Hager had made admissions to him, and testimony from Robinson's girlfriend identifying Hager as one of the assailants—evidence that was subject to cross examination and counterargument during Hager's DC trial. Habeas counsel allege "[u]pon information and belief" that the Robinson murder was actually committed by David Parker and Paul Lucas, not Parker and Hager, and state that they will seek to compare unidentified fingerprints recovered from the gun used to kill Robinson with those of Lucas, and also seek Lucas's medical records and autopsy to show that he was treated for a gunshot wound sustained during the Robinson shooting. [Pet. at 53.]

Even making the (considerable) assumption that the evidence would be as habeas counsel surmise (and assuming that the Virginia jury in the Barbara White trial would have reached a different conclusion about Hager's guilt than the D.C. jury that convicted him of the Robinson murder), habeas counsel cannot establish ineffectiveness here because *trial counsel investigated and pursued the very issues habeas counsel now raise in Hager's § 2255 motion*—including the

72

theory that Lucas, not Hager, committed the murder with Parker—and nonetheless decided as a strategic matter to enter into the stipulations regarding the Duvall and Robinson.

For example,  [TC0017111–7112][25] As a result, trial counsel sought to test the bullets recovered from the Robinson crime scene for Lucas's DNA and the gun for his fingerprints. [TC004716] After consulting with Hager's counsel from the DC murder trial [TC0061378–1379], trial counsel moved for the appointment of a ballistics expert [Dkt 237, TC0001172–1180], which the Court granted [Dkt 240]. Trial counsel also sought to track down Parker to interview him. "[W]e want to show it was LucasP, not Hager who was with him, ███████ ██████████. We want to get the DNA off the bullet at the apartment to see if it has any from LucasP because ███████████████████████████████████████████ ██████████████████████████████████████ [TC0016479]

Despite assistance from the government, however, trial counsel could not locate useful DNA or fingerprint evidence. This was not surprising given that Robinson was killed in 1995 and Hager was convicted in 2000. By July 2007, defense investigators had determined that "the only

---

[25] Incidentally, ███████████████████████████████████████
██████████████ [TC0017112]
██████████████████████████████████████████████
█████████████████████████ [TC004716].

fingerprint available from the Robinson murder is the print off the magazine," which matched Hager. "Other prints were lifted off the gun that didn't match Hager. These may [] be Lucas' prints," the investigator noted, but the defense was "not sure we're going to be able to ever get those." [TC0004763] By letter dated September 2007, the government informed trial counsel that "[w]e believe that we have provided you with all of the physical evidence we have been able to locate," including "ballistics evidence in our possession" regarding the Robinson killing, and reiterated that "the original latent fingerprints" from the crime scene could not be located. [TC0042641] Trial counsel filed a motion under *Arizona v. Youngblood* to strike the aggravator homicides in light of this apparent loss or destruction of discrete pieces of physical evidence from those cases, but trial counsel rightly conceded that there is "no indication that the destruction or loss of the evidence in question occurred through bad faith," which doomed such a claim. [Dkt 288 at 2; TC0001354.] Indeed, they internally recognized that "[t]he case law is not good" for their argument. [TC0047513.]

As for Parker (who had never been tried for the Robinson murder), defense investigators located him in August 2007, but he was worried that testifying for Hager might lead authorities to "reopen the case and charge him," even though initially "[t]hey did not have enough evidence to take him to trial with Tommy." As the investigator put it in a memo to trial counsel, "Parker believes he knows what I am asking him to do. He liked Tommy well enough but did not have anything to do with the Robinson murder. He does not want to be returned to Virginia to testify for Tommy. He is afraid they may reopen the case and charge him. This would eliminate any chance of him ever being paroled." [TC0007465]

While trial counsel was vigorously investigating the Robinson murder, they were also engaged in discussions with the government about stipulations. [*See* TC0061481.] Thus, when the

74

opportunity came to stipulate to the barest facts regarding the Robinson murder—and thus to avoid putting before the jury the details of that killing as well as the Duvall homicide (which habeas counsel do not challenge)—trial counsel made a strategic decision to enter into the stipulation. This strategic decision is not only sound—it was a windfall for Hager, who kept from the jury the details of two additional violent homicides. It certainly was not ineffective. *See, e.g.*, *Hooker v. Mullin*, 293 F.3d 1232, 1246 (10th Cir. 2002) ("In light of *Strickland's* direction to deferentially scrutinize counsel's performance and not second guess counsel's strategy after an adverse decision, we cannot say counsel performed below prevailing professional norms in stipulating to the two aggravators. Without the stipulation, the State would have presented the factual evidence of the circumstances resulting in the juvenile convictions." (citation omitted)); *Dyer v. Calderon*, 122 F.3d 720, 737 (9th Cir. 1997) ("Indeed, had [trial counsel] not stipulated to the use of the firearm, the prosecution also could have called the victim of the robbery to the stand to testify. Wanting to avoid this potentially damaging testimony, [trial counsel]'s stipulation was reasonable."), *vacated on other grounds*, 151 F.3d 970 (9th Cir. 1998); *Taylor v. Culliver*, 2012 WL 4479151, at *165 (N.D. Ala. Sept. 26, 2012) ("Clearly, counsel made a strategic decision to make the stipulation to keep the prosecution from discussing the horrific facts of the murders."), *affirmed*, 638 F. App'x 809 (11th Cir. 2015). Indeed, trial counsel attempted to turn these stipulations to Hager's benefit. During opening statements for the eligibility phase, trial counsel stated that the defense had stipulated to these killings "because we have no interest in straining your credulity or goodwill contesting facts that we know to be true." [JA 1484]

     2.     *Trial counsel effectively responded to aggravating evidence regarding Hager's violent activities in prison and his likelihood of future violence.*

As discussed above, the jury was asked to return findings on several non-statutory aggravating factors regarding Hager's actions while incarcerated. There were three specific

75

findings related to this issue: (1) that on March 15, 2003, Hager was "observed hitting another inmate during a large scale prison fight"; (2) that on April 27, 2004, Hager was "disciplined for possession of . . . an eight-inch long metal shank with a sharpened point on one end"; and (3) that on June 29, 2004, Hager was "observed hitting and kicking another inmate during a prison fight." In addition, the jury was asked to find whether Hager "poses a danger to others in that he is likely to commit, and to direct others to commit, additional acts of violence in any setting." The jury unanimously found each of these aggravators to be present beyond a reasonable doubt. [JA 2951–52.]

As will be discussed in greater detail below, Hager offered extensive mitigating evidence on the issue of future dangerousness, and asked the jury to consider mitigating factors on this issue, including that "[t]he Bureau of Prisons has facilities adequate to monitor and prevent any future assaultive and violent conduct" by Hager and that Hager "is unlikely to represent a continuing danger to society, as he already is showing signs of 'aging out.'" [JA 2955–56.] Not one juror concluded that these mitigating factors were present by a preponderance of the evidence.

In order to assess trial counsel's effectiveness in responding to the government's aggravating evidence, it is important to understand trial counsel's general mitigation strategy. Broadly stated, that strategy was two-pronged. *First*, trial counsel argued that Hager, even if violent in the past, was likely to "age out" as he grew older, and thus his history of violence while incarcerated did not mean that he presented a risk of future violence. Trial counsel argued, for example, that as "[t]estosterone levels drop" prisoners "seek stability and routine." [JA 1722][26]

---

[26] In a brief argument at the end of their brief, habeas counsel contend that "[t]rial counsel's decision to present an 'aging out' case was unreasonable and prejudicial" because "it conceded that Mr. Hager was a violent prisoner to begin with" and because Hager had within the last year stabbed Alphonso Satchell "and defense counsel had no plans to contest that allegation." [Pet. at

*Second*, trial counsel argued that BOP "is not an incompetent organization," but rather "a professionally run organization which can handle people far worse than Tommy Hager." [JA 1721; *see also, e.g.*, JA 2724 (The Court: "the thrust of your case was that the Bureau of Prisons can control any future dangerousness.").][27] For example, in one internal memo trial counsel note a conversation with Mark Cunningham, who offered expert testimony about future dangerousness, "aging out," and BOP's ability to control prisoners. Cunningham actively *discouraged* trial counsel from doing an individualized risk assessment of Hager, because Cunningham "believe[ed] that Tommy, unfortunately, is a greater risk in the BOP System than most individuals whom he has interviewed." Thus, Cunningham advised that trial counsel adopt "Plan B," "which would be

---

187.] It is undisputed that Hager *was* a violent prisoner to begin with and he had in fact stabbed Satchell. In light of this record, Dr. Cunningham concluded that a risk assessment "presents as a mixed picture" because "Tommy, unfortunately, is a greater risk in the BOP System than most individuals whom he has interview." [TC0004812.] Even now, habeas counsel do not (and cannot) dispute the facts of Hager's prison record. These facts would have been before the jury whether or not trial counsel presented an "aging out" argument, and counsel cannot be deemed ineffective for acknowledging indisputable facts and at least attempting to blunt their impact. Habeas counsel do not even attempt to argue what alternative theory should have been pursued, and thus they cannot establish prejudice.

[27] In a brief argument at the end of their brief, habeas counsel contend that "[t]rial counsel's decision to present this testimony was unreasonable and prejudicial for the same reason that their decision to present 'aging out' testimony was: it conceded that Mr. Hager was someone that the BOP needed to 'contain' and control, including by sending him to the most secure facility in the BOP system, ADX Florence." [Pet. at 188–89.] This claim fails for the same reasons provided in the footnote above. Habeas counsel also contend that "counsel should have investigated, discovered and presented the available evidence that demonstrates compellingly [1] that Mr. Hager was not a violent prisoner, [2] that some involvement in large prison altercations over the course of a lengthy incarceration in a penitentiary is unavoidable and [3] that, in fact, as the BOP had found repeatedly, Mr. Hager actually represented a low risk of violence as compared to the average prisoner." [Pet. 189–90.] The first category of evidence is contrary to fact and did not exist. The second category was presented at trial. And, as discussed above, the third category—psychological reports showing normal functioning—would have conflicted with trial counsel's mitigation strategy and would be even more flatly contrary to the mental health strategy now recommended by habeas counsel.

77

to talk about what is available within the BOP System to assure that whatever risk the client presents that risk can be reasonably accommodated by the BOP." [TC0016477] Another one of the defense experts, Harvey Cox, noted in an email to trial counsel that "[t]he reality of prisons and jails, no matter how secure, is that inmates frequently find ways to fashion weapons," and that even where a facility has "procedures to curtail weapons," "it occurs anyway." [TC0016458.] Knowing trial counsel's strategy, Cox acknowledged that this fact "does not help your case." [TC0016458][28]

Habeas counsel now attack, piecemeal, trial counsel's response to the government's aggravating evidence. But habeas counsel's after-the-fact arguments do not even acknowledge trial counsel's overall mitigation strategy, and habeas counsel do not offer a coherent mitigation strategy of their own. As will be shown below, trial counsel was not ineffective in challenging the government's aggravating evidence for many reasons. But primary among them is that, had trial counsel taken the approach now advocated by habeas counsel, all they would have done is

---

[28] In a brief argument at the end of their brief, habeas counsel contend that trial counsel were ineffective because Dr. Cunningham conceded that the best predictor of an inmate's future violence is his past violence. Habeas counsel contend that "Dr. Cunningham told the jury that the government's argument that Mr. Hager represented a future danger to others in prison based on his prior record was correct." [Pet. at 190.] (At the same time, Cunningham testified that "the research demonstrates that the seriousness of the offense that sent you to prison is not predictive of your likelihood of violence in prison" [JA 2025], thus importantly clarifying that the fact that Hager was convicted of murder did not make him more likely to engage in violence. Of course, as discussed in the preceding footnotes, Dr. Cunningham's professional judgment, expressed privately to trial counsel, was that Hager "is a greater risk in the BOP System than most individuals whom he has interviewed" and though Hager had not caused any serious injuries in prison "[t]his is as much by the Grace of God as by anything that can be attributed to Tommy Hager." [TC0004812–13.] Habeas counsel do not provide any reason to dispute this conclusion. Trial counsel made a strategic decision to present Dr. Cunningham's despite his opinion on Hager's future dangerousness, concluding that the positive aspects of his testimony outweighed this drawback. That strategic decision was not ineffective.

convince the jury—contrary to their overall mitigation strategy—that the BOP is a dangerous place and that Hager is bound to be involved in future violence.

**The DC-Alabama Altercation.** One of the government's non-statutory aggravators was that "[o]n or about March 15, 2003, while incarcerated at U.S.P. Pollock, a penitentiary, the defendant was observed hitting another inmate during a large scale prison fight, which resulted in a prison lock down." The government's evidence in support of this aggravating factor included:

- Jason Shannon, a prison guard at USP Pollack, testified that in 2003 he was called to break up "an altercation between District of Columbia inmates and . . . Alabama inmates." He testified that, as he approached the inmates, he saw Hager fighting with another inmate and he gave him "a direct order to stop fighting and lay down on the ground," but Hager "refused the order," requiring Shannon to "actually push[] him to the ground. He immediately jumped back up. So I took control of him with considerable more amount of force and put him on the ground." [JA 1793–94.]

- John Feeney, a Special Investigative Agent at USP Pollack, was in charge of conducting the formal investigation into the March 2003 DC-Alabama fight. He testified that he arrived at the prison shortly after the altercation began to find "uncontrolled fighting" with 40 or 50 people involved. [JA 1799–1800] Based on subsequent interviews, he learned that the fight arose out of an inmate basketball game. [JA 1801–02] During his testimony, Feeney identified Hager in video surveillance stills showing him going to a residential living unit where he was not allowed and "pulling on another inmate" and "on top of" another inmate. [JA 1806–08] He also testified that the prison went into lockdown after the incident, a precautionary step to avoid the overlapping alliances of gang networks in the prison from triggering a riot and losing control of the institution. [JA 1815–16] As part of the discipline process for the incident, Feeney recommended that Hager be transferred from USP Pollock to a facility where he would be "locked down, for the most part, 23 hours a day." [JA 1819] (Hager was eventually transferred, but not before he was involved in the DC-Memphis altercation, discussed below.)

Habeas counsel do not contend that trial counsel should have objected to this evidence as a general matter. Rather, they fault trial counsel for not using cross-examination to elicit testimony that, "[a]lthough the DC inmates at USP Pollock were not a gang, they generally stuck together" and followed an "unwritten rule" of joining in fights on behalf of other DC inmates. [Pet. at 70.] Such testimony, they contend, "would have corroborated the testimony of correctional officer Randy Ryland, who testified during the penalty phase that if a member of your group was involved

79

in a fight, you were expected to help, and that there were consequences if you did not," and would have "rebutted Feeney's testimony that fights are usually "a one-on-one thing" and that inmates "try to avoid those big groups, two groups getting at it." [Pet. at 70.]

As noted above, however, trial counsel's mitigation strategy involved establishing that Hager was likely to age out and that BOP had control over its prisons. Had trial counsel followed the approach now advocated by habeas counsel, they would have undercut their overall strategy and invited the jury to conclude that Hager—even if not the instigator—was bound to continue participating in future prison riots in out-of-control BOP facilities. Whether as instigator or mere participant, the conclusion would be the same: Hager had previously been involved in prison violence and was likely to continue that pattern. Indeed, the case that Hager was likely to be involved in future violence is arguably strengthened by testimony that he will be "expected" to join future fights.

Trial counsel's internal communications reflect precisely this concern. In one email with Cunningham, for example, trial counsel noted that "the altercations have been in part subject to a gang analysis. That is, the DC Prisoners vs. the Alabama Prisoners could flag an issue for the BOP which might require a higher level of caution in handling Tom Hager." [TC0016477.] In another internal memo, trial counsel note that they had "cautioned" Hager that it was "critical" that he not get into further disciplinary trouble while awaiting trial at the Alexandria Jail, as this "could well mean the difference between life and death." [TC0004772.] In other words, it mattered little *why* Hager had been involved in prison violence in that the past. Trial counsel knew they had to convince the jury that he was unlikely to be involved in it in the future. Habeas counsel's current critiques regarding the DC-Alabama fight would not have addressed this concern.

80

**Hager's possession of a shank at U.S.P. Pollock.** The government also offered evidence in support of its non-statutory aggravator that "[o]n or about April 27, 2004, while incarcerated at U.S.P. Pollock, the defendant was disciplined for possession of a dangerous weapon, an eight-inch long metal shank with a sharpened point on one end." Randy Ryland, a guard at USP Pollack when Hager was there in 2004, testified that in April 2004 he searched Hager's cell and found an eight-inch sharpened metal shank behind the toilet. [JA 1850–51.] He also testified that in approximately 15 years at the BOP he had recovered "approximately 400 shanks" from inmates. [JA 1848.] Habeas counsel do not appear to challenge trial counsel's effectiveness regarding this evidence and the jury's finding of an aggravator based upon it.

**The DC-Memphis Altercation.** Another of the government's non-statutory aggravating factors was that "[o]n or about June 29, 2004, while incarcerated at U.S.P. Pollock, a penitentiary, the defendant was observed hitting and kicking another inmate during a prison fight, which resulted in a prison lock down." In support of this aggravator the government offered evidence including:

- Feeney testified that the altercation between DC inmates and Memphis inmates started when a Memphis inmate got into an altercation with one of the DC "shot callers," [JA 1812–13] who was "directing the DC inmates" [JA 1836]. Based on his review of surveillance videos and interviews with individuals present for the incident, he testified that Hager stabbed another inmate named Starks, and that a knife was later recovered from Hager. [JA 1841–42.]

- Bruce Davidson, a guard at U.S.P. Pollock, testified that as the inmates saw guards approaching the fight, they "converged in three circles": an "inner circle" where the beating and stabbings were occurring, a "second circle" to keep the guards out, and a third circle of "the DC shot callers that were directing the stabbing and the beating." [JA 1867] Hager was on the inside. As Davidson approached the inner circle, he observed Hager stabbing Starks "several times. Then when I got there, I knocked him on his ass. He still continued to fight and try to get at Mr. Starks. I had to physically hold him to the ground while we tried to control the rest of the scene. But he didn't stop." [JA 1867–68] He saw that Hager "had a metal shank; a nice one." [JA 1868.] He "took it right out of his hand." [JA 1869.]

81

Again, habeas counsel does not contend that trial counsel should have objected as a general matter to the evidence of the DC-Memphis fight, nor do they contend that trial counsel should or could have avoided a jury finding on this aggravator. In other words, there is no dispute that Hager was involved in the fight. Rather, they offer piecemeal critiques of trial counsel's handling of this issue.

*First*, habeas counsel fault trial counsel for not objecting to the evidence that Hager stabbed Starks during the fight, arguing that Feeney's and Davidson's testimony was improper because the government's death notice "did not state that Mr. Hager stabbed anyone during the DC-Memphis altercation." [Pet. at 61–63.] Habeas counsel contend that "[h]ad trial counsel made a timely objection and timely motion for a mistrial, . . . the Court would have granted a mistrial, or, at the very least, stricken Feeney's testimony and forbade any further testimony that was inconsistent with the Notice of Intent." [Pet. at 62–63.] But the Fourth Circuit has held that the death notice must only provide the defendant with "adequate notice of the aggravating factor, . . . not notice of the specific evidence that will be used to support it." *United States v. Higgs*, 353 F.3d 281, 325 (4th Cir. 2003). Trial counsel was well aware of *Higgs* (which habeas counsel do not cite), and of the futility of objecting to evidence that Hager stabbed Starks because they had already failed at pressing such an argument in response to evidence of an additional stabbing Hager had committed while incarcerated at Northern Neck (discussed in greater detail below).

In any case, trial counsel *did* move for a mistrial (albeit after the testimony about stabbing Starks had already come in), arguing (precisely as habeas counsel now contend they should have) that "[t]he notice of intent never alleged as an aggravator that [Hager] stabbed Mr. Starks," and contending that the government should be "limited to their proof by what they formally gave notice of as an aggravator." [JA 2479] The Court properly denied this motion, consistent with *Higgs*.

82

Further, and as the government argued at the time, even if evidence of the stabbing went beyond the narrower allegations in the death notice relating to Hager's mere involvement in the DC-Memphis fight and the attack on Starks, "the defense put on a case dealing with future dangerousness. [Thus,] [e]ven if [evidence that Hager had stabbed Starks] had not come in as part of [the government's] case-in-chief, it certainly would have been permissible rebuttal" because "the general nature of future dangerousness would encompass evidence such as this." [JA 2480] Habeas counsel does not acknowledge, let alone challenge, this argument.

*Second*, and apart from whether or not the stabbing was included in the death notice, habeas counsel fault trial counsel for not objecting to the stabbing evidence on the basis that its admission was "fundamentally unfair" in that, "[h]ad trial counsel known that the government was going to present evidence that Mr. Hager had stabbed an inmate at U.S.P. Pollock, counsel would have pursued a different investigative and trial strategy concerning the DC-Memphis altercation." [Pet. at 63.] Significantly, habeas counsel omit to note that Hager raised this issue on direct appeal, where he "contend[ed] that the district court plainly erred in allowing testimony" regarding the Starks stabbing "although the final report characterized the incident as only a fight." *Hager*, 721 F.3d at 201. The court of appeals was unmoved, noting that Davidson and Feeney "were cross-examined on this discrepancy. . . . Simply stated, this was an issue for the jury to decide." *Hager*, 721 F.3d at 201.

In any case, trial counsel *did* in fact know that the government was likely to present evidence of Hager's involvement in the stabbing of Starks. For one thing, contrary to habeas counsel's contention that the DC-Memphis report "concludes that Mr. Hager did not stab Starks,"[29]

---

[29] Separately, habeas counsel allege that trial counsel should have moved to admit the BOP incident reports regarding the DC-Alabama altercation and the DC-Memphis altercation, alleging that "the

the document actually indicates that "it is suspected inmate Hager was in possession of a weapon

during this incident, [though] no specific weapon could be directly linked to him." [TC0038019][30]

DC-Alabama Report paints a picture of Mr. Hager's relatively minor role in the DC-Alabama altercation that was not captured by witness testimony" and "the DC-Memphis Report not only concludes that Mr. Hager did not stab Starks, it affirmatively identifies the inmate who did the stabbing." [Pet. at 65.] But the incident reports plainly contradict this argument. The report from the March 2003 DC-Alabama incident corroborates testimony from government witnesses by listing Hager among the inmates "significantly involved" in the "rioting." [TC0038050] It also includes other aggravating details that were not presented at trial, including that one inmate was severely stabbed. [TC0038061] Though Hager was not involved in the stabbing, the detail undercuts trial counsel's argument that BOP was able to control inmate populations. The report also provides data on several inmates indicating that they—unlike Hager—had "not received any disciplinary reports," [TC0038053–8056], thus undercutting the idea that Hager was a generally peaceful prisoner who was unwillingly swept up in prison violence. And the report contains other evidence that directly undercuts trial counsel's mitigation themes, including statements by inmates predicting that the fight "would probably go right back on" until the other side stabbed someone in retaliation [TC0038077–8081], statements expressing fear that the DC inmates are a "very wild breed" with knives who "can't keep peace for nothing" [TC0038079], and indications that inmates use their work assignments to store weapons [TC0038085]. The report from the June 2004 DC-Memphis fight similarly corroborates the testimony of government witnesses in key parts, including by placing numerous shanks in Hager's location and Davidson's report that he saw Hager in possession of a weapon. [TC0038005–8006.] And it contains comments from inmates expecting "retaliation," and that "things are not over" and "there will be another assault." [TC0038010.] that "DC inmates are always starting problems" and "running things." [TC0038010.] Admitting these documents would have affirmatively harmed Hager's penalty-phase case.

At the end of Hager's § 2255 motion, habeas counsel allege that the government violated its discovery obligations by failing to produce memorandums filed by the prison guards, draft BOP incident reports, attachments to the reports, and recordings from the incidents. [Pet. at 197–99.] But the government produced all information of which it was aware. This is confirmed by the fact that trial counsel independently subpoenaed the BOP for Hager's prison records and apparently did not obtain the materials that habeas counsel now presume exist.

[30] The report contains significant other circumstantial evidence that Hager possessed a weapon during the melee. For example, Officer Davidson submitted a memorandum stating that he "saw several weapons were recovered in the immediate area," including "one belonging to inmate Hagar, Thomas," which was "in [his] possession. Four other weapons were recovered but could not be associated with specific inmates." [TC0038006] Trial counsel's handwritten notes next to this information read: "Δ used shank." Lieutenant Taylor submitted a memorandum identifying eight inmates (including Hager) involved in the attack on Starks and stating that "[a]n immediate search of the area where the fight occurred was conducted discovering (6) six homemade weapons." [TC0038005] Later, the report identifies four "homemade sharpened metal weapon[s]

84

In addition, trial counsel clearly anticipated the need to respond to evidence that Hager was involved in the stabbing, illustrated by the fact that trial counsel brought Starks to trial, and expressly represented that they were "considering" calling him "strictly to say that he was not, in fact, stabbed by [Hager]." [JA 2540.][31]

To the extent that Davidson's and Feeney's testimony went beyond the conclusions in the DC-Memphis incident report, they and other witnesses provided explanations for why every detail observed by a guard might not make it into a final BOP report. Feeney, for example, explained that "inward prison channels . . . didn't think there was enough evidence to support" a finding that Hager himself stabbed Starks [JA 1813–14] because "you couldn't actually see the weapon" on the video, and "nobody else would sign" the report with that conclusion in there. [JA 1835] He further explained that the warden would not sign the report to state that Hager had actually stabbed Starks, because there wasn't "enough evidence to support the stabbing. You could see the motion on the video, but you couldn't actually see the weapon." [JA 1841][32] Davidson likewise explained

---

found on the ground" where the attack occurred that could not be linked to specific inmates. Hager's personal incident report noted that he was identified by staff and video surveillance "repeatedly striking and kicking" Starks, and also states that Starks "sustained a two inch laceration to the lower left abdomen, a quarter inch laceration to the right forehead, a quarter inch puncture wound to the mid right thoracic area, and half inch puncture wound to the left sacral area, and bruising and swelling to the left mandible area." [TC0063925]

[31] Habeas counsel separately allege that trial counsel were ineffective in deciding not to call Starks and other inmates whom they had brought to Alexandria for trial. This argument is addressed in greater detail below.

[32] Separately, habeas counsel allege that trial counsel was ineffective for failing to develop and present the testimony of Associate Warden Bobby Tyler to rebut Davidson's testimony that someone who was "looking out for" Hager had removed the conclusion that Hager stabbed Starks and had been found with a knife after the DC-Memphis altercation, and Feeney's testimony "that 'Mr. Tyler' was one of the staff members who had refused to sign the Report if it stated that Mr. Hager had done the stabbing.'' [Pet. at 72.] According to habeas counsel, Tyler would have said that "if the Report did not conclude that Mr. Hager had stabbed Starks or been found with a shank, as Feeney and Davidson testified, it was because there was not enough evidence to support those

that, to the extent that the final report of the DC-Memphis incident did not indicate that Hager had a shank during the attack, that could be attributable to "somebody . . . looking out for him." In prison, Davidson noted, "you can control behavior a lot by lessening the severity of some of the infractions. . . . [I]t happens every day in very single prison." [JA 1870–71.] Habeas counsel now describe this as "shocking testimony" that "that BOP officials 'cover up' serious assaults to help certain inmates" and contend that "trial counsel's failure to object was highly prejudicial to Mr. Hager because it left the jury with the impression that Mr. Hager did stab Starks and was found with a shank, but those events were removed from the final report *only* because someone was looking out for Mr. Hager." [Pet. at 56–57.] To the contrary, the benign explanations provided by Feeney and Davidson merely clarified that prison justice often functions like formal judicial process, relying on charge bargaining and suspended sanctions to control prisoner behavior. [*See, e.g.*, TC0063941, TC0063958.] There was also evidence that prisons had an incentive to shape disciplinary reports in order to avoid unduly punishing innocent victims of prison violence. For example, Lonnie Barnett testified that written disciplinary reports can lead to unfavorable (and unfair) consequences for victims as well as perpetrators, including additional threats to prisoners and disruptive transfers to protective custody. [JA 2651][33]

---

conclusions." [Pet. at 72.] But that is entirely consistent with what Feeney said at trial. There is nothing "shocking" about a warden's wanting additional evidence of an offense before agreeing to make an official finding on it, just like there is nothing shocking about an AUSA insisting that an agent develop additional evidence of a crime before agreeing to bring an indictment in a case.

[33] This testimony is corroborated by the reports of the DC-Alabama and DC-Memphis altercations. The report on the DC-Alabama riot recommended a transfer for the assault victim even though he "played no active role in this incident and was chosen because of his prior residence in Alabama. He was clearly sleeping when he was assaulted by an inmate armed with a knife." [TC0038092] The report on the DC-Memphis fight recommended moving an inmate even though he was "not engaged in any activities at USP Pollock to bring this situation on himself, and is considered a verified protective custody case." [TC0038022]

*Third*, habeas counsel allege that trial counsel failed to use the official reports to cross-examine Feeney and Davidson regarding (1) Feeney's testimony, contrary to the DC-Memphis Report, that inmates had reported seeing Hager stab Starks [Pet. at 63–64], (2) Davidson's testimony that he had seen Hager stabbing Starks and took a shank away from Hager, even though the report indicated that Davidson submitted a memorandum in which he only mentioned Hager "striking Starks with closed fists and kicks" [Pet. at 64]. But again, trial counsel *did* cross examine Davidson and Feeney on precisely these points. In cross-examining Feeney, trial counsel obtained admissions that the report that he endorsed did not state anywhere that Hager stabbed anyone [JA 1834–35], that Hager was not listed among the 29 "inmates identified as a source of tension among DC inmates," and that his report had significant errors regarding whether other inmates struck and stomped Hager [JA 1831–32]. As for Davidson, on cross-examination he stated that he "could only speculate" as to who was watching out for Mr. Hager. [JA 1877.] Davidson further conceded that he could not find any mention in the final report "of a shank being recovered from Mr. Starks [*sic*; undoubtedly should be Hager] in the BOP report on the incident." [JA 1876.] On this point, trial counsel actually came away with more than they were entitled to from Davidson, who failed to notice that the report plainly references his memorandum in which he reported that he "saw several weapons were recovered in the immediate area," including "one belong to inmate Hager, Thomas," which was "in [his] possession." [TC0038006] Rather than gild the lily with Davidson and risk him realizing his error, trial counsel wisely pocketed this concession and moved on.

*Fourth*, habeas counsel challenge trial counsel's alleged failure to object to Davidson's allegedly "vague, baseless, and unreliable opinion testimony" and the "outrageous and speculative testimony" "regarding Mr. Hager's conduct at U.S.P. Pollock, the conditions at U.S.P. Pollock and their effect on correctional officers, and Mr. Hager's future dangerousness." [Pet. at 54.]

87

Much of Davidson's testimony that habeas counsel now casts as "outrageous" and "unsubstantiated" [Pet. at 55]—including Davidson's testimony that Hager "used to carry a lot of weapons around the yard," that he "was a member of a pretty roughly [*sic*] crowd," "probably one of the worst" at the prison, and that he was "dangerous himself." [JA 1865], or that Hager "just laughed" [JA 1869] when Davidson took a shank away from him—was rationally based his "many" dealings with Hager and his sixteen years of experience with BOP. Certainly a BOP guard is qualified to offer his factual experience with an inmate. Likewise, Davidson's testimony that, had guards not broken up the Starks attack in time, Starks "would be dead without a doubt" [JA 1868] was based on Davidson's personal observation of the attack and Starks's condition immediately afterwards. Starks, Davidson testified, "was stabbed several times, and he was literally beat to hell." [JA 1869] Colorful testimony is not objectionable.

To be sure, some of Davidson's statements crossed the line. But when this occurred, the Court pointedly interrupted and admonished Davidson, and trial counsel cannot be ineffective for choosing to avoid drawing further attention to this testimony when the Court had already intervened. For example, at one point Davidson—not in response to any question from government counsel—began to talk about "things you might see on TV" before the Court *sua sponte* interrupted him. [JA 1872–73] Moments later, Davidson, again unprompted, offered that "I don't own a swimming pool, but I buy bleach from the pool store in five-gallon jugs to keep on my--" [JA 1873], leading the Court to interrupt him again and strike his testimony. Davidson also stated (again not in response to any question from government counsel): "I'm telling you, this guy is not done killing. He is going to get back out, and he is going to do it--" at which point the Court immediately cut him off. [JA 1871] At sidebar after Davidson's testimony, government counsel moved to strike the comment, and the Court noted that defense counsel "should have moved at

88

that time," to which trial responded: "It was said." [JA 1881] Whether or not trial counsel should have drawn further attention to the statement by moving to strike it, or simply relied on the district court's *sua sponte* interruption is a question of tactics, and trial counsel cannot be deemed ineffective for deciding it was best to let the comment go. *See, e.g.*, *Gatti v. Cain*, 558 F. App'x 496, 498 (5th Cir. 2014) (holding that defendant "cannot overcome the presumption that counsel made a reasonable strategic decision to decline the admonition," where trial counsel explained to the Court: 'I'm not going to request an admonition. That just calls their attention to it more'"). Habeas counsel make much of this comment from the Court and of trial counsel's failure to object or move to strike at an earlier point, contending that "[t]here is no conceivable strategic or tactical reason for counsel not to have objected" [Pet. at 58], and suggesting that the Court implied that it would have granted a mistrial had trial counsel immediately moved for one. This is inaccurate, as the Court made clear that its curative instruction remedied any prejudice from Davidson's comment. [JA 1880–81.]

His credibility severely diminished by having three times been interrupted by the Court,[34] Davidson was also further undermined by trial counsel's effective cross-examination. For example, he refused, utterly implausibly, to concede that an inmate's physical size has anything to do with his ability to defend himself. [JA 1875] After testifying on direct that Starks was "literally beat to hell" and "would be dead without a doubt" if guards had not quickly intervened [JA 1868–69], he backtracked on cross and refused to call Starks's injuries life threatening. [1875] After

---

[34] Davidson did not present as a particularly polished witness. He appeared in court wearing an Indiana Jones style leather jacket. And his repeated and gratuitous use of curse words in the course of only a few minutes on the stand—"Then when I got there, I knocked him on his ass" [JA 1867], "When I knocked him on his ass, he did" [JA 1868], "Goddamn it, Hager, I just caught you a week ago, and here you are with another weapon" [JA 1869], "Oh, Jesus. He -- pardon the expression, he was . . . literally beat to hell" [JA 1869]—could not have enhanced his credibility with the jury. Habeas counsel thus overstates his persuasiveness and influence as a witness.

89

initially insisting on cross that the incident report included a copy of a memo he wrote stating that he found a shank on Hager, when confronted with the report he was forced to concede "You know what? I don't see it." [JA 1876–77] (As noted above, it turns out that Davidson was correct—the report did indicate that Davidson found a shank on Hager—but the jury never learned that.) On direct, he stated that "[s]omebody was looking out for [Hager]; not just him personally, but there is a very powerful group on the yard that control a lot of things," [JA 1870]; on cross, he backtracked and stated that he only "speculated that's why" mention of Hager stabbing Starks was not in the final report. [JA 1877] And after testifying on direct that "[t]here is no way to modify [the] behavior" of prisoners serving life sentences, and "no incentives not to get in trouble. I mean, you can't do anything to them, literally." [JA 1872], Davidson conceded on cross that privileges such as commissary, visitation, and telephone access can be granted or withdrawn as a means of influencing inmates' behavior. [JA 1879]

Of course, it bears repeating that the issue in this 2255 petition is not the propriety of Davidson's commentary—some of which was objectionable—but the effectiveness of trial counsel's response. On the latter issue, habeas counsel's case falls short.

*Fifth*, habeas counsel contend that trial counsel "unreasonably failed to develop and present the testimony of other inmates who were incarcerated at U.S.P. Pollock and who witnessed or participated in the DC- Alabama altercation, the DC-Memphis altercation, or both," even though "[t]hese witnesses had information that would have helped undermine and rebut the government's future dangerousness case generally and the testimony of Feeney, Davidson, and other BOP correctional officers specifically." [Pet. at 68–69.] According to habeas counsel, these inmates would have "undercut the government's argument that Mr. Hager was a violent and uncontrollable inmate who started fights and had weapons for the purpose of attacking and attempting to kill other

90

inmates" [Pet. at 71] by testifying: that Hager "did not start the DC-Alabama altercation but simply got mixed up in it" [Pet. at 69]; that Hager "did not start the DC-Memphis altercation but simply got mixed up in it" [Pet. at 69]; that Hager did not stab Starks [Pet. at 70]; that "[i]f a fight broke out involving a DC inmate, there was an unwritten rule that other DC inmates were expected to join in" [Pet. at 70]; that "[s]hanks were common" at U.S.P. Pollock and inmates needed them for protection [Pet. at 70–71]; and that the BOP staff were biased against DC inmates.

To begin, many of the points above were elicited by trial counsel either through cross-examination of government witnesses or through direct examination of the witnesses whom trial counsel called in mitigation. For example, Shannon conceded on cross-examination that he did not see who started the fight between Hager and the other inmate. [JA 1795.] Feeney also testified that, "[e]very time you have an incident like that, there is always the danger that other groups will become involved and pick sides. And that results in more people getting hurt." [JA 1812] On cross-examination, Davidson testified that there are many shanks in prison. [JA 1875.]

Further, contrary to habeas counsel's contentions that trial counsel "unreasonably failed to develop" testimony from other inmates, trial counsel's files indicate that trial counsel *did* undertake extensive investigations regarding potential testimony from other inmates, including by conducting numerous in-person interviews and by bringing several inmates to Alexandria for trial. [*See, e.g.,* TC0017260 (Jan. 2007 email from defense investigator re: "Inmate Tour Status" detailing plans to contact or visit ten inmates); TC0037884–7888 (defense witness list showing at least ten potential inmate witnesses).] The information developed from these investigations was typically unhelpful in that, as discussed above, it would have significantly undermined trial counsel's theory of the case.

91

For example, one inmate, Alvin Narce, described the DC-Memphis altercation as originating between one DC inmate and another Tennessee inmate and the stakes rising. "They all leave the court. They get weapons. Word spreads and everyone is 'off the bench.' There were about 40 DC guys back about 5 minutes later . . . . Alvin sees Nick Starks and goes up to him— they fight and Alvin stabs Starks—they tried to say that Tommy stabbed him, but Alvin did it . . . ." [TC0004823] Another inmate, Michael Davis, said that several inmates had recently been involved in a 'strike" against the guards; while inmates were free not to participate in the strike, "if you didn't you would have been given a hard time and seen as weak." [TC0016368.] Other inmates offered potentially helpful information but indicated that they would not testify at trial. For example, Anthony Riley "said he didn't remember Tommy and even if he did he wouldn't talk about any information pertaining to other inmates." [TC0061305]

Habeas counsel do not disclose the identity of the prison inmates whose testimony they now allege trial counsel should have developed and presented[35] Hager thus should be deemed to

---

[35] Habeas counsel offer specifics with regard to only two inmates: Anthony Holstick and Nick Starks. Holstick, they claim, "would have testified that during the [DC-Alabama] altercation he threw a punch at Mr. Hager, that Mr. Hager never struck him, and that everyone from a particular community needed to 'clear the bench' if a member of that community became involved in a fight," and would have "refuted the testimony of government witness Jason Shannon," a correctional officer who "testified that he saw Mr. Hager fighting with Holstick." [Pet. at 67.] Starks apparently "would have testified that Mr. Hager did not stab him." [Pet. at 68.] "Hearing from Starks directly that Mr. Hager did not stab him would have resolved any doubts that the jury may have had about Mr. Hager's actual role in that altercation."

In fact, trial counsel were prepared to call Holstick and Starks for precisely these purposes, and sought a pretrial ruling that such testimony would not open the door to the government "offering yet unnoticed acts of violence." [JA 2537] The Court noted that it could not, of course, rule on what kind of cross-examination or rebuttal would be permissible without hearing the testimony. [JA 2541] Trial counsel ultimately decided to abandon these witnesses, a strategic decision that cannot be deemed ineffective considering the risk of opening the door to evidence like that discussed below.

have waived this claim. But even if the government must shadowbox with mystery prisoner-witnesses, there is reason to doubt habeas counsel's post-hoc claims regarding inmate testimony. *See, e.g.*, *Herrera v. Collins*, 506 U.S. 390, 423 (1993) (O'Connor, J., concurring) ("Affidavits like these are not uncommon, especially in capital cases. They are an unfortunate although understandable occurrence. It seems that, when a prisoner's life is at stake, he often can find someone new to vouch for him. Experience has shown, however, that such affidavits are to be treated with a fair degree of skepticism."); *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992) ("This sort of latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have believed the heart of Shano's account of petitioner's actions.").

In any case, regardless of the new information habeas counsel may (or may not) have acquired from their mystery inmates, they cannot succeed in showing that trial counsel—after conducting the thorough investigation discussed above—was ineffective for not interviewing every potential inmate who may have been involved in the prison fights. When there is a challenge to the adequacy of counsel's investigation, the Supreme Court stated: "In assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable

---

In any case, while Starks told investigators that "he knows the subject who stabbed him was not Hager," he also told them that he "had words with Tommy in a past incident and nothing came of it," and could not say whether Hager was involved in the DC-Memphis fight because "there were about thirty of the D.C. group involved." [TC0017225.] (Incidentally, and contrary to habeas counsel's confident predications about what Starks would have testified to, trial counsel's notes indicate that Starks initially refused to get on the bus to come to Alexandria to testify for Hager [TC0017354], and was "reluctant (unwilling) to name this person" who actually stabbed him. [TC0008427] Trial counsel would be understandably wary of presenting testimony from such an unpredictable witness, especially when balanced against the disastrous potential downside of calling a witness to the stand only for him to refuse to testify.)

attorney to investigate further." *Wiggins*, 539 U.S. at 527. Trial counsel could reasonably conclude that seeking out and interviewing every possible inmate involved in the prison riots would have produced only diminishing returns. Whatever the prisoners would say, trial counsel could not offer evidence that Hager wasn't involved in the fights (because he was), and would be at significant risk of opening the door to additional evidence of violence and other bad acts. Essentially, habeas counsel contends that, in countering the future dangerousness aggravator, trial counsel should have argued that Hager was not the instigator, but merely a participant, in the prison violence. While that may have had the effect of diminishing his culpability, it would not have reduced the case for his future dangerousness. In other words, it was *because* of trial counsel's investigations, not for failure to conduct them, that trial counsel were well informed in choosing not to present testimony from other inmates. Habeas counsel cannot show that this decision was ineffective.

Critically, trial counsel also knew that calling additional inmate witnesses to testify on the topics identified by habeas counsel risked opening the door for the government to present evidence of additional acts of violence committed by Hager while incarcerated. Trial counsel was acutely aware of this risk. For example, in discussing whether to call inmate Michael Davis regarding the 2003 incident, trial counsel warned that they should "check . . . on how far the door is opened when we put these guys on." [TC0020117.]

Trial counsel had good reason to fear opening the door, because they were aware that Hager had committed numerous other acts of violence while incarcerated, beyond those already presented to the jury by the government at trial. This included violent conduct towards prison staff and guards, a new category of violence beyond the inmate-on-inmate violence that the government had presented in its penalty case-in-chief. For example:

- In February 1998, while incarcerated in the District of Columbia Department of Corrections, Hager "became loud, abusive and disrespectful" when a guard refused to

94

open a door for him. "He shouted 'you [mother] fucking bitch, I'll see you on the street and fuck you up.'" [TC0063431.]

- On another occasion in April 1998 Hager walked past a DC DOC guard "pointing his finger in a threatening manner yelling you 'punk ass motherfucker'" and later "continued to be more aggressive and threatening towards me without cause." [TC0063432.]

- In October 1998, Hager, while incarcerated in the DC DOC, Hager "was . . . identified by photo as being 1 of the inmates involved in stealing canteen by knifepoint." [TC0063436.]

- In November 1999, DC guards searching Hager's cell "discovered a metal rod approximately 8 inch long which had been sharpen[ed] to a point concealed in the lining of his institutional coat." [TC0063467.]

- In April 2003, while incarcerated at U.S.P. Pollock, Hager "refused staff orders to submit to restraints to be moved out of the recreation cages" and "[f]orce had to be used to remove" him. [TC0063608.]

- In August 2003, at U.S.P. Pollock, Hager refused a pat-down search from a guard, approaching the guard "in a threatening manner, waving his arms in the air and loudly stat[ing] 'You gonna have to hit the duces.'" [TC0063529.]

In addition to this information which trial counsel knew was in the government's possession, trial counsel also had reason to be concerned about other details coming out on cross-examination from their own witnesses. Susan Hines, whom trial counsel called to testify on the issue of "aging out," told trial counsel that, while incarcerated at BOP Pollock, Hager "ran a tight ship" and "'was up to his eyeballs in the business.'" [TC0007302.] Ted Hull, the warden at Northern Neck (where Hager was incarcerated immediately before being brought to the Alexandria detention center prior to trial), told defense counsel "that Hager was a much greater problem than Ted understood and he is lucky there was no serious injury to anyone—Hager had a lot of people frightened and he was sort of 'running' the place when he was in general population."

95

[TC0020053.][36] Having weighed the risks that this information would come out—on cross-examination or rebuttal—trial counsel cannot be ineffective for having concluded that Hager's mitigation case was best served by not presenting the unpredictable and unreliable testimony of additional prison inmates.

**General evidence of future dangerousness.** In addition to alleging and proving aggravating factors related to the specific incidents of violence discussed above (the DC-Alabama fight, the shank possession, and the DC-Memphis fight), the government alleged and the jury found beyond a reasonable doubt that Hager "poses a danger to others in that he is likely to commit, and to direct others to commit, additional acts of violence in any setting." [JA 2951–52.] In support of this aggravator (and in addition to the evidence of the specific instances of violence discussed above), the government presented evidence including the following:

- Milton White, a Discipline Hearing Officer at USP Pollock, testified that he conducted eight hearings involving Hager over a three-year period, including one for possession of the shank that led to a disciplinary transfer recommendation, "about as bad as I can be with a sanction in regard to an inmate." [JA 1885] Prior sanctions had had "[v]ery little" effect on Hager. White noted that, typically, "there is an attempt by some inmates to avoid responsibility[] because of the sanctions that might be imposed." Hager, in contrast, was "very candid about his involvement," suggesting that "[h]e had a different point of view. It seems like he thought maybe he was exempt, or he might be fearless of the inmate discipline process." [JA 1886] He also testified, based on his 20 years' experience with the BOP, that "there is no guarantee at all" about the safety of inmates and guards within BOP. [JA 1887]

- Feeney, as discussed above, testified about his work investigating the March 2003 DC-Alabama incident and the 2004 DC-Memphis incident. He also testified regarding "three or four" other personal dealings with Hager in addition to his investigative work and disciplinary recommendations made after the two gang fights. When asked whether, "[b]ased on [his] experience with Hager, . . . if he were to be in jail for life

---

[36] Before trial, in April 2007, Hager was detained at Northern Neck with Stanley Currie, who would testify against Hager at trial. ████████████████████████████████████ [TC0045794.] Shortly after returning to a BOP facility after testifying against Hager at trial, Currie was stabbed.

96

without parole, would that have an effect on diminishing his violence," he answered "no." [JA 1824][37] Feeney also testified that, even in a lockdown facility, there is no way to assure that a prisoner would not have contact with other inmates and guards [JA 1819], that he has not personally observed changes in behavior from violent inmates after they reach the age of 40 [JA 1824], and that there is no way to guarantee the safety of inmates or guards [JA 1825].

- Davidson testified that, based on his experience, there was no place that Hager would be housed where he would not have contact with guards or other inmates. [JA 1871] Davidson testified that inmates serving life sentences "are almost uncontrollable. . . . There is no way to modify their behavior . . . . I mean, you can't do anything to them, literally." [JA 1872][38]

- Steven Morris, a guard at the Northern Neck Regional Jail, testified regarding an October 2006 incident when he was called to a pod to see Hager chasing another inmate, Alphonso Satchell, with a blue pen. [JA 1893–94.] After Morris gave him two

---

[37] Habeas counsel contend that trial counsel was ineffective for failing to object to this alleged "opinion testimony" because it "had no basis in fact and was nothing more than rank speculation." [Pet. at 61.] As habeas counsel acknowledge, however, trial counsel *did* object to this testimony, and the Court sustained the objection, while noting that Feeney's testimony would potentially be admissible on rebuttal. Then, after an off-the-record conversation with government counsel, trial counsel agreed to concede the objection, and government counsel asked Feeney a limited number of circumscribed questions on this topic. [JA 1820–24.] One can logically infer that, during the off-the-record conversation, counsel agreed to limited questioning of Feeney on the understanding that he would not be called as a rebuttal witness—a sound strategic call that would have prevented the government from offering more targeted and thorough rebuttal testimony after hearing from Hager's witnesses on future dangerousness. That strategic call was not ineffective.

[38] Habeas counsel allege that trial counsel were ineffective in failing to challenge Davidson's statement that "the majority of life sentence inmates refuse" programs offered by the prison, despite evidence that Hager "earned his GED within several months of arriving at USP Pollock" [Pet. at 65], and failed to cross-examine him with Hager's BOP record, "which shows that he earned his GED and worked—and received positive evaluations for that work—during his incarceration at USP Pollock" [Pet. at 58]. But, contrary to habeas counsel's representations, it is not clear that Hager obtained a GED: though his September 2004 progress report noted that he had "completed the GED Program *course* in December 2001," [t]o date he has not completed any other programs." [TC0063869 (emphasis added).] During a review in July 2003, one of his "Long Term Goals" was "obtain GED by 12/2004." [TC0063881–3882.] (The government addresses below habeas counsel's related contention that trial counsel were ineffective for failing "to develop and present any evidence of the positive features of Mr. Hager's BOP record, including his education, his work history and performance evaluations, and the evaluations of his future dangerousness to other conducted by BOP psychologists." [Pet. at 80.])

97

separate orders, Hager dropped the pen. Morris reported that Satchell had been stabbed "in his arm, and a few times on his chest." [JA 1894–95][39]

- Alphonso Satchell testified about the stabbing incident, describing how Hager approached him and tried to "hold court" on him—*i.e.*, assault him—because Satchell was cooperating with the government. [JA 1930–31; 1936–37.] "Hager was the judge, and they had other inmates involved," and they wanted to Satchell to come into a cell. "That's when he stabbed me. He stabbed me like four times." [JA 1930–31.][40]

---

[39] Habeas counsel now fault trial counsel for failing to cross-examine Morris regarding "inconsistencies" between his testimony and his incident report. [74–76] The so-called "inconsistency"? At trial Morris testified that he saw Hager with a blue pen in his hand, while in his report he stated that he could not see what he was holding and only found it to be a pen *after* Hager dropped it. Had trial counsel attempted to cross-examine Morris on such a basis, Morris likely would have explained that he reasoned that the pen found on the ground beneath Hager was, indeed, the object that Hager had in his hand moments before when he was chasing Satchell.

Habeas counsel likewise contend that trial counsel should have cross-examined Morris about "inconsistencies" between his testimony and other officers' incident reports. According to habeas counsel, Morris testified that Satchell was stabbed in the arms and chest, while other guards reported wounds to the arms and neck. [Pet. at 75–76.] Again, had trial counsel sought to cross-examine Morris on such silly and nit-picky distinctions, the jury would have realized that any such trivial differences do not change the conclusion that *Hager stabbed Satchell with a pen*.

Habeas counsel also fault trial counsel for not objecting to Morris's testimony that he had a clear memory of the event because he remembered talking to his lieutenant about it and remarking "you know, that could have been me; what if he had been upset with me." [JA 1895–96.] According to habeas counsel, this "planted the seed in the jury's mind that there was a risk that Hager might assault either Morris personally or prison staff generally." [74]

[40] Habeas counsel allege that trial counsel failed to cross-examine Satchell regarding his expectation that the government would seek a sentence reduction for his cooperation [Pet. at 76–77], and regarding past treatment for ADD and depression, and his past abuse of prescription drugs [Pet. at 77–78]. Habeas counsel concede, however, that Satchell's cooperation and potential sentence reduction were elicited on direct examination. And it is not clear how cross-examination about childhood depression and past drug abuse would have helped Hager, especially where Hager himself was asking the jury to spare his life largely based on his own childhood experience and past alcohol abuse.

Habeas counsel also fault trial counsel for not cross-examining Satchell regarding alleged inconsistencies between Satchell's trial testimony and statements he made to investigators immediately after the incident. As for the alleged inconsistencies, habeas counsel contend that Satchel testified at trial that he was attacked by Hager alone after Hager and other inmates wanted him to come into a cell for them to "hold court" because he was cooperating with the government; habeas counsel argue that Satchell told investigators that he didn't know why he was singled out,

- Brenda Clarke, a guard at Northern Neck, testified that she recovered a shank that Hager had hidden in his cell in a shampoo bottle. [JA 1938–40.]

In addition to habeas counsel's arguments addressed in the footnotes above, habeas counsel allege generally that trial counsel were ineffective in failing "to develop and present any evidence of the positive features of Mr. Hager's BOP record, including his education, his work history and performance evaluations, and the evaluations of his future dangerousness to other conducted by BOP psychologists." [Pet. at 80.] This argument fails. Trial counsel was not ineffective and Hager was not prejudiced by not presenting this evidence at trial.

As an initial matter, habeas counsel are incorrect to argue that trial counsel failed to "develop" this information. Trial counsel's internal communications make clear that they were well aware of Hager's BOP records. [*See, e.g.*, TC0037400–7407 (notes from defense investigator summarizing details of BOP records); TC0017333 (email trial counsel noting that "BOP records

---

that he was "initially assaulted" in his cell, and that "Hager was not alone in this." But there is no inconsistency: Hager was the one who stabbed Satchell, though the assault was perpetrated with the help of other inmates.

On the question of who stabbed Satchell, habeas counsel contend that trial counsel were ineffective for failing "to develop and present the testimony of known witness Cotey Wynn," a fellow inmate at Northern Neck who, according to habeas counsel "would have testified . . . that he, not Mr. Hager, stabbed Satchell." [Pet. at 79–80] But trial counsel could hardly sponsor Wynn's testimony, even if they were aware of it. [TC0019547.] In any case, had trial counsel sponsored Wynn's testimony, they would have had to ask the jury to believe Wynn over Satchell and over Morris, the prison guard who saw Hager chasing Satchell with the pen. This would have been a foolish strategic call given that trial counsel themselves called several prison guards as part of their mitigation case. Calling Wynn to claim responsibility for the Satchell stabbing would also have likely led the government to respond by calling other guards, in addition to Morris, who would testify that Hager stabbed Satchell [*See, e.g.*, TC0029261 (Barry Sward); TC0029260 (Richard Baserap).]

99

reflect several altercations and other infractions, but BOP psychologists have routinely rated him as not unduly violent and several witnesses [to include a guard] can serve to minimize the infractions").]

More obviously, trial counsel knew that presenting evidence about Hager's good behavior and positive adjustment while incarcerated opened them up to cross-examination and rebuttal evidence regarding Hager's numerous other bad acts in prison showing his bad behavior and lack of adjustment. For example, Susan Hines, who hired Hager at USP Pollock, told defense counsel that Hager "was involved with the Latin Kings leader down in Pollock. To control them, she would give them big jobs and make them her 'assistant.' This way she could keep a closer watch on their activity and it gave them a sense of self-importance so they were less likely to get into trouble. She said that sometimes Tommy would pay others to do his work though." [TC0007032.] The potential that Hines would make a similar statement on cross-examination highlighted that Hager had much more to lose than to gain by presenting this evidence at trial.[41] Indeed, when trial counsel sought to elicit testimony from Hines at trial about her "impression" of Hager, the government asked for a sidebar to warn that such character evidence would open the door for the government to "back[] the truck up to the courthouse" with rebuttal evidence. [JA 2402–03.] A few pieces of the truckload that trial counsel knew the government could offer in rebuttal:

---

[41] In its death notice, the government had included as an aggravator that Hager "had little or no gainful employment in his adult life and has supported himself by drug trafficking and robbery." [JA 214.] Although this factor was dropped from aggravating factors which the jury was asked to weigh during the selection phase, evidence of Hager's positive work record in prison would likely have opened the door to additional evidence of his lack of legitimate employment while free, which [TC0004579.]

[TC0004579.]

[TC0004579.]

- In 1999, after a female guard announced her presence, Hager was seen "laying on top of his bed, without any underwear on, stroking his penis in an up and down motion." [TC0063488.]

- In November 2002 he was disciplined for "attempting to gain some sexual pleasure or gratification by making inappropriate contact with [a] staff member" while masturbating. [TC0063565.]

- In November 2003, while Hager was apparently at work, "engaged in a sexual act . . . attempting to gain some sexual pleasure or gratification by making inappropriate contact with [a] staff member" while masturbating. [TC0063544.]

- A review in August 2004 noted that "[d]ue to numerous disruptive and predatory behaviors, an increase to MAX custody is needed to manage inmate Hager." [TC0063866.]

- A progress report from September 2004 stated that "Inmate Hager has displayed poor institutional adjustment" and indicated that he had "received 9 incident reports." [TC0063869.] Another document describes Hager as having "a history of threatening conduct" with "behavior [that] can be described as exceptionally chaotic." [TC0063360.] It also stated that "Mr. Hager's institutional adjustment has been poor. Based on the numerous disciplinary problems he can be described as threatening." [TC0063360.]

Trial counsel also knew that evidence of these additional acts risked torpedoing their theory that Hager could be controlled by way of administrative sanctions within the BOP, by highlighting that administrative sanctions had no apparent effect on Hager's behavior. For example, on April 13, 2004, Hager was observed "urinating on the wall" inside the prison, leading to a 30-day loss of telephone privileges. [TC0063933] In February 2004, Hager was "sitting at the back of the dining hall on the last roll of tables with his 'penis' hanging out of a hole that he has in his pants . . . , an ongoing problem with this inmate" [TC0063946], leading to loss of visiting privileges and phone privileges for one month, and disciplinary segregation for fifteen days [TC0063951]. For various other offenses Hager had lost phone privileges, commissary privileges, and administrative detention, all without effect. [TC0063525–3528.] None of these sanctions appeared to have deterred Hager from additional conduct violations, including the violent conduct discussed above.

The case against taking the risk of introducing records relating to Hager's work history is further strengthened by the simple fact that evidence of Hager's education and work record, while perhaps probative of his functioning within BOP, did not directly undercut the government's future violence case: a prisoner can participate in work programs to obtain money and still be violent. Similarly, the idea of introducing BOP psychological reports would have been unwise given trial counsel's strategy (discussed in greater detail below) to avoid directly presenting evidence that Hager had a cognitive defect, in order to avoid the risk of the government offering rebuttal evidence on this issue. (Indeed, it is doubly strange for habeas counsel to argue that trial counsel should have presented this evidence. According to habeas counsel, trial counsel should have presented evidence that Hager "suffers from neuropsychological deficits" [Pet. at 147], a conclusion that is significantly undercut by the facts that years of psychological reports that do not suggest any such impairments.)

*    *    *    *    *

Simply stated, the evidence showed overwhelmingly that Hager had engaged in a pattern of violent behavior in prison and that he posed a threat of further violent behavior in the future. Trial counsel chose to attack this evidence wholesale rather than piecemeal, focusing on arguing that Hager would "age out" of prison violence, and that BOP had the ability to control Hager rather than attempt to challenge the specific facts of the violent incidents presented by the government. Habeas counsel now question that strategic decision but, critically, they attack piecemeal rather than wholesale. Had trial counsel taken the steps habeas counsel now contend they were required to, Hager would have fared worse, not better, in that the small mitigating points counsel might have succeeded in making would have been overwhelmed by a flood of additional aggravating facts and arguments. Trial counsel's strategy, selected after thorough investigation, was not ineffective, and Hager was not prejudiced.

102

> 3.    *Trial counsel effectively responded to the offense-related aggravating factors.*

In addition to the aggravators relating to the prior homicides and Hager's violence while incarcerated, the government alleged, and the jury found beyond a reasonable doubt, six aggravators relating to the manner in which Hager killed Barbara White: (1) that Hager "knowingly created a grave risk of death to a person in addition to Barbara White in the commission of the offense and in escaping apprehension for the offense," (2) that Hager "committed the offense charged after substantial planning and premeditation," (3) that Hager "distributed a controlled substance, namely, crack cocaine, to a juvenile," (4) that Hager "committed the offense charged . . . in an especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to Barbara White," (5) that Hager's "statements and actions following the murder of Barbara White reflect a lack of remorse," and (6) that Hager "caused injury, harm and loss to the victim and the victim's family and friends, as evidenced by the victim's personal characteristics and by the impact of her death upon the victim's family and friends."

Habeas counsel now attacks trial counsel's effectiveness regarding the aggravators for creation of a grave risk of death, substantial planning and premeditation, and distribution of a controlled substance to a juvenile. But habeas counsel's arguments fail: trial counsel provided effective assistance regarding each of these aggravators, and Hager cannot establish prejudice.

**"Grave risk of death" to Alexis White.** After killing Barbara White, Hager took the phone off the hook and locked Ms. White's 13-month old daughter in an apartment containing—in addition to the all the usual household items that would pose a grave risk of a death to any unsupervised toddler who could walk and climb and move around—a bathtub filled with blood-soaked water, a plugged-in curling iron, and knives and broken knife pieces scattered around the bathroom and floor. Paul White, Barbara's father, testified that he arrived at the apartment at

103

approximately 4:30 p.m. on November 30, 1993, approximately eighteen hours after Barbara had

been killed and Alexis left alone in the apartment late the previous evening. [JA 914.] When he

arrived, the blinds were drawn and he could hear the child inside crying. [JA 914.] "As soon as

you opened the door, Lexi was standing three or four feet inside the apartment." [JA 914.] He

noticed "that there were bloody footprints on the carpet, on the floor, footprints that were small

that Lexi had tracked around." [JA 915.] He also "noticed blood all over the mattress, the bed,

bloody footprints on the floor, knives and silverware laying around." [JA 915–916.] "Lexi was just

covered in blood, and she stunk really bad just because she'd been in the apartment for so long

without having her diaper changed." [JA 917.]

Habeas counsel now contend that trial counsel were ineffective for failing to rebut the

government's contention that Hager committed a grave risk of death to Alexis by leaving her in

the apartment. Habeas counsel's primary argument is that trial counsel should have objected to the

government's evidence that the child was, in fact, in the bathroom with her mother's body, the tub

full of bloody water, the curling iron, and the majority of the knives. For reasons discussed below,

habeas counsel is incorrect, and trial counsel was not ineffective in not precluding this evidence or

keeping the government from arguing that the child was at risk of death from drowning,

electrocution, or injury from the knives.

But habeas counsel's argument fails at a more fundamental level. Assuming that the child

did not get into the bathroom, they argue:

> There was . . . only one knife that the child could potentially have
> come into contact with and that was a blunt steak knife that was
> laying on some carpet in the hallway and unlikely to have caused
> the child fatal injury. . . . It was also, counsel should have argued,
> highly unlikely that the child would perish from starvation. It was
> significantly more likely, as indeed in fact happened, that after the
> decedent failed to show up for work the next morning, one of the

104

> decedent's family members would come to the apartment and find the child.

[Pet. at 91.] That toddlers "need to be closely supervised to avoid harm is common knowledge." *In re Christopher S.*, 2013 WL 5436673, at *9 (Tenn. Ct. App. Sept. 27, 2013). A 13-month-old toddler cannot be left alone unsupervised for five minutes—let alone *eighteen hours*—without exposing the child to serious risk of injury or death.[42] The child could have climbed up onto the bed or a couch, and fallen and broken her neck. She could have reached up to a dresser and pulled down a heavy object. She could have ingested any of the numerous items in the apartment and choked. And yes, she could have starved or died of dehydration. When Hager closed and locked the door he had no idea that it was "significantly more likely" that one of Barbara White's family members would come to check on her the next day if she didn't turn up for work. He didn't know

---

[42] Caselaw overflows with tragic examples of death suffered by children older than the child here who were left alone for periods much shorter than the 18 hours here. *See, e.g.*, *In re Austen M.*, 2015 WL 2166516, at *1 (Conn. Super. Ct. Mar. 31, 2015) ("Austen and his brother Ryder were left alone in a room of the family home on March 26, 2014, without an adult present at the premises to supervise them. Ryder accidentally choked to death while the children were left unattended."); *Romero v. Quiroga*, 2013 WL 6158067, at *1 (D. Nev. Nov. 21, 2013) ("Ms. Quiroga left Adan, age 3, alone and unsupervised in a bedroom. That bedroom also contained a clear plastic bag, which [the] young child somehow placed over his head. He apparently suffocated due to the plastic bag cutting off his airflow, and he was discovered about an hour later."); *State v. Riggs*, 2 S.W.3d 867, 873 (Mo. Ct. App. 1999) ("[A] reasonable juror could have found that leaving a two-year-old child outside for forty-five minutes, coupled with a warning from the trailer park manager about the unfenced duck pond, put that child at risk, and defendant by her inaction knowingly endangered her child."); *State v. Goff*, 297 Or. 635, 639–40 (1984) ("[T]here was sufficient evidence in this case for a jury to find the defendant guilty of child neglect. At a minimum, she left unattended her 22-month-old child and eight-year-old child with no supervision for a period of five hours on Halloween night in a home containing unlit matches and flammable materials. Every responsible adult should know that fire is a likely danger when children are left alone with access to matches."); *R.H. v. Texas Dep't of Family & Protective Servs.*, 2013 WL 1281775, at *1 (Tex. App. Mar. 28, 2013) ("Early in the morning hours of January 1, 2012, Mother breast-fed the baby and, being both tired and intoxicated, did not return the infant to the playpen where she usually slept. Instead, Mother kept the child in her bed where the boys were also sleeping. When the boys woke their mother later in the morning, she found the baby pale, cold, and unresponsive. The child died later that day.").

that she had a job (or if she had taken the next day off), if she had family to check on her (or if her family lived nearby). Even if the child had not been able to get into the bathroom, there is no way that trial counsel "would have convinced the jury that it could not find beyond a reasonable doubt that the grave risk of death statutory aggravating circumstance was present in this case." It would have been ineffective for trial counsel to even attempt to make such a callous argument to the jury.

In addition, the government argued that Hager created a substantial risk of death to the child because of her access to the bathroom with the tub full of bloody water, the knives, and the plugged-in curling iron. In support of this contention, the government relied on both lay and expert testimony:

- Paul White testified that as he walked past the bathroom "I noticed the bathroom door was *mostly* closed. *It wasn't latched.* There was a crack of light around it that you could see . . ." [JA 916 (emphases added).] He was then asked, "What did you do when you saw the bathroom door was ajar with the light on?" and answered "I *pushed* the bathroom door open, and I was still holding Lexi." [JA 916 (emphasis added).]

- Paula White, Barbara's sister, testified that she took custody of Alexis after Barbara's death. [JA 1521] After the murder, Paula White noticed a change in the child's behavior when it came to taking a bath, in that the child refused to get into the bathtub. [JA 1522][43]

- Detective Mark Garman, who was qualified as an expert in crime scene investigation and blood pattern stains [JA 1486], examined the blood-stained pajamas worn by Alexis. There was blood in various parts of the pajamas, including on the footpads, the

---

[43] As the government began to elicit testimony from Ms. White regarding Alexis's fear of bathtubs, trial counsel objected under Rule 403. [JA 1508–09] Trial counsel represented to the court that they had no intention to argue that Alexis never went into the bathroom after the murder, and conceded that the evidence showed that "she stuck one hand in the water in the tub." [JA 1508–10] When the government offered to forego the testimony in exchange for a stipulation that Alexis was "undoubtedly in the bathroom and stuck her hand in the water," defense counsel demurred. [JA 1511–12.] The court ultimately sustained the objection in part and overruled the objection in part, instructing the government to elicit the testimony "in a way that minimizes the emotional aspect of it. . . . I don't want you to elicit that she screamed at this point [in the trial]." [JA 1513–14.] Consistent with the court's instructions, counsel for the government asked only whether Alexis had a change in behavior and refused to take a bath or get into the bathtub after the murder. [JA 1521–22.] Trial counsel wisely precluded the emotional aspect of the testimony without attempting to alienate the jury by challenging the fact that the child had been in the bathroom.

knee area, and "a larger amount of . . . dark red, dark brown staining . . . on both the cuff and up the sleeve, the interior sleeve of the jumper." [JA 1497.] Garman testified that the stain "appears to be caused by wicking or the sleeve being in a liquid, a dark colored liquid, reddish brown colored liquid" in part because the stain line was "jagged" and "uneven," consistent with 'what we would see when fluid would be drawn up into an item of clothing." [JA 1498.] In light of that evidence, Garman testified that he believed that "the diluted blood on the sleeves came from the tub." [JA 1503.] Government exhibit 225, a close-up photo of the sleeve, depicts this pattern. [*See* JA 3139.] As for the blood found on the footpads of the pajamas, and tracked through the apartment by Alexis, Garman testified that he believed the source of that blood was "[t]he blood pool which was at the foot of the bed" [JA 1504], which—contrary to habeas counsel's argument that "[r]easonably competent counsel would . . . have pointed out to the jury that, while the child's bloody footprints appeared in the bedroom and the hallway, the government's photographs of the crime scene revealed that no such footprints were visible on the floor of the bathroom" [Pet. at 90]—would explain why Alexis's bloody footprints appeared in the bedroom and the hallway but not the bathroom.

Habeas counsel now contend that it was "untrue" that the child was in the bathroom, and even goes so far as to allege that the government "knew or should have known that the testimony was false." [Pet. at 87, 196.] "The child could not have put her hand in the bloody water in the tub after the homicide, because the bathroom door was shut and she could not get in there." [Pet. at 87.] In support, they point to Arlington Johnson's grand jury testimony that the bathroom door "was shut" when they left, and "unequivocal statements" recollected by Detective Murphy that Paul White had told him that the bathroom door was "shut." [Pet. at 89,] Of course, none of these statements suggested that the door was latched shut (and habeas counsel ignore Paul White's testimony at trial that the door was *not* latched shut), and it is of course possible that a child who is capable of walking can push a door open and pull it closed behind her. Also, as anyone who has ever operated a door knows, many doors will simply swing shut gently on their own accord.

As for Garman's testimony, habeas counsel argue that it should not have been admitted, as it "was inadmissible on grounds of irrelevancy," because "[i]t was impossible to know whether the child's clothing was in the same condition when Garman examined it in September of 2007 that it had been in when it was recovered 14 years earlier" or whether the condition of the clothing

107

had been "altered" the day that Alexis was discovered alone in the apartment. [Pet. at 87.] But these go to the weight of the evidence, not its admissibility, so any objection would have been legally futile. Further, though habeas counsel contend that Garman's testimony was inadmissible under Federal Rule of Evidence 702, they cite no case and only reference a "Preliminary Oral Report from Forensic Science Expert." This claim should be deemed waived.

**Hager's "substantial planning and premeditation."** Habeas counsel argue that trial counsel were ineffective for failing to challenge the aggravating factor that Hager killed Barbara White after substantial planning and premeditation. According to habeas counsel, rather than resulting from premeditation, "the events that led to Ms. White's death unfolded haphazardly in the moments that they occurred" [Pet. at 91], and "the manner in which events allegedly unfolded in the apartment strongly suggests the absence of planning or premeditation" [Pet. at 92–93]. To hear habeas counsel tell it, after Hager "hit Ms. White with a gun" (knocking her tooth out and shattering her jaw, they fail to mention), "[h]e then had a conversation with her in the bedroom," (an obscenely euphemistic characterization, given that Hager dragged her, bleeding profusely, into the bedroom, where he struck her repeatedly while she begged for her life, before she was gagged and led to the bathroom to be stabbed to death), "and it was after that that *someone decided* that Ms. White should be killed." [Pet. at 92–93 (emphases added).] "Unquestionably a horrible result," habeas counsel hasten to add. [Pet. at 93.]

According to habeas counsel, aside from "the unbelievable testimony of Charles Johnson" (discussed below) "the government had no evidence whatsoever to support its theory that Mr. Hager planned to kill Ms. White, as opposed to simply talk to her or threaten her." [Pet. at 92.] But far from "no evidence whatsoever,", the government presented overwhelming evidence regarding Hager's planning and premeditation:

108

- Shenita King testified that, after the shooting of Chris and Rick, and about "a week before she was killed, Barbara White came looking for Shenita at the apartment Shenita shared with Hager. [JA 1075–77.] Hager "was pissed off because no one was supposed to know where we lived at." [JA 1077–78.] The subject came up again "[p]eriodicaly throughout the week before [White] was killed" because Hager was "stressed" and "pissed off." [JA 1078.] Hager was concerned because White's child's father, Wee-Wee, "was friends with the two people that Mr. Hager shot" and he was worried that they had "discovered where we lived." [JA 1078.] The day Barbara was killed, Hager came with Arlington and Lonnie to pick up Shenita at her grandmother's house and said "[t]hat we were about to get at Barbara." [JA 1079.] He had with him "ski masks and gloves," and he told the group "[t]hat we ought to wear them rolled up until we get there, and when we get there we ought to roll them back down." [JA 1079–80.] After the killing, Hager told the group "Did you hear that bitch telling me about her daughter?" and "Don't nobody say nothing because they don't have no fingerprints, no weapons, and nobody can I.D. us" and "That bitch was trying to get me killed." [JA 1089–90.]

- Arlington Johnson testified that, after the shooting of Chris and Rick, Barbara White came over to the apartment Arlington shared with Hager and Shenita. Hager was "angry" that "the bitch, Barbara, had showed up at his apartment, and he didn't know how she knew where he lived at." [JA 1139.] Johnson testified that Hager took the group to Barbara's apartment, and gave them gloves upon arrival, saying "we was going to take care of some business." [JA 1140–41.] After striking Barbara and dragging her into the bedroom, Hager shouted at her "Bitch, how did you know where we lived at? And who have you told about where we lived at?" [JA 1144.] When they threw the curling iron in the tub, White's "eyes became big, and she was shaking as if she was shocking." [JA 1150.]

- Lonnie Barnett testified that he had been out helping Arlington sell crack when Hager pulled up to pick up him and Arlington. When Barnett asked where they were going, Hager "said we was going to talk to Barbara." [JA 1197.] After they had beaten her, attempted to electrocute her, and stabbed her 82 times, Hager "stood on top of her for a couple of minutes or so" to push her down in the water and make sure she was dead. [JA 1208–09.] When Barnett encouraging Hager to get out of there, "he said that he couldn't leave because he could get the death penalty for it, and he wanted to make sure that she was dead." [JA 1209.] Hager also directed them to take the phone off the hook "[t]o be able to call back, to see if anybody had put the phone back on the hook" and so they would know when the crime had been discovered. [JA 1210.]

It is hard to imagine stronger evidence of premeditation. Hager was "pissed off," "stressed," and "angry" that the "bitch" had discovered where he lived. He brooded for a week, then planned to pick up his crew telling him they were "about to get at Barbara," "going to take care of some business," and "going to talk to Barbara." Hager then drove the group 25–30 minutes

109

from Washington, D.C., across the Woodrow Wilson Bridge to Barbara's apartment in Virginia. When they arrived, he handed out gloves and masks, which ensured that they would leave no fingerprints. After beating her, trying to electrocute her, and stabbing her 82 times, Hager held her head under water to make sure she was dead. After leaving Alexis alone in the apartment, Hager again confirmed why he had killed Barbara: "Did you hear that bitch telling me about her daughter? . . . That bitch was trying to get me killed."

Of course, the case for premeditation was made even stronger by the testimony of Charles Johnson. Johnson testified that after Hager shot Chris and Rick, Hager "came in and told me he had shot them . . . . And if he was to get locked up, to look out for him." [JA 1035] After the shooting, Hager and Johnson were concerned that Chris and Rick "would retaliate" and so "several of us . . . went around there looking for them." [JA 1036.] Johnson testified that he knew "Wee-Wee," and had heard that he was a "shooter guy" for Chris and Rick, "like their hit man." [JA 1037.] Johnson testified that he and Hager discussed "[t]hat Wee-Wee had a baby by Barbara" and they were concerned "[t]hat Barbara would tell Wee-Wee where Tommy lived at" and so they discussed "[t]hat [Hager] was going to kill her." [JA 1037.] Johnson testified that, prior to learning that Barbara White had been killed, he had a conversation with Hager in which Hager said "he was going to kill her because she came over to his house and knew where he lived at in Maryland." Hager was worried that "she would tell her boyfriend, her baby's father, where he lived at." [JA 1031.] The day White was killed, Hager and Johnson discussed that Hager "was going to kill her and that he was going to use a knife instead of a gun . . . [b]ecause the gun would be too loud." [JA 1038.] Hager and Johnson had "several conversations" around this time. [JA 1037.] After White had been killed, Johnson again saw Hager and Hager "said he had killed her, that they had stabbed her and tried to electrocute her, put her in a tub." [JA 1039.] Hager, according to Johnson,

110

said that Arlington and Lonnie "go hard now. They ain't going for nothing." [JA 1039.] Habeas counsel allege that, had trial counsel effectively cross-examined Johnson, "the jury would have rejected his testimony in its entirety." [Pet. at 92.] For the reasons above, habeas counsel's premise—that trial counsel was ineffective in cross-examining Johnson—is wrong. But even if there was more that trial counsel could have done to cross-examine Johnson, it is beyond optimistic to infer that the jury would have disbelieved him regarding his testimony about Hager's statements before and after the killing—which were substantially corroborated by other testimony and evidence in the case.

Habeas counsel argues that Hager could not have planned the murder beforehand because "[i]t is almost ludicrous to suggest that Mr. Hager planned in advance to commit a murder by electrocution," and it is "inconceivable that a person who planned to commit a murder by stabbing would neglect to take a knife with them and leave to chance that there would be suitable implements at hand on the scene." [Pet. at 93.] But the aggravating factor does not require that Hager have determined beforehand precisely *how* he was going to kill Barbara White. The evidence is simply overwhelming that Hager—after bringing three coconspirators and a gun to Barbara White's apartment on November 29, 1993—planned that she would not be alive when he left. Such a conclusion is not "ludicrous" at all. Rather ███████████████████, any *other* conclusion would be ███████ [44]

---

[44] ████████████████████████████████████████
███████████

████████████████████████████

**Hager's distribution of crack to juveniles.** Finally, habeas counsel allege that trial counsel were ineffective for "[i]nexplicably" failing "to challenge the sufficiency of the Indictment with regard to the aggravating factor or its submission to the jury." [Pet. at 95.] Habeas counsel do not (and cannot) challenge that Hager's drug conspiracy involved the participation of juveniles, including Arlington Johnson and Lonnie Barnett. Habeas counsel appear to be making a variation of the same argument that they characterize as "untenable" in criticizing trial counsel for making at the guilt phase: that "the aggravating factor does not apply to a killing that is unrelated to a particular violation of § 859"—which increases the maximum punishment for drug distribution to persons under the age of 21—"*even if* the overall conduct comprising an alleged continuing criminal enterprise or large scale distribution offense includes distribution of drugs to minors." [Pet. at 95.]

Habeas counsel's argument is flatly contradicted by the statute, which provides for an aggravator if "[t]he violation of this title in relation to which the conduct described in subsection



[TC0020040 (emphasis added).]

112

(e) of this section occurred was a violation of section 859 of this title." 21 U.S.C. § 848(n)(11) (1993). In other words, whereas § 848(e) *authorizes* a death sentence for a defendant who intentionally kills while "engaging in or working in furtherance of a continuing criminal enterprise, or . . . engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title," § 848(n)(11) provides that the jury may use the fact that the drug offense involved distribution to minors as an *aggravator* in support of the decision to *impose* the death penalty. Habeas counsel's alternative reading—that the aggravator can only be applied if the killing is related "to a particular violation of § 859" goes against this plain language (as well as logic) by suggesting that the aggravator could only apply where the murder was committed in relation to a particular violation of § 859. That would turn on an arbitrary factual distinction (*i.e.*, was a particular murder committed in relation to a particular distribution that involved juveniles?) as opposed to a reasoned moral distinction (*i.e.*, is a defendant more deserving of the death penalty because the murder was committed in connection with an underlying drug conspiracy that regularly distributed drugs to juveniles rather than only adults?).

In any case, and as discussed above, Hager cannot possibly have been prejudiced by the jury's consideration of this aggravating factor, which paled in comparison to the brutal nature of the torture and killing of Barbara White, his utter lack of remorse, his record of prior homicides (including the unchallenged and undisputed murder of Duvall), his repeated involvement in violence while incarcerated, and the horrific impact that Barbara's murder had on her family and friends.

**D.      Trial counsel provided effective assistance regarding mitigating evidence.**

The lion's share of Hager's § 2255 petition—stretching from page 96 to 195—argues that trial counsel provided ineffective assistance regarding the presentation of mitigating evidence. *First*, habeas counsel challenge the mitigation evidence presented by trial counsel regarding

113

Hager's family history and personal background. *Second*, habeas counsel argue that trial counsel were ineffective for not presenting expert witness testimony regarding Hager's neuropsychological deficits and the effects of Hager's childhood experiences on his psychological development and functioning. *Finally*, Hager raises several arguments alleging that trial counsel were ineffective in their presentation of or failure to object to certain issues or themes at trial. As discussed more fully below, all of Hager's arguments fail. Trial counsel's performance was not deficient and Hager was not prejudiced.

> 1.    *Trial counsel presented essentially all of the evidence that habeas counsel now alleges "should have" been presented.*

According to habeas counsel, trial counsel presented a mitigation case that was "limited, often contradictory and wholly unpersuasive" [Pet. at 97] when they "should have" told a story of "a multigenerational history of psychological trauma and mental impairments perpetuated and passed down over many decades, along with specific, compelling expert testimony regarding the devastating effects of this history on Mr. Hager's own mental functioning and well-being" [Pet. at 103–04]. But habeas counsel's central premise is simply incorrect. The record reveals that the facts they say "should" have been offered in mitigation *were* substantially the same ones that trial counsel presented to the jury. Indeed, a side-by-side comparison of the case that "should" have been presented and the case that was presented indicates that the key facts now highlighted by habeas counsel were presented by way of either expert testimony or lay witnesses—often in nearly verbatim format, down to the detail of the drink preferred by Hager's mother—as habeas counsel now alleges that they "should have" been presented:

114

| "The Mitigation Case that Should have been Presented" | Evidence Presented at Trial |
|---|---|
| **Hager's mother was an alcoholic and a drug addict** ||
| Hager's mother "drank and used drugs throughout all of her pregnancies, including her first pregnancy with Tommy. . . . A favorite was 'The Bull,' which was malt liquor that came in a blue can. They also liked vodka and Bacardi." [Pet. at 106–07.] | Cunningham testified that "Leavonia began drinking . . . in her early teens. . . . By age 18, she was drinking two half-pints of vodka a day, and also when she was 18 began to snort cocaine. In her twenties, [s]he was smoking crack cocaine near daily. She would reduce her cocaine abuse when she was pregnant, not stop it, but reduce it, and then resume it full force after the baby was born. . . . She drank when she was pregnant with the children, by her own report and by the report of Mutt." [JA 2100.] Other witnesses related how Leavonia would be so high that she would not realize that she soiled herself [JA 2425.] Leavonia herself testified that in the period before Hager was born she would drink and use cocaine "constantly." She liked to drink "Blue bull, the bull," a malt liquor. [JA 2545.] At trial she testified that she still used crack "every day," the last time being "Saturday" before her Monday testimony. [JA 2546, 2550.] |
| **Hager's father was an alcoholic and a drug addict** ||
| "Thomas Jr. had been an alcoholic since adolescence. With his new-found income from the moving company, he began using drugs as well. At first he snorted cocaine, a drug that was becoming ever more popular and ever more available on the streets of D.C. It was expensive, but not so expensive that it was out of reach of Thomas Jr.— at least if his income was dedicated to the pursuit of the high and not used for household expenses." [Pet. at 106.] | Cunningham testified that "Mutt began drinking . . . at age 14. . . . And then Tommy was born . . . when Mutt was 19. And he acknowledged that during those years he was drunk daily, he was unemployed, and he was running the streets. . . . Then after crack cocaine hit, he was smoking on Friday and Saturday nights, typically about $200 worth each night . . . ." [JA 2099.] Other witnesses related how Mutt "was drunk daily during Tommy['s] childhood. Then he became crack cocaine dependent." [JA 2119–20.] They described how he would be seen "staggering" with his "speech kind of slurred" [JA 2423] and how he used drugs "every day" [JA 2425]. At trial Mutt himself testified that he still drinks "every day." [JA 2552] |
| **Hager's father was incarcerated when Hager was young** ||
| "Tommy was almost five years old when his father went to prison." [Pet. at 105.] | Mutt "served 10 months in the Maryland prison system for breaking and entering. [JA 2119–20.] |

115

| "The Mitigation Case that Should have been Presented" | Evidence Presented at Trial |
|---|---|
| **Hager's father was violently abusive towards Hager's mother** | |
| Hager's father "terrorized the family. He was severely and violently abusive towards Leavonia. He had no compunction against beating her in front of Tommy and his siblings, or against abusing her in public. . . . She frequently had visible bruises, black eyes and split lips." [Pet. at 108.] "In addition to beating her, Thomas Jr. tortured Leavonia with cruel gestures such as threatening to put his cigarette out on her face. . . . Virtually every sentence he spoke was laced with profanity.'" [Pet. at 110.] One on occasion Thomas Jr. hit Leavonia "so hard that he broke her jaw, and she had to go to the hospital and have it wired shut." [Pet. at 113.] | Cunningham testified that "Mutt . . . would come home drunk and with an attitude. . . . So he begins to verbally abuse her, and to profanely abuse her. He . . . would call her a bitch and a motherfucker. . . . And this would routinely escalate into a beating. . . . Mutt would beat her with his fists like you would punch a man, and he would hit her face and head and body. He would kick her while she was on the ground. . . . He would pull her hair. He would slap her. he would sling her around. He would bust her head against the wall." [JA 2109] The children "would be seeing the evidence of this afterwards, that Leavonia had bruises, busted lips, black eyes, bloody noses, was knocked out, knocked unconscious on occasions, suffered a broken jaw." [JA 2109–10.] Other witnesses related that Mutt would beat Leavonia "bad enough for her to . . . black eyes or . . . [a] bloody nose" Mutt would call her "bitch" and "ho" [JA 2427], or "sluts, bitches, anything" [JA 2519]. One time Leavonia "couldn't talk because . . . her jaw or something was broke." [JA 2521] |
| **Hager's father was physically and verbally abusive towards his children** | |
| "Thomas Jr. . . . beat Tommy and Terrell regularly with a belt, often leaving visible marks on their bodies. He also used a switch. . . . Thomas Jr. also cussed at Tommy and Terrell and berated them, even when they were little boys. He used to tell them to shut the fuck up, what did I tell you, why in the fuck are you doing that. He also used to threaten them, telling them to shut the fuck up or else he would kill their asses. The boys were visibly afraid of their father when they were small." [Pet. at 113 | David Blair, a family friend, testified that Mutt treated Hager and his siblings "like they weren't his," "real bad." He hit them "[j]ust about whenever he got drunk." He would "hit them and smack them" and call Hager "you little motherfucker." [JA 2428.] Donny Free, a childhood friend of Hager's, saw Thomas Jr. "punch Tommy in the middle of his back. I noticed how every time Mutt start fussing, Tommy would cringe, you know, like a dog that did something that is shouldn't do. He was really scared of his father." [JA 2518.] Mutt "would talk to [Tommy] like he was a grown man, like, "Get the fuck out of my house, just like anything. He would talk to his child like he wasn't nothing." [JA 2518–19.] Mutt himself testified that he would hit Hager and his siblings "whenever I was drunk," which was every day "if I could get it." [JA 2553.] |

| "The Mitigation Case that Should have been Presented" | Evidence Presented at Trial |
|---|---|
| **Hager and his siblings attempted to fight off their father** ||
| "As they got older and bigger, Tommy and Terrell started to intervene whenever they could and physically pull their father off Leavonia." [Pet. at 111.] | Cunningham testified that the children "would see this escalation exploding as Mutt would come into the household. they would be screaming and crying, trying to pull Mutt off of Leavonia." [JA 2109.] |
| **Hager and his siblings effectively managed the household** ||
| "With their parents effectively absent, it fell to Tommy and Terrell to try to keep the family afloat. They became substitute parents, helping the younger siblings get back and forth to school, doing their hair, attending their graduations and other significant events and buying groceries and Christmas presents. At their young ages, the only way they saw to make the money that they and their siblings desperately needed was the drug trade." [Pet. at 140–41.] | "They effectively are the adults in this family by the time they were in their early teens. The parents accepted the drug proceeds for household support. In other words, Tommy and Terrell were out on the streets dealing drugs at 12, 13, 14, and the parents are taking that money to support the household. By their mid-teens, Tommy and Terrell were the authority figures in the home. At that point, they are kind of dictating to their parents what's going to happen, because after all they are the ones that are providing economic support." [JA 2105–06.] |
| **Hager and his siblings had to obtain their own food and clothes** ||
| "[W]hile other kids in the neighborhood were given exciting toys and new bikes and other treats, the Hager children got nothing. The house was filthy and cluttered. Their parents started getting behind on the bills, so there were frequent periods when the gas or the electricity were cut off. . . . Tommy, Terrell and their younger siblings were literally in danger of starving. They rarely attended school because they had no clean clothes, no money to get their hair done, no bus fare and no lunch money." [Pet. at 140.] | Cunningham testified that "Tommy and Terrell were hungry. They had inadequate clothing. the rent money went for drugs, which means you are going to end up bouncing from place to place to live." [JA 2105.] Other witnesses related that the children looked like they had "dressed themselves" and they smelled like "urine, feces" [JA 2425]; that they were "dirty." [JA 2491]; that they "didn't have adequate food, no clothing, . . . they were neglected" and "weren't being taken care of" [JA 2499–2500]. The children never went to a dentist and did not obtain their vaccinations for school. [JA 2504.] |

117

| "The Mitigation Case that Should have been Presented" | Evidence Presented at Trial |
|---|---|
| **The Hager home was filthy** ||
| "The house was also in a terrible state of disrepair. There were holes in the walls and the floor of the filthy kitchen was starting to give way. Nobody cleaned and nobody attempted any type of home improvements. The house was infested with roaches and also had a horrifying rat population that terrified Tommy's younger siblings. His sister Tesha recalls wetting the bed rather than going to the bathroom at night and confronting the rats that would almost certainly be in there." [Pet. at 142–43] | Blair testified that the Hager home was "nasty," with "a sink full of dishes, or some uneaten Oodles of Noodles sitting on the table in a bowl," "trash on the floor," "dirty clothes in the middle of the floor," a smell of "feces, urine," and a "filthy" bathroom with "a ring around the toilet." [JA 2426.] Hager's uncle Sheldon testified that "the house was never kept clean," and the Hagers were evicted "[b]ecause instead of paying the rent and stuff, they were doing the drugs." [JA 2453.] Deborah Williams testified about a visit to the house during which she saw "roaches and things like that crawling down the wall." [JA 2512.] Donny free testified that "[t]here was holes in the exterior walls, holes in the floor, holes in the inside wall. It was clothes everywhere, feces, roaches, mice. When I saw 'feces,' I mean animal, dog feces. It was nasty." [JA 2522.] |
| **Hager's childhood home was a chaotic party house** ||
| Hager's parents' apartment was "a party venue, a place that people wanting to drink, get high and hang out gravitated towards and congregated regularly. On weekends there was always a party, with people coming in and out at all hours." [Pet. at 106–07.] | Cunningham testified that over 14 people lived in the Hager household in the mid-1980s with "very little supervision or guidance that occurred. The household is continuously chaotic across [Hager's] childhood, with the alcohol and drug abuse of his parents, and then the number of people living there." [JA 2115.] Hager's uncle, Lorenzo Fields, described it as "just the kind of place where there was activity going on day and night, at any time." [JA 2489.] |
| **Hager's family life was completely eliminated once crack cocaine hit** ||
| "Tommy watched as the fragments of the family's previous life were taken away by the drug, piece by piece. Where he and his siblings had previously had new clothes for school when they needed them, none were being purchased for them anymore. No one even cared whether they went to school or not. There was no longer a reliable food supply in the house and the refrigerator stayed empty. Birthdays, Christmas and other holidays were ignored . . . ." [Pet. at 140.] | Cunningham testified that "[o]nce the crack cocaine abuse began in their middle childhood, after that, there is no more Thanksgiving, there is no Christmas, there is no birthdays. Now, in fairness, those things were there, even with the alcoholism, up to middle childhood. Once the crack cocaine started, though, those all stopped." [JA 2105.] |

| "The Mitigation Case that Should have been Presented" | Evidence Presented at Trial |
|---|---|
| **Hager turned to drug dealers for money** ||
| "In order to protect themselves and their business from law enforcement efforts, the street hustlers turned to neighborhood kids to help them. They recruited the youngsters to act as lookouts, alerting them whenever a police car entered the area. They also had children hold their stashes of drugs for them, reasoning that, in the event that they were arrested, the children would receive significantly less punishment in the juvenile justice system than they would as adults. They even paid children to run errands for them, such as going to the store for food, soda and cigarettes so that the hustlers could stay out on the corner all day and make the maximum amount of money possible." [Pet. at 141.] | Cunningham testified that "[t]here was also mentoring from these drug dealers, that from the age of six or seven, Tommy and Terrell were running errands for them. That's kind of the initial indoctrination, that they are sending these little boys to pick up food and cigarettes for them, and sodas, and then letting them keep the change or giving them a few dollars. That way, the dealer can stay out there at his spot on the street. And you send the kids to go get snacks and that kind of thing while you are out there." [JA 2161–62.] |
| **Hager grew up in a neighborhood drenched in violence** ||
| Hager "witnessed shooting, stabbings and other violence on a regular basis. He lost friends to murder and suffered multiple attempts on his own life." [Pet. at 164.] | Cunningham testified that Hager "could see gunfire between vehicles and pedestrians; that it was not at all unusual for drug dealers to be robbed -- all of those being a part of his context of violence that is surround him as he is growing up." [JA 2172.] Hager grew up with at least four friends who were killed as young people. [JA 2172.] Donny Free testified that "just about every night you would hear gun shots. Probably twice [a] month you hear talk about the person that got killed, that we knew. It was violent." [JA 2523–24.] |
| **Hager was deprived of childhood opportunities for play** ||
| "It is significant that Tommy has a clear memory of receiving a toy airplane as a gift as a small child but no memory of ever playing with it or getting it to work. Play is extremely important for a child's development. . . . Because of the chaos of his home life and his mother's severely impaired ability to be an attentive and involved parent, Tommy was deprived of those opportunities." [Pet. at 170–71.] | Hager's parents testified that they had no memories of helping him with his reading or homework, playing ball with him, taking him to the zoo, taking him to a sports game, taking him to a park, or taking him to a museum. [JA 2547, 2552–53.] |

| "The Mitigation Case that Should have been Presented" | Evidence Presented at Trial |
|---|---|
| **Hager was premature sexualized** | |
| Hager's father "used to take Tommy with him as cover when he went to another woman's house to have sex." [Pet. at 108.] Hager "witnessed his father and uncles having sex with multiple women and was pushed into having sex himself with a woman in her twenties when he was 11 years old." [Pet. at 164.] | When Hager was eleven, Cunningham testified, his uncle Tyrone "decided that it was time for him to have his first intercourse. And so Tyrone told a woman who was in her twenties that he would give her drugs to have sex with Tommy," which she did "in the presence of Tyrone and another relative." [JA 2152–53.] |
| "Known substance abusers in Tommy's family include all four of his siblings, both of his parents, his maternal grandmother, his maternal grandfather, his paternal grandfather, his paternal paternal great grandfather, his paternal maternal great grandfather, two paternal paternal great uncles, three maternal maternal great uncles, at least three maternal uncles, two paternal uncles and a whole host of first and other cousins." [Pet. at 170.] | Cunningham noted alcohol abuse was pervasive in Hager's family, including among "his paternal grandfather and his maternal grandmother, both parents, all four full siblings and a paternal half-brother, all six maternal aunts and uncles, three paternal aunts and uncles, and six first cousins." [JA 2078.] |

Trial counsel elected to present these facts (and many others)[45] through a combination of expert and lay witness testimony. Habeas counsel do not identify any significant factual differences between the mitigation case that habeas counsel contend "should have" been presented and the mitigation case that trial counsel did in fact present. Of course, even if there are relevant facts included in habeas counsel's lengthy narrative that were not previously addressed by trial counsel, that does not make trial counsel ineffective. For one thing, the failure to present individual pieces of information could hardly be prejudicial in light of the overall mitigation case presented by trial counsel. In terms of trial time, Hager's mitigation was the largest component; Dr.

---

[45] For example, though not highlighted by habeas counsel, there was evidence at trial that Hager's mother, tragically, would prostitute herself for drugs when Hager and his siblings were young. According to David Blair, she would "trick," or "jump in and out of cars, you know," "three or four times a week." [JA 2429.] "She did what she had to do." [JA 2429.] Donny Free testified about a van parked behind his building "where guys used to take the crackhead prostitutes. And I saw [Hager's] mother go in there on occasion." [JA 2522]

Cunningham's testimony alone took approximately two days. Further, trial counsel cannot be deemed ineffective for not learning information from Hager's family and other witnesses if, back at the time of trial, the witnesses refused to provide it to them. Counsel's files indicate that they repeatedly experienced precisely this problem in attempting to obtain mitigation information from several of Hager's family members.[46] Perhaps some witnesses who were addicted to drugs and alcohol in 2007 were sober by the time they were approached by habeas investigators. Or perhaps being an additional ten years removed from Hager's violence made some witnesses more willing to provide information. Perhaps Hager himself, often recalcitrant with trial counsel, was more willing to cooperate after his death sentence had been imposed. Under any of these circumstances, trial counsel can not be blamed for not having obtained the information before trial.

For example, habeas counsel now fault trial counsel for not offering evidence in mitigation that Hager was "generous towards non-relatives. . . . [I]f Tommy heard that someone's lights had been cut off, for example, he would go to them and help them out." [Pet. at 151.] When trial counsel sought to elicit the same information from Hager before trial, he could not provide any. In what appears to be an interview with Cunningham, Hager provided information about individuals he had helped with rent or other financial needs. But his 'help" ██████████████████

██████████████████████████████

_____

[46] For example, in a letter to the Court dated August 2, 2007, trial counsel noted "extreme difficulty . . . in dealing with the defendant and, more particularly, with his family." [TC0020099.] In another email with the subject matter "Garland Appt and Hager Family's Uncooperativeness," trial counsel note that Leavonia had canceled an appointment and noted that trial counsel needed to "get our client to prevail upon his family to straighten up." [TC0048883.] In still another message, trial counsel noted "continued resistance from the family. They have been regular no shows to meetings." [TC0017519.] Apparently they would not even help obtain physical evidence for use in saving Hager's life: "There is a large plastic bag of family photos the family denied even existed until about four weeks ago . . . ." [TC 0017519.]

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████ [TC0016466][47] On a lead from Hager's mother, trial counsel investigated a man named Melvin Young, who stated that Hager had given him money for him to buy clothes for his children. [TC0017316.] But Young's description of Hager made him unusable as a witness: "Mr. Young says that Tommy is cold-blooded and can be vicious. However, Tommy has another side to his personality." [TC0017316.]

Without much factual difference between the mitigation case that "should have" been presented and the case that was presented, habeas counsel criticize the manner in which trial counsel chose to present this information, alleging that it was "ultimately wholly unpersuasive." [Pet. at 97.] But the tactical decision to present Hager's family background through a combination of expert and lay testimony was not ineffective. Critically, habeas counsel never suggest *how* they would have had trial counsel present the extraordinarily detailed information contained in Hager's petition in a coherent, efficient manner that would hold the jury's interest.[48] As trial counsel noted

---

[47] Habeas counsel also contend that trial counsel were ineffective for not offering mitigation evidence that Hager "had a particularly soft heart when it came to the children of crack users." [Pet. at 151.] Had such evidence been presented, it would have called out for the obvious response, on cross-examination or in rebuttal, that if Hager truly had a "soft heart" for the children of crack users, he would stop selling crack to their parents. Hager's "soft heart" for innocent children also did not stop him from Alexis White after killing Barbara, or from gloating "Did you hear that bitch telling me about her daughter? . . . That bitch was trying to get me killed." [JA 1089–90.]

[48] It is hard enough to maintain one's attention merely *reading* the mitigation materials presented by habeas counsel, which delve into decades-old minutiae from the lives of Hager's relatives [Pet. at 115–38], including—apropos of nothing in particular—that Hager's paternal great grandfather "once fell asleep in front of a wood stove after drinking too much," causing him to suffer burns [Pet. at 117], and that his maternal grandmother was in a car accident as a teenager, leaving her

122

at the time, "I do not believe too many more witnesses will help us—they will bore the jury and blunt the impact of the core witnesses. . . . To cast the net too broadly at this juncture will be distracting and counterproductive." [TC0019981.] This conclusion accorded with the advice trial counsel received in a session when they attended the "Death Penalty College," which stressed the need to "keep the pace of mitigation moving crisply so that the jury does not intersperse witnesses with their thoughts dismissing the case." [TC0012381–2382.]

What about habeas counsel's challenges to the specific mitigation witnesses presented by trial counsel? The primary mitigation expert witness was Dr. Mark Cunningham, who presented Hager's personal and family background through the lens of risk factors and protective factors, relying on extensive academic literature and his own research in reviewing Hager's admittedly tragic childhood and his family's history of alcoholism, violence, criminality, and self-destructive behavior. As part of his testimony, Cunningham utilized a series of family genograms showing the diverse dysfunction and degeneracy through Hager's family tree and some 136 slides presenting his conclusions regarding the effects of this personal and family background on Hager's ability to make good choices, his functioning as a non-criminal productive member of society, and his moral culpability. [JA 3142–84.]

Habeas counsel now mock Dr. Cunningham's presentation of Hager's personal and family history as based on "the intuitively apparent, if not blindingly obvious, proposition that exposure to certain risk factors as a child and adolescent, such as violence in the community, criminal

---

"absolutely terrified of getting in cars for the rest of her life," and causing her to demand that she be driven "so slowly that people honked at them" [Pet. at 129]. No reasonable lawyer would have presented this evidence in such tedious detail to the jury. In any case, again, Cunningham *did* present digestible highlights of this evidence relating to Hager's family's history of crime, violence, and substance abuse at trial. [JA 2119–24; 2167–68; JA 2060–62; 2077–79.]

behavior by family members, aggressive behavior as a youngster, lenient family attitudes towards criminal behavior, etc., increase the likelihood that an individual will go on to commit criminal and violent acts." [Pet. at 97.] But the mitigation case that habeas counsel claim "should have" been presented, though dressed up with slightly different language than that used by Dr. Cunningham, is based on the same "intuitively apparent, if not blindingly obvious" proposition.[49] Indeed, a side-by-side comparison of several of the trauma-related themes that habeas counsel now contend "should have" been raised shows that they *were* raised by Dr. Cunningham—in several cases in substantially similar terms:

| "The Mitigation Cases that Should have been Presented" | Testimony Offered by Dr. Cunningham |
| --- | --- |
| "All children have the potential to be adversely psychologically affected by exposure to traumatic events or to grow healthily with the benefit of proper care, provision of safety and encouragement. Whether a child is able to survive trauma without developing symptoms of Posttraumatic Stress Disorder (PTSD) depends on the confluence of many factors, including the child's cognitive resources, his education, his genetic predisposition for mental illness, the efficacy of his principal caretaker, the sources of support available to him, the severity of the trauma, the ages at which the events occurred and the number of traumatic events that he is exposed to and other factors." [Pet. at 164.] | "[C]hildhood is profoundly formative and important in terms of the direction that someone's life takes." [JA 2024.] There are "factors that . . . put [individuals] at increased risk for . . . bad choices, some of those factors being genetic in nature, like alcohol and drug abuse, or psychological or personality disorders; some having to do with traumatic exposures that have occurred along the way[.]" [JA 2038.] "If you have lots of risk factors and not many protective factors, then you are at grave risk of making decisions that carry you into delinquency and criminality and violence in the community. Alternatively . . . if you have lots of protective factors and not many risk factors, you are not very likely to make bad choices that carry you into criminality and violence." [JA 2066–67.] |

---

[49] Sixty-six pages after dismissing Dr. Cunningham's presentation, habeas counsel offer the following similarly obvious statement: "Reasonably competent counsel would have presented testimony of a mental health professional with particular expertise in the psychological and neurological effects of exposure to traumatic events. Such an expert would have explained to the jury that Tommy's history of repeated, chronic exposure to traumatic events, including exposure at critical points in his development, severely compromised his ability to become a healthy and productive adult." [Pet. at 163.]

| "The Mitigation Cases that Should have been Presented" | Testimony Offered by Dr. Cunningham |
|---|---|
| "These and other factors influence the outcome for a child exposed to trauma because they impact how the child processes the memories of the traumatic events and hence how they affect his schooling, his capacity to form relationships and the ability to manage stress." [Pet. at 164–65.] | "The more damage . . . the person has sustained as they are growing up, the greater the risk that they will make bad choices." [JA 2038–39.] A child will "tak[e] whatever disruptions there are in the system, and whatever effects of neglect and trauma and corruptive and violent influences in the community around him, and he ends up expressing that in his behavior." [JA 2056.] |
| "And, especially with young children, they must have someone – whether it be a parent, a caretaker, a teacher, a therapist or some other individual who is involved in their lives – who can help them process what happened and help them to understand and make sense of it." [Pet. at 165.] | One important protective factor is "social bonding to positive role models. The most powerful of those would be those close at hand in the family, but might also include others. . . . [I]t might be a teacher. Or . . . it might be a coach that grafted onto you and mentored and guided you." [JA 2064.] |
| "Healthy development requires a child to master the ability to relate to others, to express distress and to receive comfort. These skills are the infrastructure of functionality; they are a necessary foundation for success at work or at school, for forming relationships with others and for developing tolerance for distress. Children are not born with them; they have to be learned. If trauma deprives the child of the opportunity for that learning to take place, the child's potential for growing up to become a healthy, productive adult is severely curtailed." [Pet. at 167.] | "[I]f, when you are growing up, you have this kind of foundation for your life, if there is no family history of addiction or psychological disorder, if there is no childhood maltreatment or violence exposure, there is no developmental abandonment or instability, then that's the foundation that your life and your choices rest on. And what would typically go along with this sort of foundation are a number of factors that stand between you and those bad outcomes, like an intact family, where there is acceptance, affirmation, as well as stability and structure and consistency. . . . But if you have a family history of addiction or psychological disorder, [or] childhood maltreatment or violence exposure, [or] . . . developmental trauma or abandonment or instability, [then] . . . you typically don't have those things that would stand between you and the bad outcomes[.]" [JA 2035–36.] |
| "Neither did Tommy have a single individual in his life who was able, attentive and involved enough with him to help him understand and make sense of the traumatic events he endured, the single most common finding in resilient children." [Pet. at 168.] | "I found that to be a kind of a compelling description of the role that a particularly powerful, well-bonded, protective relationship with even a single human being can have, even in the midst of an environment that has many risk factors." [JA 2066] |

| "The Mitigation Cases that Should have been Presented" | Testimony Offered by Dr. Cunningham |
|---|---|
| "In the absence of the necessary resources, what will be encoded in memory will be principally the emotion that the child experienced when the event was occurring, such as intense fear, along with disjointed and incomplete images of what happened. When a memory is encoded this way, when retrieved, voluntarily or involuntarily, it reappears in the same form. . . . When the child is exposed to such an unconscious cue they also experience the intense fear that was encoded in memory along with it, and may have no idea what is happening to them." [Pet. at 165–66.] | "[K]ids are very egocentric. That means they interpret the word in terms of what's around them. So if my world is out of control, I don't think there is something wrong with my parents; I think there is something wrong with me." [JA 2102.] "Some kids have resilience and other protective factors that they may weather that. But in the absence of those protective factors, you substantially increase the crippling effect on this person emotionally." [JA 2104] When a child is neglected, that "ends up distorting the very structure of this person who is developing, in terms of the way this child looks at himself or looks at people around him, and the definitions that he makes about himself, as he feels incompetent when his life is out of control." [JA 2107.] |
| "Tommy never had any of the resources that might have allowed him to process and cope with the severe and chronic trauma to which he was exposed. His impaired intellectual functioning and his inability to succeed in an educational environment deprived him of the opportunity to develop the vocabulary and verbal fluency necessary to encode his traumatic memories in a coherent narrative." [Pet. at 168.] | "I think creating a healthy human being kind of like building a house. And what happens in early childhood, pregnancy and early childhood, is that a foundation is laid, the foundation that everything else is going to be built on. And that requires being neurologically and developmentally healthy, and then having a secure, stable relationship with parents. This secure, stable relationship is not just a function that the same people are around, although that's part of it. It's also about the quality and intensity of that security and nurturance. . . . And that has to happen every day, and a lot each day, particularly across those first several years of life, which is why we are so concerned if parents are drinking or drugging or neglectful during those early years when that foundation is being laid." [JA 2069–70.] |

| "The Mitigation Cases that Should have been Presented" | Testimony Offered by Dr. Cunningham |
|---|---|
| "Women and girls frequently react differently to exposure to traumatic events than men and boys do. They are less likely to engage in aggressive or violent behavior, and more likely instead to have consequences such as difficulty with interpersonal relationships and revictimization as adults." [Pet. at 126.] | "It isn't that females are undamaged by what happens to them in childhood. It's that the damage comes out in other ways. They become sexually active early. They have children early. They end up in relationships where they are abused and mistreated. They may end up drinking or drugging, or having psychological problems. Their lives may be a wreck. They may be very poor parents. They just don't come into the criminal justice system." [JA 2059.] |

In addition to challenging trial counsel's general mitigation strategy, habeas counsel object to Dr. Cunningham's testimony to the extent that he "inexplicably . . . conducted no evaluation of Mr. Hager's actual psychological functioning," "no formal assessment of Mr. Hager's brain functioning," and "no assessment of Mr. Hager to determine whether he suffered" "psychological effects of exposure to traumatic events." [Pet. at 98, 100.] As discussed below, trial counsel had good reason—reached after months of exhaustive research and strategizing—to keep Dr. Cunningham from investigating or opining in these areas. Habeas counsel also point to alleged factual errors made by Dr. Cunningham[50] and conclude half-heartedly that "Dr. Cunningham's

---

[50] According to habeas counsel, Dr. Cunningham mistakenly claimed that Hager's aunt Pamela Hager had abused drugs and alcohol and "also unable to accurately recount where Mr. Hager had lived at different points during his childhood." [Pet. at 99–100.] Both "errors"—if they were errors—were trivial and inconsequential. For example, even if Dr. Cunningham confused Hager's residences in Southeast and Northeast Washington, D.C., there was no dispute, as he explained, that "Tommy Hager [lived] consistently in crime-ridden neighborhoods." [JA 2292–93.] Habeas counsel do not dispute this fact and Hager was not prejudiced by any error. Separately, habeas counsel challenge Dr. Cunningham's testimony regarding when Hager's mother began smoking crack cocaine. It seems clear that Dr. Cunningham made a mistake when he stated that Hager's mother was using crack cocaine before 1981. [JA 2341–42.] As Detective Anthony Washington testified in rebuttal, "[c]rack cocaine arrived in the District of Columbia around late 1985 into the early'86 time frame." [JA 2624.] The mistake was a minor smudge on Dr. Cunningham's credibility, but a witness's mistake does not mean that trial counsel was ineffective, nor does it mean that Hager was prejudiced, especially because Leavonia herself and several other witnesses

testimony was affirmatively damaging to Mr. Hager's case for life and trial counsel's decision to

call him as a witness fell below an objective standard of reasonableness and severely prejudiced

Mr. Hager." [Pet. at 100.] Even if Dr. Cunningham made an immaterial factual slip up, that does

not make trial counsel ineffective for calling an expert who, as of 2007, had testified "in

approximately 50 federal capital cases, and in approximately 75 state capital cases" throughout the

United States. [JA 2022.] The defendant raised a similar claim in *United States v. Lee*, 2008 WL

4079315 (E.D. Ark. Aug. 28, 2008), *aff'd*, 715 F.3d 215 (8th Cir. 2013), challenging his trial

counsel's "decision to use Dr. Cunningham to report or narrate Petitioner's life and family history"

---

subsequently clarified that the drug she was using in the 1970s and 80s was powder cocaine, not crack cocaine.

Habeas counsel try to manufacturer an ineffectiveness claim by pointing to Detective Washington's testimony that powder cocaine was a "rich man's drug" in the 1980s. [JA 2624–25.] Pointing to reports and news articles suggesting that cocaine was widely available in the 1970s, habeas counsel argue that Detective Washington's "false" testimony "appeared to have established that all four of Mr. Hager's witnesses who had testified regarding the use of powder cocaine were lying." [Pet. at 180.] Trial counsel were thus ineffective, they claim, for not seeking to exclude Detective Washington's testimony, not offering expert testimony of their own that powder cocaine was widely accessible, or not presenting evidence "that in the early 1980s . . . Thomas Hager Jr. [was] steadily employed [and] . . . Leavonia Hager was receiving welfare payments every month," meaning they "clearly had the means to purchase powder cocaine." [Pet. at 181–82.] Of course, the sources cited by habeas counsel do not make Detective Washington's testimony "false." And numerous witnesses *did* testify that Thomas Hager Jr.'s paycheck went to drugs, even $200 a night on weekends.. [*See* JA 2099, 2453, 2456, 2492.] In any case, trial counsel were not ineffective for deciding against drawing the jury's attention to such a minor issue, and Hager was not prejudiced: as the government conceded during rebuttal closing argument, "[i]t doesn't matter whether it was powder cocaine or alcohol, whether it was crack or some other drug. [Hager] had a bad childhood." [JA 2829.] Separately, in squibs at the end of their motion, habeas counsel allege that the government violated Hager's constitutional rights by sponsoring Detective Washington's "false" testimony and by "failing to disclose" evidence regarding the use of powder cocaine in Washington, D.C. in the early 1980s," including "law enforcement investigations, reports, and records of arrests and criminal convictions that was in the actual or constructive possession of the government." [Pet. at 195.] But Detective Washington's testimony was not false. Habeas counsel does not state what "evidence" should have been disclosed, and the government is not aware of any.

128

and to *not* have him "perform any risk assessment or offer any testimony on direct as to a formal diagnosis or future dangerousness." *Id.* at \*47. The court "reject[ed], as completely unfounded, Petitioner's challenge to his counsel's decision to use Dr. Cunningham. His counsel's performance was objectively reasonable under any definition of the phrase." *Id.*

Nor is there merit to habeas counsel's objections to trial counsel's decision to present some of Hager's life and family background through lay witnesses. Habeas counsel's primary critique is that some of the lay witnesses called—in addition to offering heart-rending testimony about the neglect Hager and his siblings faced at the hands of their alcoholic and drug-addled parents—also testified that they sought to "pitch in" to help Hager and "look out for him" when they could. [Pet. at 101, 102.] Essentially, habeas counsel argue that trial counsel was ineffective because Hager's childhood—while undeniably tragic—had a few glimmers of comfort. *But these are the facts of Hager's upbringing.* Habeas counsel do not suggest how a mitigation case could have been presented that would hide these facts or prevent them from being elicited on cross-examination or rebuttal.[51]

---

[51] Indeed, Hager's § 2255 petition presents his childhood as unmitigated squalor and deprivation. But while there is no dispute that Hager's childhood was a tragedy that no child should have to endure, there was some evidence that his parents tried to provide their children with a well-disciplined home. As noted above, Hager's relatives pitched in to help when they good. In addition, Terrell Hager, Tommy's brother, reported to Dr. Cunningham that, before crack hit in the mid-1980s, "he recalls that they had many Christmases that were good Christmases. They had presents under a tree. The presents were wrapped. They had Thanksgivings that they celebrated together with turkeys, a lot of food. There were birthdays that were celebrated among the family." [JA 2667–68.] After crack, "all of those things went away." [JA 2668.] (Despite their complaints about the mitigation witnesses called by trial counsel, even habeas counsel concede this point, noting that, before crack, Hager's "parents and their friends and neighbors used to sit outside and drink together on warm weekend nights and even play games with the children"; after crack they "were always inside behind closed doors and ignoring the youngsters." [Pet. at 139.]) By the time crack hit, Hager—who was born in 1973—was about twelve years old and already actively dealing drugs on his own and making his own money. [*See* JA 2441.] Trial counsel carefully sought to limit their mitigation evidence to the time before Hager began drug dealing, knowing that any mitigation

Separately, habeas counsel fault trial counsel for presenting "extremely brief" and "frankly dehumanizing" testimony from Hager' parents. [Pet. at 103.] The government submits to the contrary that Hager's parents' testimony, though brief, was incredibly powerful. Hager's mother Leavonia, appeared as she was and freely admitted that she was still using crack cocaine "every day," including the Saturday before her Monday testimony at her son's capital trial. [JA 2546, 2550.] Trial counsel elicited the following tragic testimony from Leavonia:

> Q.    Do you ever remember helping Tommy with his homework?
>
> A.    No.
>
> Q.    Have you ever visited -- do you remember visiting any of his teachers?
>
> A.    No, sir.
>
> Q.    Do you remember any specific meals you ever made for him and served to him?
>
> A.    No.
>
> Q.    How many times a week did you launder his clothes?

---

evidence they put on from the time after Hager began drug dealing could be met with rebuttal evidence that Hager was transitioning from a childhood victim of terrible circumstances to a teenaged and young-adult perpetrator—dealing drugs, carrying a gun, becoming enmeshed in violence, making money, and leaving behind the earlier squalor of his life. [*See* JA 2525–34; TC0037895 (noting that trial counsel considered seeking an "agreement with gov re scope of cross of mitigation witnesses if we limited direct to early years").] Even if Hager was at times helping his family, he was also part of the problem. ████████████████████████████████ ████████████████████████████████████████████████████████████████ [TC0017399.] Hager was also making the choice to continue drug dealing. Hager's uncle testified on cross-examination that by the time Hager was in his late teens he tried to talk to Hager about his drug dealing, "[a]nd, as always, 'I'm gonna stop. I'm not going to do this,'" but Hager never went and got a regular job. [JA 2461] The government hastens to add that a twelve-year-old drug dealer is not morally and criminally responsible as an adult would be. But trial counsel rightly acknowledged that just as Hager's family conditions became truly horrific with the outbreak of crack, he largely broke free, making the mitigation case more complicated than habeas counsel suggest.

A.    Beg your pardon?

Q.    How many times a week did you wash his clothes?

A.    Oh, I can't even remember.

Q.    Do you ever remember helping him with his reading?

A.    No.

Q.    Can you remember ever taking him to the zoo?

A.    No.

Q.    Do you remember ever taking him to a park?

A.    No, sir.

Q.    Do you remember ever taking him to the museum?

A.    No.

[JA 2547] Hager's father, who admitted that he uses cocaine regularly and drinks "every day," provided similar heart-wrenching testimony:

Q.    Do you ever remember helping Tommy with his homework?

A.    No.

Q.    Do you ever remember visiting any of his teachers?

A.    No.

Q.    Did you ever play ball with him?

A.    No.

Q.    Did you ever take him to a baseball game, a basketball game, or hockey game?

A.    No.

Q.    Did you ever take him to the zoo?

A.    No.

Q.    Did you ever take him to the park?

131

A.    No.

Q.    Did you ever take him to a museum?

A.    No.

Q.    Did you ever cook him a meal?

A.    No.

[JA 2552–53.] The jury had just heard days of testimony from Dr. Cunningham and several other lay witnesses regarding the squalor and neglect Hager experienced as a child because of his parents. The jury was then given an opportunity to see and hear, first-hand, the two individuals about whom they had heard so much, still addled by drugs and alcohol and still letting their son down. Thomas and Leavonia were indisputably broken, but there is nothing dehumanizing in a parents' testifying at their own son's death penalty trial about how they failed to provide him with some of the most basic, simple childhood joys. The government submits that these portions of the trial transcript are incredibly powerful. Trial counsel cannot be deemed ineffective for presenting these two human beings as they were.

The jury was obviously moved by trial counsel's mitigation presentation. Ten jurors concluded that Hager's parents "offered no supervision or guidance when he was a young child"; nine jurors agreed with Dr. Cunningham that Hager's "childhood was filled with risk factors" and eight agreed that Hager "enjoyed few protective factors." These numbers indicate that the jury seriously grappled with the issue of mitigation and accepted many of the points offered by trial counsel. They also indicate that trial counsel's presentation was not ineffective. Ultimately, though, the jury returned a death verdict. And given the brutality with which Hager tortured and murdered Barbara White, his lack of remorse, his prior murders and convictions (one of which is not disputed), and his undisputed violence in prison, Hager cannot now establish that a different mitigation presentation along the lines habeas counsel present would have led a reasonable jury to

132

impose a sentence of life imprisonment rather than death. For this reason, even if he could establish deficient performance, he cannot establish prejudice.

> 2.    *Trial counsel made a strategic decision not to present evidence regarding Hager's psychological condition or mental health.*

Interspersed with their general critique of trial counsel's mitigation case, habeas counsel allege more specifically that trial counsel failed to secure "a thorough neuropsychological evaluation" that would have shown that Hager suffers from "neuropsychological deficits." [Pet. at 154.] Habeas counsel, however, fail to address the well-documented steps trial counsel undertook to determine whether to present mental-health evidence in mitigation, which included multiple pre-trial examinations by respected experts in forensic psychiatry and neuropsychology. Habeas counsel also ignore trial counsel's very deliberate and strategically sound decision not to present this evidence during the penalty phase. While some of that evidence might have been somewhat helpful, trial counsel decided that the benefit of presenting expert testimony that Hager suffered from some type of mental disorder was far outweighed by the damage presenting that evidence almost certainly would have had on counsel's overall mitigation strategy. Theirs was a very real and reasonable concern, and one that trial counsel discussed with their mental health experts and resource counsel. Cross examination of the mental health experts who had examined Hager, coupled with the results of an examination offered by the government in rebuttal, very likely would have demonstrated to the jury that Hager was, in fact, ███████████████ and likely to commit additional violent acts while incarcerated. In the end, trial counsel performed a reasonable investigation of the law and facts regarding Hager's mental health and made an objectively reasonable decision to forego a mental health mitigation strategy. As such, trial counsel's performance, as seen from counsel's perspective at the time without "the distorting effects of hindsight," was not constitutionally deficient. *Strickland*, 466 U.S. at 689.

133

**Neil Blumberg.** In March 2006, shortly after being appointed to represent Hager, trial counsel identified and conferred with a number of mental health experts. On March 16, 2006, trial counsel first spoke by telephone with Dr. Neil Blumberg, a forensic psychiatrist, who agreed to work on the case. [TC0004555.] By order entered March 21, 2006, the Court granted trial counsel's motion for leave to retain Dr. Blumberg. [*See* Dkt 34.]

Dr. Blumberg met with Hager at Northern Neck on April 11 and 24, 2006, each time for about three hours. ███████████████████████████████████████████████

███████████████████████████. Hager generally was "untrusting" with Dr. Blumberg, which was expected ████████████████████████████████████████████

████████████. Although Dr. Blumberg administered some cognitive tests, he told counsel that he would need to have a full battery of neuropsychological tests performed on Hager, conduct interviews with Hager's parents and other relatives, and review all of Hager's available juvenile records before rendering an opinion. Dr. Blumberg noted that Hager most likely suffered from some cognitive impairment, with evidence of anti-personality disorder, although he was not mentally retarded. [TC0004563–4564.]

Dr. Blumberg conducted additional interviews with several family members and two more interviews with Hager on October 10 and December 28, 2006. The following day, Dr. Blumberg discussed with trial counsel his final interview with Hager. ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████. Trial counsel and

134

Dr. Blumberg go on to have a frank conversation about whether Dr. Blumberg would make a very good witness for Hager. Trial counsel summarized their discussion in an email to his co-counsel:

> From strategic position, Neil [Dr. Blumberg] not sure he will make a good witness. Not sure how many we will need to tell the story – one of the things we may consider re Mark [Cunningham] to keep him insulated from the offense itself ███████████████ ██████████████████████████ – Neil agrees that all experts are saying the same thing to some degree – Neil would want to stop his story prior to the current offense – ███████████████ ███████████████ – Neil's approach is to arrive at a diagnosis, then look back and find out how he as arrived at a very impaired level of functioning – i.e. how one arrives at an antisocial personality disorder.[

[TC0019431 (email from McCarthy to Kiyonaga, Dec. 29, 2006).].

Dr. Blumberg subsequently submitted his expert report for trial counsel, subject to revision based on the results of Dr. Schretlen's neuropsychological examination. In his report, Dr. Blumberg found that Hager met the criteria for the following diagnoses:

- Alcohol Dependence;

- Cognitive Disorder Not Otherwise Specified;

- Learning Disorder Not Otherwise Specified;

- Antisocial Personality Disorder.

[Blumberg report, Apr. 9, 2007.]

Dr. Blumberg went on to describe for trial counsel how Hager's family history and background contributed to his opinion:

> The defendant has an extensive family history of psychiatric illness, alcoholism, drug abuse and criminality. From a genetic perspective, Mr. Hager was at increased risk for developing mental health problems, alcoholism, substance abuse and a pattern of criminal behavior. His family history is also notable for learning difficulties in a large number of relatives, with all of his siblings having dropped out before graduating high school. His risk for developing these disorders was further increased by his exposure to his parent' and relatives' drinking, drug use and domestic violence, as well as

> growing up in a high –crime neighborhood in which he was further exposed to drugs, violence and antisocial activities.
>
> Both of his parents were active alcohol and drug abusers. His mother was reported to extensively drink during her pregnancy with the defendant. Mr. Hager was described as being somewhat hyperactive as a child and did poorly in school. The defendant further witnessed his father frequently beating his mother, as well as engaging in infidelity and administering harsh, if not abusive, physical discipline to the defendant.

[Blumberg report, Apr. 9, 2007.] In a conversation with trial counsel about his report, Dr. Blumberg indicated



[TC0004701–4702.]

Shortly after the preparation of his report, Dr. Blumberg contacted Dr. Schretlen to see if his test results supported Dr. Blumberg's preliminary assessment. Specifically, Dr. Blumberg asked whether the test results warrant a diagnosis of cognitive disorder, borderline intellectual functioning, or learning disability. The short answer from Dr. Schretlen was that Hager did not have a cognitive disorder; that Hager did not have borderline intelligence overall; and that Hager did not show the requisite gap between IQ and academic achievement to make a diagnosis of learning disorder. [TC0036918–6920]. As a result, Dr. Blumberg's diagnosis was reduced to Alcohol Dependence and Antisocial Personality Disorder. He wrote trial counsel:

> I received the report by Schretlen and he has effectively eliminated my diagnoses of cognitive disorder nos, learning disorder, and borderline intellectual functioning. We're left with difficult childhood, alcohol dependence and antisocial personality disorder. Neil

[TC0018248 (email from Blumberg to Kiyonaga, Apr. 15, 2007).]

136

In a meeting on May 9, 2007, involving trial counsel, mitigation specialist Christine Penry, and resource counsel David Bruck and Lisa Greenman, trial counsel decided that they would not use Dr. Blumberg at trial.

**David Schretlen.** Trial counsel retained Dr. David Schretlen to administer the neuropsychological tests needed by Dr. Blumberg. The Court approved his appointment by order entered May 5, 2006. [Dkt 51.] On October 13 and 14, 2006, Dr. Schretlen met with Hager at the Northern Neck jail. The second meeting on October 14 was, coincidentally, the day following Hager's stabbing of Satchell. ███████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ [TC0019547–9548.]

████████████████████████████████████████████████████████████

████████████ [*Id.*] Dr. Schretlen's preliminary impression following the testing was that there is "nothing really wrong with [Hager] that's going to rise to the level of any neuropsychological defense." [*Id.*] He found no evidence of a neuropsychological impairment. Hager did "fairly well" on the testing, with an estimated IQ of about 80, with good innate intelligence and adequate reasoning abilities. This did not surprise Dr. Schretlen given Hager's ability to think rationally and function in the real world by running a drug enterprise. [*Id.*]

Dr. Schretlen subsequently scored all of the tests and reported the results to trial counsel. [*See* TC0004601–4602; TC0007587–7589]. In summary:

- Hager had an overall IQ of 80, with academic achievement testing reasonably consistent (all in the 70s); this was described by Schretlen as "not smart," but he said that Hager did well in problem solving.

- Hager's scores were normal for psychological motor speed (which can be an important indicator of brain dysfunction.

- Hager's scores were normal for distractibility.

- Hager scored well on the executive functioning tests except for the visual-spatial tests.

- Hager scored well on tests relative to impulse control.

Dr. Schretlen noted that an MRI might be helpful to determine whether Hager had any lesions in the right side of his brain, as his tests results might be consistent with right side lesions, but only an MRI could tell. Persons with right hemisphere lesions can have difficulty in communicating and navigating personal relationships (but they would have nothing to do with a propensity for violence). [TC0004601–02.]

**David Williamson.** Trial counsel also consulted with David Williamson, a forensic psychiatrist, about developing their mitigation case.[52] Trial counsel used him as a sounding board for mitigation issues and included him in their expert notice filed July 2, 2007. [Dkt 233] Although Dr. Williamson did not do a formal examination or assessment of Hager, he did review Dr. Blumberg's and Dr. Schretlen's reports. Dr. Williamson opined that Hager is not classically antisocial but more narcissistic, which is consistent, as both Dr. Schretlen and Dr. Blumberg labeled Hager as narcissistic. [TC0004675–4676; TC0019431.] Dr. Williamson's proposed expert testimony eventually evolved into an explanation of Hager's background:

> Dave talks about a conceptual review of his environment including
> the horrendous family background, showing a trajectory of time
> looking for personality idiosyncrasies. He will identify abuse and
> neglect and look at the big picture.

[TC0036821–6823 (email from McCarthy to Kiyonaga, Feb. 16, 2007).]

As noted above, a head MRI was recommended by Dr. Blumberg and Dr. Schretlen to investigate any potential brain impairment. Dr. Richard Restak, an expert neurologist, was retained to analyze the results. The MRI was performed on March 19, 2007, at the VCU Hospital in

---

[52] Dr. Williamson worked pro bono, so there is no order entered by the Court Ellis authorizing trial counsel to retain him as a potential expert witness.

Richmond, Virginia. Dr. Restak found the MRI to be normal, and Dr. Restak indicated that he could provide nothing further in the case. [TC0037061–7070; TC0037051; TC0036835; TC0036825.] The results were forwarded to Dr. Blumberg, Dr. Schretlen, and Dr. Williamson. [TC0018844.] No one found anything useful in the MRI results for either the guilt or penalty phase. [TC0036843; TC0037043.]

Dr. Blumberg's observations in December 2006 proved prescient. Trial counsel, given the results of the mental health evaluations and observations of its experts, particularly Dr. Blumberg and Dr. Schretlen, became increasingly concerned that the filing of a notice under Rule 12.2(b) of the Federal Rules of Criminal Procedure would do considerably more harm than good to their mitigation case. Not only would it subject the doctors to cross examination (with the possibility that they would be required to testify that, in their opinion, ███████████████████████ ),[53] but the filing of a Rule 12.2 notice would also allow the government to ask the Court for an order giving a government-retained expert the opportunity to examine Hager. Testimony by a government expert would very likely undermine the defense argument that Hager does not represent a future danger in prison and that he could become a positive influence in the lives of his two daughters. As a result, trial counsel began working with Dr. Mark Cunningham, a forensic psychologist, to testify that Hager was subjected to numerous developmental factors that increased the likelihood that he would engage in criminal conduct. Dr. Cunningham would not offer a diagnosis of a current psychological disorder, and thereby the government would not get an

---

[53] The email exchanges between counsel and the experts in which the experts offered their opinions would have been discoverable as the experts' Jencks. [See Dkt. 106 (Discovery Order).]

opportunity to evaluate the defendant. [*See* TC0004699-45 (email from McCarthy to Kiyonaga, Apr. 6, 2007); TC0018299–8300 (McCarthy trial journal entry, Apr. 6, 2007).][54]

This fear—that a Rule 12.2 notice would give the government an opportunity to put on rebuttal testimony and cross examine Hager's experts—was shared by resource counsel as well. [*See* TC0017246.] In fact, resource counsel was concerned that the Court might authorize a government examination of Hager simply if the defense expert had reviewed the reports of examination done by Blumberg and Schretlen. [TC0017246 (email from Kiyonaga to McCarthy, undated (but prior to June 6, 2007 meeting)).] This prompted trial counsel to restrict Cunningham's interviews with Hager [TC0036844–6851], and not provide offense-related information to other experts. In the end, Hager's choice of expert testimony and expert notices attempted to walk a very fine line between a discussion of developmental factors (e.g., Hager's family, childhood, education, neighborhood, etc.) and the effect those factors may have had generally versus the actual effect those factors had on Hager, *i.e.*, a specific psychological diagnosis. This meant scaling back the planned psychological and psychiatric aspect of the mitigation case by not calling Dr. Schretlen, Dr. Blumberg, or Dr. Williamson at trial but instead relying on the testimony of Dr.

---

[54] The government contracted with Dr. Raymond Patterson, an expert psychiatrist with whom the Court is familiar, to assist government counsel in understanding the steps taken by trial counsel to evaluate their client's mental health. After reviewing background materials on the case as well as the expert reports and communications between the experts and trial counsel, Dr. Patterson advised that (1) the experts retained by trial counsel are well-respected within their fields and competent to evaluate the defendant; (2) the evaluation and tests conducted were reasonable and what Dr. Patterson would expect them to have done in their situation; (3) the advice provided by the experts in light of the results of the evaluations and tests was appropriate; and (4) trial counsel's concern that a subsequent evaluation of the defendant by an expert retained by the government would likely result in damaging aggravating evidence was reasonable. Dr. Patterson provided his opinion orally to government counsel.

Cunningham and Dr. Hill[55] to present evidence of Hager's adverse developmental factors and the effect of these factors on criminality generally. [*Compare* Dkt 272 (Def.'s Amended Notice of Experts, filed August 31, 2007) *with* Dkt. 193 (Def.'s Notice Under Fed. R. Crim. P. 12.2, filed Mar. 27, 2007), Dkt. 201 (Ex Parte Addendum to Def.'s Notice Under to Fed. R. Crim. P. 12.2, filed Apr. 13, 2007), *and* Dkt. 233 (Def.'s Notice of Experts, filed July 2, 2007).][56]

Trial counsel's decision to forego mental health evidence was a strategic decision made after a thorough investigation. *Strickland* teaches that this type of decision is "virtually unchallengeable" on habeas review for alleged ineffective assistance. More importantly, it was the right choice, and a choice made numerous times in death penalty litigation. As noted above, had trial counsel presented mental health testimony, the experts would have been forced to acknowledge that ██████████████████████████████████████████████,[57]

---

[55] Trial counsel eventually decided to forego calling Dr. Hill as cumulative of Dr. Cunningham's testimony.

[56] This did not stop trial counsel from attempting to get psychological-related evidence in front of the jury through Dr. Cunningham. For example, trial counsel asked Dr. Cunningham whether "[a]s a consequence of [the community] violence" that he discussed during his testimony, "there [are] any psychological disorders that are experienced?" [JA 2175], and trial counsel argued that the jury should be permitted to decide whether or not Hager was in fact psychologically impacted. "He is simply giving them the information that they can reject or accept." [JA 2182.] The Court ultimately ruled that Cunningham could not offer this testimony without giving notice and opportunity for the government to conduct an evaluation of the defendant under Fed. R. Crim. P. 12.2. [JA 2203–05.] As noted above, habeas counsel fault trial counsel alleging that Dr. Cunningham "inexplicably . . . conducted no evaluation of Mr. Hager's actual psychological functioning," "no formal assessment of Mr. Hager's brain functioning," and "no assessment of Mr. Hager to determine whether he suffered" "psychological effects of exposure to traumatic events." [Pet. at 98, 100.] But as the discussion above shows, there was nothing "inexplicable" about this. Trial counsel, after consulting with numerous expert witnesses over a period of months, made the strategic determination that Hager had much more to lose than to gain by the introduction of this evidence.

[57] ████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████ [TC0017144.]

141

███████████████████████████████████████████████████████████████; that

Hager is an extreme narcissist whose decisions are completely devoid of any consideration of the

his choices may have on his daughters; that his "acts of kindness" are typically the product of self-

interest and not benevolence (*e.g.*, helping out friends in exchange for sex); and that Hager remains

a threat to others even while incarcerated. On top of this, the government would then have had the

opportunity to call an expert witness who might opine that Hager does not suffer from any serious

mental illness, mental disorder, or brain pathology; that there are no mental health factors that are

mitigating whatever sentence, if any, is determined by the jury or court; and that a diagnosis of

Antisocial Personality Disorder is not a serious mental illness that would be a mitigation factor in

sentencing and actually quite common among criminal defendants. The government expert might

also testify that Hager is indeed a psychopath, ██████████████████████ and a

danger to others in any environment.

This was the situation in *Runyon v. United States*, a capital case tried before Judge Smith

in the Norfolk Division. *See United States v. Runyon*, 2017 WL 253963 (E.D. Va. Jan. 19, 2017).

Runyon claimed that his trial counsel were ineffective in not pursuing a mental health defense in

the penalty phase. Trial counsel had filed a notice under Rule 12.2 that it would put on such

mitigating evidence, but when counsel saw the reports prepared by the government's experts, Dr.

Raymond Patterson and Dr. Montalbano, counsel decided to forego mental health evidence in

mitigation. In denying Runyon's claim of ineffective assistance in this regard, Judge Smith wrote:

> Based on the opinions contained in the government's experts'
> reports, counsel was not deficient for choosing to exclude them from
> consideration by the jury. While some information may have been
> helpful, or at least neutral, the majority of the reports would have
> undermined testimony about the Petitioner's positive family and

---

Any of these could have been potential fodder for cross-examination of an expert witness who testified about Hager's mental health or psychological condition.

> work history, and would have hindered a mental health mitigation strategy. Defense counsel obviously could not "cherry pick" from these reports—it was all or nothing. Accordingly, the court finds that it was reasonable, and counsel certainly was not ineffective, for avoiding introduction of the government's experts' reports on the Petitioner's mental health.

2017 WL 253963 at *33.

Again, this same issue was addressed in *Elmore v. Sinclair*, 799 F.3d 1238 (9th Cir. 2015), a habeas action brought in federal court attacking a state court capital conviction. In that case, the Ninth Circuit held that trial counsel was not constitutionally ineffective for not pursuing a mental health mitigation strategy:

> We conclude that defense counsel was not deficient in focusing on a remorse-oriented strategy, rather than presenting evidence related to Elmore's mental health or brain damage. Even if we entertain the possibility that Elmore might be correct that some of the material Komorowski did not present to the jury could have assisted his case, his arguments are little more than a challenge to his defense attorney's trial strategy with the benefit of hindsight. As long as defense counsel uses a "sound trial strategy," employing that strategy does not constitute deficient performance. "Counsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." "Once counsel reasonably selects a defense, it is not deficient performance to fail to pursue alternative defenses."

> Having retained a trial consulting firm that conducted two mock trials, Komorowski and his defense team made a reasonable strategic decision to pursue a remorse defense. These mock trials showed that jurors responded better to evidence about Elmore's remorse and acceptance of responsibility than to mitigation evidence concerning his mental health or brain damage. Komorowski thus focused his attention on having three judges, who had overseen phases of Elmore's charging and sentencing, testify about Elmore's remorse and willingness to accept responsibility by pleading guilty. He also called the defense investigator to present the jury with Elmore's background information, such as his family history and service in Vietnam.

> Considering what they perceived to be the relative strength of a remorse defense, Komorowski and the defense team made the

143

strategic decision to pursue this defense exclusively. Komorowski did hire two mental health experts to evaluate Elmore. Based on the findings of the mental health experts, Komorowski was concerned that a strategy that presented other defenses to complement the remorse defense would detract from, or destroy, the remorse strategy. For example, in response to a mental health defense, the prosecution's expert could have potentially introduced evidence of Elmore's past sexual abuse of Kristy Ohnstad and other acts of sexual molestation that Komorowski believed would have led to a death penalty. In particular, through researching some of Elmore's mental health issues, defense counsel had discovered that Elmore had engaged in inappropriate sexual activity with other girls. Komorowski also was concerned about opening the door for the prosecution to present the details of the crime to the jury.

Ultimately, the decision to present a limited defense to restrict the prosecution's rebuttal evidence was a legitimate strategy. *See Bell v. Cone*, 535 U.S. 685, 700 (2002). Based on the research of the defense team, Komorowski believed at the time that a "mitigation package on remorse and acceptance of responsibility" would prevent the prosecution from presenting damaging rebuttal evidence. It was not deficient performance for Komorowski to elect this strategy.

799 F.3d at 1250–51 (citations and alterations omitted); *see also, e.g.*, *LeCroy v. United States*, 739 F.3d 1297, 1319 (11th Cir. 2014) (noting, in a case where trial counsel's mental health strategy largely mirrored that of trial counsel's here, that "the decision not to call Doctor Hilton as a witness did not prejudice the defense because—as the District Court put it—'[defendant]'s mental-illness evidence was the ultimate double-edged sword'"). Hager's trial counsel did not conduct mock trial exercises, but they similarly engaged in extensive investigation, research, and discussion— including months of consultation with expert witnesses and outside counsel—in deciding whether or not to present a mental health defense. Their strategic decision not to put such evidence on was not ineffective.[58]

---

[58] Trial counsel reasonably relied on the advice provided by its expert witnesses in making this decision. Counsel are generally entitled to rely on the opinions of mental health experts. *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002); *see also Bell v. Thompson*, 545 U.S. 794, 809–10

In any case, and as repeatedly discussed above, Hager was not prejudiced by trial counsel's decision not to present a mental health defense. To establish prejudice, Hager must show a reasonable probability that counsel's deficient performance prejudiced the outcome of the case. *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* In a case involving failure to investigate or present mitigation evidence, prejudice occurs when "the likelihood of a different result if the [missing] evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla v. Beard*, 545 U.S. 374, 393 (2005) (quoting *Strickland*, 466 U.S. at 694).

The mental health evidence Hager faults trial counsel for not introducing is the classic "two-edged sword." *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), and its introduction, even in the form suggested in the § 2255 motion, would have resulted in the jury hearing more aggravating, rather than mitigating evidence. Habeas counsel do not address, and cannot discount, the likelihood that the aggravating effects of such evidence would have swamped any potential mitigating effects. Nor (as discussed above) do habeas counsel demonstrate how this evidence would have overcome the other overwhelming evidence in aggravation in this case.

      3.      *Trial counsel wisely chose not to call Terrell Hager as a mitigation witness.*

Separately, habeas counsel claim that trial counsel's decision not to call Terrell Hager as a mitigation witness was unreasonable. To the contrary, it was a wise choice. Although trial counsel

---

(2005) (suggesting defendant "would have faced an uphill battle" to convince a court the mental health investigation should have continued despite an expert opinion defendant was not mentally ill). Indeed, counsel may justifiably rely on an expert, though a better strategy becomes available in hindsight. *Stokley v. Ryan*, 659 F.3d 802, 814 (9th Cir. 2011); *see also Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir. 2010) (holding defendants have no constitutional right to the effective assistance of experts); *Hamilton v. Workman*, 217 Fed. Appx. 805, 809–10 (10th Cir. 2007) (agreeing with an analysis that observed that the "Constitution does not entitle a criminal defendant to the effective assistance of an expert witness").

had prepared for his testimony [TC0008391–95], they also realized that they would not be able to insulate Terrell Hager from cross examination about the drug dealing and killing in which he and his older brother were involved. █████████████████████████████████

███████████████ [TC004818.] And Jay Connell, a trial attorney with capital case experience with whom trial counsel regularly consulted, also advised not to use Terrell Hager as a witness.

█████████████ The government would have been able to cross-examine Terrell Hager as to his bias and credibility and would have been able to treat him as the co-conspirator he was. ████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████ According to the arrest affidavit in that case, Bannister had been shot eight times, with two contact wounds to the back of his head. [TC0049867–9868.][59]

Another damaging incident for both Tommy and Terrell Hager, but one that shows that they support each other even to the point of killing someone if necessary, was the murder of Quan Harris. Quan Harris was present when Terrell Hager murdered Maurice Smith on October 31, 1995. Terrell Hager shot and killed Smith after an argument and fight at a bar. Tommy Hager learned that Quan Harris was a witness against Terrell when Tommy Hager saw Harris cashing a witness voucher at Superior Court in Washington, D.C. Tommy Hager told Larry Greenhow that

---

[59] In the government's death notice, the government alleged that Hager, not Terrell, had killed Bannister. Hager had been charged in that case, but those charges were subsequently dismissed. The government dropped that non-aggravating factor, as it had learned that Terrell, not Tommy, was most likely the one who killed Bannister, though Tommy was part of the shoot-out. The government had learned from other witnesses that Terrell was most likely responsible for shooting Bannister, ████████████████████████. [TC0004625, 4631.]

he planned to kill Harris, and Hager told Terrell to ask his attorney to postpone his trial to give Hager an opportunity to kill Harris. (Hager also tried to locate another witness, Stacy, who was also a possible witness against Terrell.) Harris subsequently was arrested himself and confined at the D.C. Jail. Terrell told Larry Greenhow that Terrell was going to make sure Quan Harris did not appear in court. A few days later, Harris was killed at the D.C. Jail, and investigators in that case believed that Terrell Hager had solicited that murder. In his proffer, Hager told trial counsel that Terrell had gotten two friends at D.C. Jail to kill Quan Harris. [TC0004631–4636; *see also* TC0011814–1818 (summary of Larry Greenhow, Jr.'s grand jury and trial testimony); TC0038587–8590 (government motion in limine in *United States v. Terrell Hager*).]

In the end, had Terrell Hager testified, he most likely would have had to assert his Fifth Amendment rights, lie, or testify truthfully, exposing himself to prosecution for multiple murders and damaging his brother's mitigation case in the process. Trial counsel made the right decision not to call Terrell Hager as a witness.

> 4.      *Trial counsel effectively utilized what little evidence was available of Hager's relationship with his daughters.*

Habeas counsel also contend that trial counsel failed to "investigate, develop, and present evidence of Hager's longstanding positive relationship with his two daughters," Tonia Thomas and Anika King. [Pet. at 183.] According to habeas counsel, at the time of trial Hager he enjoyed a "positive and rewarding relationship with his daughters for many years." [Pet. 185.] Contrary to

habeas counsel's arguments, however, trial counsel were not deficient in trying to present evidence of Hager's relationship with his daughters. The girls' trial testimony did not go as well as trial counsel had hoped, but through no fault of counsel or any deficiency in their investigation or trial preparation. The fact was that Hager had little contact with his daughters prior to the charges being brought in this case. Trial counsel was directly responsible for making sure Hager's daughters could visit him while he was awaiting trial, both at Northern Neck and Alexandria. The two girls could not visit on their own, of course; they were too young. Had it not been for trial counsel providing transportation and arranging for visits, Hager's daughters would not have had much, if any, contact with their father.

Both of Hager's daughters were born in 1994. Hager has been incarcerated since 1997. The girls obviously have no recollection of Hager as a "father" during the time-frame before he went to prison. And despite anecdotes from family members that Hager was a "good" father, that was not borne out by his conduct. Hager was a drug dealer, robber, and killer—a narcissistic psychopath (as reflected in the mental health evaluations discussed above). He had little regard for anyone but himself and did little to support his children or their mothers.

Chenile Thomas, Tonia's mother, told trial counsel's mitigation specialist, Ms. Penry, that Hager was not much of a father. He was never around and provided no support. [TC0016419.] Ms. Thomas said that Tonia loves her father, and she would not stand in the way of Tonia visiting him while he was jailed locally. [TC0017380; TC 0016419–6420; TC004787–4788.] For Shenita King, Anika's mother, life with Hager was different. Hager was physically abusive to her. As described above, on one occasion, Hager shot King in the neck while she was sitting in a car ██████████ ██████████. He also beat her so badly that she went to the hospital and filed a complaint against Hager.

148

Though Hager had been held at Northern Neck since February 2006, his daughters first visited him there on October 19, 2006. Trial counsel had arranged the visit, and Ms. Penry, the mitigation specialist, provided transportation. Both girls were excited about the visit. Tonia had not seen her father since 2001, and Anika had not seen him in over two years. Apparently the daughters did not understand that Hager was serving essentially a life sentence, and they asked him whether he was getting out next year. At that point, Hager explained something to each girl, which caused them to cry. Penry reported that, rather than trying to comfort them, Hager and his sister, Tiffany (who had come along for the visit), "laughed at them instead of trying to comfort them." [TC0016353–6354.]

Hager's family apparently did nothing to facilitate follow-up visits with Hager at Northern Neck, and it was left to trial counsel to push the family to allow the girls to see their father. Trial counsel inquired in May 2007, when Hager had been moved to Alexandria, whether Ms. Penry had made any progress in getting the girls to see Hager. As discussed above, Ms. Penry, who had frequent contact with family members, noted that she feared that neither the family nor the children would help them. She described the family situation as "toxic." [TC004713–4714.] Hager's daughters finally did visit him in late May 2007, and another visit was planned for June 10, 2007, although there was a mix-up at the jail that day when they arrived. [TC0016375; TC004728.] With repeated pushing, however, trial counsel managed to get the family to allow for more visits, and by the summer of 2007, the daughters were able to visit with their father in the Alexandria jail more regularly. [TC0018866.]

Trial counsel had anticipated that Hager's two daughters would be able to testify about the impact on them if their father were to be executed. Dr. Hope Hill was responsible for assisting in that effort. [TC0017527.] Trial counsel had Dr. Hill prepare videos discussing how they would

149

feel should their father receive a death sentence. The Court's evidentiary rulings, however, thwarted their efforts. The Court determined that, at age 13, the two girls were old enough to testify live, and that execution impact evidence was not admissible [JA 2591], even though similar evidence had been admitted in other capital cases, a ruling upheld by the Fourth Circuit on appeal. *See Hager*, 721 F.3d at 193–97 (concluding that "we are confident that the jury would have reached the same sentence that it did even if the district court had admitted the videotape" (alternations and internal quotation marks omitted)). The court's decision, however, severely damaged counsel's planned mitigation evidence from Hager's two daughters. Trial counsel was left trying to abstract testimony from them about what their father means to them—not that they love him and don't want to see him get executed—a considerably harder task especially in light of their limited contact with him.  They did the best they could, but it was obvious at trial that the girls had difficulty explaining for the jury how their father plays a positive role in their lives.

Hope Hill would have been a poor surrogate for the girls' testimony. As noted, Dr. Hill spent most of her energy and time trying to get the girls to discuss the impact on the family should their father receive a death sentence, and the court would not admit that testimony. With that avenue closed, she had little to add to what the girls had already said.

Hager's assertion that trial counsel should have called the two mothers as witnesses in their mitigation case is absurd. In 2007, Chenile Thomas was very explicit. She did not want to have anything to do with the case and would not be willing to testify.[60] Calling Shenita King would

---

[60] Given what she had already said about Hager as a father, there was no reason to consider calling her as a witness.  She had no sympathy for Hager's situation.  When asked what impact Hager's execution might have on her daughter, she said that Tonia would "get over it." [TC0004789.] Hager himself seemed to agree. ████████████

[TC0017396.]

████████████ [TC0017396.]

have been a disaster, particularly given Hager's past history of violence against her.  Shenita did allow her daughter to communicate with Hager, although Shenita believed that the primary reason Hager called for Anika was to find out where Shenita was living outside of D.C. (she was not in the witness protection program as alleged). Other than Terrell Hager, Shenita knew as much about Hager and his life of crime as anyone, and had trial counsel tried to use her to portray Hager as a "good" father, the cross-examination of her would have been devastating to Hager's mitigation case.[61]

In the end, trial counsel was not ineffective in presenting the testimony of Hager's two daughters. Once the court ruled against them on the type of evidence the court would allow, trial counsel found it very difficult to put on evidence that showed Hager was a good father. Nor was Hager prejudiced because additional evidence was not presented. There was none.

> 5.    *Trial counsel effectively responded to information regarding the murder of federal judge.*

Habeas counsel further complain that trial counsel was ineffective in responding to the prosecution's questioning of Dr. Cunningham regarding the murder of a federal judge in the late 1970s. [Pet. at 191–94.] At trial, the government questioned Dr. Cunningham about the inmates "directing people on the outside, who are not locked up, do criminal acts," including directed murders. [*See* JA 2332–33.] As an example of such a murder, government counsel asked Dr. Cunningham whether he was familiar with the murder of Judge John H. Wood in Texas, who was assassinated in 1979 prior to a criminal trial. [*See* JA 2333–34.] The Court intervened shortly after this exchange to explain to the jury that while the prosecution had elicited the testimony to "show

---

[61]

[TC0018876.]

151

that those things can happen," the Court was not "concerned in the slightest" and the jury "should disregard that insofar as it has anything to with me." [JA 2335–36.] As habeas counsel presently acknowledge, Hager raised this issue—making what amount to the same arguments—before the Fourth Circuit, which rejected these arguments, observing that the government was simply "seeking to challenge Dr. Cunningham's suggestion that the BOP was able to control prison violence, not that Hager might harm the federal judge presiding over his trial," and that "the district court's limiting instruction served to remove any doubt that the testimony had anything to do with him." *Hager*, 721 F.3d at 202-03.

It is "well settled" that a criminal defendant cannot "'recast, under the guise of collateral attack, questions fully considered [by the appeals court]'" absent a favorable intervening change in the relevant law. *United States v. Dyess*, 730 F.3d 354, 360 (4th Cir. 2013) (quoting *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976) (*per curiam*)). Habeas counsel's current arguments are the same arguments appellate counsel raised on direct review save for the addition of a single paragraph contending that trial counsel was ineffective in failing to object to the prosecutor's examination. At core, then, habeas counsel's present arguments amount to an attempt to secure relief on previously rejected claim by recharacterizing it as an ineffectiveness claim.

In any event, the claim also fails on its merits. Habeas counsel argue that defense counsel should have objected to the prosecution's line of questions because it implied that Hager was a risk to both the district court and the jury. [Pet. at 193.] Yet, as the Fourth Circuit explained, the issue not whether Hager might harm someone outside of prison, but "Dr. Cunningham's suggestion that the BOP was able to control prison violence." *Hager*, 721 F.3d at 203. Indeed, habeas

152

counsel's current arguments are especially unavailing with respect to the jury, which was never even mentioned in the colloquy between the Government and Dr. Cunningham.

Habeas counsel are also mistaken in asserting that the district court's limiting instruction "greatly amplified the prejudicial impact" of the prosecution's questioning. [Pet. at 192–93.] The Fourth Circuit flatly rejected this same point. *See id.* ("[C]ontrary to Hager's assertion that the limiting instruction by the district court made matters worse by suggesting that he might be concerned about his safety, the district court's limiting instruction served to remove any doubt that the testimony had anything to do with him."). That decision was entirely correct: such limiting instructions routinely suffice to cure prejudice resulting from even significant disruptions to a trial. *See, e.g.*, *United States v. West*, 877 F.2d 281, 288 (4th Cir. 1989).

Habeas counsel focuses [Pet. at 193] on the Government's error in asserting that the assassination of Judge Wood was ordered "out of the jail," JA2334:20-21, when in fact it was ordered by an individual who was out on bail, *see Hager*, 721 F.3d at 203. Habeas counsel, however, never explains how or why this made a difference; there are many examples that such assassinations have been planned from inside prisons. *See, e.g.*, *United States v. Thompson*, 130 F.3d 676, 681 (5th Cir. 1997) ("While in jail, Thompson solicited inmate Stephen Gerber to kill The Honorable Kenneth Hoyt, an able and respected judge of the United States District Court for the Southern District of Texas"). The Government's factual error was regrettable, but ultimately immaterial to the line of questioning.

Finally, habeas counsel fail to discharge the burden of showing that trial "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. As the Fourth Circuit observed, "[t]here [wa]s overwhelming evidence of guilt in the record and any possible error did not play a role in the outcome of either phase of [the] trial.

153

Moreover, each aggravating factor (both statutory and non-statutory) determined by the jury was well supported by the record." *Hager*, 721 F.3d at 203 (quoting *Runyon*, 707 F.3d at 520 (in turn quoting *United States v. Lighty*, 616 F.3d 321, 371 (4th Cir. 2010))).

> 6. *Trial counsel effectively responded to the government's victim impact testimony.*

Habeas counsel also contend [Pet. at 194–95] that trial counsel should have objected when Brenda Beer, Barbara's mother, asked, during an emotional moment in her testimony, "Is Mr. Hager's life worth any more than Barbara's[?]" JA1954:22-23. As the transcript makes clear, trial counsel never had a chance to object to this testimony, because both the Government and the district court intervened:

| | |
|---|---|
| Witness: | Is Mr. Hager's life worth any more than Barbara's[?] |
| The Court: | Ms. Beer - - |
| Government: | Ms. Beer, please. |
| The Court: | Just answer to questions put to you, Ms. Beer. |
| Witness: | I'm sorry. |

Hager suggests that trial counsel should have objected to the Ms. Beer's testimony, or moved to strike it or a for a mistrial. But it was entirely reasonable for trial counsel to conclude that such heavy-handed and unwarranted responses to the testimony of a grieving mother, especially given the immediate intervention of the district court and the Government, would only have drawn further attention to the statement and raised the opprobrium of the jury. *See e.g.*, *Humphries*, 397 F.3d at 234 ("[T]rial counsel may have reasonably feared that the jury would view his very probably *unsuccessful* and unjustified objection at that point as mere pettifogging—and discounted his credibility accordingly."). Indeed, there was certainly no basis for a mistrial given Ms. Beer's extremely brief statement, the absence of any indication of an intent to influence the

154

jury, and the Court's instruction. *See Messer v. Kemp*, 760 F.2d 1080, 1086–88 (11th Cir. 1985) (finding no basis for mistrial where "the father of the victim . . . lunged toward the defendant screaming and shouting" because "the outburst was not calculated to influence the jury and . . . the curative instructions given by the court were sufficient to counter any prejudice which might arguably have ensued"). This claim is meritless.

III.    **Hager's claims of government misconduct are waived, procedurally barred, and meritless.**

Hager's § 2255 motion includes numerous single-paragraph arguments relating to alleged prosecutorial misconduct, including supposed failures to disclose various categories of evidence and presentation of "false" testimony. To the extent that these claim rehash issues raised in the main part of Hager's § 2255 motion, the government responds to them above. Beyond that, the Court should decline to consider them. A habeas petition—especially a 200-page counseled habeas petition—"is expected to state facts that point to a real possibility of constitutional error." *Dyess*, 730 F.3d at 359. Hager's "vague and conclusory allegations" regarding government misconduct should be "disposed of without further investigation by the [Court]." *Id.*

Even if not waived, these claims are barred by the doctrine of procedural default because they "could have been but were not pursued on direct appeal." *United States v. Mikalajunas*, 186 F.3d 490, 492 (4th Cir. 1999). As the Supreme Court has made clear, "Habeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (internal quotation marks omitted); *see also, e.g.*, *Hernandez Portillo v. United States*, 2014 WL 3615815, at *1 (E.D. Va. July 17, 2014) ("Petitioner's claims of . . . prosecutorial misconduct during trial are not properly before the Court on a § 2255 motion because they were either addressed during his appeal or could have been pursued on direct appeal, but were not."). "Where a defendant has procedurally defaulted a claim by failing to raise it on

155

direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' or that he is 'actually innocent.'" *Bousley*, 523 U.S. at 622 (citations omitted); *see also Mikalajunas*, 186 F.3d at 492–93. Hager has not identified "cause" for his failure to raise these claims on direct appeal. And, as discussed above, Hager is not "actually innocent' of murdering Barbara White and is not actually innocent of his death sentence.[62]

## IV.    Hager's intellectual disability claim is procedurally barred and meritless.

Hager's final claim [Pet. at 204–05] is that he is ineligible for execution because he is intellectually disabled. The Court should reject his argument.

Hager completely failed to present this claim to the Court during his trial or to the Fourth Circuit on direct appeal, notwithstanding ample opportunity to do so. It is therefore procedurally defaulted. *See Bousley*, 523 U.S. at 621. Again, to excuse such an error, Hager would have to demonstrate "either 'cause' and actual 'prejudice,' or that he is 'actually innocent.' " *Id.* at 622 (citations omitted). He fails on all three counts.

---

[62] One claim in this section merits a brief discussion. Habeas counsel highlight a series of allegedly "improper" statements from the government's various closing arguments during the guilt and penalty phases, alleging that the government improperly "channeled" Barbara White and Alexis White, "labeled Mr. Hager as evil," "invited the jury to send a message to the decedent's family," and improperly mentioned Hager's life sentence. As habeas counsel concede, trial counsel objected to the prosecutor's statement regarding Hager's life sentence, and the Court instructed the jury that the government's comment was "not correct. It's not true. You are to put that out of your minds." [JA 2801.] In light of this clear curative instruction, habeas counsel cannot establish prejudice. Nor can habeas counsel establish that trial counsel was ineffective in objecting to this comment—or in failing to object to the other allegedly improper comments—because "[a] decision not to object to a closing argument is a matter of trial strategy, and it cannot be the basis of ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. *United States v. Jones*, 287 F.3d 325, 332 (5th Cir. 2002); *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992); *Jones v. Estelle*, 632 F.2d 490, 492–93 (5th Cir. 1980) ("[C]ounsel's failure to object to improper remarks by a prosecutor is not ineffective assistance unless the remarks are so prejudicial as to render the trial fundamentally unfair."). Thus, to the extent that Hager's claims based on alleged government misconduct are not waived or defaulted, they are meritless.

*First*, Hager does not even argue cause nor could he successfully. *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that intellectual disability is a defense against execution, was decided years before his trial. He therefore cannot now claim that he was unaware of this law or was unable to develop evidence to support this claim. *See Coleman v. Thompson*, 501 U.S. 722, 753 (1991) ("We [have] explained clearly that 'cause' under the cause and prejudice test must be something *external* to the petition, something that cannot fairly be attributed to him."). Rather, it appears that trial counsel was aware than any effort to raise an *Atkins* claim would fail. For instance, trial counsel's October 14, 2006 notes explain:

> Dr. Schretlen [a neuro-psychologist] will test out the client but says his preliminary impression is that there's nothing really wrong with the client that's going to rise to the level of any neuropsychological defense. Roughly he believes he'll score at approximately an IQ of 90. There's no evidence of neuropsychological impairment. He did fairly well on the testing. The client's bio-intelligence is good too, i.e., he has good innate intelligence. Though he did not do well in school this was logically because he did not try and did not pay attention. He has adequate reasoning abilities in the low to average range. In fact his criminal behavior over the years, running a drug enterprise speaks to his ability to think rationally and to function in the world."

[TC0004597.]

*Second*, and related to the above, Hager does not and cannot establish prejudice. To prevail on his *Atkins* claim Hager must show both that before the age of 18 he had "(1) significantly subaverage intellectual functioning as demonstrated by performance on a standardized measure of intellectual functioning administered in conformity with accepted professional practice, that is at least two standard deviations below the mean ('the I.Q. prong') *and* (2) significant limitations in adaptive behavior as expressed in conceptual, social, and practical adaptive skills ('the adaptive prong')." *Walker v. Kelly*, 593 F.3d 319, 323 (4th Cir. 2010) (reciting Virginia law). This he cannot do. Hager's principal argument focuses on the I.Q. prong and asserts that a recent, uncorroborated,

157

unexamined, and unproduced I.Q. test suffices to open the door for his claim. But this is plainly insufficient. This makes it impossible to assess whether Hager was in fact exhibiting "poor cooperation" and malingering in order to "intentionally produce[] false or greatly exaggerated symptoms." *Ortiz v. United States*, 664 F.3d 1151, 1159 (8th Cir. 2011).

Furthermore, Hager only briefly acknowledges the adaptive prong [Pet at 205–06], while ignoring that much of the evidence at trial directly undermines his arguments. As Dr. Schretlen observed, Hager was able to manage a successful drug operation. He had individuals who worked for him. He was capable of persuasive deception, like when he persuaded Fletcher and Pearson to lower their weapons before he shot them. He understood threats to his criminal doings and took active steps to eliminate them. Indeed, he was able to plan and execute Barbara's murder, bringing three other individuals along as accomplices. Even since his incarceration, Hager has proven to be a self-reliant, adaptable, and manipulative prisoner. These are the proven facts from trial. Hager, in turn, offers nothing but speculation.

*Finally*, Hager offers nothing to suggest that the procedural bar to his *Atkins* claim should be lifted because he is actually innocent of his crime. *See United States v. Jones*, 758 F.3d 579, 583 (4th Cir. 2014). The evidence at trial overwhelmingly established his guilt of Barbara's murder. And Hager does not and cannot argue that his sentence falls within the narrow "miscarriage of justice" exception available where a petitioner can establish "by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty." *Sawyer*, 505 U.S. at 348. Hager's vague and out of date evidence does not meet this demanding standard.

## V.   An evidentiary hearing is unnecessary

Under 28 U.S.C. § 2255(b), the district court need not conduct an evidentiary hearing where "the motion and the files and the records of the case conclusively show that the prisoner is

entitled to no relief." For all the reasons above, the record here "conclusively show[s]" that (1) trial counsel's representation was not deficient, and (2) Hager was not prejudiced by any of the error alleged by habeas counsel. The Court can and should decide this case without an evidentiary hearing. *See, e.g.*, *United States v. Bernard*, 762 F.3d 467, 483 (5th Cir. 2014) (affirming district court's denial of an evidentiary hearing and concluding "that reasonable jurists could not disagree with the district court's disposition of any of [defendants'] claims on the voluminous record presented"); *Purkey v. United States*, 729 F.3d 860, 869 (8th Cir. 2013) ("[O]ur *de novo* review of the record conclusively shows [defendant] is unable to establish prejudice as required by *Strickland.* We therefore hold that the district court did not abuse its discretion by denying [defendant's] request for an evidentiary hearing."); *Cox v. Ayers*, 414 F. App'x 80, 83 (9th Cir. 2011) ("Because the evidence conclusively demonstrates that Petitioner's ineffective assistance claim could not succeed, he is not entitled to an evidentiary hearing on the matter.").

## CONCLUSION

"I could get the death penalty for this." So said Tommy Hager as he pushed Barbara White's head under water in her bathtub, filled with bloody water and a toddler's rubber floaty toys. She was already dead, having been stabbed 82 times by Hager and his accomplices. But before leaving and locking Barbara's her 13-month-old child alone in the apartment with her mother's body, Hager wanted to be sure.

Trial counsel sought to save Hager from a conviction in this case and then sought to keep Hager from getting the death penalty. Despite their diligent and effective efforts, they failed. Habeas counsel now also make the same attempt, attacking virtually every component of trial counsel's performance. But habeas counsel has fared no better because the facts remain the same as they were for trial counsel: even after two thorough investigations by two sets of lawyers, there remains overwhelming evidence of Hager's guilt, and overwhelming support (starting with the

159

brutality of Barbara White's murder) for the jury's verdict of death. Habeas counsel raise numerous challenges to trial counsel's decisions on how to present certain pieces of evidence, or whether and when to object, or where to focus their investigation, or who to call as a witness, or what to argue in mitigation. One of the key themes in this response is that many of the strategies and themes that habeas counsel now insist "should have" been adopted were in fact pursued by trial counsel, only to be (properly) rejected because of the constant risk that any piece of exculpatory or mitigating evidence offered by the defense opened the door to a crushing response of inculpatory or aggravating evidence from the government. Trial counsel, aware of those risks after exhaustive investigation and preparation, diligently pursued a coherent and effective defense strategy, seeking to maximize the exculpatory and mitigating evidence, and to minimize the inculpatory and aggravating evidence. As the government has repeatedly emphasized in this response, "[i]t is a cardinal tenet of the Supreme Court's ineffective assistance jurisprudence that 'strategic decisions made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Branker*, 506 F.3d at 371 (quoting *Strickland*, 466 U.S. at 690).

Fifteen years after he killed Barbara White, the jury decided that Hager should get the death penalty, as he predicted. His conviction was affirmed in all respects by the court of appeals. He benefited from the vigorous and effective advocacy of John Kiyonaga and Joseph McCarthy in seeking to avoid that outcome. It is a credit to our justice system that Hager's verdict was returned and affirmed despite—not because of—their efforts. Hager's motion should be denied.

160

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of March, 2017, I will file the foregoing in person with the Clerk of Court, and send a copy by email and U.S. Mail to the following counsel of record:

Blair G. Brown
bbrown@zuckerman.com
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Phone: (202) 778-1829

Julie Brain
juliebrain1@yahoo.com
916 South 2nd Street
Philadelphia, PA 19147
Phone: (267) 639-0417

Date: March 9, 2017

Respectfully submitted,

Dana J. Boente
United States Attorney

By: _____ /s/ _____

James L. Trump
Assistant United States Attorneys
Eastern District of Virginia

The Justin W. Williams
        U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, VA 22314
Phone:          (703) 299-3700
Fax:             (703) 299-3980
jim.trump@usdoj.gov